```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     TARKUS IMAGING, INC.,
 4                                        : CIVIL ACTION
               Plaintiff,                 :
 5                                        :
                    v.                    :
 6                                        :
     ADOBE SYSTEMS, INC.,                 :
 7   CANON U.S.A., INC.                   :
     NIKON AMERICAS, INC.,                :
 8   and NIKON, INC.,                     :
                                          : NO. 10-63-LPS
 9             Defendants.
                              - - -
10
                         Wilmington, Delaware
11                       Friday, June 1, 2012
                          Pretrial Conference
12
                              - - -
13
     BEFORE:        HONORABLE LEONARD P. STARK, U.S.D.C.J.
14
                              - - -
15   APPEARANCES:

16
                    CONNOLLY BOVE LODGE & HUTZ, LLP
17                  BY:  HENRY E. GALLAGHER, ESQ., and
                         CHAD S.C. STOVER, ESQ.
18
                         and
19
                    QUINN EMANUEL URQUHART & SULLIVAN, LLP
20                  BY:  FREDERICK A. LORIG, ESQ., and
                         RICHARD H. DOSS, ESQ.
21                       (Los Angeles, California)

22                            Counsel on behalf of Tarkus
                              Imaging, Inc.
23

24

25                            Brian P. Gaffigan
                              Registered Merit Reporter
```

```
1    APPEARANCES:  (Continued)

2
            POTTER ANDERSON & CORROON, LLP
3           BY:  RICHARD L. HORWITZ, ESQ.

4                 and

5           MILBANK TWEED HADLEY & McCLOY, LLP
            BY:  CHRISTOPHER E. CHALSEN, ESQ.,
6                CHRISTOPHER J. GASPAR, ESQ., and
                 NATHANIEL T. BROWAND, ESQ.
7                (New York, New York)

8                    Counsel on behalf of Canon U.S.A., Inc.

9

10          FISH & RICHARDSON, P.C.
            BY:  DOUGLAS E. McCANN, ESQ.
11
                 and
12
            FISH & RICHARDSON, P.C.
13          BY:  FRANK E. SCHERKENBACH, ESQ., and
                 THOMAS A. BROWN, ESQ.
14               (Boston, Massachusetts)

15                   Counsel on behalf of Adobe Systems, Inc.

16

17

18

19

20

21

22

23

24

25                          - oOo -
```

```
 1                  P R O C E E D I N G S
 2              (REPORTER'S NOTE:  The following pretrial
 3    conference was held in open court, beginning at 8:35 a.m.)
 4              THE COURT:  Good morning, everybody.
 5              (The attorneys respond, "Good morning, your
 6    Honor.")
 7              THE COURT:  Let's start by putting your
 8    appearances on the record for me, please.
 9              MR. GALLAGHER:  Good morning, your Honor.
10              THE COURT:  Good morning.
11              MR. GALLAGHER:  Hank Gallagher for the
12    plaintiff, Tarkus Imaging.  With me, my partner Chad Stover
13    from Connolly Bove Lodge & Hutz.  Then we have Fred Lorig
14    and Richard Doss from the Quinn Emanuel firm, and Mr. Lorig
15    and Mr. Doss will be splitting the presentations by issue.
16              THE COURT:  Okay.  Thank you very much.  Good
17    morning to all of you.
18              MR. GALLAGHER:  Thank you.
19              MR. LORIG:  Good morning.
20              MR. McCANN:  Good morning, your Honor.
21              THE COURT:  Good morning.
22              MR. McCANN:  Doug McCann from Fish & Richardson
23    on behalf of Adobe.  With me are my colleagues Frank
24    Scherkenbach and Tom Brown.
25              THE COURT:  Welcome.
```

1          MR. HORWITZ:  Good morning, your Honor.

2          THE COURT:  Good morning.

3          MR. HORWITZ:  Rich Horwitz from Potter Anderson

4    on behalf of defendant Canon.  With me from Milbank Tweed,

5    Chris Gaspar, Chris Chalsen, Nathaniel Browand; and then our

6    client, Rodger Sadler from Canon USA is here.

7          MR. SADLER:  Good morning.

8          THE COURT:  Welcome to all of you.

9          So we are here for the pretrial conference.  We

10   have a pretty busy agenda.  The way I want to proceed is I

11   first want to hear argument on the summary judgment motions

12   and on the Adobe motion to sever or for separate trial.

13   After we heard from everybody on those motions, we'll move

14   on to argument on the motions to exclude or limit expert

15   testimony.  After we have heard all of that, I will hear

16   argument on the remaining motion in limines.  And after we

17   have gone through all that, we'll discuss the remaining

18   matters in the pretrial order, including possibly some

19   discussion of the voir dire, the verdict form, preliminary

20   instructions, any additional issues you may all have at that

21   point.

22          I expect that we will, while we will spend a lot

23   of time together, I expect we will be done by 12:30 today.

24          So with that, I want to hear on the summary

25   judgment motions and the motion to sever or separate trial

1    first.  So we will hear first from defendants, and you can

2    go in whatever order you wish amongst yourselves.

3                MR. SCHERKENBACH:  Does your Honor have a

4    preference?  Would you be hearing on severance first?

5                THE COURT:  I don't a preference.  Have you

6    worked that out with your codefendant?

7                MR. SCHERKENBACH:  We haven't really discussed

8    the order.  We thought your Honor might have a preference.

9                THE COURT:  I don't have a preference.  Since

10   you are up, Adobe is first, why don't you argue your motions

11   first.

12                MR. SCHERKENBACH:  All right.

13                THE COURT:  Then we will hear Canon.  And then

14   we will hear from plaintiff on all of Adobe and Canon's

15   motions.

16                MR. SCHERKENBACH:  Okay.  Very good your Honor.

17   If I may proceed.  On behalf of Adobe, just so the record

18   is clear, there are three summary judgment motions.  One, DI

19   220, is for summary judgment of no infringement; DI 222,

20   summary judgment of no indirect infringement; and DI 224

21   relating to willfulness.  So those are the three summary

22   judgments.  The motion to sever is DI 353.

23                You mentioned you wanted to hear about MILs at

24   the end.  Our one remaining MIL on which you have not ruled

25   is a willfulness MIL.  It might make sense to deal with that

1      at the same time as the summary judgment.

2                  THE COURT:  Certainly, you can feel free to

3      talk about willful infringement.  It comes up in both

4      summary judgment and the MIL.  Strictly speaking, I'll

5      consider it as a MIL later.

6                  MR. SCHERKENBACH:  Okay.  Fair enough.

7                  So let's start with the noninfringement.

8                  Actually, your Honor, I take that back.  I'd

9      like to start with willfulness and indirect infringement

10     because I think that will be somewhat more straightforward.

11                 THE COURT:  Okay.

12                 (Slides passed forward.)

13                 MR. SCHERKENBACH:  And we can project these at

14     the same time.

15                 There we go.

16                 So to begin with, willfulness first.  I think

17     the parties are missing one another to some degree in the

18     briefing on this.  Our motion was predicated entirely on the

19     objective prong; right?  And that is -- can you go to the

20     next slide?  Thanks, Tom.

21                 That obviously it's a two-prong test under

22     *Seagate*.  The Court is well familiar with that.  Tarkus

23     has showed two things.  The first prong is there was an

24     objectively high likelihood that Adobe's actions were

25     infringement of a valid patent and only if that hurdle

1    is cleared is the first point here.  Only if that hurdle

2    is cleared do you get to the subjective prong, who knew

3    what when.  Did you act reasonably in light of what you

4    knew and so forth.  It's phrasing the case as did Adobe then

5    know or should it have known of that objectively high risk.

6         We did not move on the basis of the subjective

7    prong, and we're not suggesting that there are no factual

8    disputed factual issues about that, at least none that we're

9    prepared to say to decide it's about the objective prong.

10   This is by way of introduction.

11        Tarkus's brief is almost entirely about the

12   subjective prong piece so they actually, as I read their

13   briefing, do not engage on our fundamental argument, which

14   is notwithstanding the fact that some of the claim

15   constructions, for example, that we urged are not ones the

16   Court adopted, in particular, take "output devices" as an

17   example.  We thought it was a reasonable argument to say it

18   had to be a real device.

19        Your Honor decided otherwise but the issue is

20   really whether our argument was so unreasonable, so off the

21   reservation that it was objectively unreasonable for us to

22   take that position.  That really is entirely a judgment call

23   by your Honor.

24        Tarkus does not engage on that issue.  They

25   didn't argue about it in their papers, they didn't take the

1   position on it on their papers, and I'm really not going to

2   reargue it.  I mean it's there in the briefs.  I certainly

3   hope the Court thinks notwithstanding the fact you went with

4   their claim construction that we were not so far out there

5   that it was essentially a crazy position to take.  The

6   standard here is exceptionally high.  And, as a result of

7   this, there are many, many cases where courts are now

8   routinely granting summary judgment of no willfulness.

9           Can we go to that slide, Tom?  Just let's just

10   go to the one with the cites.  Keep going.

11           Here we go.  Again, this is not, this is in the

12   briefs but I just wanted to give you a sense, your Honor, of

13   really how the sort of company you would be in -- this is

14   slide 7 -- this sort of company you would be in to grant

15   summary judgment on this issue.

16           Willfulness is routinely falling on these cases

17   and for good reason.  Because under the *Seagate* standard,

18   it's an extremely high standard; and, as you know, these

19   defenses, if it's allowed into the case, can work very

20   significant mischief, especially in a case like this where

21   you have got a little guy against a big guy, maybe two big

22   guys.

23           So the jury is going to be predisposed to

24   focus on that.  They're going to be predisposed to focus

25   on willfulness issues because they can understand them,

 1    especially in a case like this where the technology is

 2    exceedingly complex.  And it's much easier to talk about,

 3    gee, when did Jack Holm meet with Adobe?  When was that?

 4    What was said?  Was the patent issued at the time?  So on

 5    and so on and so forth.

 6         It makes it extremely hard for a company like

 7    Adobe to beat back those allegations even though, as you

 8    will see in the context of the motion in limine, everything

 9    they rely on for their willfulness case happened before

10    Adobe had notice of the patent.

11         So completely independently of the fact that

12    we had an objectively reasonable basis to believe we didn't

13    infringe, what they rely on is legally irrelevant because

14    the patent hadn't issued yet.

15         THE COURT:  Now, the subjective prong, is that a

16    question of law or a question of fact?

17         MR. SCHERKENBACH:  It's a question of law.  That

18    is something.  In fact, you can pick up really pretty much

19    really one of these cases, I mean actually several of which

20    I was personally involved with.  *Uniloc* is kind of the

21    latest, greatest example.

22         It's up to the District Court to look at the

23    record, where the argument is, hey, our litigation defenses

24    were reasonable, it's your job as the District Judge I

25    believe, with all due respect, to assess that.  You are in

1   the best position to assess that, especially where we're

2   talking about claim construction, a claim construction

3   position, whether reasonable or not.  If that was

4   reasonable, in *Uniloc,* if you look at what Judge Smith did

5   in that case, he said, yeah.  I mean that was a *Microsoft*

6   case.  Microsoft had several reasonable defenses, even some

7   the jury rejected but they were reasonable.  Even some Judge

8   Smith rejected.  They were reasonable.  I can't say they

9   were so far off the reservation.  And the Federal Circuit

10   said that is absolutely right.  And we must have cited a

11   dozen cases and there are more.

12          So that is really, it is an extremely important

13   issue in the case really with all due respect because I

14   don't think, I hope you think it's not, it's not a close

15   call.  I mean unless you are prepared to say we have no good

16   faith basis for our noninfringement case, which I think is

17   an extreme position.  And,

18          In fact, again, Tarkus hasn't even said that.

19   They haven't even take the position themselves.  They have

20   focused on subjective.

21          So if you couple that with again the mischief

22   this can do if it's let in, this is a very important issue

23   to us.  We need to find ways to streamline this case.  It's

24   too complicated.  There are too many claims.  The technology

25   is hard.  This should be an easy one for the Court, I hope,

1   from our perspective, to deal with.

2            That is all I'm going to say on willfulness,

3   unless your Honor has questions, and I'll move on to

4   indirect.

5            So indirect.  Can we go to slide -- well, slide

6   8 is the intro slide and 9 sets out the standard.

7            So for indirect, we're talking about inducement

8   and contributory infringement.  Okay?  Obviously for both,

9   Adobe has to have had knowledge of the patent.

10            So this is slide 9 now.  And there is no dispute

11   in this case that Adobe had no knowledge of the '823 patent

12   until October of 2008.  I referred to that in passing in the

13   remarks on willfulness because that is basically the basis

14   for our MIL on willfulness which I will come back to.

15   Again, all of the evidence of willfulness they want to

16   rely on is before that date so it should be off the table

17   anyway.

18            But in the indirect infringement context, you

19   have to have knowledge.  You have to have deliberate

20   indifference to a known risk that a patent exists.  Excuse

21   me.  That that is not the known state.  You have to have

22   knowledge and you have to intend to cause infringement.  You

23   have to intend to cause infringement.

24            Their argument really is this deliberate

25   indifference standard.  Gee, Mr. Holm came to up.  He said

```
 1    he had some technology.  He said he had filed for some

 2    patents.  You should have done more.  You should have

 3    investigated.

 4              It was your burden.  You should have gotten an

 5    opinion of counsel.  That is one of their primary.  You

 6    should have gotten an opinion.  You should have done this,

 7    you should have done that.

 8              That is not the standard for inducement.  It

 9    actually isn't even the standard for avoiding willfulness.

10    It used to be before Seagate, it's not now.

11              They have to show, again, it's a very high

12    standard, that we intended to cause infringement of the

13    patent.

14              Let's go to the next slide, which does set out

15    the standard.  This is a proposed jury instruction adapted

16    from one of the models on inducement.

17              But as your Honor knows, we had inducement just

18    in the case last month.  Your instruction on that case is

19    totally consistent with this.  There is a notion that the

20    inducer has to specifically intend users to infringe, not

21    just that they take acts that constitute infringement.

22              There is just no evidence of that in this case,

23    whatsoever, either before or after October of 2008 that

24    Adobe intended that to happen.

25              Adobe obviously doesn't think for a minute this
```

1    patent applies to what it is doing.  They have consistently

2    told Mr. Holm that.  We have consistently explained that in

3    our positions here in this court.  So the mental, the intent

4    piece of inducement is just missing.

5          Let me go on to contributory infringement

6    which I hope is easiest of all.  This one comes down to

7    your Honor's view of the law.  So it's a legal issue.  There

8    is no factual dispute on this.  The legal issue is this:

9          Tarkus says, for purposes of contributory

10   infringement, that what you look at for substantial

11   noninfringing use, which is the standard, is just the

12   accused feature.  So in this case, it's the auto feature

13   of Adobe Camera Raw, which in turn is contained in Adobe

14   products like Photoshop and Creative Suite.  They say you

15   look at just the feature and you say does that feature have

16   substantial noninfringing uses.

17         And if you accept that principle, Tarkus then

18   says, well, by definition, the auto feature does not because

19   we say it infringes.  If you use the auto feature, you

20   infringe, Q.E.D.

21         That is not the law.  I mean if it were the law,

22   there would always be contributory infringement in every

23   case because a plaintiff would always be able to say, we're

24   accusing this feature.  The feature infringes.  Therefore,

25   it has no noninfringing use.  It produces a statute to it, a

1    tautology.  The cases recognize this.  And,

2              So let's go to slide 13.

3              I want to focus for present purposes on the last

4    bullet here.  So the cases say, well, look, you can't let a

5    patentee do that because it would read contributory out of the

6    statute.  The issue is, is the feature a separable feature?

7    Is it separable from the larger, whatever larger system or, in

8    this case, you know, product that it is included in.

9              And this feature auto is not -- there is no

10   question that it isn't separable.  Tarkus has not argued in

11   its briefing that it is separable.  Right?  It doesn't make,

12   I don't think, make any sense to say, well, you can take one

13   feature and one user interface screen in a large software

14   product and say it's separable because you could extract it

15   and sell it separately or because you could do this or you

16   could do that.

17             One other point on this.  And this may be

18   why Tarkus hadn't really argued about separability.  Their

19   damages theory in this case, of course, is all about the

20   larger product.  Their damages theory is predicated on not

21   even Adobe Camera Raw.  So, again, I think we have some

22   examples here.  So you have got the auto feature in Adobe

23   Camera Raw, in Photoshop, which in turn is in Creative

24   Suite.

25             Their damages theory takes as its base all

1    of the revenue of Creative Suite, all of the revenue of

2    Photoshop.  That is how they get to their big number.  Okay?

3            They can't have it both ways.  If that is their

4    damages theory, they can't then, for contributory

5    infringement, say, oh, no, you look at this tiny piece down

6    here and talk about that tiny piece and whether it has

7    substantial noninfringing uses.

8            Just to give you a sense of this.  Obviously,

9    we're going to see this at trial.  Can we go to slide 14?

10           How varied this feature is in the product as a

11   practical matter and whether it's separable.  So slide 14, I

12   know it's a little small.  You have a hard copy, if you want

13   to look at it later or whatever.

14           This is the splash screen or an initial screen

15   for Adobe Camera Raw 7.0.  Okay?  So this is not even a

16   Photoshop or Creative Suite screen.  Even if you just start

17   with Camera Raw, which is part of the larger apps, that is

18   what you see.

19           So where is this auto feature?  How does it fit

20   in the larger product?  Is it really a separable feature?

21           So you have got -- first of all, you have a tool

22   bar, a basic tool bar in Adobe Camera Raw that has all these

23   features which we have blown up on slide 15.

24           Go to the next slide, Tom.  Animation, how

25   exciting.

1              Okay.  We don't have to go through all these,

2      and I won't even count them, but there must be a dozen or so

3      features in the tool bar.  None of those have to do with

4      auto.  Okay?  So it's not in the tool bar.

5              Then let's go, just zip through these.

6              So then you go to tabs, okay?, over on the right

7      side.  So we were just looking at all these tools in the

8      tool bar.  Auto has nothing to do with that.  Then you go to

9      the tabs and there are, there are a raft of different tabs.

10             So can we step through all those?

11             Just again to give you a sense, there is two,

12      four, six, eight, nine, ten tabs.  There are ten different

13      tabs, each of which has its own set of features.  Okay?

14             Panels.  I call them tabs.  Panel is what Adobe

15      calls.  I should use the right phrase.  One of those panels

16      is the basic panel and one of the features on the basic

17      panel is the auto feature.

18             So you are talking about one feature on one

19      panel in an Adobe Camera Raw plug in that has another dozen

20      tools on the tool bar that is part of Photoshop, that is

21      part of Creative Suite.  I mean I don't know how much more

22      granular frankly you can get.  This case will serve as the

23      poster child for this issue.

24             All right.  That is all I have on contributory.

25      I don't know if you want to the -- Do you want me to do all

1    of them?

2                    THE COURT:  Keep going.

3                    MR. SCHERKENBACH:  All right.  I'll keep going.

4                    Let's talk about noninfringement.

5                    This one I think we've given you two pieces

6    because I, having thought about it a little bit more,

7    decided I wanted to drill down.

8                    But, electronically, can we combine them?

9                    So I think you have two pieces of paper.

10                   THE COURT:  I do.

11                   MR. SCHERKENBACH:  I am sorry to do that to you,

12   but electronically we sort of interleaved the second one

13   into the first one at the appropriate point because I wanted

14   to give you one specific, really specific example of a

15   failure of evidence in this case because the briefing I

16   think makes this unduly complicated.

17                   We moved for summary judgment before claim

18   construction, as you know from our supplemental brief.

19   Well, let me back up a minute.

20                   We assumed Tarkus's constructions when we filed

21   the motion, so your claim construction didn't undermine our

22   motion.  In fact, in a couple respects, as you know from the

23   supplemental brief, we make it better.

24                   In round numbers, what are we missing here?

25   Three elements of the claim.  The claim has five elements.

```
1    We're missing three of them.  And we don't think any of them
2    are disputed, but I want to focus in particular on one of
3    them:
4              Obtaining density capabilities of an output
5    device.
6              And I will use the shorthand, if I can, because
7    I know time is an issue.
8              Adobe doesn't do that.  No one at Adobe does
9    that.  No user of auto does that, obtaining density
10   capabilities of an output device.  If you apply your claim
11   construction, there is no evidence anybody does that, full
12   stop.
13             Second, determining ... a reproduction pictorial
14   dynamic range from the density capabilities of the output
15   device.  Since we don't do anything about density
16   capabilities of an output device.
17             We don't do the determining step either.
18             And then the third one we have to construct a
19   tone reproduction curve that, among other things, is based
20   on a comparison between these two different pictorial
21   dynamic ranges.  You have to have an original, which is the
22   original image, and the reproduction, which is how you want
23   it to look when you are over, when you are done.  And you
24   have to compare the two and construct a tone based on
25   comparison of the two.
```

1                Now, again, we don't do it.  And there shouldn't

2      really be all the mystery and briefing about this because at

3      the end of the day, the technology in one sense is complicated.

4      You know, the math is maybe a little complicated.

5                The concept is not.  Okay?  This is a software

6      case.  They have accused a software product.

7                They either can point to some place in the code

8      that does these method steps or they can't.  And we've been

9      trying, since this case was filed, to get an answer to that

10     question.  And your Honor may recall --

11               Tom, I'm going to come back to split

12     infringement.  So can we go to the added slides, please.

13               Sorry to skip around.  I'm trying to

14     consolidate.

15               THE COURT:  That's fine.

16               MR. SCHERKENBACH:  Okay.

17               (Screen blanks out.)

18               MR. SCHERKENBACH:  Technical difficulties.

19               (Screen image back.)

20               MR. SCHERKENBACH:  Just to remind you, obtaining

21     density capabilities requires, at the end of the day, them

22     showing some either obtaining or calculating the negative

23     logarithm of reflectance, transmittance, or luminance

24     factor.  This is your claim construction and actually it

25     more or less was the claim construction when we filed our

1    motion.  The only dispute was over this word "factor" which

2    Tarkus wanted to add and you agreed when you put that word

3    in.  Okay?

4                So that is what they have to show exists.  And

5    as I say, we have been trying not just for this limitation,

6    for all limitations, to get them to take a position on this

7    and tell us where it is.

8                Go ahead, Tom, to the next one.

9                Okay.  We have looked high and low when the case

10   was filed, we said, because they pointed initially -- they

11   didn't give us any detail as to where to look for this.

12   Then they said, well, it's the use of the Adobe RGB

13   specification.  Your product makes use of that specification

14   in performing the method.

15               So we said, okay.  Let's go look at the

16   specification.  This is in the record so I'm not going to,

17   you know, go through it.  You have this document in the

18   record, the specification.  It's not that hard to read.

19   It's not that long.

20               You can look high and low in this specification

21   and you are not going to see any reference to the negative

22   logarithm of anything..  it's not a question of character-

23   ization.  It's not a question of disputed facts.  It's not

24   there.  And they have never said that it is.

25               Okay.  How about the source code?

1            Go to the next one.

2            It's not in the spec.  Maybe the source code

3    takes something that is in the spec and uses it to calculate

4    the negative logarithm of something called a luminance

5    factor, which in substance is a luminance factor, or maybe

6    the code itself has this required density capability.

7            So you go to the source code, which is somewhat

8    longer but not that terrible at all for a software case.

9    Here is the relevant routine.  Is it there?  Anywhere,

10   can they point to where there is a negative logarithm of

11   luminance factor calculated, used, obtained, you name it?

12           It's not there.  Okay?

13           We're getting now to the order that we finally

14   got from your Honor, from the Court where we served an

15   interrogatory.  We said we can't find it.  Please tell us

16   specifically by claim element which specific part of the

17   code corresponds to the claim element.

18           They punted initially.  All right?  They wouldn't

19   answer.

20           We filed a motion to compel.  We had a hearing.

21   During the hearing, they caved in and your Honor essentially

22   said I'm going to hold you to your agreement to now answer

23   this interrogatory, and you have to answer by October 28th

24   of last year.

25           They want more time.  We gave them more time.

1    Long story short, December 21st, they finally serve a further

2    supplemental response to the relevant interrogatory, No. 18.

3    They serve a response to 18.

4            Do they finally give us the source code we

5    alleged cites to the source code where this exists?  No.

6    They say they will further supplement their response later.

7            So, honestly, totally apart from the merits,

8    you would be fully justified in saying, and I hope you do,

9    "enough."  We've been chasing this issue for a very long

10   time with them.  They have been playing hide the ball and

11   they still couldn't answer it at the time, even after the

12   time you ordered them to answer it.

13           Now, they did serve expert reports.  So if you

14   don't want to go there, they served expert reports in

15   December of 2011.

16           Do their expert reports identify specifically

17   in the code where -- I'm using the example of density

18   capabilities, obtaining density capabilities.  Do they say

19   in the source code where we calculate a negative logarithm of

20   anything and, in particular, luminance factor?

21           No, they don't.  Their papers are full of

22   citations to these expert reports.  If you follow the

23   bouncing ball and you actually look at any -- you can pick

24   any citation you want and you go look at it, you are not

25   going to see it.

1          Mr. Elswick is their code person, and he went

2    through the code, no doubt.  And he explained how the code

3    works.  Nothing about a negative logarithm of luminance

4    factor, or I've been using the shorthand.  Your claim

5    construction says:  transmittance, reflectance or luminance

6    factor.  It's all about luminance factor.  They never even

7    claimed that there is anything about the transmittance or

8    reflectance that is relevant to this element.

9          He doesn't identify anywhere in the code that

10   this calculation happens, that the value exists, and it was

11   pulled from somewhere else.  It's not there.  And,

12         Again, this is in the record.  You have his

13   report in the record.  I won't say it's an easy read but

14   the section they point to is Section 2.2.  It's only three

15   pages or so.  It is relatively simple to look at that.

16   That's the only section they rely on.

17         Mr. Giorgianni, who is their testifying expert,

18   cites to Mr. Elswick, Section 2.2 for this obtaining density

19   capabilities step.  You go look at Section 2.2, it's not

20   there.

21         So one of their two expert reports, done.  Then

22   you go to Mr. Giorgianni's report.

23         Oh.  And by the way, Mr. Elswick, it was purely

24   an analysis of how the code worked.  It doesn't say anything

25   about the patent.  It doesn't say anything about claim

1   elements, claim limitations, nothing.  There is no matching,

2   there is no real substantive analysis here.  It's just the

3   code does this and then it does that and it does that and it

4   does that.

5           So the last resort, their last place to run is

6   Giorgianni's report.  Does he point to where in the code

7   this exists?

8           No.  His analysis is based on basically using

9   the product.  He says I looked at the code.  I really relied

10  on Elswick for the code.  And for this one in particular,

11  obtaining density capabilities, he points to only Section

12  2.2.  This is in paragraph 58 of his report, Section 2.2.

13  Which, again, never refers to luminance factor, never refers

14  to logarithm, negative logarithm.  It's not a question of a

15  factual dispute.  It's not there.

16          Now, here we are in the pretrial conference,

17  June 1, 2012.  We got, last night -- you don't even know

18  this yet -- their supplemental expert report responding to

19  Mr. Stevens' supplemental report.  And they have a new

20  theory now -- and I'm sure we're going to hear about this --

21  as to how this is present and how it's satisfied, that has

22  to do with the equivalent of other things that are in the

23  code.

24          Honestly, it was too late last night to even

25  get into the details but we have shifted ground again.  All

1    right?  They should not be allowed to drag that in now to

2    defeat this motion.  And I think you will find, when you

3    look at it, it still isn't there.  They still can't show

4    where this is.

5              So this case, again, I appreciate their experts on

6    both sides.  You have been bombarded with paper, and it's not

7    easy to figure out.  And there may be a reason for that.  That

8    it's hard to follow the bouncing ball here.  But please, if

9    you track through the citations they actually give you, I

10   really think you are going to find there is no "there" there.

11   On the substance, there is no "there" there.

12             THE COURT:  Now, although it is a software case,

13   are you arguing that they have to find in the code exactly

14   where each of the elements occur or might they be able to

15   prove infringement without necessarily identifying where in

16   the source code each of the elements is based?

17             MR. SCHERKENBACH:  On the facts of this case, I

18   think it has to be in the code.  There are some cases where

19   there are somewhat detailed functional specifications for

20   the code.

21             It really sort of depends on the software

22   development process.  It could even be an e-mail that

23   someone detailed or a formal functional spec from which the

24   developers implemented the code.  Some companies do that.

25   Most companies don't.

1          Fine.  They don't have anything like that.

2          THE COURT:  So if I conclude they don't have

3     anything like that but they have two well credentialed and

4     in my view, let's just say, qualified experts who say I've

5     looked at everything, I think it does it, why is that not

6     enough to create a genuine material dispute of fact?

7          MR. SCHERKENBACH:  Two answers to that.  First

8     of all, their experts haven't said that.  This case is, it's

9     not a case where you have said the claim requires X.  Their

10    expert says I find X, can't really point to it, but I think

11    it's there.  In my opinion, it's there.  And our guy says

12    no, it's not.

13         Neither Mr. Elswick, nor Mr. Giorgianni has ever

14    said in any of their reports or Mr. Giorgianni submitted a

15    declaration in support of the motion.  He has never said

16    that the Adobe product obtains, uses, or calculates the

17    negative logarithm of reflectance, transmittance, or

18    luminance factor.  He has never said that.  They say other

19    things from which, with all due respect, then their lawyers

20    argue:  well, it's similar.  It's close.

21         So you are not going to find that.  So I don't

22    think this is -- well, I know this is one where you don't

23    have a situation of the experts dispute the fundamental

24    fact.

25         But anyway, number two, I don't think your

1    analysis can stop there, with all due respect.  Because if

2    that were the case, we would never have summary judgment in

3    a technical patent case.  I mean one expert is always going

4    to say A and the other is going to say B.  That is the way

5    of the world.  It's always going to happen.  And if all the

6    Court is looking for those statements, see you later, let's

7    go to trial, we're never going to have summary judgment.

8              I think there has to be, they have to show, in

9    opposition to our motion if their expert had said there was

10   a negative logarithm of luminance factor.  What the support

11   for that?  Is there plausible enough support that a jury

12   could believe it?  That a jury could say, okay, I see there

13   is some evidence supporting that?  And,

14             So I think even at that level, and with all due

15   respect, I do think the Court needs to take that step, you

16   are not going to find it here.

17             Now, just a footnote to this, and it's a

18   rather important one.  I have focused on obtaining density

19   capabilities.  What I have said applies for sure for the

20   comparison step, the constructing and tone reproduction

21   curve based on a comparison of pictorial dynamic ranges.

22             We have been chasing this mystery comparison.

23   Where does it happen?  Where is it?  Who did it?  Show us

24   where it is.  Same issue.

25             All right.  Just one other argument on

1   noninfringement that I want to -- there are more in the

2   papers but I want to just comment on one.  This is sort of

3   the other extreme, your Honor, where it's not technical,

4   completely nontechnical and, in that sense, I suppose may be

5   easiest of call.

6           I'm sorry.  I'm back on slide 4 now in the

7   spiral set.

8           They have a significant split infringement

9   problem in this case to prove that all the steps of the

10  method are performed.  And just to remind you, there is a

11  single independent claim in their patent, one claim.  It's a

12  method claim.  It has five steps.

13          Their theory is that two of the steps -- and

14  I'll show you the details in a minute -- two of the steps

15  were performed by a developer in 2003 when he created the

16  code.  Three of the steps are performed by users today when

17  they click on the auto button, literally, nine years later.

18          That is not only sounds implausible, it is

19  legally impermissible for them to do that.  So they really

20  don't even get to first base on this issue or really on

21  the substantive issues because of the split infringement

22  problem.

23          Now, Tom, can we go to slide 5?

24          We laid out in our papers that this is their

25  theory.  In other words, who does which step.  And they

 1    don't deny in their papers that that is indeed their theory.

 2    Okay?

 3              Mr. Giorgianni, we went through each of the

 4    steps, and we said who does this one?  Who does this one?

 5    Who does this one?

 6              The step of collecting statistics of an

 7    original, that happens as a result of something the user

 8    does; is that right?

 9              Yes.

10              That's the first step of the claim.

11              Obtaining density capabilities, that's the next

12    step of the claim.

13              Who does that?  That would be the person who

14    developed the program.  This program was developed --

15    actually, this might be disputed whether it was 2002 or

16    2003, but let's say 2003.  So right there we have two

17    different people doing different steps of the claim.

18              Go to the next one, Tom.

19              Who does determining the original pictorial

20    dynamic range from the statistics of the original image?

21    Who does that?

22              And the question was:  Did that step of

23    determining take place as a result of an end user's action?

24              Yes.

25              So now we're back to the user.  So Step 1 is the

1    user.  Step 2 is software developer.  Step 3 is user.

2              Go ahead.

3              The second piece of the "determining" element is

4    determining the reproduction pictorial dynamic range from

5    the density capabilities of the output device.

6              Who does that one?  Well, now we're back to

7    the programmer.  That would be a programmer.

8              So user, developer, user, developer.  And just

9    to finish, the remaining steps are users.

10             So we're all over the place in this claim with

11   these different actors.

12             Now, is that automatically death?  No, but the

13   standard is pretty high and under the law the standard is

14   pretty clear.

15             Go ahead to the next one.

16             Well, this just graphically, your Honor,

17   highlights for you, blue are user steps and orange or

18   whatever that color is are programmer steps.

19             Next.

20             So either one person has to do them all -- this

21   is the *BMC* case; right?  Either one person has to do them

22   all, and the mere fact that a manufacturer distributes its

23   product with instructions on -- you know, the fact that

24   Adobe tells people there is an auto feature and how it

25   works is not remotely close enough to satisfy this test,

1    the test of basically direction or control.

2            Go to the next one, Tom.

3            Okay.  No, stay here on split infringement.

4            So either one person does all the steps or if

5    it's not -- if you have a split infringement situation, one

6    person has to direct or control the steps of the other.

7            Not true here.  In fact, I believe, again, I

8    believe they implicitly conceded this because they deal

9    with it in a footnote in their brief where they say, well,

10   there is an en banc case pending.  It's *McKesson*.  There is

11   two.  *McKesson* is one of them.  And the Federal Circuit,

12   they are saying is probably going to change the law in some

13   regarding split infringement.

14           Who knows what the Federal Circuit is going to

15   do.  We think not, certainly not in a way that makes a

16   case for them.  But you can't wait around for that.  You

17   have to find the law the way it is now, and the way the law

18   is now, under *BMC*, they don't get to first base on split

19   infringement.

20           So that is an independent reason for

21   noninfringement.  It doesn't turn on experts.  It doesn't

22   turn on the technology.  It's a straight-up legal issue that

23   your Honor, with all due respect, should decide.

24           All right.  I think ...

25           THE COURT:  That leaves your motion for separate

```
 1   trial.

 2              MR. SCHERKENBACH:  Right.

 3              THE COURT:  Or to sever.

 4              MR. SCHERKENBACH:  Sever.  That one, I can be

 5   brief on.

 6              I don't think there is any dispute or any real

 7   meaningful dispute that Adobe and Canon were misjoined under

 8   the rule the way -- not only the way it was changed as a

 9   result of the AIA but even under the prior rule which

10   required same transaction or occurrence.

11              That question was somewhat open until the EMC

12   case, the Federal Circuit EMC case.  The Federal Circuit

13   answered that question and basically said, look, even

14   before the change to the statute, you had to have -- to join

15   multiple defendants in the same case, you had to have the

16   same transaction or occurrence being the source of the

17   alleged infringement.

18              And there is no allegation that -- to Tarkus's

19   credit, they aren't even arguing that is true here.  It's

20   not true here.  Okay?

21              So here we are on the eve of the pretrial

22   conference.  So what.  Right?  We didn't move to sever the

23   case because, frankly, as a practical matter, it didn't

24   matter.  It matters a lot for trial in our view or at

25   least it could matter a lot for trial in our view.
```

1          So these parties were misjoined.  The question

2    is what to do about it.

3          You know under Rule 42 that regardless actually

4    of joinder or misjoinder, you could decide to put parties

5    together, put issues together, not put issues together.

6    It's a discretionary call.  That is true, and Tarkus makes

7    that point.  *EMC* makes that point.

8          But a couple of things on that.

9          No. 1.  I think they read *EMC* much too broadly

10   in that respect.  They basically say, well, joinder,

11   misjoinder, eh, no harm/no foul because you can always

12   consolidate under 42(b) and *EMC* says basically you can

13   always do it and it's always appropriate.  Right?

14         *EMC* doesn't say that.  In fact, I think it would

15   be a mistake for your Honor to read it that broadly because

16   if you look at the new Section 299, which I know doesn't

17   technically apply to the case but it's Congress saying what

18   they think the law was and what it should be, and that is

19   that you should not even consolidate for trial.  There is

20   a specific provision in that statute that says you should

21   not even consolidate for trial unless you have got this

22   same transaction occurrence test satisfied.

23         Now, I'm not saying you are bound by that.  I

24   just think when you interpret *EMC*, which has to do with a

25   pre-AIA case, that you should bear in mind what Congress

```
 1    explicitly said in the AIA, because they're not inconsistent

 2    at all.

 3              So the question is where are we at the end of

 4    the day?  Should you separate us out or not?

 5              There is really only one overlapping issue,

 6    validity and one overlapping witness who is Professor

 7    Stevenson.  Right?

 8              The infringement issues are completely

 9    different.  The damages issues are completely different.

10    The willfulness issues are completely different.  And other

11    than a single expert who is an expert and, of course, is

12    being paid for his time, unlike fact witnesses, there is no

13    witness overlap.

14              So we would very much like -- and I understand

15    Canon may have a somewhat different view, but Adobe feels

16    strongly we would like our own trial.  We are faced here, to

17    return to the place I started, this is a David-and-Goliath

18    case.  That is their theme.  It's little guy, big guy, and

19    willfulness.  That is their case.

20              If we're together in that scenario, a big

21    Japanese company, a big Silicon Valley company, we are

22    swimming up a very fast moving stream.  And I don't think

23    it's fair to us to do that in a situation where there is so

24    little overlap and where the law clearly entitles you to do

25    something about it.
```

1              Now, I'm sensitive to the practicalities of the

2    situation.  I suggested that I think if the case were split

3    that we could each have a week.  I think the case could be

4    tried in a week each.  It sure could be tried in a week each

5    if your Honor were to do something by taking willfulness,

6    for example, out of the case.  You could bifurcate, if you

7    are not prepared to take it out of the case, bifurcate

8    willfulness and damages so we have two liability trials.

9              So there are ways to do it, to hold that block.

10   We're not per se asking you to move the thing.  That is an

11   option, too.  But the most important thing I think is to

12   give each of us our fair shot, our separate shot.

13             THE COURT:  When you say Canon, you're not

14   quite sure they're with you, I know they don't say they

15   oppose but it sure looks like they oppose.  Among other

16   things, if I granted your motion, I have to decide which of

17   you gets to go first, and you appear to be diametrically

18   opposed on that.

19             How would I make a decision on anything than an

20   arbitrary decision?

21             MR. SCHERKENBACH:  Well, I thought about that.

22   And as much as I love to go first, I'm prepared to let Canon

23   choose.  If they want to go first, they can go first.  You

24   know, I think that is more than fair since they are not --

25   I'll let them speak for themselves, but they can choose.  I

1    don't care if I go second or when I go.  But I really do

2    want Adobe to have its own shot in telling its own story

3    with respect to Mr. Holm particularly if you're going to let

4    all this willfulness stuff in, because that is going to be

5    this case.

6            THE COURT:  You say there is not a lot of

7    overlap.  Of course, there is the background of the patent

8    which would have to be done twice.

9            But I'm concerned with, as you know, there is a

10   lot of evidentiary decisions that get made during the course

11   of a trial, even a one-week trial.  If you go second, are

12   you going to have your fair shot at all of those issues that

13   I have resolved already between Canon and Tarkus?

14           MR. SCHERKENBACH:  Well, I don't think so.  I

15   mean I wouldn't -- if we're talking about the same evidence

16   and you have ruled on the same evidence, at least with the

17   same context or factual background, I don't have any problem

18   living with whatever decision you make in Case No. 1 and

19   Case No. 2.  I mean this is not about -- it really is not

20   about getting two bites at the apple at all.

21           I mean, frankly, even on validity, they have a

22   validity defense, we have a validity defense.  This really,

23   from Adobe's perspective, fundamentally is a noninfringement

24   case, which is why I don't care if I go first, I don't care

25   if I go second.  You can make evidentiary rulings.  To the

1    extent they apply, they apply.  I'll live with it.

2              But, again, so much of this case is going to be

3    driven by -- you have seen how complex the technology is.  I

4    mean we're going to do our best but not a real high chance

5    the jurors are going to get into the negative logarithm of

6    luminance factor.

7              THE COURT:  Okay.  What about on validity?  Are

8    you willing to tie your fortunes to Canon if they go first?

9    You would just be bound by the validity ruling in the first

10   trial?

11             MR. SCHERKENBACH:  Sort much.  There is one

12   footnote to that.  On art other than Adobe's prior Photoshop

13   product, the answer is yes.

14             We have -- so there is very substantial third

15   party prior art in the case that the companies share in

16   their defense.  We are also relying on Photoshop Version 3.0

17   which is prior art which had its own auto feature.  Slightly

18   different implementation than the accused feature in Adobe

19   Camera Raw, but our view is those differences are not

20   material to the patent.

21             So part of our defense is, look, Tarkus, we

22   don't infringe your patent, but if you think we do, you

23   can't have it both ways.  You can't interpret your patent in

24   a way that covers what we do now and avoid Photoshop 3.0.

25             Now, I have no idea whether Canon would ever

1    intend to present that.  I don't know.  But I do think that

2    at least that piece of it, we should be allowed to put into

3    our case even if it's the second case.

4              THE COURT:  But if they were willing to put 3.0

5    into their case, then you would have no invalidity case

6    left.  You would just agree to stipulate to be bound by the

7    invalidity ruling.

8              MR. SCHERKENBACH:  I would.  But, again, I would

9    just as long as we're allowed to put in 3.0 as a backstop to

10   equivalence.  Right?  Because under the doctrine of

11   equivalents, they can't cover the prior art.  So I'm not

12   going argue --

13             THE COURT:  That is an infringement issue.

14             MR. SCHERKENBACH:  That is an infringement

15   issue, yes.  But just in terms of the evidence that your

16   Honor would see in the second case, it still is.  And,

17             Their case is going to come down to equivalence

18   as well.  I'm convinced of that.  We have a DOE willfulness

19   case here.  So I have got to be able to put in my prior

20   product and say you can't interpret your patent, not in a

21   way that only covers that.

22             But, yes, other than that, I will live with what

23   happens on validity.  Yes.

24             THE COURT:  Okay.  Thank you.

25             MR. SCHERKENBACH:  Thank you.

1          THE COURT:  Let me hear from Canon now on their

2     motions.

3          MR. CHALSEN:  Good morning, your Honor.

4          THE COURT:  Good morning.

5          MR. CHALSEN:  May it please the Court, my name

6     is Chris Chalsen, counsel for Canon USA.

7          First, your Honor, I would like to address

8     Canon's motion of summary judgment of noninfringement.

9          THE COURT:  Okay.

10          MR. CHALSEN:  My colleague Mr. Gaspar will be

11     addressing Canon's motion for summary judgment of invalidity

12     after I speak.

13          THE COURT:  And then if either of you would like

14     to address the motion for separate trial or severance, I'd

15     like to hear that, too, before I turn it over to plaintiff.

16          MR. CHALSEN:  Okay.  Sure.  Actually, I was

17     going to sort of segue with that.

18          With that, I think our summary judgment motion

19     moots the issue of severance.  I think the Court, I'm

20     hoping, will agree with us on that issue when you see the

21     presentation.  I have read the materials.

22          There really is no genuine issue of material

23     fact here that needs to be decided by a jury in this case,

24     your Honor.  The failure of evidence is replete.  And in

25     that sense, our case is even more compelling than Adobe's on

1    this issue because Tarkus has not even identified anything

2    corresponding to what would be an equivalent type of software.

3    They analyze software that their own expert admitted had

4    nothing whatsoever to do with the claimed invention.  But,

5    you know, we'll get to that.

6              Go to the first slide, please.

7              Your Honor, I'm sure you are familiar with the

8    claim.  With the Court's indulgence, I'll put it up there

9    one more time.

10              As Mr. Scherkenbach mentioned in connection with

11    Adobe's motion, this claim has multiple elements that are

12    related to the density capabilities issue and the definition

13    of density as your Honor interpreted.

14              It's actually in this claim four separate times.

15    So there are actually four different elements of this claim

16    that require Tarkus to establish that we obtain the density

17    capabilities of the output device.  And even under the

18    Court's ruling that density capabilities can be obtained or

19    assumed, still the case.  There has to be an obtaining of

20    density capabilities.

21              The first is done in connection with obtaining the

22    density capabilities of the output device.

23              Then, the so-called reproduction pictorial

24    dynamic range has to be determined from those density

25    capabilities.

1              Then the tone reproduction curve, which is what

2    this case is all about, has to relate the statistics of the

3    original image to the visual density capabilities of the

4    output device.  And,

5              Then the construction has to be based on a

6    comparison between the original pictorial dynamic range and

7    the reproduction pictorial dynamic range.

8              The reproduction pictorial dynamic range is

9    built by obtaining the density capabilities from the output

10   device.  So it's actually four different limitations in

11   this claim completely hinge on obtaining the density

12   capabilities of the output device, either assuming them or

13   going out and obtaining them from the actual output device.

14             Next slide, please.

15             Tarkus has completely failed to show that

16   Canon's software obtains or assumes density capabilities of

17   an output device.

18             It completely failed to show that we determine a

19   reproduction pictorial dynamic range from those density

20   capabilities.  It can't because we don't have -- we don't

21   obtain density capabilities.  And,

22             It has completely failed to show we construct

23   any kind of tone reproduction curve between the OPDR and the

24   RPDR.

25             I'm sure your Honor is familiar with this.  I

 1      just went through the claims and the claim construction

 2      process, but basically this invention is about taking an

 3      original or data of an original image, looking at the output

 4      device, determining the density capabilities of the output

 5      device, and converting that original data file into an

 6      output data file by making a comparison between the original

 7      images, the pictorial dynamic range of the original images

 8      and the pictorial dynamic range computed based upon the

 9      density capabilities of the output device.

10                  Next slide, please.

11                  Tarkus has simply not identified any Canon

12      software for those disputed steps, the three disputed steps

13      I talked about or even anything having to do with density

14      capabilities.  They rely on Mr. Giorgianni.  And we're

15      going to get to this in more detail in our Daubert motion

16      later, your Honor.  He admitted he didn't even really -- he

17      said he didn't spend much time trying to understand Canon's

18      code.

19                  Mr. Elswick, who is their source code expert,

20      only analyzed source code that has nothing whatsoever to do

21      with our claimed invention.  And,

22                  This isn't just lawyer argument.  Mr. Giorgianni,

23      who is Tarkus's other expert, admitted that illuminant

24      estimation, in his own words, has nothing whatsoever to do

25      with the claimed invention.

 1            So Tarkus's decision to ignore or disregard how

 2   the accused software works is fatal to its case, your Honor.

 3   This is a software case.

 4            Next slide, please.

 5            Tarkus seems to want to gloss over the failure

 6   to prove that we are using these density capabilities of the

 7   output device by saying, well, you are using sRGB, and sRGB,

 8   this is a color space standard, inherently has something

 9   that is equivalent to density capabilities.

10            Tarkus doesn't even take the position that

11   sRGB has density capabilities specified in it.  As Mr.

12   Scherkenbach said, there is no recitation in the sRGB

13   standard of anything having to do with the negative

14   logarithm of luminance factor.  It's just not in the sRGB

15   standard.  The sRGB standard points to luminance but never

16   to luminance factor and never to negative log of a luminance

17   factor, which is how your Honor identified density.  And,

18            As I said before, they have not at all shown

19   where in our code there is any comparison between the OPDR,

20   the original pictorial dynamic range, and the reproduction

21   pictorial dynamic range.

22            Next slide, please.

23            I'm just going to focus a bit more on this

24   obtaining density capabilities of the output device.

25            Again, they haven't identified of the source

1    code.  Your Honor, on this point, Tarkus sort of rather

2    amazingly takes the position because we didn't join Adobe's

3    motion to dismiss during the discovery period for failure

4    to have identified the source code during that time, to

5    identify the infringing routines in the source code at that

6    time, that we somehow aren't -- or it somehow relieves

7    themselves of the burden that our source code infringes

8    their claim.

9              Nothing can be further from the truth.  All we

10   said at the time was we were willing to wait until they file

11   their contentions and serve their expert reports to see how

12   they mapped the claims to our source code.  That is all we

13   did.  That was just a timing issue.  And,

14             Adobe's motion was actually to dismiss the case

15   during the course of discovery.  We did not join that motion

16   at that time because -- and your Honor conducted the hearing

17   on that issue.  We just said we'll wait until we get the

18   expert report.

19             Well, we got the expert reports and the

20   contentions; and there is no correlation whatsoever between

21   the claimed invention and our source code in those expert

22   reports.

23             Mr. Giorgianni, in fact, admitted our source

24   code does not obtain density capabilities of sRGB.  And,

25   instead, they say it's readily ascertainable so you must be

1    using it or you could easily use it or you may be using it.

2    It's somewhere in there.

3              But, in fact, sRGB doesn't have density values

4    associated with it.  It doesn't have density as your Honor

5    has defined it.  So it's a false statement even to assume

6    that we may be using it or it's readily ascertainable.  It's

7    simply not there.

8              Your Honor's claim construction on this point

9    is quite clear, and it's not off the wall.  In fact, it

10   was proposed by Tarkus.  Density is negative logarithm of

11   reflectance, transmittance, or luminance factor.  It's

12   Tarkus proposed compromise to add the word "factor" in there

13   to may it more precise and understandable and consistent

14   with the specification.

15             There is really no disclosure in the sRGB

16   standard of anything called the luminance factor.  It's just

17   not there.  There are no negative logs.  And our software

18   doesn't obtain it or doesn't assume it.

19             Next slide, please.

20             Failure of Proof No. 2 is that the claim

21   requires that the reproduction pictorial dynamic range is

22   based on the density capabilities.  Since we don't have the

23   density capabilities, we can't create an RPDR based on that.

24             But your Honor has also construed the pictorial

25   dynamic range.  I know not separately from -- you haven't

1    construed "reproduction pictorial dynamic range" separately

2    from "original pictorial dynamic range," but the overlapping

3    component "pictorial dynamic range" your Honor did construe.

4    And that is required to not have just a mere estimate of the

5    edges of detail but to actually have the edges of detail, as

6    your Honor pointed out in the specification.  Those are

7    calculable numbers.  Those precise numbers are described in

8    the patent.

9            We're not limiting it to those numbers described

10    in the patent, but there has to be a calculation, and it has

11    to be based on the density capabilities.  And,

12            Tarkus simply has not identified any source

13    code evidence that even raises an issue of fact on this.

14    They refuse to even tell us what they considered to be a

15    reproduction pictorial dynamic range in the accused software.

16            Again, simply outputting our data in sRGB

17    format does not imply or prove or anything that we use

18    density capabilities from sRGB.  SRGB is intended to be an

19    interdevice color space that is used among -- it's quite a

20    widely used standard.  People are using it all the time to

21    communicate every kind of printer, to every kind of monitor,

22    to every kind of camera that takes pictures.  There is nothing

23    particular in that relating to the density capabilities that

24    we use in our software.  And,

25            As I mentioned before, the definition of

1    "pictorial dynamic range," that includes the edge of detail

2    in black and the edge of detail in white has to be derived

3    from this density capabilities, and it's just simply not

4    there in our device.

5              Next, please.

6              Tarkus attempts to use, as your Honor asked

7    Mr. Scherkenbach before, whether other kinds of evidence,

8    circumstantial evidence may fill in the gap if they don't

9    have any actual evidence that we infringe.  But these,

10   Mr. Giorgianni's so-called proofs on these issues also fail.

11             I mean he is looking at images that have been

12   produced without any idea of actually how those images were

13   created without there being any way whatsoever to determine,

14   to prove that those images were created by accessing our

15   density capabilities of the output device or sRGB.  And,

16             Then they point me to Mr. Akiyama's testimony

17   repeatedly.  Mr. Akiyama never testified about anything

18   called a reproduction pictorial dynamic range.

19             All of his testimony, the testimony that is

20   cited by Tarkus, and I'm sure they're going to argue about

21   that today, his testimony is solely based upon the original

22   data.  That there is highlight points and shadow points that

23   are identified in the original image data.

24             Canon does internal processing relating to those,

25   the original image data.  They don't do any processing that

1    relates that original image data to the density capabilities

2    of the output device, however.  So the fact they identify in

3    the original image data shadow points and highlight points is

4    completely irrelevant to those four steps of the claims that I

5    mentioned before, your Honor.  And,

6         There is no linkage whatsoever established in

7    Mr. Akiyama's testimony or in the expert reports to those

8    critical requirements.

9         Just turning briefly to the construction of the

10   tone reproduction curve based on the comparison.

11        Sort of a fortiori or without saying anything

12   further, you can't construct the tone reproduction curve

13   based on the comparison between the original data and the

14   density capabilities of the output device if you have never

15   obtained the density capabilities of the output device.

16   It's just simply not there.

17        Without showing those predicate steps, Tarkus

18   cannot establish the elements of the constructive step.

19        Again, there is no testimony supporting the

20   construction stage.  They again point to Mr. Akiyama's

21   testimony but it is taken completely out of context.  And,

22   again, he doesn't talk about the RPDR at all.  He just talks

23   about processing of the original image data without regards

24   to what the output device is going to be or it's any kind of

25   capabilities, much less density capabilities.

```
1              Just a brief note on the doctrine of equivalents,
2    your Honor.  Tarkus, in their opposition to our summary
3    judgment motion, for the first time tried to articulate some
4    doctrine of equivalents argument because we have pointed
5    out in our summary judgment motion that the totality of Mr.
6    Giorgianni's opinion on doctrine of equivalents was simply
7    recitation of the elements for the claim.  The device
8    performed substantially the same functions, substantially
9    the same way, to achieve substantially the same result.
10             Under the case law, that is completely insufficient.
11   The expert has to explain on an element-by-element basis why
12   there is a comparison between -- why there is equivalence
13   between the claimed invention and the accused device.  And,
14             It's impossible to do that for four different
15   claim elements when we have a complete absence of the claim
16   element.  It's not like there is an equivalent that is
17   performed on a step-by-step basis.  If the claim specifically
18   requires obtaining the density capabilities of the output
19   device and we don't do it and there is nothing else that is
20   equivalent to it, then the doctrine of equivalents analysis
21   has to fail.
22             That's all I have right now on the summary
23   judgment of noninfringement, your Honor.
24             THE COURT:  Okay.
25             MR. CHALSEN:  Mr. Gaspar will cover the summary
```

1    judgment of invalidity.

2              THE COURT:  Okay.  Thank you.

3              MR. CHALSEN:  Thank you.

4              MR. GASPAR:  Good morning, your Honor.

5              THE COURT:  Good morning.

6              MR. GASPAR:  Chris Gaspar on behalf of Canon USA.

7              The claims in suit here are all invalid, they're

8    all indefinite.  And before I get to the undisputed facts,

9    I'd like to talk just very briefly about why the Section

10   112 indefiniteness requirement is so vitally important,

11   particularly in this case here.

12             If I can go to slide No. 2, please.

13             The Federal Circuit explains -- and this is not

14   a new doctrine.  This has been around for decades, if not

15   longer than that, certainly since before the 1950 act.

16             So we have the Federal Circuit explaining that

17   the claims obviously are the ones, the part of the patent

18   that delineates what the scope of the right to exclude is,

19   and nothing else can do that.  It's only the claims.  And,

20             They have to be sufficiently definite to inform

21   the public of what the scope is and what the scope isn't.  So

22   what the scope isn't is as big a part of claim definiteness as

23   defining what the claim does, in fact, cover.  And,

24             Here, these claims are quite uncertain.  The

25   primary purpose of this requirement is to keep unreasonable

1    advantage away from the patentee by not having certainty in

2    the claims.  And the Federal Circuit has really underscored

3    this.  They said that it's meant to guard against unreason-

4    able advantages and disadvantages to others like the public,

5    Canon and Adobe, arising from uncertainty as to the

6    respective rights, and, in fact, the scope of the claim.

7            We have abundant uncertainty here.  Let me walk

8    through in detail some examples of that.

9            If I could go to the next slide.

10           This is a set of text that you have probably

11   seen before.  It's the claim.  Maybe I will ask you to look

12   at it with a slightly different lens than before.

13           The first step in the claim says you obtain

14   density capabilities of the output device.

15           Next, the claim says that you determine a

16   pictorial dynamic range based on, again, density capabilities.

17           Then, later, we construct this tone reproduction

18   curve.  And,

19           The tone reproduction curve is a very specific

20   thing.  It's a very specifically defined relationship.  It

21   relates statistics of the original image to something else.

22   That something else is visual density capabilities.  And

23   visual density capabilities is not density capabilities as

24   used in the determining step or in the obtaining step.  It

25   can't be.  It's a different term altogether, and different

1    terms in the claim must have different meaning.

2         So we can see some uncertainty starting to arise

3    right here because, first of all, this term, the visual

4    density capabilities has no antecedent basis.  Visual

5    density capabilities occurs in the claim as a term for the

6    first time in that last part here that I have shown.  It

7    just jumps in there sort of halfway through the claim.

8    And the words "visual density capabilities" don't appear

9    anywhere earlier in the claim.  All of that is completely

10   undisputed.

11        Also, the word "the" is in front of "visual

12   capabilities."  In the patent parlance, "the," of course,

13   suggests the term following it has already been called out

14   in the patent somewhere and has what the patent lawyers call

15   antecedent basis.

16        An antecedent basis just simply means for a

17   term that appears later in the claim, there has already been

18   reference made to it earlier in the claim.  The Patent and

19   Trademark Office, the Manual of Examining Procedure teaches

20   as an example what is sufficient and what is insufficient.

21   (Clearing throat.)  Excuse me.  What is insufficient

22   antecedent basis.  And,

23        The example that they give, and this is in our

24   brief at page 15, is that a claim that refers to "said

25   aluminum lever" but recites on a lever earlier in the claim

 1   is indefinite because it is uncertain as to the lever to

 2   which reference is made in the latter part.  And,

 3               That is exactly what is happening here.

 4               So what does the visual density capabilities

 5   follow?  Does it follow density capabilities?  No.

 6               Tarkus doesn't even argue that.  Tarkus instead

 7   argues that it's somehow inherently and necessarily embedded

 8   in the concept of output device which comes before in the

 9   claim.

10               Now, there is certainly a doctrine that says you

11   don't have to have express antecedent basis in a claim to

12   avoid invalidity based on indefiniteness; and we're not

13   suggesting that the law needs to be changed here.

14               But that law is very, very limited.  It's

15   limited to a circumstance where you have a mathematical or

16   a geometric certainty that exists by virtue of the type of

17   technology you are talking about or the type of limitations

18   you are talking about.

19               The examples that are in the case law are a

20   sphere having an outer surface, for example.  Every sphere

21   has an outer surface.  Does every output device,

22   mathematically, geometrically, with certainty, have visual

23   density capabilities?  I don't think anyone can make that

24   argument with a straight face.  But that is the argument

25   Tarkus is forwarding for why original density capabilities

1    has antecedent basis.

2            It certainly fails in our view, but the claim

3    undisputedly shows a lack of express antecedent basis, and

4    there has been no argument that density capabilities is the

5    antecedent basis for visual density capabilities.

6            So uncertainty, number one, is where is the

7    antecedent basis?

8            Another major uncertainty is, okay, we're

9    looking at this claim.  It says obtaining density

10   capabilities, determining something based on density

11   capabilities.  Then we get to constructing a special tone

12   reproduction curve that has a relationship.  One of the two

13   parts that are related is the visual density capabilities.

14           How did that word get in there?  Is it "the" and

15   "visual," both of those words, is it's just an accident or a

16   mistake?

17           Very importantly, Tarkus says no, this was

18   intentional.  Neither the word "the," nor the word "visual"

19   there are mistakes in Tarkus's view.  They have, in fact,

20   said that this is exactly the way that the claim was

21   supposed to come out when the inventor wrote it, reviewed it

22   and sent it into the Patent Office.  And,

23           In fact, on the opposition brief, page 16, they

24   say, "Canon correctly notes Tarkus's position that there is

25   no mistake in claim 1."  That is exactly the way they wanted

1    it to look.

2           So no mistake but we have two words that are

3    clearly out of place and that put uncertainty into the claim

4    in terms of the coverage.

5           So let's really drill down on where the rub is

6    in this case for us.  Because this is a case about software,

7    and does the software infringe?  And,

8           Tarkus has its own arguments about it.  But

9    we're entitled to know the metes and bounds of this claim.

10   In fact, we are entitled to know exactly what that tone

11   reproduction curve looks like, exactly what the relationship

12   is, so that we can design-around it, or so we can determine

13   if prior art covers it, or so we can respond to the

14   infringement charge.

15          They don't want to do that.  And what they have

16   done through the entire case, we virtually begged for it, is

17   avoided giving a definition to the term "visual density

18   capabilities" and they still haven't done it.

19          What does visual density capabilities mean?

20   Without knowing that, it is impossible for the public to

21   know the scope of the claim.

22          It is undisputed that the patent doesn't define

23   visual density capabilities.  It's undisputed that the file

24   history doesn't define it.  Tarkus's expert has never defined

25   visual density capabilities, although we will see in a minute

1    what he thinks about the subterm, which is visual density,

2    and, in fact, why his thoughts about that subterm create even

3    more uncertainty.

4              But, first of all, let's get back to visual

5    density capabilities for a second.  If we can put slide 7

6    up, please.

7              So this is a little bit small, but it's in your

8    handout.  This is an excerpt from Mr. Holm's testimony, the

9    sole inventor of the patent.

10             So we're trying to drill down on really what is

11   going on in this claim.  We're confused.  We see density

12   capabilities in one place, we see visual density

13   capabilities somewhere else.

14             So we ask:  Is the expression "visual density

15   capability of the output device" different than "density

16   capabilities of an output device?"

17             And the answer is:  Yes, I think that "density

18   capabilities" includes "visual density capabilities" but

19   it might include some or things.  It might include, for

20   example, status density, status A, status M, status T.

21             So we're trying to drill down on really what is

22   the difference, what are we looking for here in the tone

23   reproduction curve relationship that is different from what

24   was happening in the obtaining and determining steps.

25             So we ask, point blank, looking at the claim, no

1    question about what we're talking about:  Is the expression

2    "visual density capabilities" that appears in the claim

3    narrower than "density capabilities" that appears in the

4    claim?

5             The inventor's answer was:  That's probably

6    true.

7             I mean that is kind of an interesting answer

8    on two levels.  First of all, he is admitting they're not

9    the same.  "Visual density capabilities" and "density

10   capabilities" cannot just simply be equated.  They're not

11   interchangeable, in the inventor's view.  And,

12            Second of all, I think that is probably true.

13   This is the inventor we're talking to, and he can't even

14   tell us what the scope of the claim is?  This is quite

15   extraordinary, I think.

16            So let's go to some examples of how this

17   uncertainty plays out.

18            First of all, I mentioned that it's difficult if

19   not impossible for the defendants in this case to go and

20   look at their software and figure out if we have visual

21   density capabilities related to statistics in our tone

22   reproduction curve that is constructed based on all this

23   density capabilities type of matrix.  So that is uncertainty

24   for us and it is not fair.  And it is created by the

25   intentional claim language.  We've heard it's intentional.

1              Tarkus, though, itself -- and this is the really

2    interesting part.  Let's go to slide 4.

3              Even Tarkus was seriously confused about the

4    scope of this claim.  Tarkus's opposition brief to our

5    summary judgment motion confuses "visual density

6    capabilities" and "density capabilities" by arguing it

7    is the visual density capabilities that are required to

8    determine the pictorial dynamic range.  And that is what

9    they say right here at pages 8 through 9.  And,

10             This is, by the way, where they're trying to

11   explain to the Court and to us exactly what the difference

12   is between density capabilities and visual density

13   capabilities.  This is it.  This is what they want us to

14   come away with.  And they bungle it.

15             It says here:  "when a reference is to the

16   'overall density capabilities' of an output ..., the more

17   general term 'density capabilities' is used but when the

18   patent as when required, for example, in determining

19   pictorial dynamic range, the more specific term 'visual

20   density capabilities' is used."

21             But that doesn't work.  Let's go back to the

22   claim.

23             The claim says:  determining a reproduction

24   pictorial dynamic range from the density capabilities, not

25   from the visual density capabilities.

1           Slide 5 is yet another example of Tarkus being

2     all over the place on what this genus or species or subset

3     or narrowing actually should mean or should be.  It doesn't

4     even come close to a definition, but let's just see what

5     they're doing here in two different briefs filed on the

6     exact same day.

7           This is from the brief that they filed on Monday

8     in response to Adobe's motion for summary judgment of

9     noninfringement.  Here, they're saying that the difference

10    between "density" and "visual density" -- putting aside the

11    capabilities part, and that is a very different thing.  Just

12    the difference between "density" and "visual density" is

13    that density is one genus.  It's the negative log of two

14    things, reflectance or transmittance, and visual density is

15    an entirely different genus.  I mean this is what they say

16    in their opposition.

17          So that is one position.  If we can flip to the

18    next page.

19          The other position that they took with us, with

20    Canon, on the exact same day in a different brief is that,

21    no, "density" is a genus and "visual density" is a species.

22    And that is in the bottom bullet down there where they're

23    explaining that there are several different types of

24    density, including visual density as one example.

25          Earlier in their opposition brief, their main

1    opposition brief to our motion, they had said as shown in

2    the second bullet that "visual density" means "the negative

3    ... log of the luminance factor."  Which, if you compare

4    that to your Honor's definition of "density," does look a

5    little bit more like a genus species relationship.

6           But yet we still have these two competing

7    positions being taken on the same day, on Monday, in the

8    two different briefs of the two defendants or at least the

9    oppositions to our two defendants' positions.

10          So those are the major uncertainties.  Those

11   are the situations about how they play out here and why it's

12   unfair for Tarkus to be able to intentionally set a claim up

13   like this and intentionally force it that way, that makes

14   it impossible for us to figure out if we infringe this TRC

15   relationship between statistics and visual density

16   capabilities.

17          So let me make a couple of final points about

18   the law and about an argument that Tarkus makes that I want

19   to hit head on because it was also something that your Honor

20   mentioned in response to some of the presentations about

21   noninfringement.

22          Is this ripe for a battle of the experts?

23          The answer is absolutely not.  Absolutely not.

24   As a matter of law, it's not.

25          Indefiniteness is a question of law.  In our

1      brief at page 13, we have a number of cases that say that.

2      The test for indefiniteness is an objective one.  There is

3      no subjective criteria involved here.  It's an objective

4      test.  And,

5              The Federal Circuit has repeatedly, repeatedly

6      held that when you are determining a claim's indefiniteness

7      or definiteness, that is a legal conclusion drawn from the

8      Court's performance as a construer of claims.

9              It is just like your duties in construing claims,

10     holding the Markman hearing and taking in evidence at that

11     point and determining, in the Court's sound discretion, what

12     the meaning of the term before it happens to be.

13             The *Exxon* case in our brief at page 13 is a

14     great summary of that law, although that law abounds in many,

15     many different opinions throughout the Federal Circuit's

16     jurisprudence.  So summary judgment is appropriate in this

17     defense, and it's found in a lot of cases.

18             There are plenty of examples in our briefs.  Our

19     opening brief has some.  Our reply brief, which is DI 312,

20     on page 3, our footnote 5, has a list of cases where summary

21     judgment was granted and affirmed.  And,

22             Just a final point because I can sort of project

23     where I think Tarkus is going to go on this, on this entire

24     indefiniteness defense.

25             The Federal Circuit has approved not only the

1    grant of summary judgment of indefiniteness but the grant of

2    summary judgment of indefiniteness after claim construction

3    and after the very term that is in question that creates

4    the uncertainty was construed.  And that happened in the

5    *Harrah's v Station* case.  And that is cited in our reply at

6    page 5 on this particular point, but it's cited all

7    throughout our motion papers.

8                So a trial here is entirely unnecessary.  The

9    scope of the claim is uncertain to say the least.  It's

10   indefinite, absolutely.

11               All of the dependent claims here, there is only

12   one independent claim.  All the dependent claims rest on a

13   flawed independent claim so there is no way to salvage this

14   by looking at a dependent claim.

15               Defendants are entitled to know what this claim

16   means.  Not even Tarkus has defined it, so we believe it's

17   invalid for those reasons.

18               THE COURT:  And if I disagree, if I deny summary

19   judgment on indefiniteness, then what happens?  Get rid of

20   your indefiniteness defense?

21               MR. GASPAR:  Well, it's a great question because

22   what facts are in dispute, first of all, is a question we

23   would have to take up.  And the second one is what law

24   suggests that the jury should hear this instead of the judge

25   hearing it.

1           So the factual dispute question is probably the

2    easiest one to take on or at least I'll just do it first.

3           There are no facts in dispute.  The claim says

4    what it says.  We're not disputing what the inventor has

5    said on the record.  We're not disputing Tarkus's position

6    that there is no mistake from this claim and that it's in

7    fact correct.

8           There is no dispute that after all of discovery,

9    after expert reports, after extra waves of supplementation,

10   after your Honor's claim construction, that no one has ever

11   even tried to define "visual density capabilities" on the

12   plaintiff's side.  There is no dispute that the patent says

13   nothing about it.

14          So it isn't like a question of, like was the

15   light red or was the light green?  There is no dispute of

16   fact here.  We looked at the patent.

17          This is much like a claim construction exercise

18   where your Honor would not hear the jury's view on extrinsic

19   evidence and trying to make the final call as to whether or

20   not we have a proper construction of a term.  This is the

21   Court's job and opportunity to understand what the claims

22   are, to further the claim construction exercise that began

23   and to finish it with an indefiniteness finding.

24          THE COURT:  Okay.  Thank you.  Does Canon want

25   to add anything on severance or separate trials?

1          MR. CHALSEN:  Yes.  Thank you, your Honor.

2          As I mentioned before, I think summary judgment

3    would moot the issue, but the issue I think, clearly in view

4    of the *EMC* case, there was improper joinder in this case.

5    We're just struggling with the practicalities at this point

6    in the action where we have a common expert who is so

7    important to both Adobe and Canon's as Professor Stevenson

8    and whether there would be prejudice if the testimony

9    proceeded first from one of the defendants ahead of the

10   other.

11         We agree that the cases were improperly joined,

12   as I say, but we have the practical issue of what to do now.

13         One thing that -- going back to your question to

14   Mr. Scherkenbach.  We also would like to have the invalidity

15   case proceed with the benefit of Adobe's Photoshop 3 being

16   in the case.  And since that we don't have complete access

17   to those files, there is source code restrictions, Adobe

18   obviously is in a better position to present the invalidity

19   evidence relating to that.

20         I think it might be a little late in the game,

21   your Honor, but I know your Honor was involved in *Honeywell*

22   case, *Fuji Film and Samsung*.  We were involved in that case

23   early on and Judge Jordan.  It was a classic misjoinder but

24   it was before the changes in the law.

25         Now, he kept the parties in the case, stayed the

1    case as to certain class of defendants, but he -- in order

2    that there would be a first trial on common issues which

3    were inequitable conduct and invalidity, and that is how

4    the case proceeded.  Of course, the summary judgment, Judge

5    Farnan eventually took over the case and summary judgment of

6    invalidity was granted just before trial.

7            So, again, it is possible that we could have

8    a first trial on invalidity issues, or we could do it as

9    we suggested in our paper by having two different juries

10   impanelled.  I know that is a rather theoretical and

11   experimental way to proceed.

12           Our issue is not conceptually that there was

13   misjoinder and that we should be -- and we agree with Adobe

14   that there could be some kind of prejudice against both of

15   us by going at the same time, but as a practical matter at

16   this point, we are faced with the fact we have a common

17   expert and completely overlapping invalidity issues except

18   for the fact that Adobe has the additional prior art that

19   even Canon, we would like to have Adobe be able to proceed.

20           THE COURT:  What about separating invalidity out

21   and putting that off and dealing with infringement and

22   willfulness and damages now?

23           MR. CHALSEN:  Well, that would be sort of a way

24   to go if the invalidity went first, we think, your Honor,

25   because then the common issue would be resolved.  Otherwise,

```
 1    we're still in the horns of the dilemma on having the two

 2    defendants being tried at the same time, although if there

 3    was sequential trials on that issue, then the only risk

 4    would be that Professor Stevenson would be put in a

 5    situation where he would have to, he would be taking a

 6    position that somehow might be inconsistent or there might

 7    be some kind of evidentiary ruling in the first case,

 8    whoever went first, that might impact the second case or at

 9    the same time.

10                   THE COURT:  And what about you giving up on

11    invalidity and just stipulating that you will live with

12    whatever, Adobe wins or loses.

13                   MR. CHALSEN:  Yes.  I don't think we can do

14    that, your Honor.  We even had some discussions about

15    the inclusion of certain defenses in the verdict form and

16    things like that.  There is not 100 percent agreement on

17    what issues would be presented to the jury and so on at this

18    stage.

19                   THE COURT:  Okay.

20                   MR. CHALSEN:  Thank you.

21                   THE COURT:  Thank you.

22                   All right.  Let's hear from Tarkus.

23                   MR. LORIG:  Good morning, your Honor.  Frederick

24    Lorig and Richard Doss for the plaintiff.

25                   THE COURT:  Good morning.
```

1          MR. LORIG:  I don't know what the Court's

2     preference is for the order.  I was going to argue the

3     severance and the willful infringement, indirect.  Mr.

4     Doss was going to do the meat of it and deal with literal

5     infringement and the invalidity defense you just heard.  I

6     don't know if your Honor has a preference.

7          THE COURT:  That is fine.  You are up, so why

8     don't you cover your topics.

9          MR. LORIG:  With regards to the severance

10    motion, which I think is fairly straightforward, this Court

11    in *SRI*, which we quoted in our brief, held that it is the

12    experience of this Court that patents over the same

13    technology often give rise to the same questions of law and

14    fact, e.g., prior art references, same level of ordinary

15    skill in the art.

16         It was a 2005 case, your Honor, before you took

17    the bench.  But I think it's a Delaware case, and I think

18    it is appropriate because, in this case, as in many cases,

19    the common issues really predominant.  It was a question

20    of efficiency both in terms of the parties and the Court's

21    time.

22         I listened to the arguments that Mr.

23    Scherkenbach made and I don't know quite what to say.  I

24    certainly don't believe this Court would permit me to

25    taint a Silicon Valley company with a taint of a Japanese

```
 1    defendant.  I don't understand why he thought that could be

 2    done.

 3              I assure the Court no such thing would be

 4    done.  It would be a little bit like tainting Canon with a

 5    higher profit rate than Adobe has because it's a software

 6    manufacturer.

 7              I don't see any potential prejudice to either

 8    defendant.  There is such an overlap here.  It's not just

 9    where we are in the case, but there is tremendous overlap.

10              If we can put slide 16 on for a moment.

11              Your Honor, we put a binder in front of your

12    Honor.  It's a black one.

13              You have got the inventor.  You have his

14    original lawyer, Chris Michaels, the patent lawyer.  You

15    have Professor Stevenson, their expert; our common experts,

16    George Yanni and Elswick.  And you have got Mr. Yurkerwich,

17    the damages expert, who is the same.  Mr. Stoecker and

18    Mr. Schwartz.

19              You'd have to do this over and over again.  It

20    frankly doesn't make sense, even on damages.  Mr. Yurkerwich's

21    damage opinions were the same.  It was based on the RPX

22    agreement based on market share, based on profitability.  It

23    was the same theory.  He is going to be saying the same

24    things twice if we sever.

25              I think it's significant that Adobe and Canon on
```

1    their own retained and use a single noninfringement and

2    invalidity expert.  They certainly weren't being tainted

3    with one another.  They certainly weren't worried about

4    non-common issues.

5              I think Canon's view that they should be tried

6    together supports our view.  Clearly, as you heard from the

7    Adobe Photoshop 3.0, they're common issues, and they really

8    can't be avoided.  There isn't any need to duplicate time,

9    duplicate juries.

10              The defenses are nearly identical.  The accused

11   technology, they're both software and firmware that enhances

12   photos.  They're both based on an assumed output device.

13              The infringement is automatic when the user uses

14   the device.  It's all a function of the program.  It's the

15   same issue.

16              And as I said a moment ago -- I don't mean to

17   be redundant -- the damages issues are the same.  There

18   isn't a different theory for each one.  The only thing you

19   have to crank in is what is the market share?  What is

20   the profitability?  Obviously, the more money you make on

21   something you infringe, the more money you can afford to

22   share.  So it's a very straightforward issue.

23              We don't think there has been any showing of

24   prejudice.  And as with any other plaintiff, your Honor, we

25   don't -- we believe that if there is bifurcation where if

1    infringement, invalidity are here and damages are there and

2    the same jury doesn't hear the same evidence, plaintiffs are

3    prejudiced.  Defendants always want bifurcation, plaintiffs

4    never do.  It really comes down to the Court's discretion.

5    No one is ever going to say a Court is in error if it makes

6    a decision on bifurcation but we think it's a waste of the

7    Court's resources.

8                    THE COURT:  And what about the *EMC* case?

9                    MR. LORIG:  The *EMC* case doesn't say the Court

10   doesn't have the discretion.  The Court remains with the

11   discretion to try the case together.  *EMC* didn't hold that BIA

12   is retroactive.  The Court has to exercise its discretion

13   based on how it sees it.  This is not something where I

14   believe the Court can be reversed.  It is totally your

15   discretion.  That is my understanding of the law then and my

16   understanding today.

17                   THE COURT:  And what if I decided to sever

18   validity issues and put that off for some time?

19                   MR. LORIG:  It's your discretion, your Honor.

20                   THE COURT:  But what is your position?

21                   MR. LORIG:  My position is I think everybody

22   should be tried together, just for efficiencies.  But if

23   your Honor is disposed to put validity afterwards, again,

24   it's not a litigant's decision, it's the Court's discretion.

25                       If I can talk now a bit about the willfulness

 1    and the indirect infringement issues which to me are the

 2    same thing.

 3              As a prefatory comment, the way the law has

 4    been developing over the years, your Honor, for indirect

 5    infringement, you have to show that they knew of the patent,

 6    under *Global Tech*, or were willfully belong to the patent,

 7    and that they knew or should have known they were causing

 8    infringement.  You can't get through people's attorney-client

 9    privilege so you have to do it from the surrounding

10    circumstances.

11              For indirect infringement, you just have to show

12    it by 50.000001 percent.  More probable than not.

13              For willfulness, it's a higher standard.  It

14    has to be clear and convincing evidence.  The same evidence

15    is going to go in on willfulness and on indirect infringement.

16              It's going to be up to the Court eventually on a

17    JMOL to decide whether it agrees with a jury's decision.

18    And there was some talk in the end on the indefiniteness

19    motion with regards to it's up to the Court, it's up to the

20    Court, it's an issue of law, it's an issue of law.

21              So is obviousness.  And the Court, ruling on

22    obviousness or ruling on indefiniteness, recognizes that

23    there is underlying issues of fact.  The Court is not an

24    expert in the area.  We have their expert saying it's

25    indefinite.  We have our expert saying it's not indefinite.

1          Those witnesses are going to appear just as they

2     would in an obviousness issue, and the jury and the Court is

3     going to hear that evidence.  And the Court, after hearing

4     that evidence, can make a decision on JMOL.

5          If we win on obviousness or we win on

6     indefiniteness, it's the same thing.  It's an ultimate issue

7     of law of underlying facts, same standards.  And for the

8     Court to decide it in advance and try to decide which of the

9     two competing experts are correct just doesn't make sense.

10         This infects the whole indirect infringement and

11    willfulness issues, your Honor.  And, to me, let me just --

12    hold on just a second.

13         Would you put slide 17 up for a moment, please?

14         The *Golden Blount* case says it's enough for

15    defendant to give instructions, assuming that the customers

16    follow those instructions.

17         In *Global Tech*, the knowledge issue says willful

18    blindness alone is enough.  *Global Tech* was indirect

19    infringement, not a willfulness case.  So willful blindness

20    is enough to meet your test.

21         So the question is, looking at the surrounding

22    circumstances, did Adobe or Canon know or should have known?

23         And as you saw in the papers -- well, before I

24    get to that, if your Honor will permit me.  Mr. Scherkenbach

25    made a point about your Honor is a gatekeeper and you first

1    have to look at the objective standards on willfulness.  And,

2              If your Honor will recall at our Markman

3    hearing, it was an odd Markman hearing because they were

4    saying claim 1 doesn't mean what the Court ultimately found

5    it means because claim 22 is invalid.  And we went back and

6    forth with the Court in order to go with their version of

7    claim interpretation, how to find claim 22 invalid.  And

8    notice we don't have a motion for summary on claim 22 being

9    invalid.

10             So their supposed objective criteria requires

11   the Court, if they're right, to say that, well, that was

12   okay.  I mean that was understandable that you thought that

13   your claim interpretation was right because was claim 22

14   was indefinite, even though there has been no sufficient

15   testimony from a witness, there is no such opinion logged.

16   There has been no one who has so testified.  There hasn't

17   been any objective indication that they relied on a belief

18   in noninfringement.

19             In fact, the only testimony that I'm aware from

20   Adobe on this is when Mr. Knoll testified.  He was the one

21   who designed some of these features of Photoshop.  He said

22   he decided shortly before the deposition, after talking to

23   counsel, that the claim was non-infringed or indefinite.  I

24   don't remember what it was.  Mr. Doss can explain.

25             When was this?  Shortly before his deposition.

1      Okay?  So when was his deposition?  It was certainly after

2      the case was filed in 2010.

3            Now, if your Honor will recall from our papers,

4      Adobe asked for a demonstration in 2003 from Mr. Holm.  His

5      first patent issued on the common specification in 2001, two

6      years earlier.  Mr. Holm had told them that he had patents.

7            After the demonstration -- this is 2003, a year

8      before they started infringing in 2004.  This is on our 17,

9      your Honor.  I'm sorry.

10            He said, no, no, I don't want to sign your beta

11      agreement with a free license.  Why don't you pay for a

12      license?

13            The Adobe Vice President Mr. Story said, well,

14      we never lost a patent suit.  And six months later, they

15      introduced the infringing capability.

16            Now, that infringing capability was the default

17      for the first 2 -- the 1.9 million units sold.  So every

18      user, every user who used the software infringed because it

19      was the default.  It automatically came up.

20            So at the time infringement began, which is when

21      we began looking at all these things, they knew the patent.

22      They certainly knew the original one.  What is key is Mr.

23      Holm's patent at issue, the '823, issued in September of

24      2003, before they started infringing.

25            They knew he had patents.  It was a common

1    specification.  That '823 patent was published in the Patent

2    Office in February of 2003, issued in September.  It takes

3    forever for them to get printed and get everything done.

4              So after an Adobe vice president said we never

5    lost a patent suit, after he told it was a patent suit, they

6    either knew, because they had gone to the websites, or they

7    should have known because they had these discussions.

8              It's very rare in my experience for indirect

9    infringement or willfulness to have discussions like this:

10             I've got a patent.  You should license it.

11             No, we have never lost a suit.

12             And then going on to do it.

13             The idea that Adobe, under such circumstances,

14    wouldn't go to the Patent Office website to see, well, how

15    is he doing?  That is just reckless disregard.  And,

16             *Global Tech* said that is for the jury to decide.

17    That is direct for indirect infringement.  It's also true

18    for willfulness.

19             Even today, after being sued, it's the

20    infringing feature is on the basic pane.  When Mr. Doss gets

21    up, he is going to show you where the basic pane is so you

22    can understand it's right up front.  It's not varied as Mr.

23    Scherkenbach thought.  And,

24             No Adobe employee has testified that they didn't

25    think they infringed after receiving notice of the patent.

1    There was the conversations in 2003, 2004.

2              If you go to the bottom of the line.   In

3    September of 2008, there was a letter from Mr. Michaels, his

4    patent attorney, putting him on literal infringement notice

5    and saying come, let us reason together.  Let's talk.  Let's

6    discuss.  Let's try to resolve it.

7              So they can't say in 2008 to today that they

8    didn't know.

9              THE COURT:  What is the relevance of October of

10   2008?

11             MR. LORIG:  October 2008, September 2008 is the

12   same.  The letter was sent at the very end of the month, I

13   believe.  What happened was a letter was sent from Adobe to

14   Mr. Michaels saying here is our patent.  Here is our claim

15   charts.  Here is why you need a license.  Let's sit down and

16   talk.

17             So certainly from 2008 forward, they knew of the

18   patent, knew why we thought they infringed, didn't want to

19   meet and it went upon.

20             So you have at best willful blindness from

21   September, October 2004 to September 2008, and that willful

22   blindness comes from the conversations about the patents,

23   the offer of the license, the fact they were on the Patent

24   Office website.  Again, on the Patent Office website in

25   February of 2003.  Infringement didn't begin until 2004.

1          All they had to do is look at the website.

2    And why would you not look at the website after telling

3    somebody, no, we don't need a license.  We never lost a

4    patent case.

5          THE COURT:  Do you contend there is a record

6    from which a jury could find that there was actual notice of

7    the patent before October 2008?

8          MR. LORIG:  No.  You would have to do it from

9    the surrounding circumstances of being on notice of reckless

10   disregard.  We depend on *Global Tech* for that.  If *Global*

11   *Tech* had come out a different way, I wouldn't be able to say

12   it, but *Global Tech* said it is not enough to say you don't

13   know.  There they were in the Supreme Court saying they

14   didn't know; and they said you didn't know because you

15   choose not to look.

16         So the question is do the surrounding

17   circumstances suggest you had a duty to look?  That, to me,

18   is underlying issue of fact for the jury to determine both

19   for indirect infringement and for willfulness.

20         THE COURT:  And on willfulness, focus, if you

21   would, on what Mr. Scherkenbach says is the basis for their

22   motion.  The objective prong.  And that is again what he

23   says is an issue for me and not for the jury.

24         MR. LORIG:  The odd thing about the objective

25   prong is *i4i* was a JMOL.  *Stein Solutions* was a JMOL.  *DuPuy*

1    *Spine* was a JMOL.

2              It's an issue of law just like obviousness.

3    There are underlying issues of fact for the Court to

4    consider.

5              If you are going to try to step away from all of

6    these circumstances and say, okay, what do I think of their

7    claim arguments, I don't think it's -- I've never thought it

8    reasonable to say we don't infringe claim 1 because claim 1

9    isn't broad enough to include dependent claim 2 so we win

10   but you must find dependent claim 22 invalid.  That was

11   their argument.

12             THE COURT:  But I take it from that, you agree

13   that if I find that that was reasonable, then the objective

14   prong cannot be met and I should take willfulness out of the

15   case.

16             MR. LORIG:  No, I believe it has to be done on

17   JMOL because of the underlying factual issues.

18             THE COURT:  What are the underlying factual

19   issues if I think, while they didn't win, I think it was

20   not unreasonable?

21             MR. LORIG:  I think you have to have at least

22   one statement from one Adobe witness or one Canon witness

23   saying we didn't believe we infringed because ... and then

24   you find it was objectively reasonable.

25             Here, it just was not.  There is no foundation.

```
 1    There is nobody who said we didn't do this because we

 2    thought we didn't infringe.  So you don't get to the

 3    objective test because there isn't any foundation.  Somebody

 4    has to say it.  It can't be a lawyer after-the-fact

 5    rationalization.

 6              It's a little bit like saying willful

 7    infringement when you get the opinion after the lawsuit is

 8    filed.  There has to be some predicate, and the predicate

 9    has to be somebody who has testified.

10              THE COURT:  So there is a subjective predicate

11    to the objective prong.

12              MR. LORIG:  Absolutely.  Was the subjective

13    reliance objectively reasonable?  It's not for lawyers.

14              THE COURT:  And the cases say that.

15              MR. LORIG:  That is how I interpret the cases,

16    your Honor.  And if your Honor disagrees, as I said, it

17    really comes down to is it reasonable for an advocate to

18    say something, and then would it be reasonable for Adobe to

19    believe that claim 1 doesn't mean what it literally says

20    because dependent claim 22 was invalid.

21              I mean when I first got ready for that Markman

22    argument and I realized that their whole argument on non-

23    infringement depended on claim 1 being narrower than dependent

24    claim 22, I said, gee, that is really stretching it.  And,

25              I would have thought, when we were filing
```

1   summary judgment motions, I would have seen the summary

2   judgment motion saying that claim 22 was invalid for all

3   the reasons that they argued at Markman.  But they didn't.

4   If they did, then your Honor might have to make that

5   objective test.  But you can objectively look at that, and

6   we're here today and nobody is arguing claim 22.

7                  THE COURT:  I don't see how that could be at

8   all relevant if you are saying it needs to be a subjective

9   predicate.

10                 MR. LORIG:  Well, as I say, I said if your Honor

11  disagrees.

12                 THE COURT:  I see.

13                 MR. LORIG:  I'm sorry.

14                 THE COURT:  This is another.

15                 MR. LORIG:  I'm overdoing the predicates in the

16  hypothetical.

17                 THE COURT:  Okay.

18                 MR. LORIG:  My apologies to the Court.

19                 So from my point of view, at least from the

20  point of the plaintiff, the sort of arguments they are

21  making are arguments that should be made on JMOL, when the

22  Court has had a chance to listen to the testimony, along

23  with the jury.  And just as a Court can take obviousness

24  away from the jury on JMOL even though there is underlying

25  factual issues, again, the same situation is here.

1        If your Honor has questions, I can answer them,

2    or I can let Mr. Doss do what I consider the heavy lifting.

3        THE COURT:  Okay.  Let's let him do that.

4        MR. LORIG:  Okay.

5        MR. DOSS:  Good morning, your Honor.

6        THE COURT:  Good morning.

7        MR. DOSS:  Unless you have a preference in

8    order?

9        THE COURT:  Whatever you like.

10       MR. DOSS:  That sounds good.  Thank you.

11       I'll address Canon's invalidity motion first,

12   your Honor.

13       If I could have slide 8.  Thank you.

14       Contrary to Canon's argument, there is no

15   uncertainty here, particularly under the indefiniteness

16   standard, who then certainly it would be from.

17       The standard is a person of ordinary skill in

18   the art at the time, and they would have readily understood

19   the scope of the claims.  All they complain about is visual

20   density capabilities.  They admit the fact that there is no

21   antecedent basis is not a game ender.

22       So the question becomes would a person of

23   ordinary skill in the art at the time reading this patent

24   have understood what visual density capabilities means?

25       And, very simply, if you look at the patent,

1    the patent refers to ISO 53.  ISO 53 is an international

2    standard that defines density and density capabilities.

3    And, in fact, ISO 53 specifically defines visual density.

4              Do you have a switch to the Elmo?

5              (Mr. Stover adjusts settings on Elmo.)

6              MR. DOSS:  So if a person of ordinary skill in

7    the art read the patent, they looked at column 4, lines 32,

8    it refers to that exact standard, ISO 53.

9              That's ISO 53.  It's an international standard

10   that was readily available to persons of ordinary skill in

11   the art at the time, well before the patent was raised.

12             And if you look, as they pointed out in Mr.

13   Holm's testimony, that there were different types of

14   density.

15             ISO 53 has visual density.  And it talks about

16   illuminance and the visual densities in this Section 8.1 of

17   53.  The next panel has tables of log values, base ten log

18   values as well that are related to visual density.

19             It also talks about, as they say, status T

20   density, status A density.  There are many types of density.

21             A person of ordinary skill in the art at the

22   time would have understood that just by reading the patent,

23   because it refers to this.

24             In Mr. Giorgianni's testimony, he also said it's

25   in the standard.  It's not what I believe it is.  It is

1      written in the standard, what visual density capabilities is.

2                    (Mr. Stover adjusts settings again.)

3                    MR. DOSS:  Thanks.

4                    Down at the bottom, at the bullet point there.

5                    "Question:  What do you mean by visual density

6      capabilities?

7                    "Answer:  That is an ISO standard."

8                    After that, he says:  It's not what I say it

9      means.

10                   So this is consistent with the claims, the

11     specification.  There is no indefiniteness here.  It's

12     consistent with the expert's testimony and the inventor's

13     testimony.  That is Mr. Jack Holm referring to the standard,

14     and that is what he wrote in the patent.

15                   So there is no indefiniteness here with respect

16     to visual density capabilities.  And to the extent there

17     would be, it would be a factual dispute because their expert

18     says it's indefiniteness, our expert says it's not, and the

19     patent proves that otherwise as well.

20                   With regards to the case law, the mathematical

21     geometry or geometry with a mathematical or geometric

22     certainty, that is similar to the case here as between the

23     visual density and density capabilities because they're

24     mathematically related.  What they are are ways, the log

25     space is more consistent with the human visual system.  And

1    persons of ordinary skill in the art would have readily

2    understood these metrics and been able to go back and forth

3    between them.  We'll get to that more when we talk about

4    density capabilities in the infringement.

5              Could I have 19, please?  Thanks.

6              With regards to their argument that there has

7    been some inconsistency in the application, there has been

8    no inconsistency in the application of visual capabilities

9    or density capabilities in the output device for that matter.

10             Mr. Giorgianni's infringement and his validity

11   reports are consistent, which was pointed out in the briefs.

12             Canon is misinterpreting his opinions as to claim

13   1 that requires more than merely endpoints of an output

14   density capability to determine a reproduction pictorial

15   dynamic range with capabilities as assumed density values that

16   assume devices capable of producing it.  That is consistent

17   with the Court's claim construction.

18             Unless the Court has any questions on

19   indefiniteness?

20             THE COURT:  Not right now.

21             MR. DOSS:  I'll now turn to, I'll stick with the

22   Canon theme and go with infringement of Canon.

23             THE COURT:  Okay.

24             MR. DOSS:  We will get out of here by 12:30.

25             Go to slide 20, please.

1               Oh, you are already ahead of me.

2               So Canon's motion for summary judgment for

3      noninfringement is basically arguing there is no evidence

4      or insufficient evidence.  That is just simply not the case.

5      They dispute more the weight of the evidence as opposed to

6      the fact there was no evidence.

7               There is plenty of evidence.  There was expert

8      testing and analysis looking at both pre-and-post processed

9      images and examining and evaluating them as well as

10     pre-and-post processed image tone reproduction curves,

11     examination by an expert who was at Kodak for 38 years and

12     did this exact kind of thing.

13              There was source code review, contrary to

14     Canon's argument.  There was source code review and source

15     code cites.  Pinpoint cites?  No, we couldn't do pinpoint

16     cites because Canon gave us the codes in PDF and there were

17     no line numbers on them.  We gave them file names and page

18     numbers there, too.

19              There was also Canon 30(b)(6).  The only Canon

20     witness about source code, structure function and operation

21     of the code was Mr. Akiyama, and his testimony alone would

22     be sufficient enough.

23              Oftentimes, as the Federal Circuit has held,

24     circumstantial evidence may in some instances and often

25     enough is the best type of evidence.  And I think that is

1   particularly true here where they don't disagree, the source

2   code is confusing.  The source code can be confusing for

3   jurors as well.

4            The testimony of one of the guys that wrote it,

5   I think would be very helpful.  And that is indeed what we

6   relied on for some of the functionality and location of

7   source code evidence.

8            Slide 21, please.  Thanks.

9            Now, Canon's Auto Photo Fix feature does

10  infringe the '823 patent.  And there is expert testimony,

11  deposition testimony, documents that show and demonstrate

12  how it functions, and we've cited that in the expert reports

13  and on discovery responses.  There is sufficient evidence.

14           They argue about three points.  And their motion

15  focused really on the density capabilities, at least today.

16  We have in our briefs all of the citations of evidence where

17  the original pictorial dynamic range, the reproduction

18  pictorial dynamic range as well as the construction of the

19  tone curve is laid out, so I'll focus on the density

20  capabilities.

21           If I can have slide 22.

22           Because as they argued, density capabilities

23  proliferate through those other limitations.

24           Well, their product does obtain density

25  capabilities because, as their testimony of Mr. Akiyama

1    stated, they use sRGB on the input side and the output side;

2    and that input and output side, to not be confused, is where

3    the processing occurs.  It's not, as they try to argue later

4    on at all.  The order of this flow is you review and then

5    you print later down the road, and so there can't be any

6    sRGB and it's only to communicate between the devices.

7            To be clear, the sRGB we're talking about here

8    and what Mr. Akiyama testified to was that sRGB is used as a

9    working space where these Auto Photo Fix feature calculations

10   are done and where the processing is performed.

11           So you're inputting on sRGB and outputting sRGB

12   from that processing step.  And in that processing step,

13   that is where all the infringing steps are taking place.

14           Now, the sRGB, they say that doesn't mean that

15   there is density capabilities specified.  Well, similar to

16   5.3, the international standard 5.3, they don't deny that

17   sRGB is specified in ISO or international standard 61966.

18   That similarly has density capabilities, and those density

19   capabilities are defined in terms of density values such as

20   luminance factor, such as values that a person of ordinary

21   skill in the art at the time would readily have understood

22   what those values represent.  That they are density values

23   and that can be expressed.

24           It's like expressing the fact that the water is

25   frozen in Fahrenheit versus Celsius.  No matter which way

1    you convey it, it's still the same.  The water is frozen

2    whether or not you are saying it's 32 degrees Celsius or

3    zero degrees Fahrenheit.  Whether it goes the other way

4    around, I don't know.

5         In any event, if you look at claim 23 of the

6    patent, claim 23 additionally states, which is a dependent

7    claim from claim 1, and it states that the density

8    capabilities of the output device are specified using some

9    metric other than density.

10        Right there, that just undercuts their whole

11   argument because you can even express it in some other form

12   and still practice the patent claim whether or not it is a

13   calculable value, which I don't think the Court's claim

14   construction required it to be a calculable value because

15   you could assume the values, you could assume the density

16   capabilities, assume the output device.

17        However, claim 23 basically makes that go away

18   effectively.  And it's just like the claim 22 issue which was

19   construed that claim 1 must include claim 22, the assumed

20   device issue.  And that is similar with claim 23.

21        I've already talked about the previews generated.

22   It's a deceptive argument because we're talking about it in

23   code.

24        If I can have slide 23, please.  Thanks.

25        This shows some of the testimony that Mr. Akiyama

1    testified to.  We have this cited in our briefs.

2             He is talking about using a histogram analysis

3    to do highlight points and shadow points, where they put

4    those points; that they did it based on experiments, and

5    where they use sRGB and come in on the histogram on the

6    input side, .5 percent for those highlight and shadow

7    points when they're doing their, I think as he testified,

8    correction processes.

9             So there is sufficient evidence in terms of

10   their testimony, which was also verified by the code

11   analysis of Bill Elswick in his discussions with Mr.

12   Giorgianni regarding the functionality of this meeting the

13   claim limitations for output, or original pictorial dynamic

14   range and reproduction pictorial dynamic range as well as

15   the other limitations of the claim.

16            If your Honor has any questions about the

17   prosecution history estoppel question?

18            THE COURT:  No, thank you.

19            MR. DOSS:  I think it was pretty clear that it's

20   unfair, so I'll move on.  If I could have 27, please.

21            This will go to Adobe's infringement.  And I

22   think what I will do is I will just do a quick, it may take

23   about a minute or two, demo.  But I will have to do it from

24   there.  But I will talk loud.

25            THE COURT:  Okay.  If I can't hear you, I'll let

1    you know.

2              So what I'm doing, I just opened up Photoshop.

3    And this is Photoshop CS 5, Creative Suite 5.  That is

4    Photoshop as well as the Camera Raw, the Adobe Camera Raw

5    program.  And if I merely -- let's see if I can grab it

6    here.  I'll shrink this a little bit.  There we go.

7              So I have these images that are in the Camera

8    Raw format.  And if I just bring one in, just drag it in

9    there and open it up, it automatically opens up the basic

10   pane.

11             So this is within Photoshop.  This is Adobe

12   Camera Raw.  This is the plug-in that we've been talking

13   about.  And you can see the auto and default over here.

14             So in the earlier versions, the auto was on by

15   default.  And what would happen is the minute you brought

16   the image in, it would automatically process it to a more

17   pleasing image by running the underlying program and

18   adjusting the parameters values, and then a person could

19   adjust some of these things individually.

20             So, for example -- I will just do one more image

21   just to show you some of the effects of.  You put it in and

22   get the default.  That is now, and then when you process it

23   to be a more pleasing image.  And,

24             You can see the histogram up there.  You can see

25   the histogram changes which reflects some of the processing

1    and shows you what is going on in terms of the distribution

2    of the white point and the black point and the points in

3    between using tone curves.

4              And I will just grab another image.

5              So that is your default, and then you process

6    it.  You can see a lot more detail both in the dark and the

7    light, the highlights and the shadow points end.

8              Now, let's do one more real quick so you can see

9    the effect.  There are no family vacation photos here, so ...

10             There we go.

11             So you see the default.  If you can kind of see

12   the characteristics of that default in the histogram.

13             Then you hit auto.  That renders a much more

14   pleasing image.

15             I think I want to address what Mr. Lorig

16   addressed a little bit, the split infringement issue that

17   they raised.  There is no split infringement issue here.

18   There is no limitation that requires a user to click a

19   button or to do anything.

20             The original image is the start of this.  You

21   take the original image, and what happens, all the claim

22   limitation steps are processing steps that are done by

23   the computer by the program that Adobe sells, makes,

24   distributes, and tests.

25             So their whole notion of divided infringement,

1    and also the fact that they said, well, the "obtain the

2    density capabilities" was done by different actors and that

3    was done by Thomas Nolan in 2003, that is somewhat of a

4    misrepresentation in that every time -- what he did back in

5    2003 was he optimized and designed and wrote the program.

6    And what he did was set original default parameter values,

7    and some of those were based on using a working space

8    that was defined by Adobe in 1998, color imaging code

9    specification, which is like the sRGB spec, like the, for

10   example, international standard 53.

11          It's a specification, it's not merely a color

12   space.  It has data in there in terms of the density

13   capabilities of a reference monitor and it defines those.

14   So it provides you with the highlight or the white point of

15   the display, the black point of the display in luminance

16   values.  It says the luminance value white of the reference

17   monitor shall be 160 candles per meter square.  It gives you

18   all the density capability what you need.

19          What Mr. Knoll did was use that as the working

20   space for the calculations to occur.  So by doing that, he

21   is effectively setting the extreme values at the shadow and

22   the highlight end that the working space can basically

23   operate and push pixel data into.  And,

24          What he did in optimizing that back then was

25   that he said, okay, I'm not going to use those full extreme

1    values.  I'm going to come in a percentile value because I

2    think that gives more pleasing images.

3           Those values that he then set are used every

4    time an image is brought in.  Every time an image is brought

5    in, those steps are taking place.  It's determining the

6    density capabilities by assuming the values in those

7    percentile values as it comes in to get the reproduction

8    pictorial dynamic range for the processing.

9           So with that somewhat intro a little bit,

10   stepping through some of the slides.

11          So their motion for infringement, similarly,

12   Canon is at a high level.  They're merely pointing out

13   differences of opinions expressed by the experts.  There

14   is no failure of evidence here.

15          With Adobe, there were pinpoint cites to the

16   code because we had line numbers.  And there was analysis by

17   Mr. Elswick as well as Mr. Giorgianni showing that.

18          Mr. Giorgianni also did extensive testing of

19   images, looking at pre-and-post processed images as well as

20   plots of pre-and-post processed images of tone reproduction

21   curves so he can look and analyze to see what is going on.

22          These are dynamic processes.  This is a process

23   that is run on an image-by-image basis.  So just merely

24   looking at the code will not reveal to you what is going on

25   in each circumstance.  So it's almost necessary to look at

1    the code but also it's more necessary to look at the images

2    to tell what is going on, tone reproduction curves that you

3    can plot and review to see what is going on.

4            Like I said, Adobe's disputes, they go more to

5    the weight of the evidence, which is, that is for the trier

6    of fact to decide and not really amenable to summary judgment.

7            If I could have 31, please.

8            One thing Adobe argued was, they seem to argue

9    this theme of, well, we asked them and we asked them and we

10   asked them.

11           We continued to answer their questions over and

12   over, and we have answered them in different ways in order

13   to maybe help them understand what they couldn't see in the

14   beginning.

15           There seems to be a dispute between the experts,

16   a misunderstanding between the experts in some instances

17   in this case where our guy, who had 38 years at Kodak,

18   Professor at Rochester Institute of Technology in the area

19   of color imaging.  He has done this for 38 years.  He has

20   written programs about processing images.  He has analyzed

21   programs about processing images.  He knows what is going on

22   in the color science world of this, whereas their expert,

23   who is more geared towards the computer science industry, is

24   looking at it more on a code level.  And,

25           So there seems to have been a fundamental or, at

1    least at one level, an abstraction, misunderstanding between

2    the experts and we think that is ongoing.

3         But in any event, discovery is over now.  We

4    have given them all the discovery.  We have complied with

5    all the court orders, and we have given them answers.  There

6    hasn't been any spoon feeding, so to speak, here that they

7    seem to have alluded to.  They're just simply disagreeing

8    with our positions, which goes to more, like I said, the

9    weight of the evidence.

10        Just stepping through this briefly to highlight

11   some of the points that they addressed.

12        The supplemental rebuttal report was not a new

13   theory.  There is no theory out there that is new.  Density

14   capabilities, we say Adobe 98 specified as the working

15   space.  That is sufficient for density capabilities, and it

16   defines as it defines them.  And, indeed, claim 23, like I

17   said before with respect to Canon, has density capabilities

18   that can be used by some other metric other than density can

19   be specified and still function within claim 1.

20        I've addressed the single actor/single entity

21   performance.

22        Another point that this somewhat segues to but

23   we'll address in a bit here.  They made the point that

24   source code is confusing.  Density capabilities, logarithms,

25   and mathematical operations are confusing.

1          Claim 23 gets rid of that.  The jury won't even

2     have to know how to calculate the log of the luminance

3     factor because of claim 23.

4          If I could have 32, please.  Thanks.

5          Infringement under the doctrine of equivalents.

6     They mentioned it briefly.  As a high level matter, doctrine

7     of equivalents is a very factual issue.  It's almost never

8     amenable to summary judgment.  Like I said, we've shown our

9     analysis, our infringement analysis under the doctrine of

10    equivalents.  We did it in the expert reports.

11         That wasn't enough for them so they brought a

12    motion to compel.  They being Adobe, not Canon.  Canon

13    distanced itself from that saying that we need the source

14    code in this case.  We need the source code to know what is

15    going on.

16         So we did the source code.  And then we also

17    did a further doctrine of equivalents embellishment and

18    further explanation, as the Court found and allowed those

19    declarations into evidence.

20         Contrary to what they said in their briefs about

21    Mr. Giorgianni's doctrine of equivalents analysis being the

22    same, that is not what he said in his testimony.  He said he

23    ran through this analysis, for example, the processing of

24    the images, his analysis of plotting the images and looking

25    at the pre-and-post tone reproduction curves and analyzing

1    that.  That analysis, he ran through once.  And at each

2    limitation on a limitation-by-limitation basis, he looked at

3    those and said, well, is that direct or is it indirect?  Is

4    it literal?  Those were his words, direct and indirect.

5          But literal or doctrine of equivalents, he

6    looked at that.  The analysis he said that he did once

7    in the testimony was his running through the accused

8    products and then making the decision.  But he did it on

9    a limitation-by-limitation basis and he has testified to

10   that.  And that is evident in both his expert report as

11   well as in his declaration.

12         If your Honor would like, I can go through the

13   tone reproduction curve aspects, the limitations.  They

14   didn't really raise them in the arguments.  It's all in the

15   briefs, and we're fine, we're comfortable with that.

16         THE COURT:  That's fine.

17         MR. DOSS:  Unless you have any questions on

18   those?

19         THE COURT:  Not at this time.

20         MR. DOSS:  Okay.  That's all I have.

21         THE COURT:  All right.  We'll hear briefly from

22   Adobe and Canon, if they wish, on these motions.

23         MR. SCHERKENBACH:  I'll be very brief, your

24   Honor.  Let me just take them in reverse order.  They need

25   to be fresh in everybody's minds.  On the points Mr. Doss

1    just made on infringement, three or four things on that.

2              First of all, the demo, which is neat.  If I was

3    to show you Photoshop 3.0, which is the prior art, it looks

4    just the same.  You can't tell from the end results as

5    received by the user what is going on.  You don't know what

6    algorithms are being used.  You don't know how that image is

7    being processed, at least at the level that is being

8    required by the claims.

9              So while interesting, and I think it does show

10   Adobe has some unique technology, that doesn't come close to

11   carrying their burden.

12             No. 2.  I think I understood Mr. Doss to say

13   actually, no, the user performs all the steps of the method

14   in claim 1 and there is no split infringement problem.

15             While interesting, that is argument, that is

16   not evidence.  Their expert has said exactly the opposite.

17   They can't create a factual issue by having their lawyers

18   contradict their expert.  You have our slides.  It's laid

19   out in there.  There is no doubt the expert said what he

20   said.  And they're done on that, on split infringement.

21             In fact, there is law.  Not only can they not

22   create a fact issue by having a lawyer disagree with the

23   expert, even if the expert disagreed with the expert, there

24   is quite a bit of law in this area now.  If an expert in

25   a summary judgment declaration contradicted prior sworn

1    testimony, that is not sufficient under the law to create

2    a genuine material fact.

3              No. 3.  And this is I think in many ways the

4    most important.  I didn't hear anything from Mr. Doss that

5    referred to your claim construction for obtaining density

6    capabilities, which is negative logarithm of reflectance,

7    transmittance, or luminance factor.  He never referred to

8    it.

9              That is our problem, and that is why they should

10   lose on infringement.

11             In fact, what you may ultimately see, he

12   referred to their supplemental report they just filed.  That

13   he referred in his argument several times to claim 23.  There

14   wasn't a lot of discussion about it but I will just preview it

15   for you.  And,

16             Their argument, their new argument is that claim

17   23 obviates the need for them to show evidence that the

18   negative logarithm of luminance factor was used or obtained

19   in any way.  They are effectively rearguing claim construction.

20   I think this is going to end up coming before you because

21   it's the gravamen of their supplemental report.  It's an

22   entirely new theory that, hey, look at claim 23.  Claim 1

23   can't require the negative logarithm of luminance factor.

24             So that will be I think a great surprise to you,

25   it was a great surprise to us reading it last night, but

1    that is the argument they're trying to make.

2           Finally, on this pinpoint cites to the code.

3    That is one where I think you can pick one.  I hope you

4    pick one or two from their brief where we're talking about

5    obtaining density capabilities.  And if you go look at

6    what they cite, you are not going to see I believe what was

7    represented to you.

8           There is no attempt by anybody, Mr. Elswick,

9    Mr. Giorgianni, to match up anything in the code, the claim

10   elements in any way.  If you look at the code they cite, it

11   still doesn't have anything to do with what your claim

12   construction requires.

13          One word on DOE and then I will be done on the

14   infringement response.

15          If you look at Mr. Giorgianni's expert report on

16   claim 1, in two spots, he has a sentence on DOE, a summary

17   sentence on DOE which is plainly inadequate under the law,

18   and I think he recognized it so he filed a declaration in

19   response to the motion which takes one sentence and expands

20   it into a couple of extra sentences.

21          Still inadequate under the law.  This is apart

22   from the merits.  This is really more a procedural point.

23   You can't carry your burden on this by just mouthing

24   function-way-result with some things in parens.  The Federal

25   Circuit has said it over and over again.  They should not

1    be allowed to get to the jury with that level of analysis.

2    There is no meaningful analysis of the claim element

3    requires this function.  The code performs this function,

4    and here is why they're equivalent.

5           Let's go on to the way.  The claim requires this

6    way.  The product does it in the following way, and they're

7    equivalent and here is why.

8           That is the sort of analysis they would have had

9    to do to get to the jury on DOE.  They haven't done it.

10           So that is the response on infringement.

11           I wanted to say a word about willfulness which I

12    believe Mr. Lorig directed you to or commented on.  Excuse

13    me.

14           If you look at their slide and in their brief,

15    they rely on this *Golden Blount* case.  This is a legal

16    issue.  There is a *Golden Blount* case, and it did suggest

17    that for purposes of inducement, it's an inducement case, a

18    manufacturer instructing its customer how to use a feature

19    that is accused could be enough to survive summary judgment.

20    The case says that.

21           The problem is that *DSU* came later which was en

22    banc and which made the standard much higher, and everybody

23    knows it.  *DSU* is sort of a watershed case where the Federal

24    Circuit said, no, that is not enough.  In fact, *DSU* cites

25    *Golden Blount*.

1    So they're trying to make their case under the

2    law as it used to be and not the law as it is.  Under the

3    law as it is, which is *DSU,* they have to show that Adobe

4    intended to cause infringement.  They haven't.  I think you

5    can argue that that is the case.

6            On knowledge, they are really relying on the

7    willful blindness standard under *Global Tech.*  I'm pretty

8    sure your Honor is familiar with that case.  It has come up

9    in other contexts.  This is not a willful blindness case.

10            Not only are there fundamental factual

11    distinctions between *Global Tech* and this case.  *Global*

12    *Tech* was a case where the bad guys, the infringers, knew the

13    device was patented and covered by a patent and copied a

14    foreign version of it that wasn't marked by the patent

15    number so they could plausibly deny they knew there was a

16    patent.

17            In this case, I mean there is nothing like that

18    in this case.  No copying.

19            But even apart from that, the activities that

20    Mr. Lorig referred to in 2003 occurred before this patent

21    ever issued.  There was no patent.  In fact, the patent

22    wasn't even applied to until February of 2003.

23            So Mr. Lorig says -- it's sort of ironic, he

24    says, gee, Adobe should have at least looked at the website

25    in this 2003 time frame.  There was back and forth in

1    January of 2003 and there was these e-mails.

2         Well, if it had -- first of all, there is no

3    obligation to do that investigation.  That is not the

4    standard.  But if Adobe had gone and looked at the website,

5    they wouldn't have seen anything.  This application wasn't

6    even filed until later in February of 2003.  Applications

7    are secret.  And it didn't issue until September of 2003.

8         So their whole theory, just however you look at

9    it, it just really doesn't hold together.

10        One last thing on *Global Tech* on knowledge,

11   willful blindness.  If you look at that case, it specifically

12   says recklessness is not enough to constitute willful

13   blindness.

14        Even recklessness is not enough.  I really think

15   what I hear Tarkus saying, I hear what Mr. Lorig saying is

16   Adobe was reckless.  Obviously, that is disputed, but even

17   if you give them the benefit of the doubt, that is not

18   enough under the law.

19        All right.  One last comment just on severance.

20   I won't go through it in any depth.

21             THE COURT:  Before you do, what about the

22   argument that there is a subjective prerequisite before you

23   get to the objective prong?

24             MR. SCHERKENBACH:  With all due respect, that

25   is backwards.  You can look at any number of cases.  In our

1    slides on this, we cited *Uniloc* on page 3 where the Federal

2    Circuit says if the accused infringer's position is

3    susceptible to a reasonable conclusion of no infringement,

4    the first prong of *Seagate* cannot be met.  And the *Uniloc*

5    case goes on to say:  And, therefore, we don't even get to

6    the subjective prong.

7            THE COURT:  So even if there is no evidence on

8    the record that anybody at Adobe had actually thought about

9    this at the time and thought we don't infringe, although

10   maybe later our judge will say we do infringe, you don't

11   need to show any of that actual subjective thinking.

12           MR. SCHERKENBACH:  That's right.  That's right.

13   In fact, the simple answer to your question is look at

14   *Seagate* itself which I believe *Seagate* itself said there are

15   two prongs, and you do them, the objective prong is first.

16   And if they don't get over the objective prong, you don't

17   ever get to the subjective prong.  That's the order you do

18   them in.

19           And, Mr. Loring, I understand why he wants to

20   focus on and everything I heard from him was about the

21   subjective prong where they can try to manufacture a fact

22   dispute.

23           But the objective prong is for you.  Again, it

24   was on page 7 of our slides.  There are many, many cases

25   now where District Courts are granting summary judgment of

1      no willfulness based on the objective prong, and that is

2      entirely your call.  That is not something that goes to the

3      jury.

4                        THE COURT:  Do you have a comment on separate

5      trials?

6                        MR. SCHERKENBACH:  Oh, just this *SRI* case.  I

7      meant to distinguish it initially.  That is really their

8      primary argument is *SRI*.  That was another case that I was

9      personally involved in.  It was a Judge Robinson case.  It

10     really didn't present the issues you are faced with.

11                       In that case, the defendants moved to sever

12     right up front early in the case.  They basically wanted

13     parallel proceedings on everything.  And Judge Robinson

14     said, no, I'm not going to do that.  We're not going to have

15     separate claim constructions and so on and so forth.  So

16     that is obviously not our case.

17                       Ironically, in that case, the defendants, when

18     it came time for trial, they wanted a joint trial.  They did

19     not move to sever for trial for their own reasons in that

20     case.  So Judge Robinson was never faced with the issue that

21     you are.

22                       THE COURT:  Okay.  Thank you.

23                       Anything briefly from Canon?

24                       MR. CHALSEN:  Yes, your Honor.

25                       Your Honor, if it pleases the Court, I would

1   like to address the infringement issues and Mr. Gaspar will

2   address the invalidity issues again.

3   　　　　　Your Honor, just to run through, and I think Mr.

4   Scherkenbach already touched on a lot of these arguments

5   that were made by Tarkus in his rebuttal but not to burden

6   the Court with too much repetition.  Just to run through

7   them quickly.

8   　　　　　This issue about claim 23 and claim 24 that

9   Tarkus is sort of springing on everybody.  This is in

10  effect a request for reconsideration of your Honor's claim

11  construction.  It directly contradicts your construction of

12  "density" and "density capabilities."  There is no other way

13  to get around it.

14  　　　　　A couple of unfortunate misrepresentations, or I

15  don't want to get too personal on it but a couple of points

16  in Mr. Doss's presentation on the infringement issues.

17  　　　　　Firstly, sRGB does not specify luminance factor.

18  Maybe he misspoke when he said it does.  There is no

19  specification of luminance factor in sRGB.

20  　　　　　We do not use, Canon does not use sRGB as a

21  working space in the processing of our software.  The

22  working space is a standard format called YCRCD and it's

23  not sRGB.

24  　　　　　Another representation that was made and not

25  true, Mr. Doss says they couldn't provide pinpoint cites to

1    our software because we produced the software in PDF format.

2         Mr. Elswick came to our office, spent an entire

3    week going through the entire software on the computer,

4    searchable files.  He managed to identify incorrect files,

5    but he copied them, copied and pasted them and put them into

6    his report.

7         There is no justification for not providing

8    pinpoint cites based upon our having produced hard copies

9    to them in PDF format later on; but he, Mr. Elswick

10   certainly had access to the original files.  He could have

11   searched in whatever format he wanted to.  He requested

12   specific search capabilities to be able to do that.  No

13   justification for not providing pinpoint cites.

14        Again, the reliance on Mr. Akiyama's testimony.

15   Mr. Akiyama never testified about RPDR.  He never testified

16   about Canon using density capabilities of any kind of output

17   device or sRGB capabilities.

18        The standard now, you can see why Tarkus wants

19   to get this case in front of a jury instead of presenting

20   the actual evidence to your Honor.  The new standard for

21   proving infringement seems to be, well, look, it's a much

22   more pleasing image end result.  So they're going to take,

23   sort of have a demonstration, show the before and after

24   pictures.  Well, look how nice and pleasing this result is.

25        I hesitate to say, probably every single printer

1    in the world, every single camera in the world has options

2    to enhance the image.  And if that is the standard, it is

3    going to be a much more pleasing image as a result, where

4    do you draw the line?  It has nothing to do with the claims.

5    They're trying to take credit for making a more pleasing

6    image.

7            This issue of a battle of the experts.  This

8    isn't a battle of the experts.  This is all about the lack

9    of evidence.  There is insufficient evidence being presented.

10   It's not just a disagreement about the evidence.

11           The *Becton Dickinson v C.R. Bard* case is right

12   on point.  You can't take a conclusory opinion that when the

13   moving party, the defendant, has shown that there are no

14   genuine issues of material fact.  The plaintiff can't

15   survive summary judgment by just having an expert to say,

16   oh, look, there is all these other evidence that we can

17   point to, and we disagree with what the defendant has shown,

18   what the moving party has shown.

19           Here, there is no evidence that creates a

20   genuine issue of material fact because the claims require

21   this density capabilities, density.  As we pointed out to

22   your Honor, there are four different claim elements.  No

23   evidence whatsoever that those particular processing steps

24   are being performed in Canon's software.

25           That is the end of the case.  They can't then

1    say look how much more pleasing the image is and say that we

2    don't need to show actual infringement because the evidence

3    is the image is more pleasing at the end of the day.

4                    That is all I have.

5                    THE COURT:  Okay.

6                    MR. CHALSEN:  Mr. Gaspar will present on the

7    invalidity.

8                    THE COURT:  Fine.  Thank you.

9                    MR. GASPAR:  At the risk of sounding a little

10   bit flip, I think Mr. Doss couldn't possibly have made my

11   points any better had I tried them myself on this invalidity

12   question.

13                   The core uncertainties absolutely still exist.

14                   First of all, this notion that there is inherent

15   antecedent basis because "output device" shows up in the

16   claim before "visual density capabilities."

17                   I think he said, well, there is a mathematical

18   relationship there.  The logarithm space is like the human

19   visual system and that is good enough.

20                   That is not what the doctrine and the case law

21   requires.  It requires mathematical or geometric certainty,

22   not some sort of mathematically related thing between

23   logarithms and human visual systems.  It has got to be

24   perfect, it had got to be absolute, it has to be necessary,

25   and there is none of that here.

1               Now, what I'm really surprised to hear -- and

2    this I believe is a verbatim quote -- is he said:  To the

3    extent there is a question of what "visual density

4    capabilities means," that is something that the jury should

5    decide.

6               Well, the law is 100 percent opposite or clear,

7    I should say, that that is incorrect.  It's obviously just

8    an extension of claim construction.

9               What a person of ordinary skill understands a

10   claim term to mean is something that the Court resolves

11   during claim construction.  That is what the *Markman* case

12   is all about.

13              Even if there is competing evidence, even though

14   there is an objective standard, that a person of ordinary

15   skill is the lens through which you view the meaning of the

16   terms and the claims.  That is still something for the Court

17   to decide.

18              Indefiniteness is exactly the same thing.  This

19   is not something that gets kicked to the jury, just as a

20   difficult claim construction question that involves a lot of

21   extrinsic evidence, intrinsic evidence and weighing whether

22   or not a person of ordinary skill would understand that in

23   one way or another gets kicked to the jury.  It simply

24   doesn't.  It's something for the Court to have to weigh.

25              Tarkus is asking you to abdicate your role to

1    just give it to the jury; and that is something that is

2    absolutely not available under the law.

3            The Court is not allowed -- this is sort of the

4    last point that I will make -- to just ignore what the claim

5    language says.  It's not allowed to correct it.  It's not

6    allowed to just let go.  That there has been no definition

7    or explanation of what the exact difference is between

8    visual density capabilities and density capabilities.

9            Mr. Doss points to the transcript of Mr.

10   Giorgianni where the question is:  What do you mean by

11   visual density capabilities?

12           And his answer is:  That is an ISO standard.

13           Well, the standard that Mr. Doss just showed us

14   doesn't say anything about visual density capabilities.  It

15   explains the visual density.  It explains the status

16   density.  It explains the printing density.  It doesn't give

17   a definition for visual density capabilities.

18           And I have said that enough so I won't say it

19   anymore.  Thank you.

20           THE COURT:  Okay.  Well, you have all said a

21   lot.  I'm going to give you a little bit of a break.  We'll

22   take a short recess.  When we come back, I will move

23   obviously much more quickly through the agenda.

24           (Brief recess taken.)

25              *      *      *

1              (Proceedings reconvened after recess.)

2              THE COURT:  All right.  I have refreshed my

3      recollection on the calender, and I realize I do have to

4      finish at 12:30 so we are going to move quickly.

5              I next want to turn to the Daubert motions and

6      move through them truly in a quick fashion.  All three of

7      the parties have moved.  I'm going to give Tarkus the chance

8      to argue their two first, then we'll hear the responses to

9      that, and then we'll move on and hear Adobe's and Canon's.

10             MR. LORIG:  Your Honor, I'll argue the Barnes

11     and Gerardi.  Fred Lorig for the record.

12             THE COURT:  Right.

13             MR. LORIG:  Let me first start with Mr. Barnes.

14             Normally, I'm not a great believer in Daubert

15     motions against experts because it goes to the weight, but

16     the Barnes opinion -- if we could turn to slide 2.

17             He is an accountant with no patent licensing

18     experience, no testifying experience.  He has never been

19     involved in the licensing negotiation.  And he came to the

20     opinion that Tarkus would have accepted about 10 percent,

21     from Adobe, what they accepted from Nikon because of the RPX

22     agreement.

23             The issue is really whether someone -- I'm sure

24     he is a great accountant.  I'm not suggesting he is not a

25     skilled person.  But the question is whether this is the

1    type of testimony that is helpful to the finder of fact.

2              Having never been involved in licensing, I'm not

3    sure where he is coming from.  He did base his opinion on

4    unconsummated licensing discussions:  the ones with Apple,

5    et cetera.  And my understanding at least is the Federal

6    Circuit has been fairly uniform in saying we don't look at

7    discussions, we look at consummated deals.

8              I'm not saying the Court doesn't have the

9    discretion, but I would submit to the Court that ignoring a

10   consummated deal and relying on discussions that never led

11   to a deal is not terribly helpful.

12             He did rely on an Adobe agreement, Pixel Genius,

13   which isn't a patent so I'm not sure why it's comparable.  It

14   certainly doesn't deal with the color rendering technology we

15   have here.  It's not the patent at issue.  Most importantly,

16   it's not a patent.  It doesn't have the same exclusionary

17   power.

18             I understand why he relied on it.  Because it

19   was low.  If I were defending, I would certainly think about

20   it myself.

21             But the question really comes down to, is this

22   going to be helpful to the trier of fact?  And I would

23   submit it is not, and it is not based on commonly accepted

24   analytical techniques.

25             If we can go to slide 3 for a moment.

1          He talked about how he relied on a great mosaic

2     of facts.  Well, the great mosaic of facts led him to rely,

3     as I said, on a low ball licensing deal that wasn't a

4     patent, to ignore the RPX license or to assume without any

5     foundation that every member of RPX wanted to do this, even

6     though they have never done it before.

7          I submit again this is not based on scientific

8     technical and other specialized knowledge.  It's not an

9     expert's valuation.  And he disregarded the actual licenses.

10         So even though I'm always very, very hesitant

11    and rarely have brought these motions, I just didn't think

12    it was helpful.

13         If your Honor grants it, I would submit that

14    the defendants have need to try to do something else because

15    it's probably not fair to leave them with nothing.  I know

16    it's not far to leave them with nothing, but I don't see how

17    this is helpful.

18         With Mr. Gerardi, if we can turn to slide 4 for

19    a minute.  Mr. Gerardi relied on a noninfringing technology

20    that has never been used.  That nobody ever tried to make it

21    work.  That Dr. Stevenson says, well, it could be made to

22    work in a month or two but it never has been done.

23         He said -- I think he said his graduate students

24    could do it.  The case has been pending for a couple of

25    years.  Nobody has tried to do it.  Nobody has mocked it up.

1           Mr. Gerardi also relied on noninfringing

2    alternatives from HP but there is no proof that they were

3    available, much less that they worked.

4           So, rightly or wrongly, our view was this was

5    not going to be helpful.  I understand, again, why they did

6    it.  I mean it's low and, as a defendant, I might do the

7    same.  But this is not based on scientific evidence.  This

8    is on common analytical techniques.

9           To contrast it with their motion, which is

10   coming up later, we relied on analytical agreement, market

11   share.  The witness has a lot of licensing experience.  I

12   just don't think this would be helpful.

13          If we could turn to slide 5 for a moment.

14          As I said, giving no weight to the RPX

15   agreement, looking at discussions, I didn't even see

16   anything in the Canon papers about why Mr. Gerardi should

17   be permitted to rely on an opening offer for something

18   very, very, very different.  We'll get into a lot more

19   detail I'm sure during defendants motion.

20          But the Apple negotiation was for something that

21   nobody was using yet, and the Apple aperture product was a

22   tiny, tiny, tiny fraction of what Adobe and Canon did.  And

23   when they deposed Mr. Holm, I just happened to be defending

24   that one.  And what he explained is that based on his

25   projections of what Apple would sell, it equated, I forget,

1    it was either a three or five percent royalty.  That is what

2    he thought.  And at the time, he frankly needed the money

3    and he was trying to establish the bona fides because he

4    didn't have an IKON license yet.

5              So the question is why would you rely on an

6    offer that was never accepted for a market share that was

7    much, much, much lower when there is no infringement, when

8    the hypothetical is when infringement began, and then

9    basically throw the Nikon RPX agreement over your shoulder

10   and say, well, at best you divide it by every member even

11   though the only three companies we're aware of that

12   infringed.  Nikon that took the license.  Canon, by the way,

13   is a member of RPX, and Canon is excluded.  I'm going to say

14   it again.  Canon was a member of RPX and Canon was excluded,

15   as was Adobe.  So where is the logic in what Mr. Gerardi

16   offers?

17             The last point is a legal point, your Honor.

18   The Federal Circuit rejected the idea that a reasonable

19   royalty must be capped at the cost of implementing the

20   cheapest noninfringing alternative.  Certainly, it is

21   something to consider but you don't cap it.

22             So even though particularly as a plaintiff I am

23   hesitant to bring these type of motions, I thought these

24   went too far.

25             THE COURT:  Okay.  Thank you.  Let me hear

1    Adobe's response.

2              MR. McCANN:  Thank you, your Honor.  May I

3    approach the bench?

4              THE COURT:  You may.

5              MR. McCANN:  Thank you, your Honor.

6              (Binders passed forward.)

7              MR. McCANN:  Your Honor, as the damages guy, I'm

8    happy to say that I will not be spending any time talking

9    about the negative logarithm of the luminance factor.

10             I won't spend much time on this motion, although

11   as you know, we do have our own.  But, briefly, if we could

12   have the slides on the Tarkus motion.  I'll just start while

13   we're waiting for that.

14             So, your Honor has seen the papers.  The lead

15   argument is that Mr. Barnes is at best minimally qualified.

16   They point out he has never negotiated a patent license.

17             Well, first, I don't think that is true or

18   accurate.  If you check the record, what he says is he has

19   performed valuations to support patent license negotiations.

20   He himself has not been the person engaging in the negotiations,

21   but I don't think that is particularly surprising given what

22   his professional expertise is.

23             They say he has never testified in federal court

24   regarding reasonable royalties.

25             There is no question that he had plenty of

1    experience testifying on damages issues in court and he has

2    done at least 20 patent infringement cases analyzing a

3    royalty.  He just hasn't testified in those.

4              But, you know, just looking at that for a

5    moment.  If you think that is the standard for what

6    qualifies as an expert, then our lives would be a lot

7    simpler because nobody would ever be able to get past that

8    first hurdle of testifying for the first time.

9              Then the last point they had made was he had

10   mentioned Camera Raw.

11             Again, I don't think that has anything to do

12   with whether someone was qualified to testify about damages

13   issues in the case.

14             So in the end, they can see he has expertise in

15   assessing economic damages.  What they say, well, the

16   problem it's the method he applied.

17             I'm not going to go through this in great detail

18   because of the time constraint, your Honor.  This is all in

19   the slides.  But I want to hit some of the highlights other

20   than that so the Court can be satisfied that Mr. Barnes'

21   approach is appropriate.

22             So we can skip to slide 7.

23             So Mr. Barnes did four things, your Honor.  The

24   first thing is he goes through the record.  And this is all

25   in his report and all in the record.  And I put the cites at

1     the bottom of the slide to aid the Court, if the Court wants

2     to look at it later.

3              He identified the patent that is at issue, engaged

4     his understanding of it from the damages perspective.  Then

5     help went through a series of facts related to how he

6     believed that Mr. Holm had valued his patent and how he

7     believed others would value Mr. Holm's patent because that

8     would be relevant to the hypothetical negotiation that the

9     parties engaged in.

10             So he looked at an HP license that Mr. Holm had

11    given for $30,000 on the technology that was later embodied

12    in the patent in suit; a $360,000 amendment to that license,

13    the 2006 HP amendment.

14             He looked at efforts by HP to sublicense the

15    '823 patent.  And I listed some of the companies that HP

16    tried to sublicense the patent to and the results of that.

17    And,

18             Then he summarized how that HP licensing effort

19    where Mr. Holm licensed to HP informed his opinion.  Again,

20    it shows value that the inventors puts on his patent and

21    shows the value that others placed on that patent.

22             Next slide, please.

23             Mr. Holm, separate from HP, also attempted to

24    license the patent himself.  He spoke to Apple.  You heard

25    about that a moment ago.  That offer was $375,00 for the

1   aperture software, it's sort of similar to Photoshop, but

2   also $750,000 to license that same technology to the iPad,

3   iPhone and iPod, all Blockbuster products and certainly

4   reflective of the value that the inventor is putting out to

5   his patent at the time he ceased to license it.  There is a

6   best offer of five percent royalty and there is some others.

7           Again, Mr. Barnes explained how does this affect

8   his opinion?  How does this show the proper valuation of the

9   patent?  We have discussions with five companies that led to

10  no license.  You have offers showing their admissions by Mr.

11  Holm, this is what I think my technology is worth and the

12  circumstances of that offer.

13          Next slide, please.

14          The RPX agreement.  Your Honor has ruled that

15  the RPX agreement can come into the case.  It doesn't change

16  the fact that there are significant issues with that license

17  and why it is not appropriate as a comparable.  It will be

18  an issue for the jury to decide.

19          But from Mr. Barnes' perspective, it's a license

20  not between Nikon and Tarkus, it's between Tarkus and RPX, a

21  defensive patent aggregator, has now, last time I checked,

22  over 2,000 patents in its portfolio, more than 100 members,

23  all of whom have license rights to the 2,000 patents.

24          So when the $7 million is paid by RPX to Tarkus,

25  that is not just a Nikon/Tarkus license, that is so that RPX

1    then has the ability to license its 100 members to these

2    patents in addition to the 2,000 other patents they hold.

3              He summarizes how the RPX agreement forms his

4    opinion, which is what I just described.

5              Next slide, please.

6              He goes through a discussion of the accused

7    product, and he explains what Mr. Scherkenbach showed you

8    before.  How you have that accused functional of the auto

9    feature.  How that is a small feature within the larger

10   Adobe Camera Raw plug-in, and that plug-in is itself within

11   a much larger suite for the entire software package.

12             Next slide, please.

13             The Pixel Genius license.  So Mr. Barnes, he

14   takes a look at that and he says, okay, here is this Pixel

15   Genius license.  This is technology that Adobe licensed for

16   Camera Raw.  It's true that it's not patented, but it is

17   technology that relates to the same imaging processing

18   pipeline that the accused functionality is engaged in.  So

19   he looks at that and says this is an example of what Adobe

20   would pay to someone to get a license of technology that

21   would improve the Camera Raw functionality, and so it is

22   relevant.

23             Okay.  Second -- next slide.  I'll skip this --

24   he rebuts Mr. Yurkerwich's report.  I'm certain we'll hear a

25   lot about that at trial.

1           The third thing he does, your Honor, on slide 14

2    is he goes through each of the Georgia-Pacific factors,

3    certainly a well accepted methodology for establishing a

4    reasonable royalty.  He addresses each in turn.  He gives a

5    statement of facts that he thinks are relevant to that,

6    summarizes the relevance of the facts and then continues on.

7           Then, fourth, he gives his opinion ultimately.

8           So unless your Honor has further questions about

9    that?

10           THE COURT:  No, that's fine.  Thank you.  Let's

11    hear briefly from Canon on the motion that was addressed to

12    them.

13           MR. GASPAR:  Thank you, your Honor.

14           I think we heard a very interesting summation

15    about damages perhaps from Mr. Lorig but not much compelling

16    argument on why our entire damages expert report and all of

17    his opinions should be stricken in this case.

18           What Tarkus is asking this Court to do is

19    extreme on a bunch of levels.  No. 1, they're asking for

20    complete preclusion, not just a couple of opinions being

21    adjusted, not just a little bit of evidence being allowed

22    or disallowed but entire preclusion.

23           There is nothing in the record according to the

24    argument that supports that sort of preclusion here.

25           Tarkus has, based on, I hate to use the word

1    "fantasy" but they tried to reduce down an 82 page report to

2    two very small points, and they take them out of context even

3    when they do that.  So they gloss over the vast majority of

4    what Mr. Gerardi considered, what his analysis showed, what

5    factored into his Georgia-Pacific analysis, what he thought

6    were key factors in the hypothetical negotiation.  They want

7    to just have all of that forgotten, reduced to two simple

8    points as they frame them for his report, and there is no

9    justification for doing that.

10                   Now, let's talk about the two points that they

11   reduce this whole thing to and attack those head on.

12                   First of all, they say that Mr. Gerardi opined

13   that the reasonable royalty must be capped at the cost of

14   implementing the cheapest available solution.

15                   That is really not what he said.  What he did,

16   towards the end of his report, which was at page, I believe

17   it's 36 and 37 -- at the end, toward the end of his report

18   on pages 26 and 27.  No, I was right the first time.  36

19   and 37.  He lists a dozen things that were key factors that

20   the parties would have considered in the hypothetical

21   negotiation.

22                   So he talks about one, two, three, four ...

23   gets all the way to the bottom.  The last one that he

24   mentions is the impact of alternative technology on the

25   hypothetical negotiation.  He never says that there is an

1    absolute cap.  He never says reasonable royalties have to be

2    measured by that alone.  It's just one consideration of many

3    in the hypothetical negotiation.

4           Now, the *Mars* case that Mr. Lorig was talking

5    about does hold that -- let me read the language directly

6    here.

7           It does hold that, as a matter of law, it's

8    wrong to claim that the reasonable royalty damages are

9    capped at the cost of implementing the cheapest available

10   acceptable noninfringing alternative.

11          In that case, there was no alternative at all

12   offered.  This was also a Federal Circuit appeal, after you

13   have been all the way through trial.  This is not a question

14   of whether or not a damages expert should be able to opine

15   about what is or is not appropriate for consideration during

16   the hypothetical negotiation.

17          So this *Mars* case, while it does suggest after

18   trial what may or may not be appropriate, it doesn't suggest

19   precluding an expert at the outset.  So there is no support

20   that I know of for accepting what they're suggesting and

21   factually it's absolutely not what the expert said.  It's

22   just not.

23          Moving on to the suggestion, which is even more

24   I think tenuous, that Mr. Gerardi simply ignored the RPX

25   license in favor of the Apple offer.  Neither part of that

1    is true.

2              First of all, as to the RPX license, he

3    discussed it at length.  He summarized the terms on page 14.

4    He performed a comparables analysis, which is exactly what

5    Tarkus suggested is what is required when you have a license

6    that is not -- this is a patent that isn't with the party,

7    because it can't be during a hypothetical negotiation.

8              So he did the comparables analysis in two

9    different ways and he came up with two different ways to

10   look at the value of the RPX license as it would apply in

11   the hypothetical negotiation.  Not just once but twice.

12             So to say he had ignored it is again factually

13   unsupportable.  And as a matter of analytics, he didn't say

14   here is the RPX license, and I'm going to credit, he said,

15   the Apple license because that is lower.  I think that is

16   appropriate he decremented after analytically explaining why

17   the value of the RPX license and noted there were, among

18   other things, as Mr. McCann noted, a number of parties that

19   take the benefit of this license to RPX.

20             So there is not a lot of factual or legal

21   support for that claim.

22             THE COURT:  Okay.  I've heard enough on that

23   motion.  We're going to need to move on.  I don't need any

24   rebuttal on it.

25             Let's hear Adobe's two motions, please.

1           MR. McCANN:  May I approach the bench, your

2    Honor?

3           MR. SCHERKENBACH:  I was going to say we're

4    only going to talk about one, a piece of one, which is

5    Yurkerwich.

6           THE COURT:  Okay.

7           MR. SCHERKENBACH:  The Giorgianni motion was

8    based largely on DOE.  I addressed that already.

9           THE COURT:  I thought so.  Yes, you may

10   approach.

11          MR. McCANN:  Thank you, your Honor.

12          (Binders passed forward.)

13          MR. McCANN:  Thank you, your Honor.  In our

14   motion with respect to Mr. Yurkerwich, we had three

15   arguments.

16          The first, the RPX license, your Honor has said

17   the jury will decide that.

18          The second related to some multiples that

19   Mr. Yurkerwich applied to the RPX license to take the value

20   from $7 million to about $60 million.

21          The third relates to the entire market value

22   rule.

23          I'm just going to focus on the multiples since

24   the time is short.  Obviously, we would ask your Honor to

25   review the papers on the entire market value rule and we ask

 1    that you rule in our favor on that.

 2                So if we have slide 2, please.

 3                Okay.  Your Honor is familiar with the

 4    construct.  It's the hypothetical negotiation.  In this

 5    case, it takes place in late 2004.  The parties are Tarkus,

 6    on the one hand, and Adobe, a software developer, on the

 7    other.

 8                Next slide, please.

 9                Mr. Yurkerwich says, okay, a product of that

10    type hypothetical negotiation would be evaluation of a

11    patent of $7 million, and he bases it on that RPX license.

12                But then what he does is he takes that license

13    and he multiplies it by two.  He does correct it for

14    inflation, brings it down a little bit, but then multiplies

15    it by 2.3 to get it up to about $14 million, and then

16    multiplies it by two again and then two again to get to that

17    $56 million.  And it's the multipliers that we're going to

18    focus on in the next few minutes here.

19                The first, your Honor, I'm going to start

20    with -- it's not the first on the list.

21                Next slide please.

22                It's probably the easiest to deal with conceptually,

23    and that is this litigation success multiple.  Here is what

24    Mr. Yurkerwich says.  He says -- and this is from paragraph 90

25    of his report, which is DI 282, Exhibit A1.

1              He says:  In a general sense, every patent suit

2       is 50/50.  You could win you could lose.

3              Next slide.

4              He looked at some studies.  There is a study

5       that now Vice Chancellor Parsons did when he was at Morris

6       Nichols.  It was a law review article he wrote that says in

7       Delaware District Court in patent cases, you sometimes see

8       patentees winning at a rate of 67 percent.  And then if you

9       look in that same article, it can be as low as 9.3 percent

10      when you include not just the cases that go to trial but the

11      ones that don't make it.

12             Next slide, please.

13             So Mr. Yurkerwich takes sort of all that and he

14      says, okay, well, patent litigation is a 50/50 proposition.

15      And given that it is a 50/50 proposition, you should look at

16      that $7 million RPX license and you should tell yourself

17      it's not really worth $7 million.  They had to have given

18      up something because validity and infringement were not

19      conceded and that something would be a doubling because they

20      could have won, they could have lost.  So going into it,

21      they would have handicapped themselves by 50 percent, and

22      that is why you should go from $7 million to $14 million.

23             Next slide, please.

24             No consideration of the merits of the particular

25      case.  And I can't think of a way, if that were a valid

1    principle, how would that not apply to every case where the

2    reasonable royalty was premised on a litigation settlement

3    license.  You would always double it under Mr. Yurkerwich's

4    theory; and I don't think there is any basis in the law or

5    scientific principle for that.

6              Next slide, please.

7              Okay.  The market share adjustment multiple.

8    Here is Mr. Yurkerwich's argument.

9              He starts with the RPX license as the baseline,

10   the $7 million.  He says, well, that RPX license settled the

11   Nikon case.

12             As your Honor knows, we dispute that.  We say it

13   did a lot more than that.  And,

14             Then he says, well, Adobe sells 2.3 times as

15   many products as Nikon does, both supposedly having this

16   auto feature that infringes.

17             Next slide.

18             So he assumes -- there is really two problems

19   with this.  The first is he is assuming in his calculation

20   that each unit sold contains the auto feature.  And the

21   problem with that is both Nikon and Adobe, for lack of a

22   better word, bundle.  So if I were to sell Photoshop on

23   the one hand and Nikon camera on the other, those two units,

24   maybe I could compare them in the way Mr. Yurkerwich does,

25   but that is not how they are actually sold in practice, at

1    least not in every case.

2              Adobe has, for example, Creative Suites which

3    could have three products, each of which within the suite

4    have a Camera Raw plug-in, each would have the accused

5    functionality.  That would be three accused functionalities

6    in the same unit sold.

7              The same is true of the denominator.  Nikon

8    could sell the camera with software.  Both could have the

9    accused functionality.

10             So the math that gets you to 2.3 doesn't work.

11             Next slide.

12             Also, the asserted claims are method claims, and

13    accused methodologist is auto feature.

14             There is no evidence in the record that is

15    reliable of the use of the actual auto feature.  The closest

16    they could get to is surveys that showed that users use

17    Camera Raw, the larger plug-in.  Mr. Scherkenbach took you

18    through how that this auto feature is one within many of

19    that.  So all they can show is Camera Raw is used, not the

20    auto feature is used.

21             Next slide.

22             And Mr. Yurkerwich admits that the auto feature

23    is not tracked by Adobe, which, of course, suggests it's

24    lack of importance, but setting that aside for a second.

25             And he also admits he didn't look for himself.

1    So Adobe doesn't track the auto feature usage.  Okay.  But

2    that doesn't mean that Mr. Yurkerwich couldn't have gone out

3    and found some evidence.  He could have taken a survey of

4    Photoshop users and asked them how often do they use that

5    auto feature.  It's a typical technique used in damages.

6    And Mr. Yurkerwich here agrees he actually used surveys in

7    the past himself or his firm does for this very purpose.

8              THE COURT:  I'm going to need to move on.  The

9    question I think is obvious, which is isn't this all great

10   cross-examination material?

11             MR. McCANN:  It is all great cross-examination

12   material, but you are the gatekeeper, and if something is

13   not reliable you should exclude it.  And I think there is

14   prejudice to us if it does come in.

15             This case, if it were worth $30,000 or $300,000

16   has sort of a whole separate impression.  When it's worth $7

17   million or $14 or $28 or $56 million, it sends a different

18   message to the jury in terms of the scope of the infringement

19   and the wrongfulness of Adobe's supposed conduct.  If that

20   $56 million is not supported, then your Honor, as the

21   gatekeeper, should keep that out.

22             I can see your Honor wants to move on, so I will

23   just segue into my two sentences on the entire market rule.

24   That is the very reason why you should look at the entire

25   market rule briefing in the case and exclude that if you

1    find Adobe's position is merited, as I think you should,

2    because once that cat is out the bag, as they say in the

3    *Uniloc* case, once they see a billion dollars, it's more than

4    that if Adobe revenue comes out.  The jury thinks this guy

5    wants $60 million and that is worth a billion, $2 billion,

6    that is a good deal.  That is also highly prejudicial to us.

7    And if it is not supported in the evidence or perhaps by the

8    case law, you should exclude it.

9              THE COURT:  Okay.  Thank you.

10              Let me give Tarkus a chance to respond.

11              MR. LORIG:  Fred Lorig addressing the Yurkerwich

12    Daubert motion.

13              The Federal Circuit in *ResQNet* resolved this

14    issue.  I think before *ResQNet* came out, I think courts in

15    various jurisdictions, some let in settlement agreements,

16    some didn't; various plaintiffs would say no, none of the

17    settlement agreements come in because of the Supreme Court

18    case *Rude* and defendants habitually would get the settlement

19    agreements in discovery.  Their experts would then divide

20    projected units by the settlement and come out with a projected

21    low ball royalty and plaintiffs would complain.  Then in a per

22    curiam decision in *ResQNet*, the Federal Circuit reversed a

23    District Court Judge.

24              THE COURT:  As you can tell, I have very little

25    time left.  I'm not sure where you are going.  I have already

1     said had I had to say about the RPX agreement.

2               MR. LORIG:  Well, I was trying to respond to the

3     last point he made.

4               THE COURT:  Well, do that.

5               MR. LORIG:  Let me consider it done if I just

6     say *ResQNet*.  There was no triple counting or double

7     counting, your Honor.  Creative Suite was counted once, not

8     three times.

9               And if we can go to slide 7 for a moment.

10              Mr. Yurkerwich's opinion is based on a real

11    world transaction.  You had a specific number of units that

12    were disclosed by Nikon.  You had a specific amount of

13    money.  You have a specific number of Adobe units sold,

14    which if you multiply that by the applied royalty for Nikon

15    takes you to 16.5.  But Adobe's profit rate as a software

16    manufacturer is 4.7 times Nikon's rate for six years of

17    infringement.  So the objective evidence is the $7 million

18    has to be escalated.

19              Now, he could have multiplied by 4.7.  He

20    didn't.  To be conservative, he multiplied by two because

21    there were a number of years when the multiplier is only

22    two.  So he threw out the outliers to be conservative.

23              The same logic applies to Canon.  This slide

24    addresses both.  The idea being as you look at profit rates,

25    you look at sales, and you adjust in order to get a real

 1    world sanity check.

 2              If we can go to slide 6.

 3              Once you deal with the fact that the settlement

 4    agreement is coming in, the question is what do you do with

 5    it?

 6              In *ResQNet,* the per curiam opinion said it's the

 7    floor, not the ceiling.  And they warned that settlement

 8    agreements can often be less than the proper amount and so

 9    the Court should not hold it as a ceiling.

10              So what Mr. Yurkerwich did was certainly

11    consistent with *ResQNet*.  And if you look at the basic

12    issues, $56 million was only 1.7 percent of the $3 billion

13    of infringing revenues, $2.10 for each of the 19 million

14    infringing units, and they were complaining about the fact a

15    royalty was being put on the entire product.

16              When he did his backup theory, instead of

17    looking at the lump sum paid up royalty, he looked at, well,

18    what would happen if you disaggregated.

19              There was something called Adobe Elements that

20    is sold separately.  And he took out what he thought was the

21    infringing capability.  He came down to a $44 value which

22    is, you know, hundreds of dollars less than the cost of many

23    of the infringing products.  And he said, the $2.10 I got

24    from lump sum is only five percent of that implied royalty

25    and that, to me, is a sanity check form what I did using

1    lump sums.

2              Lump sum royalties are proper.  They're done all

3    the time.  And the implied royalty on a sub-part of Adobe

4    was clearly proper.

5              If we can go to slide 8 for a moment.

6              With regards to the complaints about the

7    multipliers, your Honor?  If you look at our slide 8, which

8    is taken from Exhibit C15 from Mr. Yurkerwich's report, you

9    can see the Adobe and the Canon profit rates contrasted with

10   Nikon.  So those multipliers were not taken out of the air.

11   They were taken out of real world numbers, and there was no

12   speculations involved.

13             If we can go to slide 9.

14             THE COURT:  I don't need you to address slide 9

15   at this point.  Thank you.  I have to move on.

16             MR. LORIG:  Very well.

17             THE COURT:  I'm going to give Canon about two

18   minutes to argue their motions, if they wish to.  To some

19   extent, I think we have heard some of it already.

20             MR. CHALSEN:  Your Honor, thank you very much.

21   I'll try to be as brief as I can.

22             We have two motions, two Daubert motions

23   pending:  One for Mr. Giorgianni, who is the primary

24   testifying expert for Tarkus.  The other is for a

25   Mr. William Elswick.

1            THE COURT:  And on Giorgianni, as I understand

2     it now, all you are asking is that he not be able to opine

3     that he personally reviewed source code.

4            MR. CHALSEN:  Exactly.

5            THE COURT:  Everything else he wants to testify

6     to, you are okay with.

7            MR. CHALSEN:  Yes.

8            THE COURT:  All right.  Why don't you tell me

9     about Mr. Elswick for a moment.

10            MR. CHALSEN:  Okay.  Mr. Elswick, he reviewed --

11     well, he had access to the complete source code production.

12     He zeroed in on five files, five routines.  It turns out

13     that those routines had, in the words of Mr. Giorgianni who

14     is Tarkus's main testifying expert and expert in this field,

15     nothing whatsoever to do with tone reproduction curves or

16     tone processing.

17            Now, this is kind of, in New York, they call it

18     the hutzpah award.  Tarkus's argument as to why Mr. Elswick

19     should not be precluded from expanding beyond his original

20     five files have nothing whatsoever to do with the claimed

21     invention is that we didn't cross-examine him during his

22     expert deposition to point out how he had made a mistake and

23     then thereby allow him to go back and somehow correct the

24     fact he completely misidentified and looked at the wrong

25     source code.

1          This is a critical issue because their entire

2     expert reports are predicated on only these five files.

3     Mr. Giorgianni admittedly is not a source code expert.

4          Of course, two weeks after he testified to that,

5     all of a sudden, miraculously, he became an expert after

6     being in the woodshed by Tarkus counsel, but he is not a

7     source code expert.  He didn't do independent review.  He

8     couldn't.

9          So Mr. Elswick, the only thing he found and

10    highlighted were these illuminance estimation routines,

11    which Giorgianni says have nothing to do with the claim.

12          THE COURT:  There is a dispute as to whether

13    those five portions of source code have anything to do with

14    the case or not.  Why don't I just put that all in front of

15    a jury?

16          MR. CHALSEN:  Well, your Honor, if that was the

17    limitation on what Mr. Elswick would testify, I think it

18    would be great cross-examination grounds for us.  What we're

19    concerned with is that we're going to be sandbagged at the

20    trial and, all of a sudden, there is going to be, all of a

21    sudden, new software that we have to cross-examine Mr. Elswick

22    on at the trial and think it would be unfair and prejudicial

23    for that to happen.

24          As it stands now, Mr. Elswick's testimony is, to

25    use the words of the federal rules, unhelpful.  It's

1    supposed to be helpful.  Right now, it's unhelpful because

2    it has nothing to do with the claimed invention.

3              I'm happy to cross-examine Mr. Elswick at the

4    trial as long as we don't have to worry about him then

5    shifting gears and saying, well, let me point to all these

6    other files.

7              THE COURT:  All right.  Thank you.  Let me hear

8    from Tarkus on those two motions.

9              Why don't you start where we left off.  Are you

10   going to be presenting other portions of the source code at

11   trial?

12             MR. DOSS:  Other portions of the source code,

13   presented by Mr. Elswick.  Mr. Elswick, in his report, said

14   that he reviewed the source files that were made available.

15   He chose certain ones to be produced, way more than five

16   that were produced.  He cited to sections of those five

17   files as representative of functionality.  But in addition

18   to the source code, there is testimony about source code.

19   There is testimony about functionality of source code that

20   Mr. Elswick's opinion and testimony would be helpful for in

21   interpreting that source code to a jury.

22             THE COURT:  Is he going to testify at trial

23   about source code other than those five modules that are

24   called out in his report?

25             MR. DOSS:  It depends on what the defendants

1    produce.  It depends on what they say at trial.  If they

2    say, well, this other file shows that it does this and that

3    is something --

4              THE COURT:  In your case in chief, when you call

5    him, is he going to limit his opinions to the five source

6    code modules?

7              MR. DOSS:  At this point, those five modules and

8    all calls in the source code files.  These five modules have

9    other calls, so they'll call in other modules, if you will,

10   or other functions.  They're called functional calls.  Those

11   would have to be available as well.

12             THE COURT:  All right.  Then on Mr. Giorgianni,

13   I'm not sure if it was clear until the reply brief, but you

14   now understand it's a very narrow motion.  They just don't

15   want him to talk about his own personal review of the source

16   code.  Do you intend to have him do that?

17             MR. DOSS:  Yes.

18             Could you pull up slide 11, please?

19             Yes.  I mean Mr. Giorgianni reviewed the source

20   code.  He interacted with Mr. Elswick about the source code

21   and reviewed it with Mr. Elswick.  I was personally involved

22   in some of that as well.  And he listed the source code as

23   material reviewed for his report as well as to determine the

24   functionality and testing of the accused products.  So, yes.

25             He does have many years of experience.  He was

1    38 years at Kodak, writing and reading programs and analyzing

2    source code for these exact types of applications:  image

3    processing, digital image processing applications.  You

4    know, it was in a different language but the languages are

5    very similar such that porting from one language to another

6    would be readily understood by him, and that is what he has

7    done.  What they are asking for is a complete preclusion for

8    him reviewing the source code.

9            He reviewed the source code and based his

10   opinions thereon, he cite some of the materials.  They

11   deposed him about it.  It seems unfair that he should be

12   precluded from testifying about it.

13           THE COURT:  Okay.  Thank you.

14           MR. DOSS:  Thank you, your Honor.

15           THE COURT:  Let's move on.  There is just one

16   motion in limine that I would like some more help with.

17   It's Canon's motion in limine No. 1 which really goes to

18   experts and whether something needs to be specifically in

19   an expert report.  So let me hear briefly from Canon on

20   their motion in limine No. 1.

21           MR. CHALSEN:  Thank you, your Honor.  I'm trying

22   to shift gears here.

23           THE COURT:  There is a lot here.  We're moving

24   quickly.  I think it's very related to what we were just

25   talking about.

1          MR. CHALSEN:  There are actually several

2   components to that motion.  The one relating to the doctrine

3   of equivalents I think has already been addressed.  We believe

4   he can't testify under the doctrine of equivalents.  We think

5   that is a summary judgment motion but we also think that that

6   should be precluded.

7          Probably the most important part of this motion

8   in limine on the evidence presented by the expert is

9   Mr. Giorgianni's, the so-called evidence that he relies on

10  in his expert report relating to testing that he didn't do.

11  He was 3,000 miles away when it took place.  It doesn't know

12  the equipment that was used.  Data files were apparently

13  cherry-picked by plaintiff's counsel.  He didn't select

14  which files were going to be used.

15          Mr. Elswick did these, allegedly did these

16  tests.  There is not a single word in Mr. Elswick's report

17  about how these tests were conducted, what the conditions

18  were, what software was applied, what equipment was relied

19  on.  Mr. Giorgianni's expert report just generally says all

20  the stuff was provided to me by Mr. Elswick but he doesn't

21  identify the equipment, the data files, the background,

22  anything having to do with this.  This is just complete

23  sandbagging.

24          And it's similar to the other issue where

25  they're going to show two pictures and say how pleasant

1    this looks.  That is proof of infringement.  There is no

2    foundation for this evidence.

3           It's plaintiff's burden to establish the

4    foundation for expert testimony as well, and it could be an

5    expert doing it for the purpose of the trial, but there has

6    to be some testimony for the foundational purposes.

7           Mr. Elswick's report doesn't even mention these

8    files.  And, again, they want to blame us for not asking

9    Mr. Elswick about this in his deposition, but he didn't even

10   mention these alleged drawings and figures and maps and

11   correlations that he did.

12          There is just no basis for it at all so we would

13   ask it be precluded.

14          THE COURT:  Okay.  Let me hear from Tarkus.

15   Thank you.

16          MR. DOSS:  Thank you, your Honor.

17          The testing that Mr. Giorgianni did was via a

18   web meeting, and it was at his direction.  It was not

19   cherry-picked files by him, as they would have you believe.

20   They were files.  Sorry -- cherry-picked by the attorneys.

21   They were picked by him.  The image files were selected by

22   him.  He testified that he tested not only the ones

23   disclosed in his report but hundreds of them.

24          He did specify the equipment used.  It's in, I

25   believe it's in his report or in his declaration.  That has

1    been disclosed.

2              They did have the opportunity to cross-examine

3    both Mr. Giorgianni and Mr. Elswick on the testing that they

4    did.  So it's very well disclosed in his reports.

5              They're asking for -- well, strike that.

6              This is basically a regurgitation of their

7    Daubert motion.  They're just taking another bite at the

8    apple and also another bite at the apple that they asked

9    regarding the DOE.

10             THE COURT:  Okay.  Thank you.

11             MR. DOSS:  Thank you.

12             THE COURT:  All right.  That's all the argument

13   I have time for on the motions.  Let me say a few things

14   about the scope and course of the trial.

15             Mind you, I know there is a lot of motions

16   pending, and I will talk briefly about that at the end.  But

17   on the assumption there is going to be a trial, several of

18   you have had trials in front of me so you will be familiar

19   of this.  Not all of you have, so let me run through a few

20   things about how we do things here.

21             In terms of witnesses, examinations are limited

22   to direct, cross and redirect.  There is no recross.  Only

23   one attorney may question each witness when that witness is

24   on the stand.

25             You ask for leave to approach the witness once

1    per witness and then it's freely granted for the remainder

2    of your examination of that witness.

3              We encourage transition statements.  They should

4    be brief and non-argumentive.  Particularly in a case like

5    this with the burden of proof shifting and number of issues

6    and possibly number of parties, transition statements are

7    helpful.

8              On the deposition designations, we addressed

9    this in some respects yesterday.  In addition to what is

10   in the order of yesterday, the Court requires a

11   non-argumentive letter identifying remaining objections by

12   two days before you intend to use the deposition testimony

13   at trial.  The key in those letters is that I can see

14   exactly where the remaining objections to any designations

15   or counterdesignations still are.  Then I will get you a

16   ruling on those objections some time prior to the time that

17   you offer that testimony at trial.

18             Any time that is used for reading or playing

19   depositions, of course, comes out of your trial time.  The

20   parties are responsible for giving us the breakdown either

21   by minutes or by percentage after you play or read the

22   testimony.

23             In terms of objections to expert testimony

24   being beyond the scope, I allow and require you to make the

25   objection at trial but I will not rule on that objection at

1   trial.  That objection will be ruled on in connection with

2   post-trial motions.  If you believe you have a basis to

3   sustain, to renew that objection, it has to be the subject

4   of your post-trial motions.

5            If you prevail and a new trial is necessitated

6   as a result, then all of the costs of the new trial will be

7   on the party that proffered expert testimony beyond the

8   scope of what was previously disclosed.

9            Are there any questions about that from the

10  plaintiffs?

11           MR. LORIG:  No, your Honor.

12           THE COURT:  From Adobe?

13           MR. SCHERKENBACH:  No, your Honor.

14           THE COURT:  And from Canon?

15           MR. CHALSEN:  No, your Honor.

16           THE COURT:  In terms of exhibits, as I think was

17  probably evident or already known, we'll discuss objections

18  to exhibits before a witness takes the stand.  So any

19  objections you have to exhibits should be addressed to the

20  Court generally in the morning before we start with the jury

21  but in all regards before the witness takes the stand.

22           Even though I will have ruled on objections

23  prior to the witness taking the stand, we do require you to

24  formally at some point move the exhibit into evidence.  And

25  I will ask if there is objections even though I know there

1    are no objections other than what has already been ruled on.

2           You must stand when moving the evidence in or

3    saying that there is no objection.

4           Trial.  It's a timed trial.  What we're going

5    to do in this case is I am going to charge you for the time

6    in which we are arguing those objections, so if you have

7    objections in the morning, say we meet at 8:30 and you have

8    objections to the admission of certain exhibits the other

9    side is going to use with their witnesses that day, all of

10   the time, both your time arguing the objections and the

11   other side's time responding to objections, all of that time

12   we will keep track of and charge to the objecting party.

13          Beyond that, generally it's when you are on

14   your feet, that time is being charged to you during the

15   trial.  So the time for your witness on direct, your

16   witness on redirect when you are crossing the other side's

17   witnesses.  Then, of course, your opening statement and your

18   closing argument, all of that time is charged to you as

19   well.

20          I will ask you at this point for your requests

21   or estimate, if you have it, based on the scope of the case

22   as to how many hours you think you may need.  I think the

23   maximum possible I could give per side for a ten-day trial

24   would be 22 hours per side.  But let me turn to plaintiff.

25   Do you have a specific request at this time and/or do you

1    have any questions about how we time the trial?

2              MR. LORIG:  I do not, your Honor.  I haven't

3    tried to calculate the hours but I think 22 hours is plenty.

4              THE COURT:  Mr. Scherkenbach?

5              MR. SCHERKENBACH:  I think without knowing the

6    rulings on the remaining issues, I'm going to have to ask

7    for 22 total at this point, although I'm fairly confident

8    we can do it in a lot less.

9              THE COURT:  And the total is between you and

10   Canon.

11             MR. SCHERKENBACH:  I understand.  That's fine.

12             THE COURT:  Does Canon have any different view?

13             MR. CHALSEN:  No, we can live with the 22 hours

14   split between Adobe and Canon.

15             THE COURT:  Mr. Horwitz.

16             MR. HORWITZ:  When you talked about the time for

17   dealing with objections, you said that all the time counts

18   against the party who objects as opposed to splitting it

19   when you are on your feet?

20             THE COURT:  Yes, exactly.  You understood that.

21   Yes, that is how we're going to do it.

22             All right.  So, at this point, I'm going to give

23   22 hours per side.  I'll leave it to the defendants to split

24   the 22 hours however they wish.  It may be, based on some of

25   the rulings that may come in the next two weeks, if we are

1    taking issues out of the case, I may well shorten the trial,

2    but it will be a maximum of 22 hours per side.

3         All right.  There were a couple of additional

4    issues that you all had in the pretrial order that I want to

5    make sure we talk about, if they are still issues.

6         Mr. Holm's presence and whether there should be

7    representative claims.  These are defendants' issues.  Let

8    me turn to defendants real quickly.  Do you understand these

9    both to still be in dispute?

10         MR. SCHERKENBACH:  I think they are, your Honor.

11   Representative claims, certainly we would like them to be

12   required to pick a realistic number.  They've got 16 against

13   Canon, 32 against Adobe.  There is no way they're going to

14   try all these claims.

15         THE COURT:  Why shouldn't I just let them make

16   their own tactical decision, they have got 22 hours, if they

17   want to spread them among those claims?

18         MR. SCHERKENBACH:  Because we know they're not

19   going to try that many claims.  And, meanwhile, both sides

20   have to spend a whole bunch of time and money getting ready

21   to deal with those claims.  It's really just an efficiency

22   thing.

23         I would ask they pick a reasonable number.  We

24   said five, but if it's not five, just something they're

25   going to do at the trial.

1            THE COURT:  How about Mr. Holm?

2            MR. SCHERKENBACH:  So, Mr. Holm, I'm sensitive

3    to their concern.  I mean I would like to be able to see him

4    sit through the trial.

5            You will remember we had a dispute about whether

6    he would get access in the protective order under the case

7    early on.  They wanted him to see confidential information.

8    We said we're concerned about that because of who he is and

9    what he does.  You sided with us on that and said, no, he

10   probably shouldn't have that access.

11           I don't think it's necessarily the same answer at

12   trial, and I can see the reasons why he should be allowed to

13   sit through the trial, but here is my concern:  I don't want

14   him to be able to say -- so he will testify first.  No problem.

15   He won't have been be exposed to anybody's confidential

16   information at that time.  But then if he sits through our

17   case and sees and hears our confidential information, what I

18   don't want to be faced with is Mr. Holm in rebuttal saying,

19   hey, well, gee, now that I know that stuff, that is even

20   more consistent with what I said originally.

21           THE COURT:  Are you saying you don't think he

22   should be able to even testify on rebuttal or he can testify

23   but he can't make use of the confidential information?

24           MR. SCHERKENBACH:  The latter.

25           THE COURT:  The latter.  All right.

1            Let me hear from Tarkus on these two issues real

2     quick.

3            MR. LORIG:  Fred Lorig for the plaintiff.

4            Your Honor, there is no basis to restrict claims

5     here.  There is one independent claim.  Every other claim

6     is a dependent claim.  There is no basis for the defendants

7     to claim they're in any way prejudiced because all you are

8     dealing with is one independent claim and this limitation,

9     that limitation, this limitation.

10            THE COURT:  All of that may be so, but are you

11     going to spring on them on the morning of trial or the

12     Saturday before, hey, instead of 36, it's just actually just

13     these five?

14            MR. LORIG:  No.  As far as I know, they're the

15     ones we are asserting.

16            I turned to Mr. Doss.

17            THE COURT:  But your intent is to go to trial on

18     all of them.

19            MR. LORIG:  Yes, because it's fairly

20     straightforward.  You go in there and you say this one is

21     infringed.  This one, explain why.  It's not going to take

22     long at all, and I don't think it will be any problem at

23     all.

24            I have had other cases where you have a large

25     number of claims.  Where there are independent claims, it

 1    becomes a time problem.  It's our hours.  You know, we're

 2    responsible.  If we blow it, we blow it.  But we're not

 3    intending to blow it because they are dependent claims.  It

 4    will take no more than a couple minutes to explain why this

 5    additional limitation is infringed.

 6                    THE COURT:  All right.  Mr. Holm.

 7                    MR. LORIG:  With regards to Mr. Holm, Mr. Holm

 8    is not a competitor.  Mr. Holm is a plaintiff litigant.  He

 9    has -- I believe he has a right.  I'm not sure if it's a

10    constitutional right, but I think he has a right to be here.

11                    I think he has a right to advise his lawyers.

12    He is a very knowledgeable person.  There is no reason why

13    he can't sit here and talk to us and give us his advice.  He

14    is knowledgeable in the field.  There has been no showing,

15    no showing that he has ever done anything to try to compete

16    with them or use this technology.

17                    THE COURT:  And what about when we get to the

18    rebuttal case?

19                    MR. LORIG:  I don't want to go into it, but Mr.

20    Scherkenbach and I have had a mediation and Mr. Holm was

21    there.  There is nothing that he is going to hear in

22    rebuttal that can do them any harm.  What is it that they're

23    going to say you could take to the bank I can't conceive of,

24    your Honor.

25                    THE COURT:  All right.  Thank you.

1          MR. GASPAR:  Your Honor, if I could be heard

2    very quickly on both of those points.

3          THE COURT:  Yes.

4          MR. GASPAR:  As far as limiting the claims, we

5    have a very limited amount of time for the two parties to

6    put on an invalidity case.  Limiting the number of claims

7    will make that much more possible.  It would be very

8    difficult with the number of claims asserted against both of

9    us here.

10         As to Mr. Holm, part of the basis for the

11   protective order protection right now still applies.  He is

12   still involved in standard setting organizations.  Seeing

13   source code will make him understand exactly how our

14   products work and that will not get into only into the

15   prosecution matters but also into the standard setting

16   issues.

17         THE COURT:  Okay.  Thank you.  I'm going to

18   permit Mr. Holm to sit through the trial.  I should have

19   confirmed this.  He is going to be the first witness,

20   correct?

21         MR. LORIG:  We haven't decided on the order of

22   witnesses.  He will either be the first or certainly one of

23   the first three.

24         THE COURT:  All right.  Well, I'm going to

25   require that he be one of the first two witnesses at trial.

1    And in terms of whether his testimony on rebuttal will be

2    limited, I'll deal with that as we get to that point in the

3    trial.  I am sympathetic both to his desire to be here but

4    also to the concerns expressed to how potentially he could

5    misuse confidential information at the very end of the case,

6    but we will deal with that when we get to the end of the case.

7              In terms of representative claims, while I

8    certainly think it would be helpful if the plaintiff would

9    reduce the number of claims, it would be helpful to the

10   jury, it would be helpful to the Court, it would be helpful

11   to the defendants, I'm not going to force them to do it

12   given the relationship between the independent and dependent

13   claims.  There is only one independent claim here.

14             Plaintiff has a limited number of hours.

15   Defendants I recognize have a limited number of hours as

16   well, but I believe that it's an adequate number of hours

17   given the issues that are in the case.

18             While I'm not alternatively forcing the plaintiff

19   to stick to all these claims, if the case changes radically

20   due to something the plaintiff does, that is, if it suddenly

21   reduces it to five claims or something like that, say, the

22   morning of trial and I hear an argument from defendants that

23   that is prejudicial and they need a continuance, I'm going to

24   be open to that argument.  So everyone has got to play fair

25   with each other.

1                    Let me say a few other things.

2                    On the motions that we argued earlier today.

3       For the most part, you all persuaded me that I do have

4       some more work I have to do, and I'm not prepared to rule

5       on the motions with one exception.  That is the motion for

6       severance or separate trials by Adobe.

7                    I'm going to deny that motion, and I do it in an

8       exercise of my discretion.  I believe that I have discretion

9       under the circumstances where we're this close to trial,

10      where there is overlap in issues, where I believe, although

11      the technology is complex, I believe the jury, while they

12      will have their hands full, can handle hearing the evidence

13      against both parties at the same time.

14                   I believe any suggestion of unfair prejudice is

15      not all that persuasive.  And to the extent something might

16      come up at trial that might cause concern that the jury will

17      not be carefully segregating information that comes in against

18      one defendant and just limiting it to that one, I can deal

19      with that during trial through limiting instructions, if

20      necessary.  Fundamentally, I think it's more efficient for the

21      Court and certainly for the plaintiff at this point to have a

22      single consolidated trial, so that motion is denied.  We'll

23      have a single trial.

24                   As for the other motions, while I can't make

25      any rulings, I'm willing to share with you some general

1    inclinations but these are not yet rulings.  And as I say,

2    I recognize I have more work I need to do.

3            I'm inclined at this point to deny summary

4    judgment as to noninfringement and invalidity.  My sense is

5    that I will need to hear the evidence and that I just will

6    not be in a position to make a final determination as to

7    whether any reasonable juror could find infringement or find

8    invalidity at this point prior to trial.  So I'm inclined to

9    deny those motions.

10           On summary judgment for willfulness, that is,

11   Adobe's motion for summary judgment on willfulness, I may well

12   grant that motion.  I'm willing to tell you that is where I'm

13   going to focus my attention going forward is whether or not to

14   have willfulness on behalf of Adobe, because I don't believe

15   Canon has moved for summary judgment on willfulness.  So I'm

16   going to focus on whether or not willfulness should remain

17   part of this case as against Adobe.

18           On the Daubert motions, I'm inclined to deny all

19   of them and let all of that evidence be argued in front of

20   the jury.

21           Now, mind you, none of those are rulings other

22   than on the motion for separate trial.  I've told you I'm

23   going to focus on Adobe's motion on wonderful infringement.

24   I recognize I have to make Daubert rulings before the trial

25   begins.  On the summary judgment motions, I may or may not

1    get to them before trial begins.

2            We're one minute over when I should have left,

3    but at the risk of opening things up too much, is there

4    anything super pressing that plaintiffs wish to raise at

5    this point?

6            MR. LORIG:  No, your Honor.

7            THE COURT:  Okay.  Is there anything from Adobe?

8            MR. SCHERKENBACH:  No, your Honor.

9            THE COURT:  And from Canon?

10           MR. CHALSEN:  Your Honor, just one point.

11           THE COURT:  Yes.

12           MR. CHALSEN:  We actually do have a motion in

13   limine pending on the willfulness issue.

14           THE COURT:  Right, but that is just on the

15   evidence.  That is not a motion for summary judgment.

16           MR. CHALSEN:  Right.

17           THE COURT:  Okay.  Mr. Horwitz.

18           MR. HORWITZ:  Your Honor, there is one other

19   point on behalf of defendants.  I raised this with

20   Mr. Lorig, and he wasn't able to take a position this

21   morning.

22           In your order of yesterday, there is a deadline

23   of June 4th for the identification of the presentation of

24   witnesses.  We would ask the Court to alter that slightly so

25   that on the 4th, the parties would provide their lists on

1    issues where they bore the burden of proof, and then either

2    a day or two later, once you see who the other side is going

3    to put up on the issue, then the responding party would give

4    their witnesses on those issues.

5            THE COURT:  And that is a request on behalf of

6    both defendants?

7            MR. HORWITZ:  Yes, your Honor.

8            THE COURT:  The plaintiffs, do they oppose that?

9            MR. LORIG:  Yes, your Honor.  Fred Lorig.

10           We do oppose it.  We think that the parties

11   should be in a position this late in the game to identify

12   their witnesses, and there is no need to do this staged.

13   Certainly, if there is some good cause shown, we each

14   identify witnesses.  If someone says, oh, there is good

15   cause to add, I can see that, but I think both should

16   divulge their witnesses at the same time.

17           THE COURT:  Mr. Horwitz, real quick.

18           MR. HORWITZ:  Your Honor, let me explain why

19   we're making this point.  What your Honor said was once a

20   party has identified a witness on its final list, the party

21   must call the witness or make the witness available to the

22   other side.

23           Now, if they have the burden on infringement and

24   we see who is on their list, we may or may not put someone

25   on our list.  If we don't know, then out of an abundance of

1    caution we might.  So in order not to have our witnesses,

2    for their benefit, when they don't need them, we think that

3    is only fair.

4              THE COURT:  I think that is fair.  You need to

5    know your case very soon, but we're talking now at this

6    point about Tuesday versus Monday, so I'm going to stick to

7    Monday.  I'm adopting the defendants' proposal:  Monday for

8    the witnesses in the part of the case in which you have the

9    burden and Tuesday for any remaining witnesses.

10             MR. HORWITZ:  Thank you, your Honor.

11             THE COURT:  All right.  I believe that takes

12   care of everything.  We will be in recess.  Have a nice

13   weekend.

14             (Pretrial conference ends at 12:35 p.m.)

15

16        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

17

18                            /s/ Brian P. Gaffigan
                              Official Court Reporter
19                             U.S. District Court

20

21

22

23

24

25