Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 1 of 277 PageID #: 8926
*redacted - public version*
1137

1    IN THE UNITED STATES DISTRICT COURT

2    IN AND FOR THE DISTRICT OF DELAWARE

3                         - - -

TARKUS IMAGING, INC.,

4                                    : CIVIL ACTION
          Plaintiff,                 :

5                                    :
          v.                         :

6                                    :
ADOBE SYSTEMS, INC.,                 :

7    CANON U.S.A., INC.              :
NIKON AMERICAS, INC.,                :

8    and NIKON, INC.,                :
                                     : NO. 10-63-LPS

9         Defendants.
                         - - -

10

                    Wilmington, Delaware

11                  Monday, June 25, 2012
                    *Trial - Volume F*

12                       - - -

13

BEFORE:  HONORABLE **LEONARD P. STARK**, U.S.D.C.J., and a jury

14

APPEARANCES:             - - -

15

16          CONNOLLY BOVE LODGE & HUTZ, LLP
            BY:  HENRY E. GALLAGHER, ESQ.,

17               CHAD S.C. STOVER, ESQ., and
                 PAUL E. CRAWFORD, ESQ.

18
                 and

19
            QUINN EMANUEL URQUHART & SULLIVAN, LLP

20          BY:  FREDERICK A. LORIG, ESQ.,
                 RICHARD H. DOSS, ESQ.,

21               MICHAEL GRAY, ESQ., and
                 SIDFORD L. BROWN, ESQ.

22          (Los Angeles, California)

23                  Counsel on behalf of Tarkus
                    Imaging, Inc.

24

25                  Brian Gaffigan/Tony Rolland
                    Registered Merit Reporters

1       APPEARANCES:  (Continued)

2
                    POTTER ANDERSON & CORROON, LLP
3                   BY:  RICHARD L. HORWITZ, ESQ.

4                        and

5                   MILBANK TWEED HADLEY & McCLOY, LLP
                    BY:  CHRISTOPHER E. CHALSEN, ESQ.,
6                        CHRISTOPHER J. GASPAR, ESQ., and
                         NATHANIEL T. BROWAND, ESQ.
7                        (New York, New York)

8                            Counsel on behalf of Canon U.S.A., Inc.

9

10                  FISH & RICHARDSON, P.C.
                    BY:  DOUGLAS E. McCANN, ESQ.
11
                         and
12
                    FISH & RICHARDSON, P.C.
13                  BY:  FRANK E. SCHERKENBACH, ESQ.,
                         THOMAS A. BROWN, ESQ.,
14                       MICHAEL C. LYNN, ESQ., and
                         GAURI M. DHAVAN, ESQ.
15                       (Boston, Massachusetts)

16                       and

17                  FISH & RICHARDSON, P.C.
                    BY:  ROBERT J. KENT, ESQ.
18                       (Redwood City, California)

19                           Counsel on behalf of Adobe Systems, Inc.

20

21

22

23

24

25

1                        - oOo -

2                   P R O C E E D I N G S

3                   (REPORTER'S NOTE:  The following proceedings

4       were held in open court, beginning at 8:35 a.m.)

5                   THE COURT:  Good morning, everyone.

6                   (The attorneys respond, "Good morning, your

7       Honor.")

8                   THE COURT:  Are there any issues from Adobe this

9       morning?

10                   MR. McCANN:  Good morning, your Honor.

11                   THE COURT:  Good morning.

12                   MR. McCANN:  Doug McCann from Fish on behalf of

13      Adobe.

14                   Just a couple of things before Mr. Yurkerwich's

15      testimony and I believe Mr. Scherkenbach might have some

16      issues.

17                   With respect to objections to exhibits that will

18      be offered with Mr. Yurkerwich's testimony, if I may

19      approach, your Honor?

20                   THE COURT:  You may.

21                   (Documents passed forward.)

22                   THE COURT:  And these folks, are they going to

23      bother anybody if they're working?

24                   MR. McCANN:  Not me.

25                   THE COURT:  If you need to get set up for this

1   morning, go ahead.

2           MR. McCANN:  Your Honor, the exhibits fall into

3   really two buckets -- three buckets.  The first on hearsay.

4           If your Honor looks at what I handed up, I have

5   PTX-182.  That is Mr. Yurkerwich's report.  The report, of

6   course, is hearsay and should not come into evidence or be

7   displayed today.  The expert can testify.

8           In addition to the entire report, they have

9   also listed certain subsections of the report.  The Exhibit

10  numbers would be PTX-182-75 to 77, 84, 87 to 112, 114 to

11  121, 129, 130, 133.

12          There were some supplements to the report also

13  that were PTX-328A, B1 to B5, PTX-1277, and PTX-1277B and C.

14          So all of those exhibit numbers are either the

15  entire report or excerpts of the report or its supplements.

16  We would object to those on hearsay.

17          THE COURT:  Your understanding is they are

18  intending to offer them into evidence?

19          MR. McCANN:  That is my present understanding.

20  Obviously, if they use it to refresh the witness's

21  recollection, we have no objection to that.

22          Your Honor, also with respect to one other

23  exhibit, I regret I only have the one copy.  We're trying to

24  get some more brought over, if the Court needs to see it.

25  If I may take a moment to show it to counsel?

1        (Counsel confer.)

2        THE COURT:  This is a second bucket?

3        MR. McCANN:  It is, your Honor.

4        THE COURT:  Okay.

5        MR. McCANN:  This is PTX-355.  It's a

6   spreadsheet we produced in response to a request for

7   production from Tarkus.  It is our revenue in essence for

8   the various products that we sell.  We would object to it

9   on two grounds:

10        The first is hearsay, no testimony from a

11   custodian that any hearsay exception applies to this.

12        But more importantly is the entire market value

13   rule.

14        Which brings me into my third bucket, your

15   Honor, which is, as your Honor knows, we have briefed the

16   issue with respect to the entire market value rule.  We

17   understand that Tarkus is no longer alleging the entire

18   market value rule.

19        Because of that, we believe the revenue of our

20   products are no longer relevant in this case except for

21   perhaps maybe the number of units sold for indirect

22   infringement.  We also think they should not longer be able

23   to argue that they're allowed to get a royalty percentage

24   of a larger unit.

25        I'm not going to spend a lot of time on that,

1    Judge, because we do have time issues.  What I do want to

2    do is rely on the papers we filed and read into the record a

3    list of those exhibits and demonstratives that we object to

4    as irrelevant because the entire market value rule.

5                THE COURT:  Why don't you read in the list, then

6    I will ask you a few questions.

7                MR. McCANN:  Yes, your Honor.

8                Again, PTX-182 and the subset of that report,

9    which would include 182-92 to 95, 98 to 104, 107 to 109,

10   111, 114, 118 and 119, 328B-3, 35, 1277, 1277B, and 1277C.

11               And also PDXs 20, 21, 62, 406, 429, 433, 438,

12   439, 441, and 443.

13               THE COURT:  All right.  You say it's clear that

14   they're not asserting the entire market value rule.  I think

15   that is clear.  At what point in this case did that become

16   clear to Adobe?

17               MR. McCANN:  At the opening statement.

18               THE COURT:  And if I were to rule out, let's

19   say, the $3 billion figure today, how would you square that

20   with my earlier rulings in the case?

21               MR. McCANN:  Are you referring to the Daubert

22   rulings, your Honor?

23               THE COURT:  There is Daubert, there is arguably

24   motion in limine, there is arguably what I said on Monday.

25               MR. McCANN:  It's this.  I think that Tarkus has

1    taken the position that we're asking for reconsideration.

2    Respectfully, your Honor, I don't see it that way.  When we

3    briefed the Daubert, we were arguing they can't show the

4    entire market value rule applies.  Therefore, you should not

5    let the evidence in.  And the Court said no, let's let the

6    expert come and make his presentation.  And I think the MIL

7    was in the same vein.  Now they've said we're not using the

8    entire market value rule.

9              So where that leaves you, Judge, is does

10   this Cornell case they cited in their papers create some

11   exception to the entire market value rule that would allow

12   them to continue to present evidence of the value of the

13   larger product, be it Photoshop or Adobe Camera Raw, as

14   opposed to only the value of that accused feature, the auto

15   feature.

16             I read that case fairly closely.  I'm happy to

17   discuss it, if you would like.  I think it's very clear that

18   if you want percentage of a larger thing, you must satisfy

19   the entire market value rule.

20             THE COURT:  Now, here I have generally seen it

21   as a fact dispute, unusual, I suppose, as to whether the

22   accused product is in your instance the auto feature or the

23   entire Adobe Camera Raw.

24             If I continue to see that as a fact dispute that

25   I may need the jury to resolve, does it follow that I need

1    to at least let them present evidence, if they have it, of

2    the value of your revenues derived from the sale of Adobe

3    Camera Raw as opposed to just the auto feature?

4            MR. McCANN:  Your Honor, I did not think there

5    was a dispute of fact in the case as to what is actually

6    accused.  It is this auto feature.  When you click this

7    button, certain tone corrections are applied based on an

8    algorithm that is alleged to infringe claim 1 of the patent.

9            Adobe Camera Raw has hundreds of other features

10   and I don't think any of them are accused.  In fact, I know

11   none of them are accused of infringement here.

12           I don't think there is going to be any argument

13   from counsel that something besides the auto feature and

14   its operation in Camera Raw infringes their patent.  I think

15   what they have been arguing for the trial was they could use

16   the entire market value rule to capture the value of the

17   larger Camera Raw.  And now they're saying, well, we're not

18   going to use the entire market value rule but we do think

19   that this Cornell case supports for the proposition that --

20           THE COURT:  The smallest saleable units.

21           MR. McCANN:  Yes, your Honor, which I don't

22   believe the case supports.

23           THE COURT:  Because you think even if there is

24   some merit to the concept of smallest saleable unit, they

25   still need to come up with evidence of consumer demand?

1    MR. McCANN:  That's right.  That's what Judge

2    Rader said in the case.  He said maybe, Cornell, you could

3    have show that the processor -- you could use the processor

4    sales as the revenue base provided you satisfy the entire

5    market valve rule.  You guys shot too high.  You didn't try

6    for the processor, you went above that.  I'm not going to

7    allow it.  You might have been able to do the processor.  I

8    don't know.  But in any event, he went on to grant the JMOL.

9           There is nothing in that case that says you

10   could disregard the entire market value rule and still

11   capture of the value of the processor or the CPU brick or

12   the larger server any more in this case you can capture the

13   value of Camera Raw or Photoshop if you don't use show that

14   the auto feature is the basis of consumer demand for Camera

15   Raw.

16          THE COURT:  Okay.  Does anybody else want to

17   speak for Canon on these issues before I hear from Tarkus?

18          MR. GASPAR:  (Shaking head no.)

19          THE COURT:  No?  Okay.  Tarkus.

20          Good morning.

21          MR. BROWN:  Good morning.  Sidford Brown for

22   Tarkus.

23          The entire market value rule allows a patent

24   owner to seek a royalty on something larger than the

25   smallest saleable unit upon a showing that the patented

1    feature within that smallest saleable unit is the basis for

2    demand of a larger feature.

3            There is no case that they cited that says that

4    the entire market value prohibits you from using actual

5    market data from the market on the smallest saleable unit.

6            There is no possibility of starting at a place

7    lower than the revenues of the products they actually sold.

8    By definition, there is no sales of the smallest unit.  You

9    can't get data for anything smaller than that.

10           THE COURT:  No, but it could be that you need to

11   retain an expert who can come to an informed opinion as to

12   what smaller portion of the revenue is attributable to the

13   accused feature.

14           MR. BROWN:  And we have done that.  The point is

15   we have to start with actual numbers.  And the only use that

16   Tarkus damage expert has made of what they're calling the

17   entire market value as either the value of the accused

18   products or reduced to represent the value of Photoshop and

19   the other smallest saleable units is to start with that

20   actual data as a basis for apportioning out a part of the

21   value that is associated with the accused functionality.

22           We're going to present, presuming the Court

23   permits it, we're going to present testimony from the expert

24   that he has calculated in his damage analysis from the

25   actual market value that is available what he sees as being

redacted - public version

1  the value of the accused functionality.  And those are the

2  numbers that are used in the analysis.  But we have to start

3  with real numbers.

4          What they are objecting to is a showing of how we

5  started with the real numbers from the market and apportion

6  that down to the value of the accused functionality.

7          The case they cite, Uniloc, is not like that.

8  The objectionable showing of the value from the entire

9  market in that case was gratuitous.  It wasn't used in the

10  damage analysis as a part of an apportionment.  It was just

11  put up in front of the jury to prejudice the jury by showing

12  them a large number in a market that the damage didn't apply

13  to.  That is not what we're doing.

14          THE COURT:  So you are not offering it as a

15  check on the accuracy or the reasonableness of the damages

16  figure you are asking for?

17          MR. BROWN:  The only exception to that is that

18  the damage expert has calculated what Mr. Holm's demand

19  would have been in a hypothetical negotiation based on

20  evidence as to his past licensing practices.  And as it

21  turns out, doing that exercise comes up with a number that

22  is very similar to the reasonable royalty that our expert

23  reached through analysis of the RPX license and adjustments

24  to that license.

25          So we do have that, and whether you call that a

1   check, the similarity of the numbers is something that

2   supports the reasonableness in our view of the analysis that

3   was done to come to the reasonable royalty opinion.

4           But, again, this is not like Uniloc where the

5   comparison was just gratuitous.  It was put up there really

6   just for prejudice.  There was no analysis of that market

7   that derived the opinion in that case.

8           And, again, just to reiterate, and I know this

9   is in the papers and I don't want to waste a lot of time

10  on things that I know the Court has already read, but the

11  Cornell case does look at a situation that is very similar

12  to this, and it's a case that actually has quite a bit of

13  analysis as to how you apply the entire market value rule

14  in this sort of a situation where you have a patented

15  feature that is included within another item that is

16  included within the smallest saleable unit.

17          In Cornell, Judge Rader did say that the

18  processor was the appropriate royalty base because that was

19  the smallest saleable unit.  In that case, the accused

20  functionality was a part of a feature that was itself a part

21  of the processor.  And their argument is analogous to what

22  happened there.

23          The analogous market in this case is the market

24  for Photoshop which was the smallest saleable unit that

25  included the patented feature.

1    Adobe Camera Raw was not separately marketed.

2    There are no sales numbers.  There are no revenues, no real

3    market numbers from Adobe Camera Raw for us to use.  The

4    only way we can get to the value of Adobe Camera Raw is by

5    using sales data for Photoshop because that is all there.

6    There is no smaller saleable unit.

7    So just as Judge Rader realized you had to allow

8    them to use the processor as a starting point for royalty

9    analysis, we need to be able to use real data.  Namely, the

10   revenues associated with Photoshop.

11   THE COURT:  And did you read Cornell as not

12   requiring any showing of consumer demand with respect to the

13   processor, for instance?

14   MR. BROWN:  What the opinion said, and I have

15   the quote in the letter that was submitted to the court, was

16   that if a patent owner is going to seek a royalty on a

17   larger market, then the market for the smallest saleable

18   unit, they need to justify that by showing that the patented

19   feature is a basis for consumer demand in the larger product

20   market.  And I think that's a correct statement of the

21   entire market value rule.  But that is the way I read

22   Cornell.

23   Furthermore, we do intend to present evidence

24   that the patented feature was a basis for demand in the

25   market for Photoshop, that Camera Raw was very important and

1    that this feature was very important to Camera Raw.  But I

2    don't believe that that is properly called an application of

3    the entire market value rule, and that certainly is what

4    Tarkus meant when they said we're not relying on that rule

5    to ask for a royalty in a market larger than the market for

6    the smallest saleable unit.

7            THE COURT:  What evidence are you introducing to

8    show that the auto feature is the basis for consumer demand

9    for the Adobe Camera Raw product?  If I understood you

10   correctly you're now representing you intend to do that.

11           MR. BROWN:  We have evidence from Adobe's white

12   papers and books talking about the use of the auto feature

13   and the -- in Adobe Camera Raw.  We have surveys showing

14   usage rates for Adobe Camera Raw within the population of

15   Photoshop users.  We have survey evidence showing that these

16   accused tone controls are used by users that were surveyed

17   essentially all the time, that I think it was 96 percent of

18   the time when people are using Adobe Camera Raw.

19           THE COURT:  Are you intending to show evidence

20   that the auto feature contributes to consumer demand for

21   something larger than Adobe Camera Raw, namely Photoshop or

22   Creative Suites.

23           MR. BROWN:  Sure.  Because that survey data and

24   the other contextual data to which I referred included data

25   showing the importance of Camera Raw and the increasing

1  importance of Camera Raw as a format for photographers who

2  were using Photoshop.

3          THE COURT:  So if I told you you're limited to

4  presenting evidence of revenues and sales figures related to

5  Adobe Camera Raw and you can't tell the jury about revenues

6  and sales figures for Photoshop or Creative Suites, what

7  data would you be able to put in?

8          MR. BROWN:  Your Honor, there is no sales data

9  for Adobe Camera Raw.  It's not offered by Adobe as a

10 separate product.  It's only included, it's packaged with

11 Photoshop, Photoshop Elements and Photoshop Lightroom.

12 That's why we relied on that data.  It's the smallest

13 saleable unit is Photoshop, Photoshop Elements and Photoshop

14 Lightroom.  They don't sell Adobe Camera Raw as a free

15 standing product.

16         THE COURT:  So that's why you need it as a

17 starting point.

18         MR. BROWN:  Correct.

19         THE COURT:  Going back to Mr. McCann's

20 objections, he talks about some hearsay objections to listed

21 exhibits, that's what he started with.  Are you intending to

22 use those or offer those into evidence?

23         MR. BROWN:  I'm intending to offer into evidence

24 the exhibits to Mr. Yurkerwich's expert report.  The first

25 of the exhibits is Mr. Yurkerwich's curriculum vitae which

1   is admissible on his qualification as an expert.

2        The second is a list of the documents that he

3   used in developing the opinions in this case.  Again, he can

4   show a basis for that and I think that again goes to show

5   the qualifications and the basis for his expert report.

6        There are then a series of compilations of

7   financial information that I think are not hearsay, they're

8   based on Adobe financial information, including the Excel

9   spread sheet that Mr. McCann had some printouts of.  That

10  data was produced to us by Adobe as their financial

11  information.  It's their business records.  I don't think

12  they're hearsay.

13       The charts are compilations of financial data

14  that have been produced in the case.  I think they're

15  admissible as compilations under Rule 1006 of the Federal

16  Rules of Evidence.

17       But, yes, we do intend to offer those schedules.

18       THE COURT:  Well, on his CV for instance, how is

19  that admissible?  Why can't you just have him testify to his

20  own experiences?

21       MR. BROWN:  I could have him testify, your

22  Honor.  It is just a matter of saving the time of having him

23  reading.

24       THE COURT:  I mean I suppose if you can

25  establish that he doesn't have a recollection, perhaps it's

1   past recollection recorded maybe you could get it in, but

2   I'm assuming you're not going to establish he can't remember

3   his own background, correct?

4          MR. BROWN:  I'm not planning to try to establish

5   that, your Honor, no.

6          THE COURT:  Anything else you want to say on

7   Adobe's objections?

8          MR. BROWN:  No, your Honor.

9          THE COURT:  Okay.  Mr. McCann.

10          MR. McCANN:  Very briefly, your Honor.

11          Coming into this case we believed that there

12   would be arguments about entire market value rule.  When the

13   case began we were told there would not be.  I think we just

14   heard a moment ago, I'm still not arguing entire market

15   value rule, I am going to show that the --

16          THE COURT:  He's going to satisfy the entire

17   market value rule showing, but he's not going to argue it or

18   ask for it, so where does that leave me?

19          MR. McCANN:  Well, first I think that they have

20   conceded that they are not going to allege it, so I think

21   based on that the court should preclude any evidence that

22   you're trying to seek -- that you're trying to use the

23   revenue base of the larger thing.  And he pointed to two

24   pieces of evidence.  He said, first, we're going to show an

25   apportionment.  What he was referring to was Mr. Yurkerwich

1   has calculated a 44 dollar per unit value for Adobe Camera

2   Raw, and he's saying there's a three percent royalty rate

3   that can be applied to that, and that leads to an effective

4   royalty of a dollar thirty-six per unit for the auto

5   feature.  But the point is that's derived by taking the

6   larger revenue base and applying a percentage to it and then

7   getting to the lower number.  You can only do that if you

8   are using the entire market value rule.

9        The second thing was the sanity check.  He was

10  talking about Photoshop Elements and what he's saying there

11  is Photoshop Elements is 57 dollars per unit, and if I

12  applied a five percent royalty rate to that, which they

13  contend is Mr. Holm's policy to ask for a five percent rate,

14  that works out to about 62 million dollars which is very

15  close to the 56 million dollars that you get when you use 44

16  dollars and three percent.  So no matter how you slice it,

17  Judge, what they're saying is we're using the entire market

18  value rule even though they have told you that they are no

19  longer relying on it.

20        THE COURT:  What about this idea that there

21  needs to be a starting point, isn't that correct?

22        MR. McCANN:  There are a lot of ways, Judge,

23  that you can go about I think proffering what your damages

24  are.  The one they started with in this case was to show

25  that the auto feature is the basis for consumer demand for

*redacted - public version*

1    something larger and they've abandoned it.  They could, for

2    example, have done their own survey.  They could have said,

3    well, okay, we have surveys about the use of the Camera Raw.

4    Let's commission our survey and find people, ask them about

5    this auto feature, how much would you be willing to pay for

6    it.  Do you like it, do you not like it?  And based on that

7    you could then construct evidence or a theory or an

8    instruction on what the value of the Camera Raw is.

9             I mean the cases are clear.  It doesn't have to

10   be based on price.  It just has to be based on a reasonable

11   scientific method.  There would be no issue with that.  I

12   think the problem is they structured this around the use of

13   the entire market value rule and then as I think the case

14   developed the evidence is just not there to support it.

15   There is no evidence of the use of this auto feature that

16   will be anywhere in the record.

17            The books he's referring to, a single page in a

18   200 page book that says we have this feature.  There's no

19   evidence about it being the basis for consumer demand, so

20   coming into the trial they backed away from it.  And that

21   leaves the court with the current problem, how can the court

22   allow a jury to hear evidence about the larger revenues, the

23   larger market share, if they should no longer be permitted

24   to use the entire market value rule because they've conceded

25   they're not going to.

```
 1                    THE COURT:  All right.  What about any response
 2      to the hearsay objections?
 3                    MR. McCANN:  It's hearsay, your Honor.
 4                    THE COURT:  Thank you.  Does Canon have issues?
 5                    MR. GASPAR:  We do, your Honor.  Let me -- may I
 6      approach.
 7                    THE COURT:  You may.
 8                    (Documents passed forward.)
 9                    MR. GASPAR:  Let me start if I can with a couple
10      points on this entire market value rule issue.  I won't
11      repeat everything Mr. McCann said unless you'd like me to.
12                    THE COURT:  Feel free to add what you want.
13                    MR. GASPAR:  Let me add a couple things that are
14      directly on point and even a more egregious situation for
15      Canon.
16                    First of all, Canon didn't move for a motion in
17      limine or preclusion of Mr. Yurkerwich.  We did ask before
18      opening statements that the three billion dollars and 1.5
19      billion dollars be removed and your Honor granted that.  So
20      there isn't any inconsistency in the timing of what we're
21      asking for or the substance of what we're asking for.
22                    Tarkus -- the second point I want to follow up
23      on is that Tarkus here is absolutely offering use of whole
24      printer sales and even consumable sales as a check on its
25      primary damages analysis.  It is gratuitous, it is
```

1    absolutely a check, there's no question about that.  And

2    here, when we talk about the actual market value on the

3    smallest saleable unit, there are a couple of things in

4    Canon's case that are even different from Adobe's.

5              First of all, we give away our software.  We

6    don't charge anything for it.  So the smallest saleable unit

7    is free.  They just don't like that fact.

8              The second thing is that instead of using just

9    the printer sales, which is the entire printer plus the

10   software bundled with it is the smallest saleable unit, they

11   use consumable sales as well.  So they take the printer, the

12   free software, and then they blow-up that revenue figure by

13   a multiple of 3.5 to take into account ink cartridges or

14   printer paper sales and they consider that the smallest

15   saleable unit.  It absolutely is unsupportable.

16             So there's absolutely no tie or evidence at all

17   in the record between this consumables figure and the Auto

18   Photo Fix feature, the one feature within the software

19   that's free that's bundled with printers.

20             So those are Canon's extra facts on the entire

21   market value.

22             We have a couple of other issues if you want to

23   move on.

24             THE COURT:  Yes.  Go ahead.

25             MR. GASPAR:  We have the same complaints with

1   expert reports and use of expert reports.  I can read in the

2   exhibit numbers if you'd like me to.

3                    THE COURT:  I think you should, yes.

4                    MR. GASPAR:  Our objections include those to

5   PTX-183, 183-67 through 183-104, PTX-684, PTX-1277A, and

6   PTX-183-17.  Those are all either Mr. Yurkerwich's report or

7   his exhibits to the report, scheduled and what not.

8                    The last issue is with regard to the papers that

9   I handed up.  The first paper which is PDX-462 is a blow-up

10  of part of Mr. Yurkerwich's report, and the page that is

11  blown up is this one page PTX-183-17 that I gave you right

12  behind that.

13                   And the other document that's referenced on

14  PDX-462 is PTX-692.  PTX-692 is a Japanese language string

15  of e-mails.  They are all dated in 2010.  What PTX-183-17,

16  the expert report page, purports to show is a translation of

17  this Japanese language e-mail, but it's referred to as a

18  2009 Canon e-mail.  We never received any translation for

19  this.  It wasn't served with the expert report, it wasn't

20  disclosed on any exhibit list, so there's a, I think a

21  pretty obvious discrepancy between how it's being

22  represented in the report and what it in fact actually is.

23  So we don't think they should be able to use either the

24  demonstrative PDX-462 or the underlying expert report page

25  as evidence, or of course the PTX-692.

 1              THE COURT:  Is PDX -- excuse me -- PTX-692 on

 2    their exhibit list?

 3              MR. GASPAR:  It is.  Exactly as it's presented

 4    to you with no translation.

 5              THE COURT:  Thank you.

 6              We'll hear from Tarkus.

 7              MR. BROWN:  First of all, your Honor, we have

 8    not abandoned any position we've taken.

 9              THE COURT:  You're going to need to speak up.

10              MR. BROWN:  We have not abandoned any position

11    regarding the appropriateness of any of these damages

12    calculations at any point during the case.  To the extent

13    that --

14              THE COURT:  So you never asserted the entire

15    market value rule?

16              MR. BROWN:  We never asserted any rule for the

17    proposition that we could base damages on a market larger

18    than the market for the smallest saleable unit.  That is --

19              THE COURT:  Well, you've told me before you

20    understood Chief Judge Rader to say that even for the

21    smallest saleable unit, in order to bring that in you need

22    to show some evidence of consumer demand, correct?

23              MR. BROWN:  No, Your Honor, I hope I didn't say

24    that.  I don't think that's correct.  I think what Judge

25    Rader said is that in order to base damages on a market for

1    something larger than the smallest saleable unit, you need

2    to make this showing and invoke the entire market value

3    rule.  I have that quote in the letter that we submitted.

4         But that's my understanding of what the entire

5    market value rule is.  I think Judge Rader stated it.

6         THE COURT:  All right.  Again, so at no point

7    have you asserted the entire market value rule as a basis

8    for damages against either defendant?

9         MR. BROWN:  We have not asserted that rule in

10   that way, that we are looking for damages on a market larger

11   than the market for the smallest saleable unit.  That's

12   right.

13        The next point I want to respond to is Canon's

14   point about them giving away the software and claiming that

15   that makes that smallest saleable unit.  The software only

16   works with Canon printers.  They give it away in the sense

17   that if you buy a printer and you have a license number that

18   comes with your printer, you can download the software from

19   the Internet to use with that printer.  I don't think that

20   it is accurate to say that that makes the software free or

21   separate market.

22        As to the Japanese e-mail, that is a Canon e-mail.

23   And to any extent to which they thought the translation that

24   Mr. Yurkerwich relayed on was inaccurate or misstated

25   anything, they had the e-mail.  It's been on the exhibit list.

1  They could contest it, just like any other piece of evidence,

2  if they disagree with it.

3          The fact that they are contesting the date shows

4  that they've had a translation of it.  And if they believe

5  that it's inaccurate, they can raise that with Mr. Yurkerwich.

6  But it's not a ground for excluding the evidence.

7          THE COURT:  Are you going to attempt to move

8  into evidence a translation of PTX-692?

9          MR. BROWN:  I'm going to attempt to have

10  Mr. Yurkerwich testify to it.

11          THE COURT:  In Japanese or English?

12          MR. BROWN:  He will testify in English.

13          THE COURT:  How is he going to do if you never

14  produced or put on an exhibit list, as I understand, the

15  English translation?

16          MR. BROWN:  It's part of his work as an expert

17  to develop his opinion.  Even if the translation were not

18  admissible, the original e-mail is admissible and his

19  interpretation of it is something that I think he is

20  entitled to offer.  It's part of his work as an expert in

21  this case.

22          THE COURT:  Okay.  Mr. Gaspar.

23          MR. GASPAR:  Just a couple of misstatements

24  of fact by Mr. Brown that I want to clear up for sure.

25          He said that the software doesn't work without

1    the printer.

2                The software does work without the printer.

3                He also said that you are required to have a

4    registration number to get access to this so-called free

5    software.

6                That is not true.  It's absolutely free.  You

7    can go to the Internet, download without a registration

8    number, without a purchase of a printer whatsoever.  You can

9    use it to manipulate photos.  You can save those photos and

10   use them however you want.  You don't need to buy a printer.

11   You don't need a registration number.

12               As to the e-mail, I think your Honor is talking

13   about the right types of questions when you are asking

14   Mr. Brown.

15               It's not Canon's review of its own e-mail that

16   counts, it's what Mr. Yurkerwich thought what, if any,

17   translation was provided.  We never got that translation.

18   It isn't as far as we know, because we have never seen it,

19   just a little excerpt that is in his report, whether it was

20   the entire string that was translated.  Those are the issues

21   that are raised by the way they presented this.

22               THE COURT:  Well, he at least relied on a little

23   bit of translation in his report.  Shouldn't he be allowed

24   to testify at least to that?

25               MR. GASPAR:  It doesn't say it's from a 2010

 1   e-mail.  The e-mail itself, if you look at it, we didn't

 2   need a translation to know that it was a 2010 e-mail.  We

 3   highlighted for your Honor where the dates are on that

 4   e-mail.  They're all 2010.  They're all in characters that

 5   English speakers can read.  So on its face, it doesn't match

 6   what his report says.

 7                    THE COURT:  Okay.  Thank you.

 8                    Is there anything else from Adobe or Canon

 9   related to what we anticipate to be doing this morning?

10                    MR. McCANN:  Just one other thing, your Honor, I

11   neglected to mention.  I'm sorry.

12                    There is also whether Mr. Yurkerwich can testify

13   about a litigation success multiple.  If I might just hand

14   this up, your Honor?

15                    THE COURT:  You may.

16                    MR. McCANN:  The slide I'm handing up, Tarkus

17   has withdrawn which we appreciate.  I just want to use it to

18   facilitate the discussion.

19                    Mr. Yurkerwich looked at some studies related to

20   patentee win rates in the District of Delaware and his

21   ultimate conclusion is it's a 50/50 proposition in this

22   court whether you win or lose.  That is the basis for saying

23   you can double the value of the damages we're seeking.

24                    What concerns us is the prejudice of testifying

25   to the jury that patentees win in this district as much as

1   67 percent in some studies.  We think that is very

2   prejudicial, and that might be encouraging the jury to sort

3   of just do what perhaps other panels have done in other

4   cases as opposed to winning this case on its own merit.

5          So we don't think he should be allowed to

6   testify to 67 percent or 63.9 percent.  We object to the

7   whole multiple for other reasons we've stated in our earlier

8   papers.

9          But if he were just to say I have looked at some

10  data that indicates the win rate is 50/50, we'll live with

11  that, if the Court is going to permit that testimony.

12         THE COURT:  But you don't want him testifying

13  to there being data that the win rate is higher than

14  50 percent?

15         MR. McCANN:  Yes, your Honor.

16         THE COURT:  Okay.  Does Tarkus want to respond?

17         MR. BROWN:  Your Honor, Mr. Yurkerwich does not

18  intend to testify to the win rates in the Delaware courts.

19  When we withdrew that slide, we understood the basis for the

20  objection.  The reason we withdrew it was their argument of

21  prejudice from reciting those numbers.  So Mr. Yurkerwich

22  does not intend to testify to those numbers.

23         THE COURT:  Okay.  Thank you.

24         So that is it from defense issues for the

25  witnesses we expect to do this morning; correct, Mr. McCann?

1  Mr. Scherkenbach?

2          MR. SCHERKENBACH:  It is.  They have a bunch of

3  witnesses for Mr. Knoll.

4          THE COURT:  Right.  At this point I'm not sure

5  we're getting to Mr. Knoll this morning.

6          MR. SCHERKENBACH:  I don't think we will.

7          THE COURT:  But we will need to make time to

8  deal with their issues about Mr. Knoll before we get to

9  them.

10          Mr. Gaspar, is there anything else?

11          MR. GASPAR:  No, your Honor.

12          THE COURT:  So Tarkus, I'm correct you are

13  still intending to play a deposition and then put on

14  Mr. Yurkerwich?

15          MR. LORIG:  No, your Honor.  Since they're

16  bringing the one witness live who's video we were going to

17  play, we were just going to start with Mr. Yurkerwich.

18          THE COURT:  Start with Mr. Yurkerwich.  All

19  right.  We're going to need to take a short break before we

20  go into Mr. Yurkerwich, but does Tarkus have any issues?

21          MR. LORIG:  Only one additional response to I

22  think both of them, which is many of their complaints are

23  due to the fact that the Federal Circuit decided in ResQNet

24  that settlements should come into evidence under the book of

25  wisdom because it's the closest evidence of what a patent

1   license is really worth.  Up until that point, most of us

2   didn't think they came into evidence.

3             Once it comes into evidence, at least according

4   to the unanimous panel in ResQNet, it's viewed as a floor

5   not a ceiling because oftentimes the factors take the

6   reasonability of, we withdrew that slide because even though

7   we put it to show how reasonable 50/50 was, we recognize the

8   prejudice.

9             But once you let a settlement come in, as you

10  must under ResQNet, you have to let in some factors for

11  bringing it up to a real value, particularly like we have

12  here where Nikon -- we can't tell the jury this, of course,

13  that $7 million was seen before Markman, before a lot of

14  things that happened in this case, and we pledge to the

15  Court that we're not going to do anything that we think will

16  prejudice.

17            We withdraw that 67 percent, but we have to have

18  some way of helping the jury understand that this is a floor

19  not a ceiling.  And we mean to do no prejudice by doing

20  that.  We'll work around that.  That is what the 50/50 thing

21  was all about.  Because you can win or lose.

22            THE COURT:  Okay.  Thank you.  We're still

23  waiting for all of you to give the allocation of the

24  deposition time from the depositions that were played last

25  week.  I need to have you give that to me no later than the

1   end of the lunch break today so we can figure out where we

2   are in terms of the raw time.

3          We'll take a short recess, and then we'll bring

4   the jury in.

5          (Brief recess taken.)

6          *     *     *

7          (Proceedings reconvened after recess.)

8          THE COURT:  Have a seat.

9          All right.  Let me give you some rulings on the

10  issues that are before the Court.

11         The Court has before it, of course, several

12  objections of defendants to plaintiff's damages evidence,

13  all of which evidence defendants argue is essentially entire

14  market value evidence, and since that theory of damages is

15  not being asserted, defendants argue that evidence should

16  be precluded.

17         The Court, of course, has reviewed the extensive

18  materials filed on these issues and listened carefully to

19  the arguments made today and also throughout the trial and

20  finds, I have to say unfortunately, that it is unable to

21  agree entirely with either side.

22         The Court agrees with plaintiff to the extent

23  that plaintiff must be permitted to elicit from its damages

24  expert, testimony as to the revenues of Adobe Camera Raw.

25         And let me just say my discussion now is going

1   to be focused on Adobe but my rulings are the same for Canon.

2            So the Court agrees with plaintiff to the extent

3   that plaintiff must be permitted to elicit from its damages

4   expert, testimony as to the revenues of Adobe Camera Raw.

5   But the Court agrees with defendants that plaintiff is not

6   permitted to elicit on direct examination of its damages expert

7   evidence of the total revenue figures from all defendant

8   products containing Adobe Camera Raw, for instance, Photoshop

9   and Creative Suites.

10           The Court views there to be a dispute as to

11  whether the appropriate focus for damages analysis is Adobe

12  Camera Raw or instead just the Adobe auto feature.  The

13  Court understands that Adobe Camera Raw is the smallest

14  saleable unit containing the Adobe auto feature.  Thus,

15  plaintiff must be permitted to elicit from its expert as a

16  starting point a royalty base for ACR.  That is, Adobe

17  Camera Raw.  Excuse me.

18           However, the Court, in weighing the 403 balance

19  and considering that plaintiff is not asserting the entire

20  market value rule and considering plaintiff should not be

21  permitted to obtain the benefits of the entire market

22  value rule without asserting it and without meeting its

23  requirement of evidence that consumer demand is driven by

24  the accused functionality, given those considerations, the

25  Court rules that the starting point will be revenues for

1  Adobe Camera Raw but plaintiff can only elicit that

2  testimony as a starting point and plaintiff will not be

3  permitted to elicit testimony on direct examination of its

4  expert as to how its expert got to that starting point.

5          If, however, the defendants on cross-examination

6  attempt to challenge the reasonableness of the revenue

7  figure that plaintiff's expert uses as a starting point,

8  then plaintiff's expert will be permitted to respond to

9  questions on cross-examination and/or on redirect, the

10 plaintiff may elicit testimony as to how the plaintiff's

11 expert got to that starting point.

12          The plaintiff will not be permitted on direct

13 and will not be permitted at all unless defendants open the

14 door in the Court's view to this, the plaintiff will not

15 be permitted to offer evidence of the larger revenue figures

16 as a so-called check on the reasonableness of the overall

17 damages figure that plaintiff's expert is opining is

18 appropriate.

19          The overall sales figures; and by that, I mean

20 the number of units sold as opposed to revenue; the overall

21 sales figures for products such as Creative Suites and

22 Photoshop are permitted.  That is, they will be permitted

23 to be testified about as they are relevant to indirect

24 infringement.

25          The Court further will, if defendants request

1   and provide such an instruction to the Court, the Court will

2   give the jury limiting instruction during the testimony of

3   plaintiff's damages expert and, again, as part of final

4   instructions as to the limited purpose for which revenue

5   figures beyond Adobe Camera Raw, if they come in, are being,

6   is being offered.

7           As I say, the ruling is focused on Adobe as

8   that was the bulk of the argument today but the ruling is

9   the same for Canon and its analogous products.

10          Turning to the other objections that were

11  argued this morning, defendants raised hearsay objections

12  to exhibits to the expert report.

13          The Court sustains the objections to the

14  expert's CV and the materials he looked at.

15          The Court overrules the other hearsay

16  objections, for instance, going to exhibits that are

17  financial records and spreadsheets as these documents are

18  business records.

19          Finally, the Court turns to Canon's objections

20  to PDX-462, PTX-183 and PTX-692.  These objections are

21  sustained to the extent that plaintiff will not be permitted

22  to show the demonstrative which is just a reproduction of

23  a translation of a portion of an exhibit that the Court is

24  not admitting and also -- that that is a demonstrative,

25  sorry.  And I'm not admitting the two underlying exhibits.

1     All of these documents relates to testimony,

2     relates to expert testimony about a purported 2009 e-mail

3     in Japanese, a translation of a portion of which appears in

4     the expert's expert report.  The date of the e-mail appears

5     actually to be 2010.  No translation was provided to the

6     defendants in discovery or put on the exhibit list.  Thus,

7     the Court excludes the exhibits and the related demonstrative

8     exhibit as unfairly prejudicial and confusing.

9     So that is the Court's rulings.  Are there any

10    questions from the plaintiffs before we bring the jury in?

11    Mr. Brown?

12    MR. BROWN:  Your Honor, in stating your ruling,

13    you stated ACR is the smallest saleable unit.  I just wanted

14    to make sure that the Court is clear that ACR is not sold as

15    a separate unit.  There are no financial data from sales of

16    ACR.

17    THE COURT:  Yes, you have made that clear.

18    MR. BROWN:  Also, the Court has ruled that we

19    can't use the product revenues and royalty on them as a

20    check.

21    I wasn't sure whether that applied to the

22    presentation of Mr. Holm's and Tarkus 's demand.  It would

23    be based on five percent royalty on what information he

24    would have had available as a projection of Adobe royalties,

25    which is one of the topics that the expert was going to

1     testify to.

2              I don't want to put that in if that is within

3     the range of things you intended to exclude.

4              THE COURT:  Yes, I did.  Thank you for asking

5     that.  I do intend to exclude use of revenues beyond Adobe

6     Camera Raw as a check for any purpose unless I make a ruling

7     during the testimony that the defendants have opened the

8     door to it.

9              MR. BROWN:  Thank you, your Honor.

10             THE COURT:  Okay.  Mr. Lorig.

11             MR. LORIG:  Would you permit me a question just

12    to make sure we don't get into trouble?

13             THE COURT:  Certainly.

14             MR. LORIG:  As Mr. Brown noted, the smallest

15    unit of Adobe Camera Raw was still called Essentials, which

16    I think was the $99 or something like that.  So I think

17    what Mr. Yurkerwich's damage calculations were, rather than

18    looking at the multi-thousand dollar Creative Suites, he

19    looked at the smallest Adobe Camera Raw that was sold, which

20    was Elements which I think was $99 and thought that the auto

21    feature was worth $44.

22             I'm assuming, when your Honor says limiting it

23    to the Adobe Camera Raw sales, you are referring to the

24    Elements sales that are in the damage report and you mean

25    to exclude things like Creative Suites that might sell for

1    thousands.  I'm a little confused and I assume that is what

2    your Honor meant but I wanted to clarify.

3              THE COURT:  I think we're going to have to see

4    question by question because I have not committed to memory

5    all the various revenue numbers.

6              MR. LORIG:  I suspected not.

7              THE COURT:  But the point is in the Court's

8    view, the record supports a finding at this point that Adobe

9    Camera Raw either was or could have been sold on its own and

10   therefore it is, at best, from the plaintiff's perspective,

11   the appropriate basis for a royalty base.  I understand the

12   defendants may try to argue that it is something smaller

13   than that.  But that is the largest potential revenue base

14   that the Court believes the jury should hear evidence of

15   unless defendants open the door to something bigger than that.

16             MR. LORIG:  No, I think we're okay on it.

17   That's why I wanted to put it on the record before we go

18   there.  And Mr. Brown could correct me, but my understanding

19   is originally Adobe Camera Raw was sold as a plug-in for I

20   think $99 and then the Adobe Elements, those were the

21   smallest standalone.  And I wanted to put this on the record

22   and we'll proceed slowly in this area to make sure.

23             THE COURT:  We may all have to spend some time

24   together at sidebar.

25             MR. LORIG:  I just wanted to make it clear on

 1    the record.  Thank you.

 2              THE COURT:  Thank you.  Adobe.

 3              MR. McCANN:  Only, your Honor, just with Canon

 4    Camera Raw there was a point before the auto feature was

 5    part of it where it was sold standalone for 99, not bundled

 6    with something else.  I think what Mr. Lorig was referring

 7    to, Elements, that's Photoshop Elements which was sold for

 8    57 dollars, has a lot of features, Camera Raw was within

 9    that.  As I understand the court's ruling, there shouldn't

10    be any testimony regarding the revenue.  And we will object

11    if the questions are asked.

12              THE COURT:  I'll leave it to you to object if

13    you think the question is inconsistent with my ruling.

14              Anything from Canon before I bring the jury in?

15              MR. GASPAR:  Yes, your Honor.

16              THE COURT:  Why don't you come to the podium?

17              MR. GASPAR:  Just if it please, your Honor,

18    clarification on what Canon's smallest saleable unit is

19    according to your ruling.  Is it the printer revenue, is it

20    the zero revenue from the software that's accused?

21              THE COURT:  Why don't you break it down for me

22    from the smallest base up to the largest base and I will

23    tell you?

24              MR. GASPAR:  The Auto Photo Fix feature is one

25    feature of many within the Easy PhotoPrint EX software.

 1    That software is available for a free download as I

 2    mentioned before.  The Easy PhotoPrint EX software is also

 3    bundled with printers, the inkjet printers that are accused

 4    of infringement here.

 5                THE COURT:  Right.  And that is bundled further

 6    with consumables such as ink and paper.

 7                MR. GASPAR:  No, it's not.

 8                THE COURT:  That's what plaintiff has lumped

 9    that evidence in as part of their analysis.  So the analogy

10    in the court's view is the Easy-PhotoPrint EX software, so

11    the plaintiff's expert will be permitted to testify that

12    that is the starting point for his royalty base revenue

13    calculation.

14                MR. GASPAR:  Thank you, your Honor.

15                THE COURT:  Mr. Lorig.

16                MR. LORIG:  Sorry, your Honor.  There is no

17    revenue from the Auto Fix software because it's either

18    bundled -- you know, when you buy a Canon printer in a box,

19    it includes the software loaded to the printer, and of

20    course the ink cartridges are in the printer so it will work

21    and there's some sample paper, that's the box.  So the

22    lowest revenue generator is a printer that includes the

23    software, the paper and the ink, and that's what we bought.

24                In addition, they give it away.  So there are no

25    revenues from giving it away, the only revenues are from the

1    box that includes the software loaded in it.  And I'm

2    assuming that's what we're allowed to do because otherwise X

3    percent of zero is zero.

4         THE COURT:  Well, your expert could have derived

5    a revenue stream based on his opinion and his expert

6    analysis as to how much value is contributed to the price of

7    let's say the printer from the Easy PhotoPrint EX, couldn't

8    he?

9         MR. LORIG:  Respectfully I don't think so

10   because if the expert had tried to import a revenue value to

11   software that's given away on the Internet, that would be

12   pure speculation.  I can't think of a way of doing it.

13        Following on what Judge Rader said is the whole

14   purpose of what they're trying to do is they're developing

15   their entire market value rule thing is to try to keep you

16   at the smallest saleable unit if you're not accusing the

17   larger component.  The smallest saleable unit is the box

18   that includes the software, the printer, the ink, etcetera.

19   That's what's sold.  You don't sell the software that

20   someone can download.  It's not sold, there's zero revenues.

21        So I would ask the court to consider allowing us

22   on this -- in effect, this is their fourth motion for

23   reconsideration on this issue -- to allow us to use what

24   Judge Rader said in Cornell, the smallest unit that's sold,

25   which is the printer loaded with the software, the ink, and

1     the paper.

2              THE COURT:  Mr. Gaspar, do you want to respond

3     to what may be a fourth motion for reconsideration?

4              MR. GASPAR:  I don't understand the counting,

5     frankly, and there's been no motion for reconsideration in

6     the first instance.  This is the, this letter on this issue

7     is the first time we've raised this.  We did object to their

8     slides which were unfairly prejudicial going into the

9     opening statement.  I don't know if that's what they're

10    referring to.

11             THE COURT:  Let's just view it at this time as

12    their reconsideration for the motion of how I just ruled.

13             MR. GASPAR:  Okay.  Your Honor's question of

14    whether they could have had an expert determine how much of

15    the printer price could be allocable to the software, it is

16    a perfect question.  Of course they could have done that.

17    What they did instead was we're going to use this printer

18    price as a basis to start our inflation of revenue figures,

19    so obviously they could use that printer price to go up,

20    they just chose not to use it as a starting point to go down

21    and figure out how much the software, the Easy-PhotoPrint EX

22    software, was worth.  They know how to make calculations

23    based on the full price of the printer, they just decided to

24    go up instead of go down.

25             So I don't see any reason why they should be

1   allowed to continue with their use of the printer price as

2   the smallest saleable unit, number one, and certainly not be

3   able to take that printer price and escalate it up to

4   include units that are not even sold with the printer,

5   namely an estimate of consumables.

6            THE COURT:  Do you think Judge Rader when he

7   talked about smallest saleable unit in Cornell meant what

8   was being sold or what could have been sold?

9            MR. GASPAR:  In that case it was only what was

10  being sold.  There were no sort of convoy products.

11           THE COURT:  So then why shouldn't I reconsider

12  and say that the starting point here can be for the

13  plaintiff's analysis today the printers which are bundled

14  with the software?

15           MR. GASPAR:  I think we might be talking past

16  one another.

17           THE COURT:  Try again.

18           MR. GASPAR:  The smallest saleable unit here is

19  the free EX software.  In Cornell the smallest saleable unit

20  was the processor.

21           What effectively is being argued in this motion

22  for reconsideration is that they should be able to use as

23  the smallest saleable unit the printer itself, which in that

24  case was the entire, the Cornell case was the entire blade

25  server.  So they aren't starting with the lowest saleable

1    unit, which is the free EX software, they want to start with

2    the printer sales.

3              They could have taken the printer sales if they

4    wanted to, even though it's not proper because it's not the

5    lowest saleable unit, they could have taken that sales

6    figure and figured out how to allocate the revenue from that

7    printer to just the EX software.

8              They didn't do that analysis.  They chose not to

9    do it.  Instead what they chose to do is to take that

10   printer cost, which includes the print heads, the plastic,

11   the feeder, all the other mechanical parts and other

12   computer parts of the printer and start with that entire

13   cost, and then further inflate that based on an estimate,

14   their estimate, of what the amount of paper that might be

15   sold and the amount of ink cartridges that might be sold

16   with it.  So the consumables have to go.  That's absolutely

17   not part of the smallest saleable unit.

18             We also think that the printer sale itself is

19   not the smallest saleable unit because there was no

20   allocation down from there to what the EX software, which

21   was freely available and literally free as it was available,

22   should cost.

23             THE COURT:  Thank you.

24             Mr. Lorig.

25             MR. LORIG:  Your Honor, respectfully, you don't

1   sell what you give away.  The Auto Fix software doesn't work

2   without a printer, and the, as I read Judge Rader's attempt

3   to sort of clarify what's meant as they're trying to explain

4   this total market value rule is, look, if there's something

5   that's sold like a microprocessor that was in Cornell,

6   that's what you look at.  Here what's sold is an infringing

7   device that practices -- this patent doesn't read on an

8   apparatus.  It reads on a method.  And the method is

9   practiced by the printer.  It's not practiced by the

10  software.  You know that old joke about if one clapped

11  hand's.  In order to practice the method, you need the

12  printer loaded with the software.  The printer is sold with

13  the software in a box including ink cartridges and sample

14  paper.  That's the way it's done.  And I understand the

15  court's ruling.  But to be consistent with Cornell, I

16  believe the question you asked Mr. Gaspar is correct,

17  shouldn't it be the box with the materials in it.

18  Otherwise, as I said, you have one hand clapping, you have

19  something that's just given away.  There's no way to do it.

20          And I can't believe that even the three judges

21  on the Uniloc panel, remember this wasn't en banc, they

22  didn't purport to change the law over the last 25 years, I

23  can't imagine those three judges intended to say, well, if

24  you can't figure out a way of multiplying zero by a number,

25  you get no damages, even though the statute says you're

1   entitled to a minimum rate.  I think what they were

2   struggling with is bad facts make bad law sometimes.  You

3   have somebody in the Eastern District of Texas getting

4   carried away, and what Judge Rader did when he was trying to

5   clarify what everybody meant, remember he was on the panel,

6   is look, look for the smallest unit that's sold and that's

7   what you look at, whether it's a percentage, a dollar

8   figure, paid up, there's a lot of logic to it.  There's no

9   logic when something is given away, it's not logical and I

10   don't think that's what anybody intended.

11              THE COURT:  All right.

12              MR. BROWN:  Your Honor, could I ask one

13   question?

14              THE COURT:  Go ahead.

15              MR. BROWN:  I'm sorry to drag this out.

16              Your Honor, what Mr. Gaspar said about us just

17   taking the printer price and inflating it is not correct at

18   least in one sense that I want to explain to the court

19   before the court makes this ruling.

20              There are a range of printer prices from the

21   cheapest printer up to the most expensive accused printer,

22   and the printer price that we have used is the cheapest

23   printer price.  So first of all, when you use that price for

24   the entire set of accused products, you are not asking for

25   the entire value of the printer, you're asking for a price

1   that is less than the entire value of the printer, and in

2   most instances dramatically less.

3         The reason that Tarkus's damages expert used

4   that price was because it is the smallest observable revenue

5   associated with these accused products.  And this is true

6   for both Adobe and for Canon.

7         So, again, similarly for the Adobe analysis, we

8   didn't use the price of Photoshop in this analysis, we used

9   the price of the cheapest products which was Photoshop

10  Elements, and we imputed that lowest price not only to the

11  sales of Photoshop Elements but to the sales of Photoshop

12  and the sales of Creative Suites.

13        And the value of this accused functionality is

14  in our view represented by that number, at least for the

15  following reasons, that was the minimal set of features that

16  we could get a market observation on.  And the value of that

17  feature in the more expensive products is going to be higher

18  than the value of the accused feature in the cheapest

19  products because of complementarities between the usefulness

20  of the feature with the other features that are included in

21  the more expensive printers.

22        So although we've used a number that was derived

23  from Photoshop Elements or from the cheapest Canon printer,

24  the use of that does not represent the use of the entire

25  printer revenue from Canon or the entire Photoshop revenue

*redacted - public version*

1    from Adobe, but instead is calculated to be a small part of

2    that that is intended to represent as best we can in the

3    absence of more direct data the value of Adobe Camera Raw

4    and the accused functionality in the one instance and the

5    value of the software in the other instance.

6              So I just wanted to make that clarification that

7    we're not -- the way we have prepared this analysis, the

8    part of the analysis that seems to be in question here did

9    not take the entire printer value, entire printer revenue,

10   and the reason that we chose the cheapest one was because it

11   was representative of the value of the accused

12   functionality.  But as I understand the court's ruling,

13   since that value is actually a printer price, or that value

14   is actually a Photoshop Elements price, we can't use it,

15   even though it was used as a representation of the value of

16   the included sub-product of Adobe Camera Raw in the one

17   instance and the accused software in the other instance.

18              I just want to, I want to make sure that the

19   court understands that we weren't asking to use the entire

20   revenue for Photoshop or the entire revenue for printers.

21              THE COURT:  Okay.  Thank you.

22              Mr. Gaspar.  If you wish.

23              MR. GASPAR:  Mr. Lorig's point was that there's

24   no logic in considering the Easy PhotoPrint EX as free.  If

25   that's his view, their expert could have done a workup to

1    consider what it was worth.  They didn't do that.

2              As to the question about you being able to use

3    the software with or without a printer, there is no dispute,

4    you can use the software without a printer.

5              THE COURT:  Well, you say there's no dispute,

6    Mr. Lorig says there is a dispute.

7              MR. GASPAR:  Our witness is going to say that,

8    your Honor.

9              THE COURT:  Well, that's your witness.

10             MR. GASPAR:  Our lead witness is going to say

11   that.

12             So even if there is a fact dispute about whether

13   you can use the software with the printer or use it without

14   the printer, this point about using the lowest priced

15   printer is also not true.  They have, in our -- I know you

16   probably don't have it any more but the exhibits to our

17   letter, exhibit A shows this Canon printer revenue per unit

18   of 33 dollars.  Exhibit B, you don't have to go too far in

19   their analysis where they work up to three billion dollars

20   of revenue, doesn't use the 33 dollar number.  They use a 67

21   dollar number for their printer.  So they're all over the

22   price.  And what the printer cost is they're not using,

23   certainly not consistently, the lowest priced printer value.

24   That's simply not the case.  This really all goes to why Mr.

25   Holm offered a license for $250,000 flat.

1     THE COURT:  Okay.  What I'm viewing the last ten

2  or 15 minutes or so as a plaintiff's motion for

3  reconsideration following court's clarification of its

4  ruling with respect to Canon.  I'm going to grant the

5  plaintiff's motion for reconsideration.  I have reconsidered

6  and I am going to allow the plaintiff to use as the starting

7  point for its analysis of damages against Canon revenues

8  from the printers with which the Easy-PhotoPrint EX software

9  is bundled.  Again, can't use it as a check and can't put in

10  the larger revenue figures beyond that that the expert may

11  have used to derive that figure unless and until the

12  defendants, in this case Canon, question on cross

13  examination the reasonableness of that revenue figure.

14     Beyond that, I have not granted any

15  reconsideration of the court's ruling.  And I realize that

16  although we're getting a very late start with the jury

17  today, we will probably move very slowly through Mr.

18  Yurkerwich's testimony and I will rule on specific

19  objections to questions as they come up.

20     Anything else before I bring the jury in from

21  the plaintiff?

22     MR. LORIG:  Not from plaintiff, your Honor.

23     THE COURT:  From Adobe?

24     MR. McCANN:  No.  Other than we just preserve

25  our objections previously as stated.

1     THE COURT:  Certainly.

2     And from Canon?

3     MR. GASPAR:  No, your Honor.

4     THE COURT:  Let's bring the jury in, please.

5     (Jury returned.)

6     THE COURT:  Good morning, ladies of the jury.

7     Welcome back.  I hope you had a good weekend.  I hope you

8     had a nice hour this morning.  I apologize for the late

9     start with you.  I had some matters I had to attend to, but

10    we are, believe it or not, ready to proceed at this point.

11    And we'll turn to the plaintiff to call their

12    witness.

13    MR. LORIG:  Excuse me, your Honor.  Mr. Brown

14    will present Mr. Yurkerwich, our royalty expert.

15    THE COURT:  Okay.  Thank you.

16    Mr. Brown, for the record, why don't you call

17    the witness formally.

18    MR. BROWN:  I call Mr. David Yurkerwich.

19    THE COURT:  Thank you.

20    ... DAVID E. YURKERWICH, having been first duly

21    sworn, was examined and testified as follows ...

22    THE COURT:  Good morning to you, Mr. Yurkerwich.

23    Mr. Brown, you may proceed.

24    MR. BROWN:  Good morning, Mr. Yurkerwich.

25    Good morning, ladies of the jury.

redacted - public version

Yurkerwich - direct

1            THE WITNESS:  Good morning.

2                      DIRECT EXAMINATION

3    BY MR. BROWN:

4    Q.     Mr. Yurkerwich, have you been retained as an expert

5    witness in this case?

6    A.     I have, together with my firm, Charles River

7    Associates.

8    Q.     Mr. Yurkerwich, what is your occupation?

9    A.     I work with Charles River Associates.  I'm a vice

10   president with the company.  It's an economic consulting

11   company.  And we work a lot with patents, valuing patents

12   for licensing, and also evaluating patents in the context of

13   damages in patent litigation like this.

14                 MR. BROWN:  Could we have demonstrative PDX-402,

15   please?

16   BY MR. BROWN:

17   Q.     Mr. Yurkerwich, have you prepared a series of slides

18   to help with your presentation today?

19   A.     I have.

20   Q.     And is this one of those slides?

21   A.     It is.

22   Q.     Does this slide review some of your qualifications?

23   A.     It does.

24   Q.     Would you tell the Court and the jury some of your

25   qualifications?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 52 of 277 PageID #: 8977
*redacted - public version*
1188

Yurkerwich - direct

1    A.     Sure.  Without reading the slide, I have been working

2    in the field of patented technology for over 30 years,

3    particularly with respect to valuing patents and also

4    helping license and sell patents.

5              I lead the patent transactions group at Charles

6    River Associates, which is a global consulting company.  We

7    have about 600 employees.

8              As a result, I had the opportunity to complete

9    numerous deals, licensing and sales deals for software and

10   computers and electronic devices like that are the subject

11   of this case.

12             I have testified in court about 20 times on the

13   subject of patent damages.

14             I'm currently involved in managing a large

15   patent portfolio; and,

16             I'm also helping a multinational company with

17   their worldwide patent program.

18             I originally studied at Villanova University.  I

19   majored in accounting.

20             After I graduated, I joined Arthur Andersen in

21   their Washington, D.C. office.  I was there for six years.

22   I became a CPA.  And,

23             I left Arthur Andersen in 1980 to form a company

24   called Peterson Worldwide.  I was with Peterson for 18 years.

25   I was the president of Peterson at one time and then a vice

Yurkerwich - direct

1    chairman.  I also helped develop its patent or intellectual

2    property transaction group.

3            When Peterson was sold in 1998, I spun off the

4    intellectual property part of the business, the patent part

5    of the business, and started a new company called InteCap.

6    And we grew that company to about 135 people.

7            Then we sold the company to Charles River

8    Associates, which is also called CRA.  We sold the company

9    to CRA in 2004 to be part of a larger global consulting

10   group.  And,

11           I've been with CRA since 2004.

12   Q.    Mr. Yurkerwich, you have testified that you have had

13   a lot of experience with licensing and evaluating patents.

14   In what technology areas have those licensing activities

15   taken place?

16   A.    It's really been in many technology areas but I had a

17   lot of experience in the area of information technology,

18   telecommunications, computers, hardware and software.

19   Q.    Do you see that there are a set of binders of

20   exhibits there by the witness table?

21   A.    Yes.

22   Q.    Those binders contain the exhibits that I may want

23   to talk with you about today.  They should be in order, and

24   there are tabs indicating the exhibit numbers.  When I call

25   out an exhibit number, I would like for you to look at the

*redacted - public version*

Yurkerwich - direct

1    corresponding exhibit.

2                  THE COURT:  I'm sorry.  Mr. Brown, I'm going to

3    ask you to keep your voice up, please.

4                  MR. BROWN:  I'm sorry, your Honor.

5    BY MR. BROWN:

6    Q.    Could you look in the binder at Exhibit PTX-182-78?

7    A.    I have it.

8    Q.    What is that document?

9    A.    This is an exhibit in my expert report for Adobe.  I

10   actually provided two expert reports, one for Adobe and one

11   for Canon.

12                  So this is the documents considered exhibit in

13   my Adobe expert report.  And it lists all of the documents

14   that we reviewed in connection with this case as well as

15   the depositions that we reviewed and some interviews we

16   conducted.  And then it lists several pages of research that

17   we conducted to help with the analysis.

18   Q.    Could you briefly just describe for the Court what

19   work you did as background work to prepare for giving your

20   opinion in this case?

21   A.    We conducted a study really of the technology at

22   issue in the case for both Adobe and Canon to develop an

23   understanding of its importance in the marketplace and, in

24   particular, how the invention itself relates to its use of

25   the marketplace.  And we studied all of the information

Yurkerwich - direct

1    that is in the record that might be helpful in valuing that

2    technology.

3            Ultimately, the goal was to determine a

4    reasonable royalty for the technology because the rules of

5    the Court provide that the patent owner, if the patent is

6    found valid and infringed, is entitled to a reasonable

7    royalty for the use of the invention.  So our goal was to

8    conduct a study to determine the amount of that royalty for

9    the use of the invention by Adobe for its use and by Canon

10   for its use.

11   Q.    Mr. Yurkerwich, I want to go back for a moment to

12   your experience in licensing and valuing patents.  Have you

13   actually been involved in negotiating patent licenses?

14   A.    Yes.  I have negotiated many patent licenses starting

15   in the mid '90s for patent owners and patent licensees,

16   including patents in the electronics space.  Currently,

17   as part of my portfolio work I'm doing for this European

18   investment fund, I am managing over 100 technologies and

19   helping the fund license those technologies into the

20   marketplace.  And some of those involve hardware or

21   software, electronics.

22   Q.    Does your work also involve valuing patents and

23   potential license agreements?

24   A.    Yes.  And so certainly for negotiating a license, you

25   need to have a valuation for purposes of the negotiation,

Yurkerwich - direct

1      and then you need valuation for testifying about damages.

2              So I work really in both fields, now more in

3      active licensing than in the courtroom, but I still appear

4      in court from time to time to assist in discovering how much

5      an invention is worth and what the royalties should be for

6      the use of that invention.

7              MR. BROWN:  I'd like to offer Mr. Yurkerwich as

8      an expert in patent valuation, licensing, accounting and

9      damages.

10             THE COURT:  Adobe.

11             MR. McCANN:  No objection, your Honor.

12             MR. GASPAR:  No objection, your Honor.

13             THE COURT:  He is so recognized.

14     BY MR. BROWN:

15     Q.    In your work on this case, have you come to a

16     conclusion as to what would be a reasonable royalty for

17     Adobe's use of the patented technology?

18     A.    I have.

19             MR. BROWN:  Could we have PDX-405, please?

20     BY MR. BROWN:

21     Q.    Mr. Yurkerwich, is this another slide that you

22     prepared to help with your testimony?

23     A.    Yes, it is.

24     Q.    How did you approach your work of determining a

25     reasonable royalty in this case?

Yurkerwich - direct

1   A.      In a patent damages case where the form of damages

2   is a reasonable royalty, it's based on what is called a

3   hypothetical negotiation.  It's hypothetical because it

4   didn't really happen but the Court asks you to consider,

5   well, what if it did happen?

6           And the first thing the Court asks is that you

7   consider it at the time of the first infringement -- the

8   first alleged infringement.  So in this case, I looked at

9   two different negotiations, one for Adobe in 2004, and one

10  for Canon in 2007.

11          Another reason why it's sometimes referred to as

12  a hypothetical negotiation is because in a real negotiation,

13  you don't always have agreement whether the patent is valid

14  and infringed.

15          In this negotiation, the expert is told to

16  assume that the patent is valid and infringed.  That the

17  jury finds on behalf of the plaintiff for validity and

18  infringement.  So it's a starting premise as part of an

19  negotiation.

20          Then also, the goal of the negotiation is to

21  agree upon a royalty.  So it can't be that they don't agree.

22  They have to agree.  So that's why it's called a willing

23  licensor and a willing licensee.  And.

24          Then, finally, what they agreed to is a

25  reasonable royalty.

*redacted - public version*

Yurkerwich - direct

1    There is case law, a very old case,

2    Georgia-Pacific v United States Plywood.  It was in the 70s.

3    But in that case, there was a listing of factors, 15 factors

4    that we now, in every one of these royalty cases, are asked

5    to consider those 15 factors in coming up with a reasonable

6    royalty.  So it provides guidance to the expert on how to

7    conduct this hypothetical negotiation.  And,

8    In fact, you will see that factor 15 is the

9    negotiation.  So the first 14 are things to think about in

10   connection with a negotiation and each party would think

11   about and then factor 15 is the actual negotiation.

12   So part of what I would hope to do today is to

13   explain these factors and how I evaluated the factors.

14   Q.    Mr. Yurkerwich, I believe you testified that the

15   hypothetical negotiation for Adobe would have been in 2004;

16   is that right?

17   A.    Yes.

18   Q.    And how did you determine that date?

19   A.    It's the date of the first alleged infringement by

20   Adobe of the '823 patent.

21   Q.    And I understand you have done an analysis both with

22   respect to Canon and with respect to Adobe.  I'm going to

23   start out dealing with the work you did on the Adobe

24   infringement.

25   A.    Okay.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 59 of 277 PageID #: 8984
*redacted - public version*
1195
Yurkerwich - direct

1      THE COURT:  I'm sorry.  Mr. Brown, the jury is

2  having a hard time hearing you, and I am as well, so you are

3  going to have to try to be a little louder.

4      MR. BROWN:  I'm sorry, your Honor.  I'll try to

5  speak more into the microphone.

6  BY MR. BROWN:

7  Q.    Now, you talked about a hypothetical negotiation.

8  How would Mr. Holm have determined what he would want in

9  such a hypothetical negotiation with Adobe?

10  A.    Well, Mr. Holm had a history of trying to license

11  his patent, and he had some actual licensing activity.  So

12  he had a policy, I think he testified to it actually, of

13  seeking a five-percent royalty for the use of his patent.

14  And the five percent, he would ask that it be applied to a

15  portion of the revenue related to the use of his patent.

16  So not necessarily the revenue for the whole product but a

17  portion of the product that related to the use of his

18  patent.

19      One other important part of his plan was to have

20  what is called a paid up license, or it's sometimes called

21  a lump sum license.  This royalty percentage is applied to

22  every year of sales.  And,

23      The concept of a paid up license is you pay for

24  all the future years at once, so you estimate how much will

25  be used in using the five percent rate.  Then you calculate

*redacted - public version*

1196

Yurkerwich - direct

1  what the future royalties might be, but then you take a big

2  discount because you pay for it now.  So it kind of, it

3  locks in the amount.  And it's not uncommon in licensing

4  deals for them to be paid up deals.  As opposed to paying

5  every year, you pay all at once for the whole future use.

6         So this was one of Mr. Holm's policies, to try

7  and get a five percent royalty on the piece of the product

8  that related to his invention and then have it be paid all

9  at once, but he would have to take a big discount to do

10  that.  And that was his strategy or approach.

11  Q.    What do you mean by he would have to take a steep

12  discount to do that?

13  A.    Well, what I mean is since the money would be paid

14  now instead of throughout the life of the patent, which

15  extends to the year 2017, so instead of paying five percent

16  for 2017, it would be a lower amount because it would be

17  paid now.  In effect, you are getting the money now so you

18  get to earn something on it.  And that is why it's a

19  discounted amount when you have a lump sum payment.

20  Q.    So if Mr. Holm got a lump sum payment, would he

21  continue to get any additional payments after that lump sum?

22  A.    No, it would be a one-time -- basically a one-time

23  payment for really unlimited use of the patent.  So part

24  of it involves projecting what the use might be and then

25  negotiating an agreement on what that might be, negotiating

Yurkerwich - direct

1    a discount rate as well and then coming up with a number

2    that the parties could agree to.

3    Q.     Did you estimate what Mr. Holm's demand would have

4    been based on a five percent royalty on the part of the

5    product that he associated with the accused functionality?

6    A.     Yes, I did.

7               MR. McCANN:  Objection your Honor.

8               THE COURT:  Objection?

9               MR. McCANN:  Can we approach?

10              THE COURT:  Yes.  I'll see counsel at sidebar.

11              (Sidebar conference held.)

12              THE COURT:  How about you guys stand together

13   for ease of reference?  Thank you.

14              All right.  Mr. McCann.

15              MR. McCANN:  I'll try to keep these to a

16   minimum, your Honor, but I think perhaps early on it

17   might help everybody.

18              I believe the testimony that is about to be

19   elicited is, okay, what would his demand have been?  It

20   would have been a five percent royalty.  And that would have

21   resulted in a $62 million demand based on taking Photoshop

22   Elements which is a $57 sold-in-the-store product.  Take

23   that, multiply it by the number of units forecast through

24   the life of the patent and that calculation gives us

25   $62 million, and that is sort of his opening offer and the

*Redacted - public version*

Yurkerwich - direct

1  sanity of the $62 million that they asked for.

2          I think what the Court had said is don't refer

3  to the prices of revenues of the larger products.  If that

4  is the case, I think the testimony as it proceeds will get

5  into that area your Honor said they should not.

6          THE COURT:  Mr. Brown.

7          MR. BROWN:  Your Honor, he has done a

8  calculation based on this $57 average selling price of the

9  lowest price product, using that price for all the products.

10  It's therefore less than the price of the products, it's

11  not the entire price, and it is Mr. Yurkerwich's way of

12  estimating what would have been regarded as the value of the

13  accused functionality within that product.

14          THE COURT:  What is he going to say is the value

15  of Adobe Camera Raw with the accused auto function?

16          MR. BROWN:  He is going to say that the value

17  that Mr. Holm would have used for the value of Adobe Camera

18  Raw was $57, which was the average selling price of the

19  lowest priced product.

20          THE COURT:  If that is in fact the testimony, it

21  sounds like that would be consistent with the Court's ruling

22  as a starting point.  Do I have correct, Mr. McCann?

23          MR. McCANN:  We object to that as outside the

24  scope of the report.  That is a new one.  But if that's the

25  testimony he is going to be giving ...

Yurkerwich - direct

1    THE COURT:  Then that objection would be noted.

2    But if that is the testimony he is going to give, you agree

3    it sounds consistent with the ruling I gave just this

4    morning?

5         MR. McCANN:  At least from what we heard so far.

6         THE COURT:  Okay.  Canon, nothing on this?

7         MR. GASPAR:  Not at this time, but we may come

8    back when he talks about Canon on this very point.

9         THE COURT:  Okay.  Thank you.

10        (Sidebar conference ends.)

11        THE COURT:  Mr. Brown, you may proceed.

12   BY MR. BROWN:

13   Q.    Mr. Yurkerwich, do you still have the question in

14   mind?  Or shall I ask it --

15        THE COURT:  I think you better ask it again.

16   Q.    Mr. Yurkerwich, did you do a calculation to determine

17   the amount that Mr. Holm would have demanded based on his

18   five percent licensing processing applied to what was

19   estimated to be the value of the accused functionality

20   within Adobe Camera Raw?

21   A.    Yes, I did.

22   Q.    And what was the result of that calculation that you

23   did?

24   A.    This was a, again, a lump sum calculation, so it's

25   based on the actual infringing units that we know about

Yurkerwich - direct

1   today, and then a forecast of what they might be through

2   2017, and then discounted back at five percent, and the

3   amount totals 62 million.

4   Q.    And how did you determine that Mr. Holm would have

5   demanded five percent of the amount of a product that

6   corresponded to the Raw image processing associated with the

7   accused functionality?

8   A.    Well, he had other licensing activity including an

9   offer to a company called Gretag Macbeth and also an offer

10  to Apple in which he offered a five percent paid up

11  opportunity to each of them.

12  Q.    In doing your work on this case, did you analyze

13  Adobe financial documents?

14  A.    Yes, I did.

15  Q.    And was the, was the exhibit that's been marked as

16  PTX-355 one of those documents that you reviewed?

17  A.    Yes.  Exhibit PTX-355 is actually an Excel workbook

18  with many tabs of Adobe financial data, so it was delivered

19  to us in electronic format.

20  Q.    Could you describe in a little more detail what was

21  in that document and what use you made of it?

22  A.    Well, in --

23  Q.    Without revealing the specific financial numbers that

24  were in the document.

25  A.    Sure.  Well, it included information about the units

Yurkerwich - direct

1    of Adobe products that were sold that contained the accused

2    feature and these are units related to a family of products

3    called Creative Suites, and then individual Photoshop

4    products that are bundled into the Creative Suites products.

5    So the Creative Suites products include other features other

6    than Photoshop, but they all include Photoshop.  So this

7    file gave us information about the quantities of those

8    products that were sold beginning in 2004 and going to 2010,

9    and it gave us a lot of data on the revenues that were

10   received from those products as well as the costs associated

11   with those products.

12   Q.    Mr. Yurkerwich, could you look at PTX-182-96?

13   A.    I have it.

14   Q.    What is shown on this exhibit?

15   A.    This is a chart that I prepared from the data that I

16   was just describing from that electronic Excel workbook, so

17   I extracted data from that workbook with the help of my

18   staff, and created an annual analysis of the number of

19   products sold that had Photoshop in them.  And also had

20   Camera Raw as part of Photoshop because the auto feature is

21   in Camera Raw which is in Photoshop which is in these

22   products.

23         MR. BROWN:  Your Honor, I would offer PTX-182-93

24   in evidence.

25         THE COURT:  93 or 96?

*redacted - public version*

Yurkerwich - direct

1           MR. BROWN:  I beg your pardon.  96.

2           THE COURT:  Mr. McCann.

3           MR. McCANN:  Your Honor, perhaps I

4    misunderstood, but we discussed this before.

5           THE COURT:  See you at sidebar.

6           (BENCH CONFERENCE ON THE RECORD.)

7           THE COURT:  So I do have in front of me

8    PTX-182-96.  That's the document you're offering into

9    evidence.

10          MR. BROWN:  Correct.  It was my understanding

11   that the ruling was that the expert report itself would not

12   come in, but that you were overruling the hearsay objection

13   on the schedules that were compilations of financial data.

14          THE COURT:  And Mr. McCann, was this one of

15   those schedules that was listed by you?

16          MR. McCANN:  Yes.  My understanding was what

17   your Honor had said was that PTX-355, that's the document

18   Adobe produced, that was the first thing he referenced, you

19   were overruling that objection.  This is from his expert

20   report.  It's his compilation in the back of the report and

21   we thought your Honor said that was hearsay and would not be

22   permitted.

23          THE COURT:  Were you separately objecting?

24   There was a list of exhibits to the report and then there

25   was also the documents that you produced and you objected to

*redacted - public version*

1203

Yurkerwich - direct

1    all of them, correct?

2                MR. McCANN:  Yes.  And I understood your Honor

3    to say the ones we produced, they can come in.  The report,

4    I mean that's no different than putting an infringement

5    chart in.  He can testify about his analysis absolutely, but

6    this should not be in evidence itself.

7                MR. LORIG:  Your Honor, my recollection is

8    different.

9                THE COURT:  Thank you.

10               I intended to overrule Adobe's objection to the

11   attachments to the expert report, those that were financial

12   data derived from the data that was represented to me came

13   from Adobe.  Everyone seems to be in agreement that this

14   would be such a document, is that correct?

15               MR. McCANN:  That's correct, your Honor.

16               THE COURT:  Then I'm standing by my ruling,

17   which I'm now clarifying to the extent it was unclear, that

18   those objections were overruled, those objections being

19   hearsay objections.  That's the only objection that we're

20   here to discuss right now, is that correct?

21               MR. McCANN:  Yes, your Honor.  Although again I

22   think there's revenue figures on the document and that's a

23   separate issue.

24               THE COURT:  Okay.  I do want to discuss that as

25   well because I'm standing by my revenue rulings and I can't

*redacted - public version*

Yurkerwich - direct

1    tell from looking at this document whether it's

2    inconsistent.

3              MR. BROWN:  If there were revenue information I

4    didn't intend it to be here.

5              I don't see any revenue information.

6              MR. McCANN:  I'm sorry.  This is units.

7              THE COURT:  This document just goes to units?

8              MR. McCANN:  May I?  I'm sorry.  I should have

9    brought it with me, your Honor.

10             Yes, he's correct.

11             THE COURT:  Then we don't have another objection

12   to this document.

13             MR. McCANN:  No, your Honor.

14             THE COURT:  Mr. Lorig.

15             MR. LORIG:  I just want to apologize for talking

16   earlier.  It's a little chaotic for us.

17             THE COURT:  It's a chaotic morning.  I

18   understand.  All right.

19             (END OF BENCH CONFERENCE.)

20             THE COURT:  Let me ask for the record, Canon,

21   any objection to the admission of PTX-182-96?

22             MR. CHALSEN:  No, your Honor.

23             THE COURT:  Then 182-96 is admitted.

24             (PTX-182-96 admitted into evidence.

25             MR. BROWN:  Could we have PDX-407 displayed,

*redacted public version*

Yurkerwich - direct

1   please?

2   BY MR. BROWN:

3   Q.      Mr. Yurkerwich, is this another slide that you

4   prepared to help us with your testimony today?

5   A.      Yes, it is.

6   Q.      Could you explain what is depicted on this slide?

7   A.      I apologize, it's perhaps not too easy to see.

8   Q.      Well, maybe we could have Mr. Reiter blow-up the

9   separate sections so that we could talk about the four

10  groups on here.  Does that make it easier to read?

11  A.      Yes.

12          So the reason you couldn't see the slide before

13  is that it lists the 15 Georgia-Pacific factors, so what

14  I've done is I grouped them into common subject areas to

15  help understand the factors and I conduct my analysis in

16  these groupings.

17          So this first grouping is the licensing factors,

18  and you can see the first factor, royalties received by the

19  licensor for the patent in suit.  And this is, well, what

20  sort of revenue has the patent already generated and how

21  should that be considered in this negotiation?  And one of

22  the things that I'll testify to is a license, I think the

23  jury's heard about this, the RPX license to settle the Nikon

24  litigation is an example of royalties received by licensor

25  for the patent in suit.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 70 of 277 PageID #: 8995
*redacted - public version*
1206

Yurkerwich - direct

1            The second factor is the rate paid by the

2    licensee, in this case Adobe, for the use of comparable

3    patents.  So we'll discuss that.

4            And then the nature and scope of the license,

5    you know, what is it for, and what is, in factor four, the

6    licensor's policy, that's what I was just discussing, the

7    five percent lump sum that Mr. Holm is seeking.  And then

8    finally, number seven -- and they're out of order because

9    the case lists them in one through 15, so I've grouped them

10   by subject area, so you'll see there's a five and a six on a

11   different slide.

12           Factor seven is the duration of the patent and

13   the term of the license.  So here, as I've said, it's until

14   2017, and it would begin in 2004 at the time of first

15   infringement.

16   Q.    Now, I believe you testified regarding the licensor's

17   policy with respect to licensing its patent monopoly, factor

18   four, is that right?

19   A.    Yes.

20   Q.    And that was the testimony regarding Mr. Holm and the

21   five percent demand, is that right?

22   A.    Yes.

23   Q.    And you've also talked about the nature and scope of

24   the license as a lump sum, is that right?

25   A.    Yes.

*redacted — public version*

Yurkerwich - direct

1   Q.     Now, with regard to factor two, were there any

2   comparable licenses that you considered that were, that

3   showed rates paid by the licensee, in this instance Adobe,

4   for use of comparable patents?

5   A.     I did not identify any.  And, again, these would be

6   licenses entered into by Adobe who is the licensee, and

7   Adobe produced a series of licenses that they've entered

8   into in the past, but there were no patent licenses for

9   similar technology.

10  Q.     Even if there were no patent licenses for similar

11  technology, were there any licenses in that group that you

12  analyzed that you found helpful in evaluating what would be

13  a reasonable royalty?

14  A.     No, no, I did not.

15          MR. BROWN:  Could we now have PDX-408 displayed,

16  please?

17  BY MR. BROWN:

18  Q.     In evaluating the Georgia-Pacific factors as part of

19  your reasonable royalty analysis, did you consider some of

20  the background of Tarkus and its patent and licensing

21  efforts?

22  A.     Yes, I did.

23  Q.     And is the slide that we have on the screen one that

24  you prepared to help explain this?

25  A.     Yes.  I extracted sections of my report that I

*redacted - public version*

Yurkerwich - direct

1    thought were relevant to the invention and the licensing of

2    the invention, and it appears in this chart.  And I think

3    the jury already knows that the '823 patent covers improved

4    tone processing of digital images, and that Mr. Holm

5    originated the patent during the time when he was a

6    consultant and later an employee of Hewlett-Packard, and Mr.

7    Holm did license on a non-exclusive basis in 1997 to

8    Hewlett-Packard so that he could continue to work at HP, and

9    then also HP provided him money to pay for his patent

10   applications, which are and can be quite expensive.

11            The '823 patent was granted in 2003.  And in

12   2003 Mr. Holm met with both Adobe and Canon and discussed a

13   possible license to the patent.

14            Later in 2006 Mr. Holm granted HP some limited

15   sublicense rights in fields other than photo editing

16   software like Adobe is in or printer editing software like

17   Canon or camera editing software like Nikon.  He did grant

18   them limited sublicense rights and I think he testified that

19   at the time he was under some pressure because he wanted to

20   keep his job at HP.

21            Then in 2008 he set up Tarkus to further license

22   his inventions.  And then last August, 2011 he executed a

23   license with RPX that released Nikon from this litigation.

24   I think the jury knows that Nikon was also a defendant in

25   this litigation and as part of that RPX deal Tarkus released

Yurkerwich - direct

1    Nikon from the litigation.

2              Of course, Adobe and Canon so far have refused

3    to take licenses.

4              MR. BROWN:  Could we have PDX-2 please?

5    BY MR. BROWN:

6    Q.    Mr. Yurkerwich, could you tell us whether this slide

7    depicts any of the facts that were relevant to your

8    analysis?

9    A.    Yes.  This is a slide that summarizes some of the

10   interaction between Mr. Holm and Tarkus and Canon, Adobe and

11   Nikon, and it highlights discussions that occurred in 2003

12   and later between Mr. Holm and Adobe and Canon.

13   Q.    Mr. Yurkerwich, do you have a pointer up there at

14   your desk that you would point to the --

15   A.    I do.

16   Q.    Could you just identify what the events are to which

17   your testimony was referring?

18   A.    I was referring to, for example, in this box here,

19   discussed original patent with Canon, as well as discussed

20   license with Adobe, and down here, 2008, tried to license

21   Adobe.  And I guess there's this earlier date, discussed

22   patent with Canon.

23   Q.    So is it your understanding that Mr. Holm did

24   approach Adobe seeking an agreement to license the patent?

25   A.    Yes.

Yurkerwich - direct

1    Q.    And is it also your understanding that Mr. Holm

2    approached Canon seeking to license the patent?

3    A.    Yes.

4              MR. BROWN:  Could we have PDX-409, please?

5    BY MR. BROWN:

6    Q.    Mr. Yurkerwich, could you explain what is depicted by

7    this slide?

8    A.    Yes.  This is a summary of points that are in my

9    expert report that discuss Adobe, and in particular Adobe

10   Camera Raw.  And as I've already said, the '823 patent is

11   alleged to be in Adobe's Photoshop family of products.  It's

12   called a family of products because there are this Creative

13   Suites group of products which include many other features,

14   but also include Photoshop.  And then within Photoshop there

15   is a component called Adobe Camera Raw which allows for the

16   processing of images that are taken in the Raw form and

17   because they're taken in the Raw form, they allow for higher

18   quality images on the output.  So the reason that people

19   have come to use Camera Raw is essentially they get better

20   pictures because it's like I think what's referred to as a

21   digital negative.  You can, using the electronic form,

22   create a better image.  And Camera Raw has been part of

23   Photoshop since 2004, and the '823 patent is a component of

24   Camera Raw.

25              MR. BROWN:  Could we have PDX-410?

Yurkerwich - direct

1   BY MR. BROWN:

2   Q.    Mr. Yurkerwich, this slide just repeats the list of

3   the Georgia-Pacific factors that were in the group you had

4   identified as relative advantage, is that right?

5   A.    Yes, it does.

6   Q.    And we're going to discuss that section of the

7   analysis now.  Could we have PDX-411, please?

8         What is depicted by this slide?

9   A.    Here you have three screen shots of Adobe Camera Raw.

10  This one, this first one that says without accused feature.

11  When Adobe Camera Raw was first released, that is version

12  1.0 all the way through 2.2, the accused feature was not

13  present.  It first appeared in Adobe Camera Raw version 2.3,

14  and it appears here where there are the four auto buttons

15  that are alleged to infringe the patent.  And it was here in

16  this panel in Adobe Camera Raw all the way from version 2.3

17  through to version 3.6.

18        Then with version 3.7 and all the way to today,

19  the four auto buttons were replaced with a single auto

20  button right here.  And,

21        Then these sliders, as I think you may have

22  heard them called already, are still in this panel here:

23  exposure, exposure; shadows actually is now called blacks

24  over here; and then brightness and brightness; and contrast

25  and contrast.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 76 of 277 PageID #: 9001
*redacted - public version*
1212

Yurkerwich - direct

1          So by selecting the auto button here, these four

2     sliders that are now over here are automatically adjusted.

3     And that's how it appears through to today.

4          So this is essentially shows the three

5     generations of Adobe Camera Raw before it had the accused

6     feature; then it moved into four buttons, 2.3 through 3.6;

7     and then a single button, 3.7 to present.

8     Q.    So with regard to the first of those diagrams, the

9     original version of Adobe Camera Raw, how long did Adobe

10    sell that product?

11    A.    I think it was about a year.

12    Q.    And how well did that product sell?

13    A.    Well, it sold at -- well, we don't really have

14    records that it sold very much.  At that time, it actually

15    sold as a stand-alone product and we don't have any records

16    of any significant sales.

17          Then later, starting with 2.3, it was bundled

18    with other Photoshop products.

19    Q.    So we have an initial year of sales in the original

20    form without the accused feature, and you said you didn't

21    have any information as to sales.  Did you try to figure out

22    how many sales they had of that information that was not

23    infringing?

24    A.    Yes.  I don't believe we were provided with that

25    information.

*redacted - public version*

1213

Yurkerwich - direct

1   Q.      Did you try to get it?

2   A.      Yes.

3   Q.      Do you know at what price Adobe sold that initial

4   noninfringing version?

5   A.      $99.

6   Q.      So that takes us one year, and that was introduced

7   when?  The first version?

8   A.      In 2003.

9   Q.      And then the second panel on this screen was the

10  second version.  And when was that introduced?

11  A.      2004.

12  Q.      Do you know how many sales Adobe had once they had

13  introduced the infringing feature?

14  ///////////////////////////////////////////////////////

15  ///////////////////////////////////////////////////////

16  ///////////////////////////////////////////////////

17  Q.      And how long have they been selling that product with

18  the accused feature?

19  A.      Since 2004 through to today.

20  Q.      They're still selling it?  Is that your understanding?

21  A.      Yes.

22  Q.      And has Adobe introduced more than just the three

23  releases that are depicted by the three boxes that are on

24  the screen?

25  A.      Yes.  These boxes are just to show how the buttons

Yurkerwich - direct

1   evolved from no buttons to four buttons to one button, but

2   there were actually 34 releases of Adobe Camera Raw since

3   September of 2004 when it first included the accused

4   feature.  So there had been updates to Adobe Camera Raw 34

5   times.

6   Q.    And did Adobe include the accused feature in each one

7   of those 34 releases of its product?

8   A.    Yes, it did.

9   Q.    Is that fact significant to you in terms of doing

10  your reasonable royalty analysis under the Georgia-Pacific

11  factors?

12  A.    Well, yes.  I mean it's evident that feature was

13  important because it's continued to be included in each

14  release of Adobe Camera Raw.  And one of the reasons why

15  there are new releases is to accommodate new cameras.  So

16  every time a new camera is put on the market that shoots in

17  a Raw format, the software needs to be updated to work with

18  that camera.  So one of the reasons why there are 34 updates

19  is to keep adding new cameras.

20  Q.    In addition to evaluating this history of Adobe

21  Camera Raw and its use of the accused functionality, did

22  you rely on other information to inform your views as to the

23  importance of the accused functionality?

24  A.    Yes, I did.

25  Q.    When I say "accused functionality," you understand

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 79 of 277 PageID #: 9004
*redacted - public version*
1215

Yurkerwich - direct

1   I mean that auto button that was on the screen; correct?

2   A.    I do.

3   Q.    What was the other information that you found informed

4   you as to the importance of this patented technology?

5   A.    Well, I looked at documents that were produced by

6   Adobe relating to Camera Raw and Photoshop and Creative

7   Suites that discussed the importance of Camera Raw and the

8   accused feature, the auto button.  So I examined those to

9   understand how it fit into their plans for the product, how

10  the market was reacting to both Camera Raw and then the auto

11  button.  And also how Adobe marketed that feature in its

12  user manuals, for example.  So these are all documents that

13  I found in the record and reviewed.

14  Q.    Could you look at PTX-661 in your binders?

15  A.    I have it.

16  Q.    What is exhibit PTX-661?

17  A.    It's an internal Adobe memorandum discussing a

18  marketing concern.

19  Q.    And was this one of the documents that informed your

20  opinion as to the importance of the accused feature?

21  A.    Yes.

22         MR. BROWN:  I'd offer PTX-661 into evidence.

23         MR. McCANN:  No objection, your Honor.

24         THE COURT:  No objection?  Okay.

25         MR. GASPAR:  No objection.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 80 of 277 PageID #: 9005
*redacted - public version*
1216
Yurkerwich - direct

1          THE COURT:  It's admitted.  Thank you.

2          (PTX-661 admitted into evidence.)

3          MR. BROWN:  Could we show PDX-415, please?

4    BY MR. BROWN:

5    Q.    Mr. Yurkerwich, is this a slide that you had prepared

6    from exhibit PTX-661?

7    A.    Yes.

8    Q.    And could you explain why you found this document

9    significant?

10   A.    Well, it's an indication if you look in the

11   highlighted area, particularly the sentence that says: ///

12   ///////////////////////////////////////////////////////.

13   /////////////////////////////////////////////////////.

14   /////////, and those are only the fraction of users seeking

15   new camera support.

16          So these is part of how I learned of these

17   updates being important to support new cameras.

18   Q.    Could you now please look at PTX-212 in your binder?

19   A.    I have it.

20   Q.    What is exhibit PTX-212?

21   A.    This is a 2006 Raw survey.  It's a survey about the

22   use of Raw technology.

23   Q.    And is it your understanding that this was a document

24   that Adobe had?

25   A.    Yes, I believe they -- it was produced by Adobe, and

*redacted - public version*

Yurkerwich - direct

1    I believe that they had some involvement with the survey.

2                    MR. BROWN:  I'd offer PTX-212 into evidence.

3                    MR. McCANN:  No objection, your Honor.

4                    MR. GASPAR:  No objection, your Honor.

5                    THE COURT:  It's admitted.

6                    (PTX-212 admitted into evidence.)

7                    MR. BROWN:  Could we now have slide PDX-418.

8    BY MR. BROWN:

9    Q.    Mr. Yurkerwich, is this a slide that you had prepared

10   from exhibit PTX-212?

11   A.    Yes, it is.

12   Q.    And could you explain why you found this significant?

13   A.    This is one of the questions that was asked in the

14   survey.  But the question was how often do you capture

15   digital images in the Raw mode?

16                    And here you see 55 percent of the respondents

17   said all of the time, and 22 percent said most of the time.

18                    So on a combined basis, 72 percent of the

19   respondents indicated they were capturing images in the Raw

20   format.  And this is according a 2006 survey.

21   Q.    Did you say 72 percent?

22   A.    I hope not.  I should have said 77.

23   Q.    So I take it this chart shows that it was important

24   for Adobe to have Camera Raw processing capacity.  Does it

25   relate to the accused functionality?

Yurkerwich - direct

1    A.      Well, yes.  I think this is evidence of why it was

2    updated so often.  Because there was demand to shoot in

3    Camera Raw and, of course, within Camera Raw is the auto

4    tone correction function which we'll see in later documents

5    was an important part of Camera Raw.

6    Q.      Could you now please turn to PTX-113 in your binder?

7    A.      (Witness complies.)

8    Q.      Have you found that, Mr. Yurkerwich?

9    A.      Yes, I have it.

10   Q.      What is PTX-113?

11   A.      It's another survey.  This is a 2009 U.S.

12   professional photographer survey.  And it was prepared by a

13   company called InfoTrends.

14   Q.      And is it your understanding that this was another

15   survey document that Adobe provided?

16   A.      Yes.

17              MR. BROWN:  I would offer PTX-113 into evidence.

18              MR. McCANN:  No objection, your Honor.

19              MR. GASPAR:  No objection, your Honor.

20              THE COURT:  It's admitted.

21              (PTX-113 admitted into evidence.)

22              MR. BROWN:  Could we have PDX-419 on the screen,

23   please?

24   BY MR. BROWN:

25   Q.      Mr. Yurkerwich, is this a slide that you had prepared

Yurkerwich - direct

1  from Exhibit 113?

2  A.    Yes.

3  Q.    And what significance did you find in this chart?

4  A.    So, again, this is a response to one of the

5  questions, question 17 in the survey:  In the last

6  12 months, what percent of your total digital image capture

7  was in Camera Raw format?

8          And the bars are by year, so 2007, 2008, 2009.

9          So on average, it was 58 percent in 2007 and

10  grew to 71 percent in 2009.  And then with respect to the

11  median, the numbers are much higher:  75 percent growing to

12  98 percent.

13  Q.    Okay.  When you pointed to the mean, you said

14  average.  Can you explain why these numbers look so

15  different on the two charts and what is the difference

16  between a mean and a median?

17  A.    The mean is an average of the responses.  And the

18  median is the number of responses that were above

19  98 percent.  So it means that more than half the people

20  responded at 98 percent or higher in terms of their use.

21  Q.    So that shows that by 2009, more than 98 -- more

22  than half of the people who were surveyed said that they

23  used Camera Raw format as their image capture format; is

24  that right?

25  A.    Yes.  And it means that they used it more than

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 84 of 277 PageID #: 9009
*redacted - public version*
1220
Yurkerwich - direct

1   98 percent of the time.

2   Q.     Could you now look at exhibit PTX-62?

3   A.     I have it.

4   Q.     What is exhibit PTX-62?

5   A.     It's an internal memorandum produced by Adobe

6   discussing an acquisition.

7   Q.     Is this one of the documents that informed your

8   opinion as to the importance of the accused functionality

9   to Adobe?

10  A.     Yes.

11         MR. BROWN:  I would offer exhibit PTX-62 into

12  evidence.

13         MR. McCANN:  No objection, your Honor.

14         MR. GASPAR:  No objection, your Honor.

15         THE COURT:  It's admitted.

16         (PTX-62 admitted into evidence.)

17         MR. BROWN:  Can we have on the screen PDX-420?

18  BY MR. BROWN:

19  Q.     Mr. Yurkerwich, is this a slide that you had prepared

20  from exhibit PTX-62?

21  A.     Yes.

22  Q.     Could you explain what you found significant in

23  PTX-62?

24  A.     As you can see from the slide, I highlighted one

25  sentence that I thought was significant.

Yurkerwich - direct

1           And it states:  As you know, leadership in Raw

2    processing quality and speed is something of an arms race.

3    Adobe Camera Raw has earned a strong leadership position,

4    but it doesn't win every shoot-out.

5           And it's referring to this acquisition as a

6    competitor in the field and essentially highlighted how

7    important it is to be able to process images in a high

8    quality and fast fashion that are generated through the Raw

9    format.

10   Q.    And is it of your understanding that the accused

11   feature of the Adobe product relates to processing quality

12   and speed?

13   A.    Yes, both.

14   Q.    Could you now please look at exhibit PTX-701?

15   A.    I have it.

16   Q.    What is exhibit PTX-701?

17   A.    It's a publication of Adobe's, and an author by the

18   name of Bruce Fraser.  That the topic is Camera Raw with

19   Adobe Photoshop CS2 or Creative Suites 2.

20   Q.    Is it your understanding that this is a book that

21   Adobe participated in publishing?

22   A.    Yes.

23           MR. BROWN:  I would offer exhibit PTX-701 into

24   evidence.

25           MR. McCANN:  No objection, your Honor.

Yurkerwich - direct

1          MR. GASPAR:  No objection, your Honor.

2          THE COURT:  It's admitted.

3          (PTX-701 admitted into evidence.)

4          MR. BROWN:  Could we have slide PDX-421, please?

5     BY MR. BROWN:

6     Q.    Mr. Yurkerwich, what does this slide represent?

7     A.    This is a page out of this book that discusses the

8     use of auto adjustments.  And it makes some comments about

9     the auto feature which is the accused feature.  I'll just

10    read what it says.

11         One of the interesting new features in Camera

12    Raw is the ability to have it perform autocorrections on

13    images.  Camera Raw tries to come up with optimum settings

14    for each image, essentially autocorrecting tone and

15    exposure.

16    Q.    And is it your understanding that the feature

17    referred to there is the accused functionality?

18    A.    Yes.

19    Q.    Could you now look at exhibit PTX-326?

20    A.    I have it.

21    Q.    What is exhibit 326?

22    A.    It's a chapter from a book that's called "Camera Raw

23    Controls" and it was produced by Adobe.

24         MR. BROWN:  And I'd like to offer exhibit 326 in

25    evidence.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 87 of 277 PageID #: 9012
*redacted - public version*
1223

Yurkerwich - direct

1          MR. McCANN:  No objection, your Honor.

2          MR. GASPAR:  No objection.

3          THE COURT:  It's admitted.

4          (PTX-326 admitted into evidence.)

5          MR. BROWN:  Could we have PDX-422 displayed,

6     please?

7     BY MR. BROWN:

8     Q.     Is this a slide you had prepared from exhibit 326?

9     A.     Yes.  It's an excerpt from one of the pages in the

10    chapter.

11    Q.     And what did you find significant in this passage?

12    A.     Well, it specifically addresses the auto button or

13    the accused feature and it makes some commentary about the

14    auto button.  I'll just read it.  "When you're first looking

15    at an image that may pose significant adjustment challenges,

16    it's useful to let auto take a crack at the adjustments.  It

17    may not be correct in all its guesses, but it's often right

18    in at least a couple.  And remember, since Camera Raw is a

19    parametric editor, and has multiple undo, you don't risk

20    anything other than a bit of time trying."

21    Q.     And how did you draw from that anything regarding the

22    significance of the auto feature?

23    A.     Well, I think it's encouragement to use it because it

24    has benefits, so it's a use benefit document.

25    Q.     Could you now look at exhibit PTX-366?

Yurkerwich - direct

1    A.    I have it.

2    Q.    What is PTX-366?

3    A.    This is an Adobe white paper or a paper about

4    understanding Adobe Photoshop Camera Raw 4.

5              MR. BROWN:  I'd like to offer PTX-366 into

6    evidence.

7              MR. McCANN:  No objection, your Honor.

8              MR. GASPAR:  No objection.

9              THE COURT:  It's admitted.

10             (PTX-366 admitted into evidence.)

11             MR. BROWN:  Could we see PDX-424, please?

12   BY MR. BROWN:

13   Q.    Mr. Yurkerwich, could you tell me if this is a slide

14   you prepared?

15   A.    Yes, it is.

16   Q.    And is it prepared from PTX-366?

17   A.    Yes, it is.

18   Q.    And does it relate to your opinion as to the

19   importance of the patented technology to Adobe?

20   A.    It does.

21   Q.    Could you explain how, please?

22   A.    Well, in this particular white paper and this

23   section, there's a discussion of the new auto adjustments

24   that came out with 3.7 where the auto settings were combined

25   into one button, so it starts out the old ability to select

Yurkerwich - direct

1     individual auto settings by controls are gone, but then I

2     highlighted the upside is that the new auto adjustments are

3     improved.  Try them, you may like them.  You can always

4     choose undo or use the auto button and then tweak individual

5     sliders to taste.

6          So again, it's an encouragement to use the auto

7     button and reflects its importance.

8     Q.    We're now going to turn to the next group of

9     Georgia-Pacific factors that deal with apportionment.  Could

10    we have PDX-425 on the screen, please?  And is this a slide

11    you prepared listing the Georgia-Pacific factors relating to

12    apportionment?

13    A.    Yes.  You can see I selected factors six, eight, 12

14    and 13, which I have grouped it under this title of

15    apportionment and profitability.

16          Essentially these factors ask you to look at the

17    relationship of the patented technology to the product that

18    it's part of, and to consider the profitability of that

19    product, and whether there's any customary amounts to be

20    paid for use of the patented invention, and it asks you to

21    look at distinguishing a profit between the patented and

22    non-patented elements.

23    Q.    Did you apply these factors in your analysis of the

24    facts of this case?

25    A.    Where appropriate I did, yes.

*redacted - public version*

Yurkerwich - direct

1    Q.    And what, how does the sort of general description

2    you gave of figuring out the patented part, the contribution

3    of the patented part and other parts figure in to the facts

4    of this case?

5    A.    As I think I've said a little, the patented feature

6    is an integral part of Adobe Camera Raw, as we saw how it

7    appears on the panel of Adobe Camera Raw.  And Adobe Camera

8    Raw is included, has been included in every release of

9    Photoshop since 2004.  And then Photoshop is part of the

10   Creative Suites family.  So what I've tried to do is focus

11   on the smallest piece that the feature is a part of and that

12   is Adobe Camera Raw.  So the feature is part of Adobe Camera

13   Raw, which is part of Photoshop, which is part of Creative

14   Suites.

15   Q.    Could you now look at exhibit PTX-77?

16   A.    I have it.

17   Q.    What is exhibit PTX-77?

18   A.    It's another study, and in this case Adobe Lightroom

19   user study, Lightroom being a product that includes

20   Photoshop and Adobe Camera Raw.  It's from 2008.

21              MR. BROWN:  I would offer PTX-77 into evidence.

22              MR. McCANN:  No objection, your Honor.

23              MR. GASPAR:  No objection.

24              THE COURT:  It's admitted.

25              (PTX-77 admitted into evidence.)

*redacted - public version*

Yurkerwich - direct

```
 1              MR. BROWN:  Mr. Reiter, could we display page 31

 2    of PTX-77?

 3    BY MR. BROWN:

 4    Q.      Mr. Yurkerwich, is this or PTX-77 one of the things

 5    that was in that document that informed your opinions?

 6    A.      Yes, it is.

 7    Q.      And what specifically is represented in this chart

 8    that you found informative?

 9    A.      Well, I focused on the USA column.  The survey

10    actually covered people from United States, Japan and

11    Germany that are users of Lightroom, but I focused on USA

12    and you can see there are 532 respondents, and I focused on

13    the basic adjustment line, which is the panel that includes

14    the auto feature, and in particular it, the studies showed

15    that 96 percent of the respondents were using the basic

16    adjustments, using the panel that has the auto feature.

17              MR. BROWN:  Could we put up PDX-441, please?

18    BY MR. BROWN:

19    Q.      Mr. Yurkerwich, is this the slide that shows the

20    basic panels to which you were just referring?

21    A.      Yeah.

22    Q.      And that survey that you were looking at, you were

23    looking at a number representing how many people used the

24    controls on the basic panel, is that right?

25    A.      Yes.
```

Yurkerwich - direct

1    Q.    And what controls are on the basic panel?

2    A.    Well, as I said before, in the heart of the basic

3    panel is this auto button that controls the exposure,

4    blacks, brightness and contrast sliders which are part of

5    the accused feature.

6              MR. BROWN:   Could we go back to the exhibit

7    previous, please?

8    BY MR. BROWN:

9    Q.    So the number you were looking at here was the number

10   of people who were using the basic adjustments in the U.S.,

11   is that right?

12   A.    Yes.

13   Q.    And that was 96 percent, correct?

14   A.    Correct.

15   Q.    And did you use that to inform your analysis as to

16   how you did your valuation in this case?

17   A.    Well, yes.  It's confirmation that the basic panel is

18   used by most people that are using Lightroom.

19   Q.    Ninety-six percent?

20   A.    Correct.

21   Q.    So if that's an indication as to the number of people

22   who are using the Raw, the Camera Raw part of the program

23   that are using the basic panel functions, 96 percent, did

24   you also estimate how many people who are using Lightroom

25   are using the Camera Raw part of the program?

Yurkerwich - direct

1    A.     Yes, I did.

2    Q.     How did you do that?

3    A.     There were some studies produced that revealed how

4    many people were using Camera Raw.

5    Q.     Could you look at PTX-142?

6    A.     I have it.

7    Q.     What is PTX-142?

8    A.     It's an Adobe Photoshop Elements and Lightroom user

9    study from 2011.

10   Q.     And is this another one of the survey documents

11   produced by Adobe?

12   A.     Yes, it is.

13            MR. BROWN:  I would ask that PTX-142 be admitted

14   into evidence.

15            MR. McCANN:  No objection, your Honor.

16            MR. GASPAR:  No objection.

17            THE COURT:  It's admitted.

18            (PTX-142 admitted into evidence.)

19            MR. BROWN:  Mr. Reiter, could you put up page

20   29?

21   BY MR. BROWN:

22   Q.     Mr. Yurkerwich, this is one of the pages from the

23   exhibit we were just looking at.  Can you tell me if this is

24   one of the pages that informed your opinion?

25   A.     Yes, it is.

*redacted - public version*

Yurkerwich - direct

1   Q.      And can you point to the -- can you just explain to

2   the jury what significance you found in this chart?

3   A.      Well, this chart has a series of questions and

4   answers about feature usage and satisfaction, and I focused

5   on the line called working with Raw files which indicated

6   that 88 percent of the respondents used the, if you see down

7   here, feature used frequently, nearly every time the

8   software is used, 88 percent of the time.

9   Q.      And working with Raw files means working with Adobe

10  Camera Raw, is that your understanding?

11  A.      Yes.

12  Q.      So if 88 percent -- so this slide shows that 88

13  percent of the users of Lightroom report using working with

14  Raw files nearly every time they use the software, and the

15  prior slide showed that 96 percent of the people who were

16  working with Raw files use the basic panel controls; is that

17  your understanding?

18  A.      Yes, it is.

19  Q.      So what conclusion do you draw from that?

20  A.      Well, I think it's clear that the auto feature is a

21  key element that is used by a lot of people, particularly in

22  this case, this refers to Lightroom.

23  Q.      Now, this survey is specifically for Lightroom,

24  correct?

25  A.      Yes.

*redacted — public version*

Yurkerwich - direct

1   Q.      And did you use this number that is reported here,

2   the 88 percent, in any of your analysis?

3   A.      I did.  I used it to isolate the value of Adobe

4   Camera Raw.

5   Q.      And how did you do that?

6   A.      I applied the percentage, the 88 percent to the

7   Adobe, the products -- well, to Lightroom essentially, to

8   Lightroom.  I should say to the Photoshop portion of

9   Lightroom is what I should say.

10  Q.      Did you also determine how many Photoshop users use

11  Adobe Camera Raw?

12  A.      Yes.

13  Q.      And how did you do that?

14  A.      There was another survey provided.

15  Q.      Could you look at exhibit PTX-218?

16  A.      Unfortunately it's not in the book.  PTX-218?

17  Q.      Correct.

18  A.      There's no document here.

19          MR. BROWN:  Can we provide a copy to the

20  witness?

21          THE COURT:  Certainly.

22          You may approach to hand him the document.

23          THE WITNESS:  I see what happened.  It's just

24  that the tab was in the wrong place.

25          It's here.

Yurkerwich - direct

1        THE COURT:  Do you have PTX-218 in front of you

2    now?

3        THE WITNESS:  How about you?

4        THE COURT:  I do have it, yes.

5        THE WITNESS:  Okay.  Yes.  Thank you.

6    BY MR. BROWN:

7    Q.    Mr. Yurkerwich, what is PTX-218?

8    A.    It's a Creative Suites 2 user study, North America

9    Photoshop.

10   Q.    And is this another one of the documents that was,

11   that you understand was provided by Adobe?

12   A.    Yes.

13       MR. BROWN:  I would offer exhibit PTX-218 into

14   evidence.

15       MR. McCANN:  No objection, your Honor.

16       MR. GASPAR:  No objection.

17       THE COURT:  It's admitted.

18       (PTX-218 admitted into evidence.)

19       MR. BROWN:  Could we have PDX-427 on the screen,

20   please?

21   BY MR. BROWN:

22   Q.    Mr. Yurkerwich, is this a slide that you created from

23   exhibit PTX-218?

24   A.    Yes, it is.

25   Q.    Could you explain what is significant in this slide?

*redacted – public version*

Yurkerwich - direct

1   A.      Well, as you can see, I highlighted the Adobe

2   Photoshop Camera Raw bars in the chart that show the usage

3   of Adobe Camera Raw in Photoshop Creative Suites 2 and

4   Creative Suites 2.

5   Q.      Could you go back to exhibit PTX-142?

6   A.      I have it.

7   Q.      And this is the user survey we were talking about a

8   few minutes ago; is that right?

9   A.      Yes.

10                  MR. BROWN:  Could we have PDX-428 on the screen,

11  please?

12  BY MR. BROWN:

13  Q.      Mr. Yurkerwich, is this another slide that you

14  prepared?

15  A.      Yes, it is.

16  Q.      And this is prepared from page 24 of exhibit PTX-142;

17  is that right?

18  A.      Yes.

19  Q.      What is shown by this chart?

20  A.      This is a page out of that document that addresses

21  Photoshop Elements and, in particular, features used

22  frequently, nearly every time.  And, up here (indicating),

23  working with Raw files is 35 percent.

24  Q.      Did you use these usage percentages in your analysis?

25  A.      Yes, I did.

*redacted - public version*

Yurkerwich - direct

1  Q.     How did you use them?

2  A.     I used them to isolate the portion of Photoshop

3  revenue related to the use of Adobe Camera Raw.

4          MR. BROWN:  Could we now have PDX-430 displayed,

5  please?

6  BY MR. BROWN:

7  Q.     Mr. Yurkerwich, we're now moving on to the next group

8  of Georgia-Pacific factors that you identified.  Could you

9  explain what these factors are about and how you analyzed

10  them, generally?

11  A.     Yes.  I think we probably have covered them some

12  already.

13          With respect to factor 1, we talked about

14  royalties received from Hewlett-Packard.  We haven't talked

15  about royalties received from RPX and the Nikon agreement

16  which I would expect we'll talk about next.

17          Then we did talk the fact that I didn't find any

18  comparable patents produced by Adobe, or, that is, licenses

19  for comparable patents produced by Adobe.

20          We talked about the license being paid up, and

21  we talked about, in this case, Tarkus seeking to license its

22  patent to the market; that is, not launch its own product

23  but make its invention available to others to put in their

24  products.  And,

25          Then we talked about the patent, the term of the

Yurkerwich - direct

1     agreement would be to 2017.

2     Q.     Could you just briefly explain the ranking behind

3     applying these factors to estimating a reasonable royalty?

4     A.     Well, these are items that need to be considered in

5     this hypothetical negotiation that I have been describing.

6     So in order to assess what the parties would agree to, you

7     have to consider what evidence they have.  And that's why

8     the factors are designed to help identify what evidence might

9     exist and how the parties might evaluate that evidence.

10    Q.     So you mentioned the license and the amendment to

11    that license that were entered into between Mr. Holm and

12    Hewlett-Packard; correct?

13    A.     Yes.

14    Q.     And you also mentioned a license with RPX; is that

15    right?

16    A.     Yes.

17    Q.     Now, did you find information from the license and

18    subsequent amendment to Hewlett-Packard to be informative as

19    to the value of a reasonable royalty?

20    A.     No, I did not.

21    Q.     Why is that?

22    A.     Well, the first Hewlett-Packard license was a

23    license before the patent was applied for and did not grant

24    Hewlett-Packard broad rights, if you will.

25                And the second license, the sublicense that

Yurkerwich - direct

1     came in 2006 was for a limited field of use, that is, not

2     for photo-editing software or printers or cameras.  And in

3     this case, in the case of Adobe, it's a different field of

4     use than the license to HP.

5     Q.     Were there other factors relating to the amendment

6     to the HP agreement that you took into consideration in

7     evaluating whether that agreement was indicative as to the

8     value of a license under the '823 patent?

9     A.     Yes.

10    Q.     What were those other factors?

11    A.     Well, Mr. Holm was an employee of Hewlett-Packard in

12    2006 when they requested a sublicense, and he wanted to keep

13    his job.  My understanding is he wanted to keep his job at

14    HP.  He needed the job.  So he found a good solution because

15    he didn't give up the right to license to a major software

16    company like Adobe, who, of course, he had been talking to

17    anyway, or Canon who he had been talking to, or Nikon.  So

18    the field of use that he granted did not take away from the

19    larger fields that he could still license.

20    Q.     The other license to which you referred was an RPX

21    license; is that right?

22    A.     Yes.

23             MR. BROWN:  Could we have exhibit PTX-158

24    displayed, please?  Just the first page.

25    BY MR. BROWN:

Yurkerwich - direct

1    Q.    I realize you can't read it from the screen.  But is

2    this the document to which you were referring?

3    A.    Yes.

4            MR. BROWN:  Can we blow up the first paragraph,

5    please?

6    BY MR. BROWN:

7    Q.    And you will see in there, it specifies an effective

8    date?

9    A.    Yes.

10   Q.    And that date was what?

11   A.    August 1st, 2011.

12           MR. BROWN:  Can we now blow up the last of the

13   whereas clauses in this?

14   BY MR. BROWN:

15   Q.    Mr. Yurkerwich, you will see there is a -- on the

16   third line down, about in the middle of the line, do you se

17   language starting with "Tarkus?"

18   A.    Yes.

19   Q.    Could you just read that language for us?

20   A.    Yes.  It starts here (indicating).  Tarkus has

21   therefore been forced to raise funds, Tarkus is willing to

22   settle with Nikon (as defined below) subject to Rule 408 of

23   the Federal Rules of Evidence, by granting to RPX, for a

24   license fee that Tarkus believes to be less than a

25   reasonable royalty ...

*redacted - public version*

Yurkerwich - direct

1  Q.      And was it your understanding that this document was

2  entered into by Tarkus as a settlement with Nikon?

3  A.      Yes.

4           MR. BROWN:  Could we now have exhibit PDX-54?

5           THE COURT:  Is that PD, demonstrative?

6           MR. BROWN:  I'm sorry.  PDX-54.

7           THE COURT:  It's up.

8  BY MR. BROWN:

9  Q.      Mr. Yurkerwich, we have here a callout of some of

10 the language from the RPX agreement.  Do you see that?

11 A.      Yes.

12 Q.      Is this also language from the agreement that was

13 important to your analysis?

14 A.      Yes, it was.

15 Q.      Could you explain how?

16 A.      Sure.  You can see that it indicates that the parties

17 acknowledge that Tarkus has represented that the license

18 fee was determined not by any reasonable royalty calculation

19 but instead reflect Tarkus's need for capital and the base

20 of the refusal of the Tarkus litigation defendants to

21 acknowledge the infringement and validity of the patents

22 and the refusal of RPX to pay a $14 million license fee

23 originally requested by Tarkus for the rights granted herein.

24 Q.      And who are the Tarkus litigation defendants?

25 A.      Adobe, Canon, and Nikon.

Yurkerwich - direct

1  Q.    And there is additional language in that box.  Was

2  any of that significant to you?

3  A.    Yes.  The document goes on to say that:  Upon RPX's

4  payment to Tarkus of the license fee and Tarkus receiving

5  written notice of RPX granting a sublicense to Nikon, Tarkus

6  shall immediately complete the release and dismissal

7  obligations with respect to Nikon and its affiliates.

8  Q.    Does that language reinforce your understanding that

9  the RPX agreement was entered into by Tarkus as a settlement

10 with Nikon?

11 A.    Yes.

12          MR. BROWN:  Could we now display PDX-55?

13 BY MR. BROWN:

14 Q.    Is this additional language from the RPX agreement

15 that was important to your analysis?

16 A.    Yes.

17 Q.    Could you explain how?

18 A.    Sure.  This indicates that in connection with this

19 deal; that is, releasing Nikon; RPX would pay Tarkus $7

20 million.

21 Q.    So combined with the earlier language, it says that

22 Tarkus was willing to settle with Nikon for a payment of $7

23 million.  Is that your understanding?

24 A.    Yes.

25 Q.    Do you know whether -- so this provision provides

Yurkerwich - direct

1    that RPX made that $7 million to Tarkus; is that correct?

2    A.    Yes.

3    Q.    Do you know whether Nikon paid that money to RPX to

4    pay to Tarkus?

5             MR. GASPAR:  Objection.

6             THE COURT:  Objection?

7             MR. GASPAR:  Yes.  I think we dealt with this

8    before.

9             THE COURT:  All right.  I'll see you at sidebar.

10            (Sidebar conference held.)

11            MR. LORIG:  Before we go on the record.

12            (Mr. Lorig requests a recess.)

13            THE COURT:  All right.  You have an objection?

14            MR. GASPAR:  I do.  I believe the question was

15   how much did Nikon pay to RPX.  There is no testimony from

16   Mr. Holm about that.  And further, I'm sorry, there had

17   been no testimony from Mr. Holm as to a payment from Nikon

18   to RPX.  And I believe your Honor already ruled that there

19   would be no discussion outside the four corners of the RPX

20   document about payments by Nikon.

21            THE COURT:  Wasn't that an objection relating to

22   Mr. Holm?

23            MR. GASPAR:   Indeed it was, but if there is no

24   evidence from Mr. Holm that there can't be proper expert

25   testimony about it.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 105 of 277 PageID #: 9030
*redacted - public version*
1241

Yurkerwich - direct

1          THE COURT:  Mr. Brown.

2          MR. BROWN:  I believe an expert is entitled to

3    rely on material other than admitted evidence.  And if he

4    has information on the payments and it was something he

5    considered, like he said, I think he is entitled to testify.

6    I don't think there has to be admissible evidence on every

7    point to which the expert testifies.

8          THE COURT:  Mr. Gaspar.

9          MR. GASPAR:  The only way he would know that is

10   if Quinn Emanuel told him, and that was privilege that was

11   asserted by Jack Holm.  There was also an instruction given

12   by Quinn Emanuel during Mr. Holm's deposition that this

13   would not be something that Mr. Holm would testify about.

14   This is using the privilege as a sword.

15         THE COURT:  All right.  I remember that with

16   respect to Mr. Holm.  I don't remember that coming up with

17   respect to their expert.

18         MR. GASPAR:  We're just hearing about it now.

19   I didn't expect this could possibly come with their expert

20   because there is no factual predicate for it.

21         THE COURT:  Okay.  Does Adobe have an issue?

22         MR. McCANN:  Perhaps it would be help if we had

23   an offer of proof as to the source of information the witness

24   would testify to.

25         THE COURT:  Right.  Thank you.  I am overruling

Yurkerwich - direct

1    the objection but we will see what the basis of his knowledge

2    is.  I agree he does not have to have, certainly doesn't have

3    to have it from Mr. Holm, and I don't believe there is any

4    use of the privilege as a sword with respect to Mr. Yurkerwich,

5    But we'll see where the testimony goes.

6              The first thing I will do when we get back is

7    give the jury and you as well a short break.

8              (Sidebar conference ends.)

9              THE COURT:  Before we permit Mr. Brown to

10   proceed, given the odd time that we started today, I realize

11   I have now blown way through the break time but I do want to

12   give you a short break.

13             So no talking about the case during the break,

14   and we'll get you back here shortly.

15             (Jury left courtroom.)

16             THE COURT:  We'll come back in about ten minutes.

17             (Brief recess taken.)

18             *      *      *

19             (Proceedings reconvened after recess.)

20             THE COURT:  Mr. Brown, do you have any estimate

21   as to how long the rest of your direct will be?

22             MR. BROWN:  It's a little hard to tell because

23   the program has changed a bit today.

24             THE COURT:  Right.

25             MR. BROWN:  I guess an hour.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 107 of 277 PageID #: 9032
*redacted - public version*
1243

Yurkerwich - direct

1          THE COURT:  I see.  All right.  Well, we'll

2   probably about taking a lunch break soon then but we'll see

3   how things are going.

4          MR. McCANN:  Your Honor?

5          THE COURT:  Hold on.

6          MR. McCANN:  I'm sorry, your Honor.

7          THE COURT:  Yes.

8          MR. McCANN:  We were talking during the break.

9          THE COURT:  Why don't you come to the podium.

10          MR. McCANN:  I will, your Honor.

11          THE COURT:  And everyone else can sit down, if

12   they wish.

13          MR. McCANN:  On the issue of what Nikon paid, I

14   was talking to my colleague here and I think both of us, we

15   don't know anywhere in the record where that information

16   exists.  So I would reiterate the request that before the

17   jury hears it, can we get an offer of proof as to where the

18   witness learned how much Nikon paid?

19          THE COURT:  Are you focused on whether Nikon

20   made the payment or whether RPX made the payment?  Is that

21   the issue?

22          MR. McCANN:  How much did Nikon pay to join RPX?

23   I think that is the issue, to my knowledge.

24          MR. GASPAR:  It is.

25          MR. McCANN:  None of knows that.

*redacted — public version*

Yurkerwich - direct

1          MR. GASPAR:  It is also worth noting there isn't

2     any amount that Nikon paid to RPX, first of all, anywhere on

3     the record, certainly, not the expert reports.  So we want

4     to note that objection as well.

5          THE COURT:  Why don't you both have a seat.

6          Mr. Brown, come back.

7          Mr. Yurkerwich, you are free to sit.  You will

8     have to rise when the jury comes.  I don't know when that

9     will be.

10          Mr. Brown, tell me what you are seeking to

11     elicit with respect to your last question and particularly

12     Nikon, whether they made the payment.

13          MR. BROWN:  So there is publicly available

14     information as to what members paid for membership for RPX.

15     And I believe the information that is publicly available is

16     that there is a three year commitment and that -- and, I'm

17     sorry, I don't remember the numbers but it is several

18     million dollars.

19          THE COURT:  Tell me what you anticipate your

20     witness is going to testify to.

21          MR. BROWN:  I expect he will testify when

22     Nikon joined RPX, according to RPX public information, that

23     commitment was to a two or three year membership.  I don't

24     remember the answer to whether it was two or three.  And

25     that there is a payment schedule that can be derived from

Yurkerwich - direct

1    RPX's public information as to rates corresponding to a

2    company that is Nikon's size that give an indication as to

3    how much Nikon paid for their membership.

4              THE COURT:  Okay.  Adobe.

5              MR. McCANN:  If that is all the testimony is

6    going to be, that's fine, but we thought from the question

7    he was going to testify this is exactly what it was, and I

8    know from some other source that we weren't aware.

9              THE COURT:  Canon.

10             MR. GASPAR:  I'll maintain the obviously that

11   it's not disclosed anywhere in the report.

12             THE COURT:  That what was proffered isn't

13   anywhere in the report?

14             MR. GASPAR:  That's right.

15             THE COURT:  Well, I'm going to allow to the

16   extent there are objections other than the beyond the scope

17   of the expert report which we'll handle at post-trial

18   motions.  To the extent there are other objections, I'm

19   overruling them based on the proffer and I will allow the

20   testimony consistent with the proffer that we just heard.

21             Let's bring the jury in.

22             (Jury returned.)

23             THE COURT:  Ladies of the jury, welcome back.

24             Mr. Brown, you may proceed.

25             MR. BROWN:  Could we please have PDX-432

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 110 of 277 PageID #: 9035
*redacted - public version*
1246

Yurkerwich - direct

1    displayed, please?

2    BY MR. BROWN:

3    Q.    Mr. Yurkerwich, is this a slide with the next set of

4    Georgia-Pacific factors that you used in your analysis?

5    A.    Yes, it is.

6    Q.    And could you explain these factors?

7    A.    Yes.  These two factors, five and 15, I call relative

8    positioning and you can see factor five asks about the

9    commercial relationship between the parties.  And here it's

10   a relationship of Mr. Holm, the inventor, and he is not

11   competing with Adobe; rather, he wants to license Adobe for

12   the use of his invention.

13          Then factor 15 is this hypothetical negotiation,

14   the amount that a willing licensor, here, Tarkus, would have

15   agreed to accept, and then a willing licensee would have

16   agreed to pay at the time the infringement began.  So this

17   is, and there actually are in the text of the case itself

18   there are more words, so this is a subset of the words in

19   factor 15.  So I summarized it and this is where all of the

20   other factors are considered in this hypothetical

21   negotiation.

22   Q.    So before we took our break we were talking about the

23   RPX license which had a seven million dollar licensing fee,

24   correct?

25   A.    Yes.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 111 of 277 PageID #: 9036
*redacted - public version*
1247
Yurkerwich - direct

1   Q.     Does that agreement suggest that a license under the

2   '832 patent is worth seven million dollars?

3   A.     No, not seven million.  It suggests that it's a basis

4   for determining what the license might be to another party

5   because it is a real world transaction, and it relates to

6   the '823 patent, but I've had to consider certain

7   adjustments to that amount to make it equivalent to what the

8   agreement would have been between Tarkus and Adobe.

9   Q.     And are those adjustments to account for differences

10  between the hypothetical negotiation and the negotiation

11  that led to the RPX agreement?

12  A.     Yes.

13  Q.     And you did make such adjustments as part of your

14  analysis, is that correct?

15  A.     I did.  I made four adjustments.

16         MR. BROWN:  Could we have PDX-433 displayed,

17  please?

18  BY MR. BROWN:

19  Q.     Mr. Yurkerwich, is this a slide that you prepared?

20  A.     Yes, it is.

21  Q.     And could you explain it to us, please?

22  A.     What I've done is listed the four items that I think

23  need to be adjusted from the RPX-Nikon deal for it to be

24  equivalent to what Adobe and Tarkus would have agreed to, so

25  I picked, I identified four differences between the

*redacted - public version*

1248

Yurkerwich - direct

1    RPX-Nikon deal and what the Adobe hypothetical deal would

2    have been, the first difference being the timing.

3           The Nikon deal occurred in August 2011, and the

4    Tarkus-Adobe negotiation and license would have been in

5    September of 2004.  So I've adjusted the seven million

6    downward to reflect that it would have been paid at an

7    earlier point in time.  I called it inflation adjustment

8    because I used the consumer price index to make the

9    adjustment.

10          The second item, infringing units, as part of

11   the Nikon deal there were 6.6 million infringing Nikon units

12   through 2010, and through 2010 happens to be the date when

13   all the parties had produced information about their number

14   of infringing units. ///////////////////////////////////

15   ////////////////////////////////////////////////////////

16   /////////////////////////////////////////// So I've made

17   an adjustment to correct for higher usage of the invention

18   by Adobe compared to Nikon.

19          Another item that I looked at is the

20   profitability of Nikon compared to Adobe and how they used

21   the invention, and in the case of Nikon, there's much less

22   profit compared to Adobe's profits on the sale of software.

23          And of course Adobe is using it as a photo

24   editing product, so it's kind of a primary use of the

25   invention.

Yurkerwich - direct

1        And then the last item is this validity and

2    infringement, and actually the words are reversed as I look

3    at it sitting here.

4    Q.    I see.  It should have said "certain" under Adobe and

5    "uncertain" under Nikon.

6    A.    In the case of the Nikon deal, there was uncertainty

7    as to whether the patent was valid and infringed, and that's

8    written actually in the agreement.  So they didn't have the

9    benefit of a decision from a court.  Whereas in the Adobe

10   negotiation in this court, if there is damages, if there are

11   damages, it will be because the patent is valid and

12   infringed.  So there's certainty about that.

13        In the real world, when a license is being

14   negotiated, many times the party taking the license will

15   say, well, I don't use the patent or I don't think the

16   patent's valid, they'll use it as a negotiating technique to

17   lower the amount that they would pay.  But in court, if the

18   court decides that the patent is valid and infringed, the

19   jury decides, then that uncertainty is taken away.  So it's

20   a harder negotiation, if you will.  So you have to account

21   for the difference between a license made outside of a court

22   without the benefit of certainty on validity and

23   infringement.  So actually those two words should be

24   reversed.

25              MR. BROWN:  Could we now show PDX-434?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 114 of 277 PageID #: 9039
*redacted - public version*
1250

Yurkerwich - direct

1    BY MR. BROWN:

2    Q.    Mr. Yurkerwich, is this a slide that you prepared to

3    help explain the first adjustment you made?

4    A.    Yes.  This shows the seven million dollar payment

5    that was made in August of 2011, and it shows the adjustment

6    that I made to put the payment back in time to September of

7    2004, and I adjusted it downward to account for inflation

8    which averaged 2.1 percent during that time period.  So the

9    starting point for my analysis is 6,116,000, compared to

10   seven million.

11            MR. BROWN:  Could we now see exhibit PDX-435?

12   BY MR. BROWN:

13   Q.    And Mr. Yurkerwich, could you tell us what is

14   depicted by this slide?

15   A.    This is a chart that I used to show how the damages

16   are built up from the RPX agreement.  I guess it should say

17   built down and then up because in this first adjustment it

18   actually goes down from seven million to 6.1 million to

19   account for the date.

20   Q.    Mr. Yurkerwich, could you now look in your exhibit

21   binder at PTX-328B-2?

22   A.    I have it.

23   Q.    And is this another one of the schedules to your

24   expert report that you generated from various sources of

25   financial data as a compilation?

Yurkerwich - direct

1    A.    Yes.

2              MR. BROWN:  I would offer PTX-328B-2 into

3    evidence.

4              THE COURT:  Just one page?

5              MR. BROWN:  Correct.

6              THE COURT:  Any objection?

7              MR. McCANN:  No objection, your Honor.

8              MR. GASPAR:  No objection.

9              THE COURT:  It's admitted.

10             (PTX-328B-2 admitted into evidence.)

11             MR. BROWN:  Could we now see PDX-436?

12   BY MR. BROWN:

13   Q.    Mr. Yurkerwich, can you explain this slide?

14   A.    Yes.  This is to show how I made the, what I'm

15   calling the market share adjustment.  ////////////////

16   ////////////////////////////////////////////////////////

17   ///////////////////////////////////////////////////

18   /////////////////////////////////////////////////////////

19   ///////////////////////////////////////////////////

20   ////////////////////////////

21   Q.    And is this equation -- is the data in this equation

22   derived from the exhibit we were just looking at,

23   PTX-328B-2?

24   A.    Yes, it is.

25             MR. BROWN:  Could we now look at PDX-437?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 116 of 277 PageID #: 9041
*redacted - public version*
1252

Yurkerwich - direct

1   BY MR. BROWN:

2   Q.     Mr. Yurkerwich, is this another slide you prepared?

3   A.     Yes, it is.

4   Q.     Can you tell us what's depicted on this slide?

5   A.     Here I show the result of adjusting for the larger

6   number of units sold by Adobe compared to Nikon, so it's a

7   multiplication of 2.3 times the 6.1 in the previous slide

8   that brings the damages to 14.1 million.

9   Q.     So I see you have two blocks over in the column

10  that's labeled damages build-up.  Could you explain what

11  those two blocks are?

12  A.     Well, essentially the lower block is the inflation

13  adjustment and then the second block is the unit adjustment.

14             MR. BROWN:  Could we look back at PDX-436 for a

15  moment?

16  BY MR. BROWN:

17  Q.     Now, as I understood your testimony, the reason for

18  this adjustment was that Adobe in the hypothetical license,

19  ////////////////////////////////////////////////////////

20  ///////////////////////////////////////////////////////?

21  A.     Yes.

22  Q.     Now, should the RPX agreement be interpreted as

23  covering units other than the Nikon units?

24  A.     It's possible that it could be because as part of the

25  agreement RPX got the right to license other people, namely

*redacted - public version*

Yurkerwich - direct

1   its members, past and future, and its membership is

2   constantly changing.  Some people leave as members and some

3   people come, so it's a changing group of members, and Nikon

4   became a member at the same time that this payment was made

5   and they were released from the litigation.  But none of the

6   other members of RPX are accused of infringing the '823

7   patent, and I'm not aware of anybody else that is using the

8   '823 patent.  So from my perspective the payment was made to

9   get Nikon released from the litigation.

10                  MR. BROWN:  Could we have slide PDX-56 put back

11  up, please?

12  BY MR. BROWN:

13  Q.     Mr. Yurkerwich, are you aware of anything in the RPX

14  agreement that suggests what the parties contemplated at the

15  time of that agreement as to whether there were other people

16  who were using the '823 patent technology?

17  A.     Yes.

18  Q.     And does this slide show some of the information from

19  that agreement?

20  A.     Well, this is a sentence from the agreement that

21  discusses that point.  It says other than the Tarkus

22  litigation, the patents have not been asserted against any

23  entity in a licensing, litigation or other context, in a

24  manner in which the entity has been accused of infringing

25  the patents or has standing to bring from a declaratory

Yurkerwich - direct

1    judgment, which would be challenging the validity of the

2    patent.  So it's essentially confirming the observation that

3    there doesn't seem to be anybody else that is accused or

4    needs a license.

5    Q.    It at least confirms that that was the understanding

6    of the parties at the time the license was entered into,

7    right?

8    A.    Yes.

9    Q.    After making the market share adjustment, did you

10   make any further adjustments to the amount of the RPX

11   royalty agreement?

12   A.    Yes, I did.

13   Q.    What additional adjustments did you make?

14   A.    I made an evaluation and risk adjustment, two other

15   adjustments.

16   Q.    Let's talk about the value adjustment.  How did you

17   do that?

18   A.    I studied the profitability of both Nikon and Adobe

19   in the areas that are relevant to the products that use the

20   invention, and observed that Adobe was significantly more

21   profitable than Nikon.  And as I said, Adobe is using the

22   product in a way that's more central to its business.  It's

23   a photo editing software product and a leader in that field.

24   So I did some calculations of comparing the profitability

25   over a period of years and concluded that Adobe was at least

Yurkerwich - direct

1    two times more profitable than Nikon.

2    Q.    And so what adjustment did you make?

3    A.    I made an adjustment with a multiple of two.

4    Q.    And you said that your profitability analysis

5    indicated that Adobe was at least two times as profitable as

6    Nikon in the relevant business segments, so if you

7    determined a number that was bigger than two, how did you

8    come to the number two to use it in your adjustment?

9    A.    Well, I guess in one year I observed that the

10   relationship got down to 2.1, so to be conservative I used

11   two.

12   Q.    But was there some mathematical calculation that you

13   did that resulted in the multiplier of two?

14   A.    No, not exactly two, no.

15              MR. BROWN:  Can we have PDX-441, please?  I'm

16   sorry.  Not 441.  I got the wrong slide.  PDX-439, please.

17   439.

18   BY MR. BROWN:

19   Q.    Mr. Yurkerwich, can you tell us what is depicted on

20   this slide?

21   A.    This is adding the third adjustment that I made to

22   the damages build-up which increases the damages from 14

23   million to 28 million.

24   Q.    So we started with the inflation adjusted amount from

25   the RPX agreement and then we made the adjustments that are

Yurkerwich - direct

1    listed their, is that right?

2    A.    Yes.  The slide on the right side shows the

3    adjustments.  So there are three adjustments and three

4    blocks on the right side.

5    Q.    Now, you mentioned one more adjustment that you had

6    made.  What was that adjustment?

7    A.    The last adjustment deals with this question of

8    validity and infringement and the difference between a real

9    world negotiation and a hypothetical negotiation in a court

10   where you have a valid and an infringed patent, and as we

11   saw in the RPX agreement, that was an uncertainty for that

12   negotiation, and in fact the agreement even indicated that

13   Tarkus was seeking 14 million, not seven million.

14          I've also studied quite a bit of information and

15   have real-world experience negotiating licenses and there

16   is data that suggests that this risk factor is a multiple of

17   two.  Just like 14 is 2 x 7, that's not that different from

18   the real-world differences of having a valid and infringed

19   patent.

20          MR. BROWN:  Could we now see PDX-441?

21   BY MR. BROWN:

22   Q.    Mr. Yurkerwich, can you tell us what is depicted on

23   this demonstrative?

24   A.    So this adds this fourth and final adjustment to the

25   calculation which brings the total to $57.3 million from

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 121 of 277 PageID #: 9046
*redacted - public version*
1257

Yurkerwich - direct

1    $28 million.

2            MR. BROWN:  Could we now see slide PDX-442?

3    BY MR. BROWN:

4    Q.    Mr. Yurkerwich, can you explain this slide to us?

5    A.    This is a calculation that I made to compare, to

6    determine how much it was per unit.

7            So having adjusted the RPX deal to Nikon to

8    $56.3 million, what does that mean in terms of an amount

9    per unit for all of the units that will be covered by the

10   license?

11           So the license would not only cover the units

12   through December 1st, 2010 but would also cover all the

13   units from 2010 through to the expiration of the patent in

14   2017. /////////////////////////////////////////////////

15           //////////////////////////////////////////////////

16   //////////////////////.

17           The 56 million, therefore, if you divide the 56

18   million by 41.3 million units, you arrive at an effective

19   royalty unit of $1.36.  So that's for essentially every

20   Photoshop product that had Adobe Camera Raw.

21           MR. BROWN:  Could we now see PDX-443.

22   BY MR. BROWN:

23   Q.    Mr. Yurkerwich, can you now explain what is depicted

24   on this slide?

25   A.    Here, I have compared the $1.36 that I just computed,

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 122 of 277 PageID #: 9047
*redacted - public version*
1258

Yurkerwich - direct

1    the effective royalty rate, to a number that I computed for

2    Camera Raw users.  As I mentioned earlier in my testimony

3    based on the surveys of Camera Raw usage, I multiplied those

4    usage levels by the Photoshop revenue and determined an

5    average value for Camera Raw users of $44.

6           So the $1.36 is three percent of $44.  So

7    effectively this paid up license at $56.3 million converts

8    to three percent of the $44 of Camera Raw user revenue.

9           MR. BROWN:  Could we have PDX-403, please?

10   BY MR. BROWN:

11   Q.    So, Mr. Yurkerwich, based on the analysis that you

12   have done in this case and as you testified here today, what

13   is your opinion as to the amount of a reasonable royalty

14   for Adobe's use of the '823 patented technology in Adobe's

15   products?

16   A.    $56.3 million.

17   Q.    And that amount is derived as you explained today; is

18   that right?

19   A.    Yes, it's derived from looking at the Georgia-Pacific

20   factors, the hypothetical negotiation and in particular,

21   focusing on the RPX/Nikon deal as a comparable license to

22   the one that would have been negotiated with Adobe,

23   adjusting that license for the differences between Nikon

24   and Adobe.

25          MR. BROWN:  Could we now display PDX-444?

*redacted - public version*

Yurkerwich - direct

1  BY MR. BROWN:

2  Q.    Mr. Yurkerwich, we recognize the top line as being

3  the reasonable royalty opinion that you have given so far

4  today.  There are two additional rows in this table.  Can

5  you explain what those rows indicate?

6  A.    Yes.  These are alternate calculations if a different

7  infringement date beginning is used.  So the middle row

8  assumes that an infringement begins in October 2008, and the

9  last row assumes that infringement begins in January 2010.

10  So as a result of the infringement potentially beginning

11  later, there would be fewer units and therefore less money

12  paid in a lump sum payment.

13  Q.    Why did you make these alternative calculations?

14  A.    During my deposition in this case by Adobe, they

15  asked me if I had made calculations as of alternate dates,

16  and I had not at the time of my deposition but after my

17  deposition I provided these alternate calculations.

18  Q.    Now, you had given the opinion that the payment would

19  be in the form of a lump sum; correct?

20  A.    Yes.

21  Q.    So to summarize, Mr. Yurkerwich, your opinion is

22  represented in the first row of this chart; correct?

23  A.    Yes, it is.

24  Q.    And the second and third rows are alternative

25  scenarios that you prepared in the event that there is any

Yurkerwich - direct

1  finding that there was a later date of first infringement;

2  is that correct?

3  A.      That's correct.

4            MR. BROWN:  Let's turn now to Canon.

5            THE COURT:  Before we do, let's give the ladies

6  of the jury their lunch break.

7            Of course, during the lunch break no talking

8  about the case.  I know that your lunch is here and we'll

9  give you about a half hour for that, and then we'll hear

10 about Canon.

11           (Jury left courtroom.)

12           THE COURT:  We will be in recess.

13           (Luncheon recess taken.)

14           *     *     *

15           (Proceedings reconvened after recess.)

16           THE COURT:  Bring the jury in.

17           (Jury returned.)

18           THE COURT:  Welcome back, members of the jury.

19           Mr. Brown, you may continue.

20 BY MR. BROWN:

21 Q.      Good afternoon, Mr. Yurkerwich.

22 A.      Good afternoon.

23 Q.      Although I promise to move on to Canon, I want to go

24 back for just one more detail with the Adobe information.

25 Can you look at exhibit PTX-328B-3?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 125 of 277 PageID #: 9050
*redacted - public version*
1261
Yurkerwich - direct

1    A.    I have it.

2    Q.    And could you tell us what this exhibit is?

3    A.    Yes.  It's an Excel worksheet that I prepared that

4    computes the $1.36 per unit that I mentioned on my previous

5    testimony before lunch.

6    Q.    So this is the source of the $1.36 per unit

7    derivation based on the lump sum payment that you derived

8    by analysis of the RPX agreement and the Georgia-Pacific

9    factors; is that right?

10   A.    Yes.

11            MR. BROWN:  I would offer PTX-328B-3 into

12   evidence.

13            MR. McCANN:  No objection, your Honor.

14            MR. GASPAR:  No objection.

15            THE COURT:  It's admitted.

16            (PTX-328B-3 admitted into evidence.)

17   BY MR. BROWN:

18   Q.    Now we'll turn to Canon.  Could you look at exhibit

19   PTX-183-62?

20   A.    I have it.

21   Q.    And could you tell us what that is?

22   A.    Yes.  This is the documents considered exhibit to

23   my Canon expert report.  So like Adobe, it lists the Bates

24   numbers of the documents that I reviewed for Canon together

25   with the depositions that I reviewed and certain interviews

Yurkerwich - direct

1    that were conducted, and then it lists sources of research

2    over several pages that I conducted.

3    Q.    And does that list of documents describe or document

4    to some extent the work and analysis you did to reach your

5    opinion regarding Canon?

6    A.    Yes, it does.

7               MR. BROWN:  Could we have PDX-445?

8    BY MR. BROWN:

9    Q.    Is PDX-445 one of the slides you prepared to help

10   with your testimony today?

11   A.    Yes.  It's a summary of information about Canon USA

12   and the Auto Photo Fix product.

13   Q.    And in the third bullet point, you referred to Auto

14   Photo Fix.  Is that one of the accused products in this

15   case?

16   A.    It is.  It's actually one of three.  There is

17   Auto-Image Fix and Auto Photo Fix and Auto Photo Fix II.  So

18   there are three.  And they follow the generation of their

19   product.  Auto-Image Fix was 2007, Auto Photo Fix was 2008,

20   and Auto Photo Fix II was in 2009.

21   Q.    Were there any differences in those products relevant

22   to the accused technology as far as you understand?

23   A.    No.

24   Q.    Mr. Yurkerwich, have you reached an opinion on what

25   would have been a reasonable royalty for Canon's use of

*redacted - public version*

Yurkerwich - direct

1    the '823 patented technology in the accused products?

2    A.    Yes, I have.

3    Q.    And how did you go about the analysis that led to

4    that conclusion?

5    A.    I followed the same approach as with Adobe.  I went

6    through the Georgia-Pacific factors and constructed the

7    hypothetical negotiation and came to an opinion what the

8    reasonable royalty would be coming out of the hypothetical

9    negotiation.

10   Q.    Could you open up your exhibit binder to look at

11   Exhibit 183-94?

12   A.    I have it.

13   Q.    Now, in regard to Adobe, you testified that you had

14   done an analysis to see what would have been the amount of

15   Mr. Holm's royalty demand in a hypothetical negotiation

16   based on his historical licensing positions; is that right?

17   A.    Yes.

18   Q.    And did you do the same for Canon?

19   A.    I did.

20   Q.    And what conclusion did you reach as to what would

21   have been Mr. Holm's demand based on historical licensing

22   positions regarding the amount of a royalty at five percent

23   for the part of the Canon accused products that corresponded

24   to the accused functionality?

25   A.    I used the same methodology projecting units into the

Yurkerwich - direct

1   future and then applying the five percent to a portion of

2   the Canon revenue and then discounting that result back to

3   the date of the hypothetical negotiation, which would be

4   2007.  And I arrived at a figure, and again using a five

5   percent rate, came to a figure of $29.4 million.

6            MR. GASPAR:  Your Honor, let me object to the

7   use of this exhibit we discussed at sidebar.  I can explain

8   why.

9            THE COURT:  I think it's only been shown to

10   the witness at this point so the objection is overruled.

11           You may continue.

12           MR. BROWN:  Can we have PDX-449 on the screen,

13   please?

14   BY MR. BROWN:

15   Q.    Mr. Yurkerwich, these are the relative advantage

16   factors that we discussed in connection with the Adobe

17   analysis.  Did you apply these same factors in your analysis

18   with respect to Canon?

19   A.    I did.

20   Q.    Could you look at PTX-183-67?

21   A.    I have it.

22   Q.    What is exhibit PTX-183-67?

23   A.    It's a summary of the printers that are accused of

24   infringement.

25   Q.    Is this a summary you prepared from financial data

Case 1:10-cv-00063-LPS  Document 507  Filed 10/17/12  Page 129 of 277 PageID #: 9054
*redacted - public version*
1265

Yurkerwich - direct

1   that was produced?

2   A.    Yes.

3             MR. BROWN:  I would move to have PTX-183-67

4   admitted in evidence.

5             MR. GASPAR:  No objection.

6             THE COURT:  Adobe?

7             MR. McCANN:  No objection, your Honor.

8             THE COURT:  It's admitted.

9             (PTX-183-67 admitted into evidence.)

10            MR. BROWN:  Could we have slide PDX-450, please?

11  BY MR. BROWN:

12  Q.    Mr. Yurkerwich, is this the slide you prepared from

13  PTX-183-67?

14  A.    Yes, it is.

15  Q.    And what does it show?

16  A.    It shows my calculation of printers with the accused

17  feature through December 31st, 2011.  It includes actual

18  information and then an estimate.  Actual information

19  through 2010 and then an estimate for 2011.

20  Q.    And how many accused printers does that show that

21  Canon has sold through 2011?

22  ///   //////////.

23  ///   /////////////////////////////////////////////.

24  //////////////////////////////////////////////////////

25  ///////////////////////////////////////////////////

1   /////////

2   A.     Yes.

3   Q.     Could you explain that, please?

4   A.     Well, it's an indication that Canon has included this

5   feature in a significant number of the printers that it

6   offers for sale demonstrating its importance.  Of course,

7   it has continued to include the feature knowing that the

8   patent existed.

9   Q.     And in addition to this history, were there other

10   facts that you found in your investigation that gave you

11   information as to the importance of the accused

12   functionality to Canon's printer business?

13   A.     Yes.  Similar to Adobe, there were other documents

14   that were produced by Canon that discussed the importance of

15   the feature and how it was marketed and generally its

16   significance to their business.

17   Q.     Could you look at PTX-673?

18   A.     I have it.

19   Q.     And what is exhibit 673?

20   A.     It's a document from Canon's website.  It's a

21   tutorial about enhancing images.

22          MR. BROWN:  I would ask that PTX-673 be admitted

23   into evidence.

24          MR. McCANN:  No objection.

25          MR. GASPAR:  No objection, your Honor.

Yurkerwich - direct

1      THE COURT:  It's admitted.

2      (PTX-673 admitted into evidence.)

3      MR. BROWN:  Could we put up PDX-453, please?

4  BY MR. BROWN:

5  Q.    Mr. Yurkerwich, is this a document that you prepared

6  from PTX-673?

7  A.    Yes.

8  Q.    Could you tell us what the import is?

9  A.    It is within this document about enhancing images and

10  particularly highlights the Auto Image Fix feature which can

11  work on your photos directly from a connected digital camera

12  or compatible memory card enabling you to perfect your

13  printouts without connecting to a computer.  If you're

14  printing through your Canon camera or printer card slot,

15  Auto Image Fix is turned on by default.

16  Q.    How did that information show the importance of the

17  accused functionality?

18  A.    Well, it highlights the notion of perfecting your

19  printouts through Auto Image Fix, and also the fact that

20  it's turned on by default.

21  Q.    Could you now look at PTX-680?  Have you found that?

22  A.    Yes.

23  Q.    What is PTX-680?

24  A.    It's a specification sheet regarding the Canon PIXMA

25  MP 250 inkjet Photo All-in-one Printer.

Yurkerwich - direct

1      MR. BROWN:  I would move that exhibit PTX-680 be

2   admitted into evidence.

3           MR. GASPAR:  No objection.

4           MR. McCANN:  No objection, your Honor.

5           THE COURT:  It's admitted.

6           (PTX-680 admitted into evidence.)

7           MR. BROWN:  Could we put up PDX-454, please?

8   BY MR. BROWN:

9   Q.    Is this slide a presentation that you prepared from

10  PTX-680?

11  A.    Yes.

12  Q.    And does this show what you found important in that

13  document?

14  A.    Yes.  The document highlights on its cover what you

15  see blown up, use the new Auto Photo Fix 2 software in

16  Easy-PhotoPrint EX to automatically adjust and correct your

17  photos.

18  Q.    Could you now look at exhibit 687, please?  I'm

19  sorry.  PTX-687.

20  A.    I have it.

21  Q.    What is PTX-687?

22  A.    It's an internal Canon memorandum.

23           MR. BROWN:  I would move to have PTX-687

24  admitted into evidence.

25           MR. McCANN:  No objection.

*redacted - public version*

Yurkerwich - direct

1        MR. GASPAR:  No objection.

2        THE COURT:  It's admitted.

3        (PTX-687 admitted into evidence.)

4        MR. BROWN:  Could we see PDX-455, please?

5   BY MR. BROWN:

6   Q.    Is PDX-455 a slide you prepared to show what you

7   found important in PTX-687?

8   A.    Yes.  This is a planning document in which the author

9   highlights we want to appeal Auto Image Fix feature in all

10  line-up, regardless of built-in or PC applications.

11  Q.    Could you now look at PTX-75?

12  A.    I have it.

13  Q.    What is exhibit PTX-75?

14  A.    It's entitled Auto Photo Fix technology guide.

15        MR. BROWN:  I would move the admission of

16  exhibit PTX-75.

17        MR. GASPAR:  No objection.

18        MR. McCANN:  No objection.

19        THE COURT:  It's admitted.

20        (PTX-75 admitted into evidence.)

21        MR. BROWN:  Could we show PDX-456, please?

22  BY MR. BROWN:

23  Q.    Mr. Yurkerwich, is this an exhibit you prepared from

24  PTX-75?

25  A.    Yes.

Yurkerwich - direct

1   Q.     And could you explain the slide, please?

2   A.     It highlights, again, the Auto Photo Fix that

3   includes functions that automatically analyze and categorize

4   the scenes in photographs to ensure that each scene is

5   optimized in accordance with its type.  This year photo

6   optimization has further advanced by enhancing the accuracy

7   of face detection and scene analyzation.

8   Q.     Could you now look at PTX-684?

9   A.     I have it.

10  Q.     What is exhibit PTX-684?

11  A.     It's an internal Canon memorandum.

12  Q.     And is this another one of the documents you found

13  that informed your views as to the importance of the accused

14  functionality?

15  A.     Yes.

16         MR. BROWN:  I would move the admission into

17  evidence of PTX-684.

18         MR. McCANN:  No objection.

19         MR. GASPAR:  No objection, your Honor.

20         THE COURT:  It's admitted.

21         (PTX-684 admitted into evidence.)

22         MR. BROWN:  Could we have PDX-457

23  displayed, please?

24  BY MR. BROWN:

25  Q.     Is this a slide that you prepared from PTX-684?

*redacted - public version*

Yurkerwich - direct

1  A.     Yes.

2  Q.     And does it show information that you found relevant

3  to your opinion as to the importance of the accused

4  functionality to Canon's printer business?

5  A.     Yes.  It highlights the fact that Canon believed that

6  ease of use was a key factor in creating demand for their

7  products, so you can see obviously what's written there in

8  there digital photography and printing has to be easy for

9  the consumer and the money will follow.  Which I believe

10 that means they'll increase sales if it's easy for people to

11 use.

12          MR. BROWN:  Could we now display PDX-459?

13 BY MR. BROWN:

14 Q.     Mr. Yurkerwich, we're now going to deal with the set

15 of Georgia-Pacific factors dealing with apportionment and

16 profitability, and this is the same set of factors that we

17 discussed in connection with Adobe, correct?

18 A.     Yes, it is.

19 Q.     Could you look at exhibit PTX-183-83.

20          I'm sorry.  Let me withdraw that.

21          Mr. Yurkerwich, did Canon lose money on the

22 printer business involving the printers that are accused of

23 infringing in this case?

24 A.     Yes, it did.

25 Q.     And why would a company like Canon engage in a big

*redacted — public version*

Yurkerwich - direct

1  business like selling these inkjet printers to lose money?

2  A.    Well, they weren't in the business to lose money,

3  they were in the business to make money, and the way you

4  make money in the inkjet printer business is by selling ink

5  and paper.  So the printers themselves, the selling price of

6  the printer doesn't cover its cost, but by the time people

7  print with it over a period of years, or even months, they

8  have to buy more ink and paper, so Canon sells ink and

9  paper, and it's the way they become profitable because when

10  you use the printer, you use ink, you use paper, and when

11  you put the two together, the ink, the printer and the

12  paper, then they make money.

13  Q.    Well, is it your understanding that the accused

14  functionality is a part of the printer, not a part of the

15  ink or the paper?

16  A.    Well, I guess it's used with the printer to print,

17  and that uses ink and paper.

18  Q.    So is it your understanding from having reviewed the

19  financial information produced in this case that Canon made

20  money on their sales of -- on their use of the accused

21  functionality?

22  A.    Yes.  When you consider the ink and the paper

23  together with the printer, they make money.

24  Q.    And did you see any evidence that Canon do consider

25  the sales of the ink and the paper as part of their business

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 137 of 277 PageID #: 9062
*redacted - public version*
1273

Yurkerwich - direct

1    model?

2    A.    Yes.  I saw in at least a couple of internal

3    documents, one memorandum where they discussed a ratio of

4    three times --

5              THE COURT:  Is there an objection?

6              MR. GASPAR:  There is.

7              THE COURT:  Let's have a sidebar.

8              (BENCH CONFERENCE ON THE RECORD.)

9              THE COURT:  First, let me just say it's a little

10   hard to see you back there, so if you want me to hear you,

11   you're going to have to speak up.

12             MR. GASPAR:  Your Honor ruled already that the

13   demonstrative that shows this ratio of 3.13 based on the

14   translation of the e-mail from 2010 would not be allowed.

15   It's a demonstrative.  Your Honor also ruled that the e-mail

16   cannot be used nor the translation of it that was found in

17   Mr. Yurkerwich's report.  So there's no evidence of a 3.12

18   or 3.5 multiplier.

19             THE COURT:  You understand this to be testimony

20   based on the exhibits that I excluded this morning?

21             MR. GASPAR:  Directly.

22             MR. BROWN:  It's testimony by an expert on the

23   basis for his opinions and he doesn't need to restrict his

24   opinions to things that are based on admissible evidence or

25   admitted evidence.  He can make the judgment that the

*redacted - public version*

1274

Yurkerwich - direct

1 translation that was made of that document is a reasonable

2 translation for the purposes for which he used it and I

3 think it's appropriate for him to testify.  I'm not going to

4 offer the demonstrative, I'm not going to offer the exhibit,

5 but I think he's permitted to testify on his own analysis.

6         MR. GASPAR:  His analysis can't be based on a

7 fact that's never going to enter evidence, and it can't be

8 based on e-mail that you have already stricken from the

9 record, so he's going to testify that an e-mail told him, in

10 fact, that's what he started saying, that there's a ratio of

11 3.13 of consumables revenue to the printer revenue, that's

12 what was coming out of his mouth as I objected, so I believe

13 that we should have that answer stricken in its entirety.

14         THE COURT:  I'm going to overrule the objection.

15 I agree with plaintiffs.  The document is not coming in, but

16 the expert is going to testify that this is something that

17 he reasonably relied on.  I'm going to let him do that.

18         Anything else?

19         MR. GASPAR:  No, your Honor.  I believe I'll be

20 permitted to cross though as no documentary evidence to

21 support this without opening the door to allow the document

22 in, is that permissible?

23         THE COURT:  We'll have to see how you do it, but

24 you'll certainly be permitted to cross and we'll see what

25 happens from there.

Yurkerwich - direct

1    MR. GASPAR:  But I do want to clarify on cross,

2    if I ask you have no documentary evidence to support this,

3    have I opened the door then for him to bring in the e-mail

4    that you've already stricken?  Do you see the catch-22 that

5    I'm in?

6    THE COURT:  Well, we're going to see what

7    happens on cross when we get there.  Okay?  Anything else?

8    MR. GASPAR:  No.

9    (END OF BENCH CONFERENCE.)

10    THE COURT:  You may proceed.

11    BY MR. BROWN:

12    Q.    Mr. Yurkerwich, do you remember the question that was

13    asked?

14    I actually think we were in the middle of the

15    answer rather than the question.

16    A.    I think -- well, I was saying that I had seen

17    internal information at Canon confirming the fact that they

18    make more money on the ink and the paper and it's part of

19    their business plan to do so.  And in fact, I saw a ratio of

20    three to one essentially, for every printer dollar there

21    would be three dollars of ink and paper revenue, which is

22    more profitable, and therefore the amount of profit on the

23    ink and the paper offsets any losses there are on printers.

24    Q.    Mr. Yurkerwich, could you look at PTX-697?

25    A.    I have it.

Yurkerwich - direct

1   Q.      What is exhibit PTX-697?

2   A.      This is some Excel work sheets that were produced by

3   Canon relating to profits from the sale of printers and what

4   are called consumables which is ink and paper.

5                   MR. BROWN:  And I would move PTX-697 into

6   evidence.

7                   MR. McCANN:  No objection, your Honor.

8                   THE COURT:  Hold on.  I have to hear from Canon.

9                   MR. GASPAR:  Your Honor, for the record, we

10  maintain our objection to this document based on your

11  rulings earlier this morning.

12                  THE COURT:  All right.  Let me see you at

13  sidebar.

14                  (Sidebar conference held.)

15                  THE COURT:  Is this anything more than just

16  making sure the record is clear?

17                  MR. GASPAR:  I am just trying to make the record

18  is clear.  That is exactly right, your Honor.  If this is

19  being used to support convoyed sales, that is the source of

20  the objection.

21                  THE COURT:  You have to speak louder.

22                  MR. GASPAR:  If this is being used to support

23  the convoyed sales arguments based on consumer revenue, that

24  is the source of the objection, just to preserve it,

25  understanding you already ruled.

Yurkerwich - direct

1    I didn't want to cause another sidebar.  I

2    apologize.  If it's being used for another purpose, I'd like

3    to hear that.

4            THE COURT:  Let me state, if it isn't already

5    clear, any objections that anybody has already made where I

6    ruled on them, those were still preserved as far as I'm

7    concerned.  So you don't need to rise again to state those

8    objections again.

9            To the extent you are thinking you have a

10   different objection, of course, you do have to state it.

11           MR. GASPAR:  So by not objecting, I'm not

12   waiving.

13           THE COURT:  If I'm asking you in front of the

14   jury to say "no objection" --

15           MR. GASPAR:  Can you proceed.

16           THE COURT:  -- essentially I'm asking can we

17   proceed.  I'm not asking you to waive objections that you

18   previously made.  I just want to get the document admitted,

19   if I ruled previously that it's going to be admitted.

20           MR. GASPAR:  I understand.

21           THE COURT:  Do you think you have some other

22   objection?

23           MR. GASPAR:  No, that is the basis.

24           THE COURT:  All right.  We can continue.

25           (Sidebar conference ends.)

Yurkerwich - direct

1          THE COURT:  The document that has been offered

2   is admitted.

3          (PTX-697 admitted into evidence.)

4          MR. BROWN:  Thank you, your Honor.

5   BY MR. BROWN:

6   Q.     Mr. Yurkerwich, can you now look at PTX-695?

7   A.     I have it.

8   Q.     What is exhibit PTX-695?

9   A.     It's a similar document to the last document.  That

10  is, it's an Excel spreadsheet.  It's an income statement

11  that sets forth revenue and profits from the sale of

12  printers and the sale of consumables.

13  Q.     Is the financial information that Canon produced in

14  PTX-697 and PTX-695 financial information that you analyzed

15  as part of your work in this case?

16  A.     Yes, it is.

17         MR. BROWN:  And I would move that exhibit

18  PTX-695 be admitted.

19         MR. GASPAR:  No objection, your Honor.

20         MR. McCANN:  No objection, your Honor.

21         THE COURT:  It's admitted.

22         (PTX-695 admitted into evidence.)

23  BY MR. BROWN:

24  Q.     Could you please look at exhibit PTX-102?

25  A.     I have it.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 143 of 277 PageID #: 9068
*redacted - public version*
1279

Yurkerwich - direct

1    Q.      And what is PTX-102?

2    A.      It's a survey related to Canon product called

3    Pro9500.

4            MR. BROWN:  I would ask that exhibit PTX-102 be

5    admitted into evidence.

6            MR. GASPAR:  No objection, your Honor.

7            MR. SCHERKENBACH:  No objection, your Honor.

8            THE COURT:  It's admitted.

9            (PTX-102 admitted into evidence.)

10           MR. BROWN:  Could we have Exhibit PDX-469

11   displayed, please?

12   BY MR. BROWN:

13   Q.      Is this a slide that you prepared from PTX-102?

14   A.      Yes.

15   Q.      And this in fact shows page 40 of that document; is

16   that right?

17   A.      Yes.

18   Q.      And could you tell us what is shown by this document

19   and how, if at all, you used the information?

20   A.      Yes.  This is a page out of the survey for this

21   printer that asked the respondents what bundled software

22   they used.  And one of the bundled softwares that they

23   identified is Easy-PhotoPrint EX, and 60 percent of the

24   respondents indicated that they used it.  And then

25   60 percent indicated that they did not use any bundled

Yurkerwich - direct

1  software, which means 40 percent do.  And the 40 percent

2  are scattered amongst these categories, including 16 percent

3  that use Easy-PhotoPrint EX.

4  Q.    And what did you take from this graph that you, for

5  purposes of your analysis?

6  A.    As part of my analysis in determining the amount

7  of revenue that might be related to the accused feature, I

8  considered how many people are actually using the photo

9  editing software.  And this chart is a data point that

10  indicated between 16 and 40 percent of the respondents in

11  this survey were using it.  So later in my work, I estimated

12  a percentage of use of photo editing software.

13              MR. BROWN:  Could we now see PDX-471?

14  BY MR. BROWN:

15  Q.    Mr. Yurkerwich, we're now going to turn to discussing

16  the licensing factors that we discussed in connection with

17  Adobe.  Did you use the licensing factors in your analysis

18  of the reasonable royalty for Canon?

19  A.    Yes, I did.

20  Q.    Now, could you look at factor 2, which is the rates

21  paid by the licensee for the use of comparable patents?  Do

22  you see that?

23  A.    Yes.

24  Q.    Did that particular factor affect your opinion in

25  this case?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 145 of 277 PageID #: 9070
*redacted - public version*
1281

Yurkerwich - direct

1    A.    No, it did not.

2    Q.    Why not?

3    A.    Canon did not produce any licenses.

4    Q.    Okay.  And as we've already discussed, there were two

5    licenses under which royalties were received by Mr. Holm and

6    Tarkus for the patent in suit; correct?

7    A.    Yes.

8    Q.    We've discussed the HP license in connection with

9    Adobe.  Did the HP license provide any information that

10   you found useful in your reasonable royalty analysis with

11   respect to Canon?

12   A.    No, it did not.

13   Q.    And were the reasons the same as the reasons why you

14   didn't provide information that was useful in the analysis

15   with respect to Adobe?

16   A.    Yes.  It wasn't comparable in the sense of the deal

17   that is being negotiated in this hypothetical negotiation

18   between Canon and Tarkus and Mr. Holm.

19   Q.    And in your analysis regarding a reasonable royalty

20   for Canon, did you make the same general sort of adjustments

21   that you made with respect to the reasonable royalty

22   analysis for Adobe?

23   A.    I did.  I identified the same four adjustments as

24   being needed to make the RPX/Nikon deal comparable to what

25   the Canon deal would be in a negotiation.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 146 of 277 PageID #: 9071
redacted - public version
1282

Yurkerwich - direct

1        MR. BROWN:  Could we have slide PDX-474 on the

2    screen?

3    BY MR. BROWN:

4    Q.    I see we have the same problem in the validity and

5    infringement row that we had before; is that right?

6    A.    We do.

7    Q.    And the certain and uncertain should be reversed; is

8    that correct?

9    A.    That's correct.

10   Q.    And with that caveat, can you explain the contents of

11   this slide?

12   A.    Sure.  So it's the same four factors as in the Adobe

13   analysis, and the timing as it relates to Canon would be

14   July 2007.  That is the date of first infringement for

15   Canon. //////////////////////////////////////////////////

16   //////////////////////////////////////////////// And,

17        In terms of profitability, I have characterized

18   Canon as moderately profitable as compared to Nikon who is

19   at low profitability.  So Canon's profits are greater than

20   Nikon but less than Adobe.  And I should point out that in

21   assessing profitability, I considered the business of

22   selling printers, paper and ink.  And,

23        Then, finally, with respect to validity and

24   infringement, it's the same sort of risk analysis.  The RPX

25   agreement had that uncertainty whereas this negotiation with

Yurkerwich - direct

1   Canon would not have that uncertainty if the Court finds the

2   patent valid and infringed.

3                MR. BROWN:  Could we have PDX-475, please?

4   BY MR. BROWN:

5   Q.      What does this slide show?

6   A.      This is the first adjustment, what I call the

7   inflation adjustment, to move the $7 million back in time

8   to July 2007.  And since it's not as far back as Adobe, the

9   number is bigger.  It's $6,529,976.  And that reflects

10  inflation averaging 1.7 during the time period from July '07

11  through August 2011.

12  Q.      Could you now look at exhibit PTX-207B-1?

13  A.      I have it.

14  Q.      And is this a slide that you -- is this a table that

15  you prepared from the financial data that was produced in

16  the case?

17  A.      Yes.  This is identical to the table that I produced

18  for Adobe.  It presents the number of units sold through

19  2010 by Adobe, Canon and Nikon.  And I use this to make the

20  market adjustment.

21               MR. BROWN:  I would move to admit into evidence,

22  PTX-207B-1.

23               MR. McCANN:  No objection, your Honor.

24               MR. GASPAR:  No objection.

25               THE COURT:  It's admitted.

Yurkerwich - direct

1                (PTX-207B-1 admitted into evidence.)

2    BY MR. BROWN:

3    Q.    Mr. Yurkerwich, could you explain what this chart

4    shows?

5                MR. BROWN:  Actually, can we put this up on the

6    screen?

7                MR. REITER:  What is the number?

8                MR. BROWN:  C13ER.

9                Is there any way to enlarge that at all?

10   BY MR. BROWN:

11   Q.    Mr. Yurkerwich, can you explain what is depicted on

12   that, even although we can't read all the type?

13   A.    Well, let me explain it in general and then maybe we

14   can blow up part of it.

15   Q.    Okay.

16   A.    So you can't really see but this says 2004, 5, 6, 7,

17   8, 9, 10.  And this upper section is Adobe.  So these are

18   the Adobe units, infringing units.  And,

19                Here we have the Canon infringing units starting

20   in '07, 2007, 2008, 9 and 10.  And,

21                Then we have the Nikon units in 8, 9 and 10.

22                And what is over here -- maybe we could blow up

23   this right side -- are the totals, and a computation of the

24   ratio.

25                If you remember, in the case of Adobe, I

*redacted - public version*

Yurkerwich - direct

1   computed a ratio of 2.3 based on a comparison of the Adobe

2   units to the Nikon units.

3   ///////////////////////////////////////////////////

4   ///////////////////////////////////////////////////

5   Q.    Were those ratios used in your adjustments to the RPX

6   agreement in calculating a reasonable royalty?

7   A.    Yes, they were.

8             MR. BROWN:  Could we now have PDX-477?

9   BY MR. BROWN:

10  Q.    Does this slide show the market share adjustment

11  according to the ratio that you calculated in the exhibit

12  that we just had on the screen before?

13  A.    Yes, it does.///

14  ///.  ///////////////////////////////////////////

15  ///////////////////////////////////////////////////////

16  /////////////////////.

17  A.    Correct.

18            MR. BROWN:  Can we now look at PDX-478.

19  BY MR. BROWN:

20  Q.    What is exhibit, I'm sorry, slide PDX-478?

21  A.    Yes.  What this reflects is the similar chart as

22  Adobe, what I will call the damages buildup.  And it starts

23  with this first block down here which is, in this case, $6

24  and-a-half million adjusted to $7 million.  $7 million

25  payment down to $6 and-a-half, and then increasing that by a

Yurkerwich - direct

1    ratio of 1.4 because Canon has 1.4 times more units than

2    Nikon, or had, for the equivalent time period.

3    Q.    Could you now look at exhibit PTX-183-104?

4    A.    I have it.

5    Q.    What is PTX-183-104?

6    A.    This is a summary of profitability information for

7    Canon and Nikon.

8    Q.    Is this a schedule that you prepared from the

9    financial information that has been produced in the case?

10   A.    Yes, it is.

11              MR. BROWN:  And I would ask to have exhibit

12   PTX-183-104 admitted into evidence.

13              MR. GASPAR:  No objection.

14              THE COURT:  Adobe?

15              MR. McCANN:  I'm sorry, your Honor.  No

16   objection.

17              THE COURT:  It's admitted.

18              (PTX-183-104 admitted into evidence.)

19              MR. BROWN:  Could we see slide PDX-479?

20   BY MR. BROWN:

21   Q.    Is this a slide, a slide you prepared based on

22   exhibit PTX-183-104?

23   A.    Yes.

24   Q.    And can you explain the slide, please?

25   A.    Yes.  This is the information I obtained from the

Yurkerwich - direct

1    companies filings concerning their profitability, that is,

2    Canon's profitability in the consumer segment comparing it

3    to Nikon's profitability in the video business, which

4    includes cameras.  And the percentages that you see are

5    their profits, the amount of profit, and the bottom row is

6    a comparison of one to the other.

7                So just looking at 2007, Canon is 20.6, which

8    is approximately 2 x 10.2, or a multiple of two.  And then

9    I did that calculation for each year.  You can see the

10   multiple in 2008 is 1.1.  In 2009, 2.1.  In 2010, 1.9.

11   Q.    And I see you've drawn a box underneath those

12   numbers.

13   A.    Yes.  So the 1.8 is an average of the four numbers.

14   Q.    And was that the multiplier you used for your

15   adjustment for the amount of the RPX agreement?

16   A.    No.  I used a lower number of 1.5.

17   Q.    Why did you use a lower number rather than the

18   average that you had computed?

19   A.    Because there is some variability of the relationship

20   and I decided to be conservative at 1.5.

21               MR. BROWN:  Could we now see PDX-480?

22   BY MR. BROWN:

23   Q.    Mr. Yurkerwich, could you explain this slide, please?

24   A.    Yes.  This adds the third adjustment to the damages

25   build-up column by multiplying the value by 1.5 representing

Yurkerwich - direct

1    the higher margins of Canon, and it brings the total number

2    to 13.7 million.

3    Q.     And were there any more adjustments to be made?

4    A.     Yes.  The one final adjustment is the risk

5    adjustment.

6    Q.     And did you make that risk adjustment in the same way

7    that you had made the risk adjustment as you did for the

8    calculation of the Adobe's royalty?

9    A.     I did.

10   Q.     And did you come up with the same number?

11   A.     Yes, I used a multiple of two.

12          MR. BROWN:  Could we have PDX-481, please?

13   BY MR. BROWN:

14   Q.     And does this slide show the additional calculation

15   of the risk multiple?

16   A.     Yes.  And again, this multiple of two is based on the

17   difference between a real world negotiation and a

18   hypothetical negotiation in a courtroom where in the real

19   world there can be uncertainty about the validity and

20   infringement of the patent, but in the courtroom setting

21   that's decided.  You don't get to damages unless have you a

22   valid and infringed patent.  So it eliminates that

23   uncertainty and is a big difference between the RPX-Nikon

24   deal and what the hypothetical deal would be with Canon.

25   And again, in the RPX there was a recognition that Tarkus

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 153 of 277 PageID #: 9078
redacted - public version
1289

Yurkerwich - direct

1    was seeking an amount of 14 million versus seven million or

2    two times what was ultimately paid.

3    Q.    Could you please look at PTX-183-95 in your exhibit

4    binder?  183-95.

5    A.    I have it.

6    Q.    What is PTX-183-95?

7    A.    This is the exhibit in my report where I made these

8    four calculation adjustments that I've just shown.

9              MR. BROWN:  I would ask that exhibit PTX-183-95

10   be admitted into evidence.

11             MR. GASPAR:  No objection.

12             MR. McCANN:  No objection, your Honor.

13             THE COURT:  It's admitted.

14             (PTX-183-95 admitted into evidence.)

15             MR. BROWN:  Mr. Yurkerwich, could we look at

16   exhibit PTX-482?

17   BY MR. BROWN:

18   Q.    Mr. Yurkerwich, what is depicted on this slide?

19   A.    This is a calculation of the effective royalty per

20   unit for Canon and it begins with the number of units that

21   would be covered by the license, ////////////////////

22   ///////////////////////////////////////////////////////

23   ///////////////////////////////////////////////////.

24   ////////////////////////////////////////////////////////

25   //////////////////////////////////////////////////

Yurkerwich - direct

1    /////////////////////////

2           I compared that number to the lump sum payment

3    that I derived from adjusting the RPX deal to compute an

4    amount per unit of 84 cents.

5    Q.    Could you now look at exhibit PTX-183-96?  I'm sorry.

6    In your exhibit book, if you would, please.  Sorry.

7    A.    I have it.

8    Q.    And can you tell us what this exhibit is?

9    A.    Yes.  This is an exhibit where I compute the 84

10   cents.

11   Q.    And this is -- is this a schedule that you prepared

12   from the financial data that have been produced in this

13   case?

14   A.    Yes, it is.

15           MR. BROWN:  I would ask that exhibit PTX-183-96

16   be admitted into evidence.

17           MR. GASPAR:  No objection.

18           MR. McCANN:  No objection, your Honor.

19           THE COURT:  It's admitted.

20           (PTX-183-96 admitted into evidence.)

21           MR. BROWN:  Could we now display exhibit

22   PDX-483?

23   BY MR. BROWN:

24   Q.    Mr. Yurkerwich, is this another slide that you

25   prepared?

Yurkerwich - direct

1   A.    It is.

2   Q.    And can you explain how it relates to your reasonable

3   royalty opinion?

4   A.    Yes.  The chart begins with the 84 cents that we just

5   discussed from the previous chart and I compare that to a

6   revenue number that I computed, and the revenue number is

7   based on the lowest priced printer, accused printer,

8   adjusted for additional revenue from ink and paper, and then

9   I took a percentage of that based on the usage of the Auto

10  Photo Fix feature, which I estimated to be 25 percent.

11  Q.    So that value represents the value of the Auto Focus

12  Fix feature, is that right?

13  A.    As used, yes.  So the comparison of the 84 cents to

14  the 28.75 indicates an effective royalty rate of three

15  percent.

16           MR. BROWN:  Could we now put up PDX-484?

17  BY MR. BROWN:

18  Q.    So, Mr. Yurkerwich, based on your analysis as you've

19  testified to here today in your expertise, do you have an

20  opinion as to what is the amount of a reasonable royalty for

21  Canon's use of the '823 patented technology and the accused

22  products?

23  A.    Yes.

24  Q.    And what is that opinion?

25  A.    27.4 million.

Yurkerwich - direct

1   Q.     And I see that that is represented on the first, on

2   the first row of this chart.  What is represented in the

3   second row of the chart?

4   A.     The second row is an alternate calculation that I

5   made assuming that the infringement begins at a later date,

6   namely January 2010. ////////////////////////////////

7   ////////////////////////////////////////////////////////

8   /////////////////////////////////////////, and therefore the

9   lump sum amount goes down to 22.7 million, or an effective

10  rate of point 89.

11  Q.     So Mr. Yurkerwich, I'd just like to summarize as we

12  finish up your direct testimony here.  Your opinion as to

13  the value of the infringement by Adobe is how much?

14  A.     56.3 million.

15  Q.     And your opinion regarding the reasonable royalty for

16  Canon's use of the patented technology in their accused

17  product is how much?

18  A.     27.4 million.

19              MR. BROWN:  I have nothing further.

20              THE COURT:  I'm sorry.

21              MR. BROWN:  I'll pass the witness.

22              THE COURT:  Okay.  Thank you.

23              Cross examination.

24              MR. McCANN:  May I proceed, your Honor?

25              THE COURT:  You may.

*redacted - public version*

Yurkerwich - cross

1              CROSS EXAMINATION

2     BY MR. McCANN:

3     Q.     Mr. Yurkerwich, good afternoon.

4     A.     Good afternoon.

5     Q.     My name is Doug McCann, I'm an attorney with Fish and

6     Richardson here in Delaware and I represent Adobe.  I'm

7     going to try to avoid hauling up yet another binder for you

8     to look at.  I think probably the three you've got up there

9     may be enough for us to get through the examination, but if

10    you need something, I can get it.

11             I wanted to begin with maybe putting this

12    accused feature into perspective.  It's your understanding

13    that what's accused of infringement here is the auto feature

14    of Camera Raw, is that correct?

15    A.     Yes.

16             MR. McCANN:  And if we could have one of your

17    demonstratives, PDX-411, please, Mr. Groat.

18    BY MR. McCANN:

19    Q.     PDX-411 is the splash of the three versions of the

20    Camera Raw that -- I have to switch the computer I think is

21    the problem there.

22             I did it.

23    A.     There you go.

24    Q.     PDX-411 is the demonstrative that you put up that

25    shows the versions of Camera Raw had changed over the years,

Yurkerwich - cross

1    is that correct?

2    A.    Yes.

3    Q.    And what we have on the far left was Camera Raw as it

4    was before the auto feature was added, right?

5    A.    Correct.

6    Q.    And then we had versions 2.3 to 3.6 where you had

7    these four auto check boxes, correct?

8    A.    Yes.

9    Q.    And then there was version 3.7 where there's now only

10   a single auto box, correct?

11   A.    Yes.

12   Q.    And what we're looking at is the basic panel of

13   Camera Raw, is that right?

14   A.    Yes.

15   Q.    And so what we have on the left, the original

16   version, it looks like one, two, three, four, five, six,

17   seven sliders?  Does that look right to you?

18   A.    Yes.

19   Q.    And then it looks like we have also I think seven

20   sliders in this version, correct?

21   A.    Correct.

22   Q.    But in addition to added the auto feature, they've

23   added some tabs up here, right?

24   A.    Yes.

25   Q.    Might be hard for you to see.  It looks like detail,

Case 1:10-cv-00063-LPS  Document 507  Filed 10/17/12  Page 159 of 277 PageID #: 9084
redacted - public version
1295

Yurkerwich - cross

1  lens, curve, calibrate; does that sound familiar?

2  A.    I can see it on my screen, yes.

3  Q.    So in version 2.3 they added a few more features

4  including the auto feature, right?

5  A.    Yes.

6  Q.    And then in 3.7 the four boxes get shrunk and now

7  there's four more sliders it looks like to me, now there's

8  11?

9  A.    Yes.

10  Q.    And then there's some more tabs up here, is that

11  right?  It looks like now I counted them up before, maybe

12  about eight, is that correct?

13  A.    There are eight tabs, but obviously they replace the

14  five tabs that were there before.

15  Q.    Okay.  Now, one thing I want to make sure is these

16  sliders, you can adjust them independently of using the auto

17  button, isn't that right?

18  A.    Yes, you can.

19  Q.    So if you push the auto button, they adjust in a

20  certain way, but you don't have to push the button, you can

21  just slide them yourself, right?

22  A.    That is correct.

23  Q.    Just so we're clear, it's this auto feature, and the

24  way it works, the algorithm it applies, that's the

25  infringement here, correct?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 160 of 277 PageID #: 9085
*redacted - public version*
1296

Yurkerwich - cross

1    A.    Yes.

2    Q.    It's the infringement of this feature that you say is

3    worth 56 million dollars, is that correct?

4    A.    Yes.

5    Q.    If we could go to the next slide, the next slide

6    being PDX-414.  Now, I don't think you displayed this

7    particular demonstrative, is that right?

8    A.    No, I did not.

9    Q.    But this is one you prepared in preparation for your

10   testimony?

11   A.    Yes, it looks like it is.

12   Q.    Okay.  And actually if you look on the right side, I

13   notice that the numbers, the values for the slide are here

14   on PDX-414, they're the same actually as the sliders on the

15   right panel of PDX-411.  So this is just a larger view of

16   what we were seeing on the right-hand side of 414, is that

17   right?

18   A.    Yes.  Right.

19   Q.    When a user is actually using Camera Raw, this is a

20   view of the entire screen that they're actually seeing,

21   correct?

22   A.    Yes.

23   Q.    And what we have displayed, of course, is this same

24   basic panel, correct?

25   A.    Correct.

Yurkerwich - cross

1   Q.      And then we have an image of what, of the photograph

2   you're working with.  And then we have some information up

3   here, is that right?

4   A.      Yes.

5   Q.      Now, this is the basic panel here.  What's this tab

6   right here for?

7   A.      I don't know.

8   Q.      How about the next one, do you know what that's for?

9   A.      I don't remember, no.

10  Q.      Do you know what any of the other tabs are for?

11  A.      No, I can't tell as I sit here, no.

12  Q.      Would you agree with me that these are other panes,

13  other panes besides the pane in Camera Raw?

14  A.      Yes.

15  Q.      Other features that the user can use to manipulate a

16  Raw image in the Camera Raw model?

17  A.      Well, they provide other capabilities.

18  Q.      Other futures?

19  A.      Other features.

20  Q.      And then across the top, do you know what these

21  particular buttons are for?

22  A.      No.

23  Q.      So if I went through and asked you each one, you

24  wouldn't be able to tell me what purpose they served?

25  A.      Not as I sit here, no.

Yurkerwich - cross

1    Q.    Sure.  But these are also other tools that the person

2    can use to manipulate the image they're working with in

3    Camera Raw, is that right?

4    A.    Well, there are other tools.  I'm not sure that they

5    all allow you to manipulate the image per se.

6    Q.    Okay.  Now, would you agree with me that there's

7    something like a hundred different features in Camera Raw?

8    A.    I don't know.

9    Q.    And no matter how many there are, the one we're

10   talking about in terms of infringement is this particular

11   one, correct?

12   A.    Yes.

13   Q.    In fact, there are books written about the features

14   in Camera Raw, isn't that right?

15   A.    Yes, there are.

16   Q.    I think you called up, if we could get PDX-421, you

17   brought up one book, Real World Camera Raw with Adobe

18   Photoshop CS2 by Bruce Fraser; do you recall that?

19   A.    Yes.

20   Q.    And this PDX-421 actually refers to PTX-701, is that

21   correct?

22   A.    Yes, it does.

23   Q.    Can you look at PTX-701 in your materials, please?

24   A.    I have it.

25   Q.    And that's the book, this book here, Real World

Yurkerwich - cross

1  Camera Raw by Bruce Fraser, correct?

2  A.    That's right.

3  Q.    And you had cited us to page 30 of the book, is that

4  right, and you called out this particular excerpt?

5  A.    Yes.

6  Q.    On page 30.  One of the interesting new features in

7  Camera Raw, that's what it says, correct?

8  A.    Yes.

9  Q.    Now, this whole book is about Camera Raw, correct?

10  A.    It is.

11  Q.    And you pointed us to page 30 of the book.  How many

12  pages does the book have?

13  A.    I'm not sure I can tell from this document.

14  Q.    And why is that?

15  A.    I guess maybe I can.  It looks like it has maybe 190

16  pages.

17  Q.    190 pages.  Maybe it would help if you looked at the

18  table of contents.  Let's call up PTX-701-11, please.

19          293 pages, does that seem right?

20  A.    Yes.

21  Q.    And in fact, actually there aren't 293 pages in this

22  exhibit, are there?

23  A.    No.

24  Q.    As presented?

25  A.    That's correct.

Yurkerwich - cross

1   Q.      If you look at PTX-071-63, what's it say there?

2   A.      Portions omitted.

3   Q.      Portions omitted.  So this book about Camera Raw, 293

4   pages, we've got just one chapter here, is that right?

5   A.      That's correct.

6   Q.      And in that one chapter you called the jury's

7   attention to one page with respect to using the auto

8   adjustment, is that correct?

9   A.      Yes.

10  Q.      Now, we also looked at some other documents I think

11  pertaining to the use of the auto feature, what's accused

12  here.  If we could have PDX-415, please.  This is an e-mail

13  from Tom Hogarty to Mala Sharma, is that correct?

14  A.      Yes.

15  Q.      And actually PDX-415 is sort of a blow-up of PTX-661,

16  is that right?  If it helps you can see it on the bottom

17  left of the slide, but that might be hard for you to see.

18  A.      No.  I see that.  I was just going to look at 661.

19          It looks like it was just the one page.

20  Q.      Okay.  Now, this an e-mail from Tom Hogarty; right?

21  A.      Yes.

22  Q.      And you know who Tom Hogarty is; correct?

23  A.      Yes.

24  Q.      He is the product manager for Camera Raw?

25  A.      Yes.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 165 of 277 PageID #: 9090
*redacted - public version*
1301

Yurkerwich - cross

1   Q.      You read his deposition?

2   A.      Yes.

3   Q.      In fact, he is sitting in the back of the courtroom,

4   the gentlemen with the blue tie?

5   A.      I didn't know that.

6   Q.      And Mr. Hogarty is the author of this e-mail?

7   A.      Yes.

8   Q.      And he is going to be testifying later today; is that

9   right?

10  A.      I don't know when he is testifying.

11  Q.      And in this e-mail, you will agree with me, you don't

12  see the words auto feature used -- is that correct? -- in

13  his description of ACR?

14  A.      That is correct.

15          MR. McCANN:   If we could see PDX-418.

16  BY MR. McCANN:

17  Q.      And, look, as far as referring to the binder, if we

18  get to an area where you need to, go ahead, but to save

19  time, I think all of my questions I can ask off your

20  demonstrative.

21          PDX-418, this is a slide you showed the jury?

22  A.      Yes, it is.

23  Q.      It is labeled Frequency That Respondents Capture

24  Digital Images in Raw Mode; is that correct?

25  A.      Yes.

Yurkerwich - cross

1    Q.    Now, capturing digital images in Raw mode, that is

2    what Camera Raw does; correct?  Or rather that is what

3    Camera Raw is designed to work with?

4    A.    Yes.

5    Q.    So this whole book, for example, is about working

6    with digital images in Raw mode; isn't that right?  This

7    whole book referring to PTX-701.

8    A.    Yes.

9    Q.    And we don't see the words auto feature on this slide

10   either; is that correct?

11   A.    That's correct.

12              MR. McCANN:  PTX-419.

13   BY MR. McCANN:

14   Q.    The 2009 InfoTrends survey, asking the frequency of

15   capture with Camera Raw format; correct?

16   A.    Yes.

17   Q.    No reference of auto feature here?

18   A.    No.

19              MR. McCANN:  PTX-420.  The e-mail from Kevin

20   Connor.

21   BY MR. McCANN:

22   Q.    As you know, leadership in Raw processing quality and

23   speed is something of an arms race.  Adobe Camera Raw has

24   earned a strong leadership position.

25              Do you recall this document?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 167 of 277 PageID #: 9092
*redacted - public version*
1303

Yurkerwich - cross

1   A.      That's correct.

2   Q.      In the words that are used, you don't see the auto

3   feature specifically described, do you?

4   A.      No.

5           MR. McCANN:  PTX-424.

6   BY MR. McCANN:

7   Q.      Understanding Adobe Photoshop Camera Raw 4 by Bruce

8   Fraser.  Do you see that?

9   A.      Yes.

10  Q.      It's an excerpt from PTX-366?

11  A.      Correct.

12  Q.      Now, this is like a technical paper that Mr. Fraser

13  and I guess Mr. Schewe prepared?

14  A.      Correct.

15  Q.      You can find it on the Adobe website?

16  A.      I'm not sure where we found it.

17  Q.      It pertains to Camera Raw Version 4?

18  A.      3.7, I think.

19  Q.      Okay.  And in event, the title is Camera Raw 4;

20  right?

21  A.      Right.

22  Q.      He says:  Try them, you may like them.  Is that

23  right?  Referring to the auto feature.

24  A.      That is what he says.

25          MR. McCANN:  PTX-426.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 168 of 277 PageID #: 9093
*redacted - public version*
1304
Yurkerwich - cross

1    BY MR. McCANN:

2    Q.    Lightroom User Survey.  Do you see that?

3    A.    Yes.

4    Q.    And what you circled for the presentation to the jury

5    is "working with Raw files;" is that correct?

6    A.    That's correct.

7    Q.    Again, Adobe Camera Raw, the module, works with Raw

8    files; correct?

9    A.    Correct.

10   Q.    And it has, as we were discussing before, you don't

11   know how many but let's say 100 features?

12   A.    I don't think there is 100 features.  At least, not

13   100 features that matter.

14   Q.    Oh, you don't think there are 100 features that

15   matter; is that correct?

16   A.    Yes.

17   Q.    You think the one feature that matters is the auto

18   feature; is that correct?

19   A.    I think it's one of the more significant features.

20           MR. McCANN:  And PTX-427 -- PDX-427.  Excuse me.

21   BY MR. McCANN:

22   Q.    The Photoshop & CS2 User Survey, citing PDX-218.  Do

23   you see that?

24   A.    Yes.

25   Q.    Again, talking about Adobe Photoshop Camera Raw.  Do

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 169 of 277 PageID #: 9094
*redacted — public version*
1305
Yurkerwich - cross

1    you see what is circled?

2    A.    I circled it.

3    Q.    We don't see the auto feature there; correct?

4    A.    No, it's not on this slide.

5    Q.    Okay.  I'd like to turn to the hypothetical

6    negotiation.

7              MR. McCANN:  You can take that down, Mr. Groat.

8    Thank you.

9    BY MR. McCANN:

10   Q.    You testified on direct about a hypothetical

11   negotiation; is that right?

12   A.    Yes.

13   Q.    And the parties of that negotiation are Tarkus and

14   Adobe?

15   A.    Correct.

16   Q.    And in this hypothetical negotiation, they are

17   negotiating over a single patent; correct?

18   A.    Yes.

19   Q.    The '823 patent?

20   A.    Correct.

21   Q.    And we can agree in real life there never has been an

22   agreement by Adobe to pay Tarkus $56 million; correct?

23   A.    That's true.  That is why we're here.

24   Q.    That's why we're here.

25             MR. McCANN:  If we could have PDX-442, please.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 170 of 277 PageID #: 9095
*redacted - public version*
1306

Yurkerwich - cross

1   BY MR. McCANN:

2   Q.    I'd kind of like to go through your calculations that

3   led to the $56 million.  And to begin with, just let me make

4   sure I understand.

5              PDX-442 shows at the top the number of units

6   that contain the accused feature sold by Adobe through

7   December 1st, 2010, and then the number of units that you

8   forecast Adobe will sell from December 2010 to March 1st,

9   2017; is that right?

10  A.    Yes.

11  Q.    And that totalled that 41.2 million or so?

12  A.    41,289,223.

13  Q.    Exactly.  And then you determined a lump sum payment;

14  is that correct?

15  A.    I did.

16  Q.    And that was the $56.3 million?

17  A.    Correct.

18  Q.    And that's the lump sum payment you determined by

19  going through your comparability analysis with that RPX

20  license; is that correct?

21  A.    That's correct.

22  Q.    We'll get to that in a second.  Now, then you

23  determined an effective royalty of $1.36.  You g0t by

24  dividing the 56 by the 41; correct?

25  A.    Yes.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 171 of 277 PageID #: 9096
*redacted - public version*
1307

Yurkerwich - cross

1          MR. McCANN:  The next slide, PDX-443.

2     BY MR. McCANN:

3     Q.     Now, you also determined this $44 value for Camera

4     Raw; is that right?

5     A.     Yes.

6     Q.     And again so I'm clear, that is for Camera Raw and

7     not the auto feature; correct?

8     A.     It's actually for a portion of Camera Raw because

9     it's based on the usage studies of Camera Raw.

10    Q.     The user studies we were looking at a second ago?

11    A.     Yes.

12    Q.     Okay.  And you take this $44 and with the $1.36, you

13    determined that three percent effective royalty rate; is

14    that correct?

15    A.     Yes.

16    Q.     You divide the $1.36 by $44?

17    A.     Correct.

18    Q.     Okay.  So I'd like to look at each of those numbers,

19    the $56 million, the $1.36, and the $44.  And we'll start

20    with the $56 million.

21           If I could -- I guess I'll do it this way.

22           (Adjusting Elmo settings.)

23           MR. McCANN:  I have another one of the

24    demonstratives but I'll use the Elmo here if I can figure

25    out how to operate it.

Yurkerwich - cross

1    I may not be that smart.

2    (Mr. Scherkenbach assists Mr. McCann.)

3    MR. McCANN:  Mr. Scherkenbach is smart enough at

4    least.

5    BY MR. McCANN:

6    Q.    All right.  This is one of the slides you presented

7    before?

8    A.    Yes, it is.

9    Q.    Okay.  And it's actually PDX-441.  And on the right

10   you have a bar graph that shows, as you called it, your

11   damages buildup to the $56 million; right?

12   A.    Yes, sir.

13   Q.    And beginning at the bottom, the first block we see,

14   this refers to your first bullet which is the RPX license

15   of $7 million and then that is discounted for inflation; is

16   that right?

17   A.    Yes.

18   Q.    To $6.1 million?

19   A.    Correct.

20   Q.    So I'm going to, so I can remember, put a $7 and then

21   I'll put a $6.1.

22   Then you took that number and you applied your

23   value adjustment; is that right?

24   A.    No.  I applied the market adjustment to adjust for

25   the number of infringing units.

Yurkerwich - cross

1   Q.     I'm sorry.  You used the market adjustment of 2.3?

2   A.     Correct.

3   Q.     And you multiplied the $6.1 x 2.3?

4   A.     Yes, sir.

5   Q.     And that little more than doubles it to $14 million?

6   A.     Correct.

7   Q.     Then you applied the value adjustment?

8   A.     That's correct.

9   Q.     And that's a 2, so that doubles it again to $28

10  million?

11  A.     Correct.

12  Q.     And then one more doubling based on the risk factor

13  brings us to the $56; is that correct?

14  A.     That's correct.

15  Q.     Okay.

16  A.     $56.3 when you add significant digits.

17  Q.     Absolutely.  .3.  We don't want to forget the .3.

18         All right.  To begin with, the $7 million, that

19  came from that RPX agreement you were talking about; is that

20  right.

21  A.     Yes.

22  Q.     That's the RPX agreement.  It's an agreement between

23  Tarkus and RPX that was signed some time in 2011; right?

24  A.     Well, it's RPX and Tarkus and Nikon by, they're

25  listed in the agreement.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 174 of 277 PageID #: 9099
*redacted - public version*
1310

Yurkerwich - cross

1    Q.    Let's talk about that.  First we can agree that Nikon

2    did not sign this agreement; is that correct?

3    A.    Well, Nikon was given a release in connection with

4    the agreement.

5    Q.    Okay.  Can we have PTX-158 at page 12, please?

6              (Elmo settings adjusted.)

7              MR. McCANN:  PTX-158, please.

8              Let me try it one more time here.

9              (Elmo settings adjusted.)

10   BY MR. McCANN:

11   Q.    Do you have PTX-158 in front of you?  If not, I can

12   get it for you.

13   A.    Yes, I can get it.

14             (Mr. Groat Elmo settings.)

15   BY MR. McCANN:

16   Q.    Do you have it?  Can you turn to page 12?

17   A.    I have page 12.

18   Q.    And the question I asked you was:  Did Nikon sign

19   the agreement?  Can you look at page 12 and tell the jury

20   whether Nikon signed that agreement?

21   A.    They did not sign this portion of the agreement, but

22   their name is prominently in the agreement because it

23   requires a release to be given to them from the litigation.

24   Q.    So Nikon didn't sign that portion of the agreement.

25   They didn't sign any other portion of the agreement either,

Yurkerwich - cross

1    did they?

2    A.    No, they got a release which is an exhibit to the

3    agreement.

4    Q.    So they didn't sign the agreement; right?

5    A.    Correct.

6    Q.    Okay.  And, in fact, the actual money that is paid,

7    the $7 million, that is actually paid by RPX to Tarkus;

8    correct?

9    A.    The money was actually wired from RPX, as far as I

10   know, but, simultaneously, Nikon joined RPX, became a member

11   and paid a fee to join, a multiple year fee.

12   Q.    They paid a multiple year fee to join RPX; correct?

13   A.    That's rights.

14   Q.    And RPX paid Tarkus $7 million; right?

15   A.    Right.  And RPX collected money from Nikon.

16   Q.    Right.  Let's talk about that.  To begin with, let's

17   talk about who RPX actually is.  Now, you will agree with me

18   RPX doesn't make a product; right?

19   A.    It depends on your definition of product.

20   Q.    Do they make software like Adobe?

21   A.    No, they don't.

22   Q.    They are a defensive patent aggregator?

23   A.    That's the term that is used.  They're a company that

24   buys patents and buys licenses to patents.

25   Q.    And companies join RPX and pay a fee; correct?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 176 of 277 PageID #: 9101
*redacted - public version*
1312

Yurkerwich - cross

1    A.      They do.  They pay -- in most cases, they pay an

2    annual fee to be a member.

3    Q.      And they pay that fee to have access to the RPX

4    patent portfolio whether it's ownership of a patent or a

5    patent license; right?

6    A.      They have, depending on when they join, dictates what

7    they have access to and they have to stay a member to keep

8    access.  So it's not everybody gets everything.  It depends

9    on the timing of when they join and how long they stay.

10   Q.      In general though, if I'm a company, I'm joining

11   RPX, paying them a fee over multiple years and in return

12   I'm getting access to the RPX patent portfolio; right?

13   A.      Some of it.  It's not guaranteed, and you have to

14   pay a certain number of years to get certain rights.

15   Q.      It's like insurance.  While I pay I have the

16   insurance covering me; correct?

17   A.      Well, it's probably a more complicated insurance

18   because the menu is varied depending on when you join and

19   what you pay.

20   Q.      Well, you know RPX describes itself as akin to an

21   insurance company; right?

22   A.      I think they do.

23   Q.      You saw their website and that's how they described

24   it, right?

25   A.      Actually, I don't remember the word "insurance" but

*redacted - public version*

Yurkerwich - cross

1   it wouldn't surprise me if it said the word insurance.

2   Q.    In fact, from the website, you know from having

3   looked at it, you say they automatically license their

4   members; isn't that correct?

5   A.    They automatically license their members based on

6   each member's deal, and it also says on their website that

7   members negotiate different deals.

8   Q.    And Tarkus negotiated a deal here with RPX?

9   A.    They did.

10  Q.    And that deal excluded Adobe and Canon; is that not

11  right?

12  A.    It did.

13  Q.    In that particular license agreement, PTX-158,

14  though, those are the only two companies who are mentioned

15  as excluded; isn't that correct?

16  A.    That is correct.

17  Q.    Now, the RPX portfolio has something like 2,000

18  patents or patent licensees in it now?

19  A.    It has I believe a couple thousand patents.

20  Q.    And now Nikon also had a license to those 2,000

21  patents; isn't that right?

22  A.    Well, theoretically.  We don't know.  We don't have

23  Nikon's agreement.  We don't have the license.

24  Q.    We do know they joined; correct?

25  A.    Yes, it appears they joined.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 178 of 277 PageID #: 9103
*redacted - public version*
1314

Yurkerwich - cross

1    Q.    You told us that before.  They joined RPX; right?

2    A.    Yes.

3    Q.    Okay.  Now, the hypothetical negotiation we're

4    talking about is not about thousands of patents, is it?

5    A.    No.

6    Q.    It's just about the one patent.  We talked about that

7    before; right?

8    A.    Correct.

9    Q.    Just that '823 patent?

10   A.    Correct.

11   Q.    Now, RPX didn't buy just the rights to one of Mr.

12   Holm's patents; is that right?

13   A.    Well, again, we don't know.  We don't have the

14   RPX/Nikon agreement.  We don't know what they got.

15   Q.    I think maybe my question wasn't clear.  RPX and

16   Tarkus signed an agreement; right?

17   A.    Yes.

18   Q.    And that agreement, PTX-158, has the license to the

19   '823 patent, right?

20   A.    Yes.

21   Q.    And two other patents; isn't that right?

22   A.    True.

23   Q.    And you can find that in Exhibit B?

24   A.    Yes.

25   Q.    Let me try to use the doc cam.  Let me just grab one

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 179 of 277 PageID #: 9104
*redacted — public version*
1315

Yurkerwich - cross

1    of my binders here.  I was hoping to avoid killing a tree,

2    but I think I can't now.

3              So you have PTX-158 in front of you; right?

4    A.    I do.

5    Q.    I have it also.  If I could turn to Exhibit B of

6    PTX-158, and let me know when you have that.

7    A.    I have it.

8    Q.    And I have it displayed here on the document camera,

9    so I can zoom and make it a little bit bigger.

10             Okay.  Now these are the three patents that are

11   licensed in the RPX agreement; right?

12   A.    Yes.

13   Q.    And we have, there it is, the '823 patent.  I assure

14   I did not set this so it would go blurry and clear and

15   blurry and clear to give you a headache.

16             THE COURT:  I take it, you can't stop it either?

17             MR. McCANN:  Your Honor, I don't know how to

18   stop it.  If I could, I would.  The technology is not my

19   friend today.

20             (Mr. Scherkenbach assists Mr. McCann.)

21             MR. McCANN:  Again, Mr. Scherkenbach to the

22   rescue.

23             Auto focus off is the trick.  Yes, not clear but

24   it will do.

25             THE COURT:  We'll see how long we can tolerate

Yurkerwich - cross

1    it.

2              MR. McCANN:  There we go, your Honor.  That's

3    better.  Well, that is worse.

4              Okay.  It's like an eye test.

5    BY MR. McCANN:

6    Q.    The '823 patent, this is the patent that is at issue

7    in this case; right?

8    A.    Yes.

9    Q.    And then we have this '945 patent; right?

10   A.    Correct.

11   Q.    And the '315 patent; right?

12   A.    Yes.

13   Q.    All three of these are Mr. Holm's patents; right?

14   A.    Yes.

15   Q.    And just looking at the title, you are starting with

16   the '315, Strategy For Pictorial Digital Image Processing,

17   right?

18   A.    Right.

19   Q.    And then the next one up also says Pictorial Digital

20   Image Processing; correct?

21   A.    Yes.

22   Q.    And then the one that is at issue in this case, also

23   Pictorial Digital Image Processing; right?

24   A.    Correct.

25   Q.    Each one of those patents contains Mr. Holm's

Yurkerwich - cross

1    invention?

2    A.      Well, different inventions.

3    Q.      Because of the claims are different on the patents;

4    right?

5    A.      Yes.

6    Q.      So maybe to say it another way or a better way, each

7    of those patents contains Mr. Holm's inventions; correct?

8    A.      Plural, yes.

9    Q.      And you heard Mr. Holm testify that the specification,

10   the written description in all the patents is the same; is

11   that right?

12   A.      I believe that is correct.

13   Q.      And Tarkus licensed all three of these patents to RPX

14   for that $7 million; correct?

15   A.      It did.

16   Q.      But in your evaluation for the hypothetical

17   negotiation, you attributed the full seven million to just

18   this patent, the '823, is that correct?

19   A.      Yes, I did.

20   Q.      You did not put any value or little value on the

21   value of the '945, correct?

22   A.      Correct.

23   Q.      Now, if this jury in doing its deliberations and if

24   it gets to the point of assessing damages thinks they should

25   attribute equal value, what would the seven million or so be

Yurkerwich - cross

1    if you divided it by three?

2    A.    Be seven divided by three.

3    Q.    2.3 million, something like that?

4    A.    2.3333.

5    Q.    You're the CPA.  Thank you.

6          Now, we talked about this a little bit before,

7    but of course RPX has many members, right?

8    A.    Yes.

9    Q.    And if we look at exhibit A which fortunately for me

10   is on the other side of the page, even more difficult to

11   read, there were at least at the time of the agreement over,

12   there were about 99 I think listed in the agreement?

13   A.    Yeah, there are 99 listed, correct.

14   Q.    And that number has grown since then?

15   A.    I don't know.  They may have lost some members also.

16   Q.    Have you checked the website recently to see what

17   they have as a number of members?

18   A.    They don't -- information like this, by the way, is

19   not published on their website.

20   Q.    They publish a number of members they have, don't

21   they?

22   A.    Some but certainly not all.

23   Q.    And recently it was over a hundred?

24   A.    I think it is over a hundred.

25   Q.    And you'll agree with me that the RPX license,

*redacted - public version*

1319

Yurkerwich - cross

1  PTX-158, makes clear that RPX has a right to give a license

2  to these 99 members, correct, except for Adobe and Canon?

3  A.     Yeah, they have a right to do that, and then within

4  RPX it would depend upon the membership status of the

5  members as to what rights they had.

6  Q.     Now, on this membership list there's a number of

7  different companies that do different things, is that right?

8  A.     Correct.

9  Q.     And you would agree with me that there are companies

10  on this list that Mr. Holm thinks could benefit from his

11  technology?

12  A.     There are a couple that he approached, yes.

13  Q.     So for example, Mr. Holm believed and believes that

14  photo editing software manufacturers, they could benefit

15  from the technology embodied in his patents, is that right?

16  A.     Well, he certainly believed that at one time.  I

17  guess it would depend on the company and whether it was

18  still relevant now.

19  Q.     A moment ago you referred to Apple as a company that

20  he approached?

21  A.     Correct.

22  Q.     And of course he's sued Adobe, right?

23  A.     Yes.

24  Q.     Both of those are photo editing software

25  manufacturers?

Yurkerwich - cross

1    A.    Well, Apple is in a much broader business I guess you

2    would say.

3    Q.    It's one of the things they sell is photo editing

4    software?

5    A.    They have some photo editing software.  It's not

6    their primary business I would say.

7    Q.    Also, Mr. Holm believed that printer manufacturers

8    could take advantage of his technology, is that correct?

9    A.    Yes.

10   Q.    And there are printer manufacturers listed on this

11   list as well, is that right?

12   A.    There are.

13   Q.    And also camera manufacturers, Mr. Holm believes

14   camera manufacturers could take advantage of his technology?

15   A.    He did, yes.

16   Q.    And there are camera manufacturers listed here as

17   well, correct?

18   A.    Correct.

19   Q.    I wanted to spend a little bit of time on the

20   adjustments you made.  So you took from the seven million

21   dollars, you discounted it to 6.1 million, and you applied

22   three multiples, correct?

23   A.    Yes.

24   Q.    The 2.3 multiple to 14 million, double again to 28

25   million, double again to 56 million?

*redacted -- public version*

Yurkerwich - cross

1  A.     Correct.

2  Q.     Starting with the first one, I think you called it

3  the market share multiple?

4  A.     Well, that's actually the second one.  The first one

5  was inflation, the second one is market share.

6  Q.     Correct.  The 2.3 is the market share multiple.

7  Well, I wouldn't call the inflation a multiple, correct?

8  That's a discount?

9  A.     Correct.

10  Q.     Now, the 2.3, the market share multiple, you

11  determined that by taking the accused Adobe units and

12  dividing it by the accused Nikon units, is that correct?

13  A.     Yes.

14  Q.     And first that's because you're treating, you're

15  using the Nikon units because you're treating this RPX

16  agreement as essentially an agreement between Tarkus and

17  Nikon for a license of the patent?

18  A.     Yes.

19  Q.     And then you're saying that Adobe has a greater

20  market share and so the license should be adjusted upward to

21  account for that?

22  A.     Well, Adobe factually has more infringing uses than

23  Nikon.

24  Q.     But you do agree that Adobe and Nikon are not in the

25  same market, isn't that right?

Yurkerwich - cross

1   A.   That's correct.

2   Q.   So Adobe doesn't sell cameras, right?

3   A.   No.  That's correct.

4   Q.   But Nikon sells cameras?

5   A.   Correct.

6   Q.   The value multiple, that's the second of the three

7   multiples, this is how we get from 14 million to 28 million?

8   A.   Yes.

9   Q.   The value multiple, I think you said on direct, is a

10  comparison of the use by Adobe as compared to the use by

11  Nikon and the profits of Adobe as compared to the profits of

12  Nikon, is that right?

13  A.   Yes.

14  Q.   And I think you said that the Adobe uses as photo

15  editing software and Nikon uses it as a camera, right?

16  A.   Yes.

17  Q.   So to you that suggests a doubling of the damages

18  from the 14 million to the 28 million?

19  A.   No.

20  Q.   That was part of the rationale?

21  A.   It was a consideration, but I also looked very

22  closely as the profitability of the two companies and

23  compared them and observed that Adobe was more than two

24  times profitable than Nikon.

25  Q.   You looked at it very closely and as you told us

Yurkerwich - cross

1   earlier, you calculated that number in your head, is that

2   correct?

3   A.     No.  I have spreadsheets that calculate ratios by

4   year of the comparative profitability levels.

5   Q.     But those spreadsheets are not in your expert report,

6   do you agree with that?

7   A.     I do.

8   Q.     So in terms of what your extra report shows, there

9   was no detailed calculation there in the report set down to

10  spread sheet, isn't that right?

11  A.     I don't think the spread sheet was in the report,

12  that's correct.

13  Q.     And you also agree that in terms of profitability

14  that a software company is generally more profitable than a

15  camera company?

16  A.     Yes.

17  Q.     So going back to PDX-441?

18         THE COURT:  For the record, this is your markup

19  of that PDX-441?

20         MR. McCANN:  It is, your Honor.  I have made

21  some annotations on the right side, a 6.1, a 7, a 14, a 28

22  and a 56.3.

23  BY MR. McCANN:

24  Q.     I'm sorry.  As we're looking at this, I just realized

25  I left off one multiple, that was the risk multiple?

Yurkerwich - cross

1   A.    Yes.

2   Q.    And that's what got us to the 56.3?

3   A.    Correct.

4   Q.    So you said assessing some risk, you could double to

5   56.3, is that right?

6   A.    Well, it's comparing the hypothetical to the actual

7   negotiation where validity and infringement are unknown in

8   one case and known in the other.

9   Q.    Okay.  Now, if the jury in its deliberations just

10  takes that one factor, the risk multiple and says they

11  reject that and say we don't find that persuasive, that

12  takes your value down from 56.3 million to 28 million, is

13  that right?

14  A.    Yes.

15  Q.    So that one change, a 28 million dollar difference in

16  the damages, correct?

17  A.    That's correct.

18  Q.    And if we take out the value multiple, if they decide

19  camera business, software business, not close enough, we go

20  down again by half, is that right?

21  A.    Yeah, although obviously they would be deciding that

22  based on more than the camera business versus the software

23  business.  They might consider the relative profitability at

24  the two companies.

25  Q.    But if they reject that analysis, we drop again by

Yurkerwich - cross

1   half?

2   A.      That's true.

3   Q.      And if they reject the third multiple, they drop by

4   half, correct?

5   A.      You mean if they ignore the fact that Adobe has more

6   than two times the number of units as Nikon?

7   Q.      If they decide I'm not going to compare a software

8   company to a camera company, they could reject it on that

9   basis, is that right?

10  A.      Well, I don't want to speak to the jury.  I don't

11  think that multiple is about a comparison of the type of

12  companies they are.  I think it's a comparison of the number

13  of units, number of infringing units.

14  Q.      How about this, if they look at the RPX agreement and

15  say that's an agreement for three patents to the benefit of

16  a hundred companies, as opposed to the hypothetical

17  negotiation which is a license to one patent between two

18  companies, Tarkus and Adobe, if on that basis they reject

19  it, then this analysis is wrong, isn't that right?

20  A.      Again, I don't know what the jury will think, but in

21  this, there is no evidence of infringement of the other two

22  patents, only the '823 patent is accused of infringement,

23  plus there's no evidence of anybody else infringing the

24  patents or anybody else being accused of infringing the '823

25  patent other than Canon.

*redacted - public version*

Yurkerwich - cross

1    Q.    That's an interesting point.  Would you agree with me

2    that Mr. Holm thinks his technology is valuable?

3    A.    Yes.

4    Q.    And that people might want to use his technology to

5    sort of improve their ability to manipulate a Raw image, is

6    that right?

7    A.    Correct.

8    Q.    So if I'm a member of RPX and I'm not currently

9    infringing his patent, I can now, can't I?

10   A.    It depends on your membership deal.

11   Q.    If I've got a membership deal, if RPX has licensed

12   that patent to me, I can now practice that technology paying

13   no more than what I paid to join RPX, isn't that right?

14   A.    It depends on the member's deal, and as I said, it's

15   an annual membership fee to be paid.

16   Q.    And as the party with the burden of proof on damages,

17   what you know is that the only two companies that clearly

18   are excluded from that RPX benefit are Adobe and Canon,

19   correct?

20   A.    Correct.

21   Q.    Beyond that you're just speculating, correct?

22   A.    I'm just saying there is no evidence of further

23   infringement or use.

24   Q.    Now, I want to just take a brief moment with the

25   dollar thirty-six.  If you could just remember back since I

Yurkerwich - cross

1   probably will be unable to put it up on the screen here,

2   your demonstrative with the dollar thirty-six was

3   calculated, that was, you had taken the 56 million divided

4   by the number of units you were forecasting to be sold and

5   got a dollar thirty-six; do I have that right?

6   A.    Yes.

7   Q.    So if the 56 million is wrong, the $1.36 is wrong

8   also?

9   A.    Correct.

10  Q.    Last question.  You understand that, of course, that

11  before the jury decides damages, they first have to decide

12  infringement, right?

13  A.    Yes.

14  Q.    And if the jury finds no infringement of the patent

15  in suit, then the damages are zero, is that correct?

16  A.    That's my understanding.

17            MR. McCANN:  Thank you, Mr. Yurkerwich.

18            THE COURT:  Thank you.

19            Before we get to cross examination by Canon,

20  ladies, we're going to take a break.  Don't discuss anything

21  during the break and we'll be back in 15 minutes.

22            (Jury left courtroom.)

23            THE COURT:  We'll be in recess.

24            (BRIEF RECESS.)

25            THE COURT:  Let's bring in the jury.

Yurkerwich - cross

1    MR. HORWITZ:  Your Honor, before we get started

2    with the jury, this is the plaintiff's last witness, and the

3    Rule 50 motions, given where we are at the time of the day,

4    how do you want to handle them?

5    THE COURT:  Let's see where we are when we get

6    there.

7    MR. HORWITZ:  Okay.

8    (Jury in.)

9    THE COURT:  Welcome back.

10   Mr. Gaspar, you may proceed.

11   MR. GASPAR:  Ladies of the jury, my name is

12   Chris Gaspar, I also represent Canon USA.

13                    CROSS EXAMINATION

14   BY MR. GASPAR:

15   Q.    Mr. Yurkerwich, how are you today?

16   A.    Good.  How are you.

17   Q.    Good.  I believe we've met in first time in New York

18   at your deposition, is that correct?

19   A.    That's correct.

20   Q.    I've left on your desk a copy of that deposition

21   transcript and also some documents if you need to look at

22   them today.

23   MR. GASPAR:  Your Honor, may I approach with

24   your copies?

25   THE COURT:  Yes, you may.

Yurkerwich - cross

1          (Documents passed forward.)

2     BY MR. GASPAR:

3     Q.      Before we start with the math, let's talk about I

4     think a couple more basic points.  You understand that Canon

5     denies Tarkus's claim that it infringes, right?

6     A.      Yes.

7     Q.      And the reason that we're here discussing damage

8     calculations is because the parties have to discuss all

9     issues in one trial, right?

10    A.      That's correct.

11    Q.      If the jury finds that Canon doesn't infringe the

12    patent, Canon pays zero, right?

13    A.      That's correct.

14    Q.      And if the jury determines that the patent claims are

15    invalid, Canon again pays zero, right?

16    A.      That's correct.

17    Q.      And if Canon determined that Adobe infringes but not

18    Canon, again, Canon pays zero, right?

19    A.      I think you meant if the jury.  You said if Canon.

20    Q.      If the jury determines that Adobe infringes, but

21    Canon does not infringe, Canon still pays zero, right?

22    A.      That's my understanding, yes.

23            MR. GASPAR:  Okay.  Can we have CDX-2000,

24    please?

25    BY MR. GASPAR:

*redacted -- public version*

Yurkerwich - cross

1   Q.     So this is a fair summary.  If no infringement by

2   Canon, no damages, and if there's no valid claims, there's

3   no damages, correct?

4   A.     That's my understanding.

5          MR. GASPAR:  You can take that down.

6   Q.     Now, the structure of the license that Tarkus and

7   Canon would have agreed to in this hypothetical negotiation

8   included I think you said a lump sum payment, is that

9   correct?

10  A.     Yes.

11  Q.     So that's a one-time payment for the license all the

12  way through the time of life of the license, correct?

13  A.     All the way going back to the beginning of the

14  infringement through the end of the patent.

15  Q.     I'm glad you clarified that.  That means that there

16  isn't going to be a payment in chunks over time, it's going

17  to be a payment right up front, correct?

18  A.     Correct.

19  Q.     Now, let's do a similar exercise with Canon's Auto

20  Photo Fix feature as Adobe's counsel did with you in Adobe's

21  auto feature in the ACR product.

22         Here the accused products are Canon printers and

23  Easy-PhotoPrint EX software, correct?

24  A.     Correct.

25  Q.     In the Canon case.

Yurkerwich - cross

1    A.    Correct.

2    Q.    And Canon's inkjet printers do a lot of things that

3    are not accused of infringement, isn't that correct?

4    A.    Yes, some more than others.  They have varied

5    features.

6    Q.    And we'll get to those features in just a minute.

7    The Easy-PhotoPrint EX software also does a lot of things

8    that aren't accused of infringement here, the software that

9    Canon provides, is that correct?

10   A.    It does other things, that's correct.

11   Q.    But the Auto Photo Fix feature is the specific one

12   you're focusing on now, just that one feature, correct?

13   A.    Correct.

14   Q.    And you're trying to value just that one feature?

15   A.    Correct.  And it's three generations of it, Auto

16   Image, Auto Photo Fix and Auto Photo Fix 2.

17   Q.    And while we're on that point, I think you said Auto

18   Image Fix was the version of the software that was released

19   in 2007, is that correct?

20   A.    Correct.

21   Q.    And Auto Photo Fix was released in 2008?

22   A.    Correct.

23   Q.    And then Auto Photo Fix 2 was released in 2009?

24   A.    Correct.

25   Q.    Is there an Auto Photo Fix 3?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 196 of 277 PageID #: 9121
*redacted - public version*
1332
Yurkerwich - cross

1    A.    There may be, but I don't think it's in this case.

2    Q.    You're not aware of any Auto Photo Fix 3?

3    A.    Not as I sit here, no.

4    Q.    So is it your understanding that Auto Photo Fix 3 has

5    never been developed?

6    A.    I don't know.

7    Q.    Do you know if development has just completely

8    stopped on Auto Photo Fix?

9    A.    I don't know.

10   Q.    Let's put up PDX-451.  Is this PDX-451 something you

11   created?

12   A.    Yes.

13   Q.    And this is something that was shown in your expert

14   report, correct?

15   A.    Yes.

16   Q.    What's shown here on PDX-451?

17   A.    It's a screen shot of the Auto Photo Fix feature.

18   Q.    So when you load and turn on the Easy-PhotoPrint EX

19   software, this is not the first screen you see, is it?

20   A.    No.

21   Q.    In fact, you have to click through a number of

22   screens to actually get to this screen, right?

23   A.    Yeah.  I would have to redo it to see how many.

24   Q.    But it's a number of them, right?

25   A.    Yeah, I don't remember how many.

Yurkerwich - cross

1    Q.     Okay.  What's this say, manual, is that what that

2    says?

3    A.     Yes.

4    Q.     And then this over here says auto?

5    A.     Correct.

6    Q.     So if you click on this manual tab, it allows the

7    user to adjust the photo manually, right?

8    A.     That's correct.

9    Q.     And that feature is not accused of infringement?

10   A.     Correct.

11   Q.     Right up here, this is a feature that says red eye

12   correction, is that right?

13   A.     Yes.

14   Q.     And that feature is not accused of infringement,

15   correct?

16   A.     Correct.

17   Q.     This one here says face sharpening, I believe, is

18   that right?  This one here.

19   A.     Yes.

20   Q.     That one's not accused of infringement?

21   A.     Correct.

22   Q.     Even though it appears on the auto panel, right?

23   A.     Correct.

24   Q.     And then this one down here, digital face smoothing,

25   that one similarly is not accused of infringement?

Yurkerwich - cross

1    A.      That's my understanding.

2    Q.      So even just looking at the auto panel, we're seeing

3    at least three features that are not accused of infringement

4    that are provided in the EX software, correct?

5    A.      Correct.

6    Q.      And that's in addition to the features that are shown

7    in the manual panel that aren't even visible in this

8    display, right?

9    A.      Yes.

10           MR. GASPAR:  Let's go to a couple of the

11   demonstratives that you showed the jury earlier today.

12   Could we have PTX-680, please?

13   BY MR. GASPAR:

14   Q.      This is a document that was used as a demonstrative

15   in one of your slides; right?

16   A.      Yes.

17   Q.      You took part of this and blew it up, part of the

18   text, this part right here?

19   A.      Yes.

20   Q.      This little part of the text right here mentions Auto

21   Photo Fix, right?  Right here.

22   A.      Yes, in the middle paragraph there or middle bullet.

23   Q.      And this bigger text says, what, high quality and

24   compact photo all-in-one printer; right?

25   A.      Yes.

Yurkerwich - cross

1    Q.    So this is another feature that Canon has highlighted;

2    right?

3    A.    Yes.

4    Q.    And this is an accused printer; right?

5    A.    It is.

6    Q.    So Canon is highlighting this feature.  In fact.

7    It's using bigger text, right, than the Auto Photo Fix here?

8    A.    That's true.

9    Q.    Even before we get to Auto Photo Fix over here, it

10   says we feature laser quality text with pigment black ink;

11   correct?

12   A.    Yes.

13   Q.    And that is a feature that is more important,

14   wouldn't you say, than the Auto Photo Fix feature at least

15   for purposes of this presentation?

16   A.    I don't know.  From what I am looking at, I won't say

17   one is more important than the other because they're all

18   pretty prominent on the screen.

19   Q.    Fair point.  We can't tell whether this is really

20   important, more important than this or this or this.  Is

21   that your point?

22   A.    It's described as new.

23   Q.    Okay.

24   A.    And it takes up three lines, so ...

25   Q.    Okay.  I think I understand.

Yurkerwich - cross

1    MR. GASPAR:  Let's keep the exhibit but not

2    that.

3    Okay.  So down here, if we can blow this up.

4    BY MR. GASPAR:

5    Q.    These are other things that are being highlighted as

6    points of interest on the cover sheet of this document;

7    right?

8    A.    Yes, including Auto Photo Fix II.

9    Q.    That is right here; right?

10   A.    Yes.

11   Q.    I'm glad we found it because it's a little hard to

12   find; right?

13   A.    Well, it's in two places on the cover there.

14   Q.    I suppose it is.  How many of these things are also

15   displayed as points of interest?

16   A.    There are eight in the first row.

17   Q.    And another four down here in this row?

18   A.    Four others, yes.

19   Q.    In fact, these are all the ease of use icons; right?

20   A.    Correct.

21   Q.    And then we have a couple of connectivity icons down

22   here?

23   A.    Yes.

24   MR. GASPAR:  We can take that one down.

25   BY MR. GASPAR:

Yurkerwich - cross

1    Q.      Now, you understand that a user could buy a Canon

2    inkjet printer and never print a photo; right?

3    A.      Yes, that's possible.

4    Q.      They could print letters, for example?

5    A.      Sure.

6    Q.      And they could print invoices as another example?

7    A.      Sure.

8    Q.      And just all kinds of Microsoft Word based documents;

9    right?

10   A.      Absolutely.

11   Q.      Spreadsheets, all kinds of things?

12   A.      Sure.

13   Q.      Okay.  So there are plenty of other uses for a Canon

14   printer than just printing photos; right?

15   A.      Yes.

16   Q.      And there are plenty of other uses for a Canon

17   printer than correcting a photo using Auto Photo Fix?

18   A.      It depends on the printer.  Some printers have more

19   features than others, and some are called photo printers.

20   Q.      Right.  Some features, some printers have additional

21   features you say?

22   A.      That's correct, yes.

23   Q.      So let's talk a little bit about how much you

24   considered the extent a customer might have used the Auto

25   Photo Fix features specifically.  I think in your opening,

*redacted - public version*

Yurkerwich - cross

1  in your direct examination, you said "you had developed a

2  study to determined the importance of the invention in the

3  marketplace."  Do you remember that testimony?  It was

4  pretty early on in your testimony.

5  A.    I think I said I looked at documents produced by the

6  parties to develop an understanding of the importance of the

7  feature, yes.

8  Q.    Okay.  And the goal I think you said was to determine

9  a reasonable royalty for the use of the invention; is that

10  right?

11  A.    Correct.

12  Q.    All right.  And you talked about one survey that

13  Canon had done about some of its products; isn't that right?

14  A.    Well, I showed a survey related to a printer.

15         MR. GASPAR:  Let's put up PDX-469, please.

16  BY MR. GASPAR:

17  Q.    Is this the survey that you mentioned during your

18  direct examination?

19  A.    It is.

20  Q.    And this is a survey question right up here; right?

21  A.    Correct.

22  Q.    And it says, please select below any of the bundled

23  software you use.  Right?  That's the question that was put

24  to the survey participants?

25  A.    Yes.

Yurkerwich - cross

1  Q.      And for Easy-PhotoPrint EX, 16 percent said that they

2  used Easy-PhotoPrint EX as bundled software; correct?

3  A.      Yes.

4  Q.      And 60 percent said they don't use any bundled

5  software; right?

6  A.      Correct.

7  Q.      So the most that anybody could use Easy-PhotoPrint EX

8  and its Auto Photo Fix feature is 16 percent; isn't that right?

9  A.      In this survey, 16 percent indicated they used that

10  software, and then another 24 percent indicated they use

11  some other type of bundled software.

12  Q.      Where do you see that?

13  A.      Because it's 100 less 60.  60 percent of the people

14  didn't use any, and 40 percent used something.

15  Q.      And 16 percent used the Easy-PhotoPrint EX?

16  A.      Well, they specifically called that out, yes.

17  Q.      Okay.

18  A.      They might have had it with their printer and turned

19  on by default, for example.

20  Q.      What might have been turned on by default?

21  A.      The photo software.

22  Q.      This?  (Indicating.)

23  A.      Correct.

24  Q.      This is the Easy-PhotoPrint EX software that we just

25  looked at on the screen a minute ago?

Yurkerwich - cross

1   A.    Yes.

2   Q.    Okay.  And that was the one that had the manual

3   features; right?

4   A.    Correct.

5   Q.    It also had the automatic features that weren't Auto

6   Photo Fix; right?

7   A.    I don't know what you mean by automatic features that

8   weren't Auto Photo Fix.

9   Q.    Well, do you remember the features that were shown in

10  the auto tab?  Red eye correction, face smoothing, et

11  cetera.  Those were features not accused of infringement;

12  correct?

13  A.    That's correct.

14  Q.    So their Easy-PhotoPrint EX -- to back up.  In

15  summary, Easy-PhotoPrint EX, as we discussed before, has a

16  number of features that don't infringe the patent; right?

17  A.    Correct.

18  Q.    And this screen here is just trying to figure out how

19  many users say that they used the EX software; correct?

20  A.    Well, it also is an indication of use of bundled

21  software.

22  Q.    Fair point.  Fair point.  What it doesn't say is how

23  many people use Auto Photo Fix; right?

24  A.    That's correct.

25  Q.    So let's drill down on that a little bit more.  In

*redacted -- public version*

1341

Yurkerwich - cross

1   your expert report, I think it's on page 52, you said, "I

2   have not seen survey evidence that tracked how often

3   customers explicitly used the accused functionality."

4          Do you see that?  It's on page 52.

5   A.     Page 52.  I'm sorry.  What paragraph is that?

6   Q.     I think it's 112.

7   A.     Oh, 112.  I'm sorry.

8          Yes, I see the sentence.

9   Q.     So the sentence says, "I have not seen survey

10  evidence that tracked how often customers explicitly used

11  the accused functionality."  Right?

12  A.     Correct.

13  Q.     That's what it says?

14  A.     Yes.

15  Q.     By "accused functionality," you mean Auto Photo Fix?

16  A.     Correct.

17  Q.     So there is no survey that you have seen that tracks

18  how much customers use Auto Photo Fix?

19  A.     Not explicitly, no.

20  Q.     Right.  And I think you also testified you work for a

21  company called Charles Rivers Associates; right?

22  A.     Charles River Associates, yes.

23  Q.     It has about 600 employees, something like that?

24  A.     Correct.

25  Q.     One of the services that Charles Rivers provides is

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 206 of 277 PageID #: 9131
*redacted - public version*
1342

Yurkerwich - cross

1    conducting surveys about customer demand for product

2    features; isn't that right?

3    A.    One of our vice presidents, part of what he does is

4    organize surveys, yes.

5    Q.    And part of what he does also is to conduct surveys

6    about the actual value of a particular product feature;

7    isn't that also right?

8    A.    Sometimes that's the purpose of the survey.

9    Q.    You didn't ask him to do a survey to find out how

10   much Auto Photo Fix was used, if at all; isn't that right?

11   A.    That's correct.

12   Q.    And you didn't ask him to do a survey to find out how

13   much Auto Photo Fix was worth, the value; right?

14   A.    No, I didn't.

15   Q.    Now, we have heard from you and also from Mr. Holm

16   about a licensing history concerning the patents that he has

17   mentioned in his case, including three patents, one of which

18   is asserted and two that are not asserted against Canon.  Is

19   that right?

20   A.    Yes.

21   Q.    And you heard Mr. Holm testify on Friday about an

22   offer he made to Gretag Macbeth; right?

23   A.    Correct.

24   Q.    And you heard him talk about an offer that he made to

25   Apple; right?

Yurkerwich - cross

1    A.    Yes.

2    Q.    And when he was talking about those two offers, he

3    said there were some guideposts that he applied in

4    constructing those offers and I think there were two

5    guideposts.  Do you remember those?

6    A.    Well, the first one that comes to mind would be the

7    five percent.  I'm not sure what the second one is.

8    Q.    Well, let's go to the five percent.  So maybe there

9    are three guideposts.  So five percent is one of them?

10   A.    Okay.

11   Q.    He also said that an important aspect of his offer

12   to both of these companies was a 50 percent discount for

13   prepayment.  Right?

14   A.    Correct.  Well, that's paying up the license up

15   front.

16   Q.    Right.  Which is like the lump sum that we had talked

17   about earlier today; right?

18   A.    Correct.  It's the discount for paying for the future

19   now.

20   Q.    Right.  And then the third aspect that was an

21   important one in his offer was that he was going to apply

22   his five percent royalty only to the amount of revenue that

23   was represented by the amount of use of his invention in a

24   particular product.  Is that fair?

25   A.    Well, I don't recall the specific words, but as I

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 208 of 277 PageID #: 9133
*redacted — public version*
1344

Yurkerwich - cross

1  said in my direct, I know his goal was to apply the five

2  percent to a portion of the revenue of the product that was

3  related to his patent.

4  Q.   Yes.  I think that is a great way to put it.  Let's

5  review that Apple offer in the calculation that you did, if

6  we could.

7        First of all, Mr. Holm estimated that the sales

8  of the Aperture software program would be about $20 million;

9  is that right?  Because he offered -- well, let me back up a

10  little bit just to refresh your memory about what Mr. Holm

11  said.

12        Mr. Holm said I believe that he was offering to

13  Apple for a payment of $375,000 a license to all three of

14  his patents, for the entire life of those patents, to cover

15  the Aperture software product and the iPhoto software; is

16  that right?

17  A.   Yeah, but it was $750,000.

18  Q.   It was $750,000 for those two software product?

19  A.   Yes, before the discount.

20  Q.   Oh, before the discount.  Okay.

21  A.   Correct.

22  Q.   Fair enough.  So he started out, when he is making

23  this calculation, with $20 million of revenue for the

24  Aperture product; right?

25  A.   Yes.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 209 of 277 PageID #: 9134
*redacted - public version*
1345
Yurkerwich - cross

1   Q.    And then he multiplied that $20 million in Aperture

2   sales by a number to bring it down a smaller number, just to

3   take into account there are other features that don't use

4   this patented invention; right?

5   A.    Yes.  I'm trying to recall his specific testimony

6   but -- I don't remember that reduction actually.  I remember

7   the $20 million and the five percent.

8   Q.    $20 million and five percent royalty?

9   A.    Right.

10            MR. GASPAR:  Why don't we put up CDX-2001.

11  BY MR. GASPAR:

12  Q.    So we can display his testimony if you want, but

13  my recollection of it, and you can tell me if yours is

14  refreshed when I show you this, is that he, for the Aperture

15  product, estimated about $20 million in sales?

16  A.    Correct.

17  Q.    And then he said, okay, not all of that $20 million

18  is fair for me to be considering as part of the royalty

19  base?

20  A.    Right.

21  Q.    So I'm going to cut that in half.  I'm going to say

22  half of it concerns technology that my patents might cover

23  and half just doesn't.  Isn't that what he said?

24            THE COURT:  Is there an objection?

25            MR. BROWN:  Your Honor, can we see the testimony

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 210 of 277 PageID #: 9135
*redacted - public version*
1346

Yurkerwich - cross

1    that this is based on rather than seeing the graphic?

2              THE COURT:  Yes.  Mr. Gaspar, why don't you take

3    a moment and direct counsel to the testimony.  Don't show it

4    to the jury at this point.

5              MR. GASPAR:  Yeah.  It has actually been admitted

6    into evidence.  It was actually Mr. Holm's testimony.  And I

7    apologize.  I was only trying to speed through this a little

8    bit faster, but we can take it much more --

9              THE COURT:  Well, I have asked you to tell

10   counsel which portion of the trial transcript you are

11   referring to.

12             MR. GASPAR:  It starts on, the Apple offer, page

13   900 which is in your trial transcript binder.

14             And, Mr. Yurkerwich, you have a copy of this,

15   too.

16             THE WITNESS:  I do?  Good.  Thank you.

17             MR. GASPAR:  I don't want to hide anything from

18   counsel or from you, Mr. Yurkerwich.

19             If you want to read from page 900 through just

20   the top couple lines of 903, that is the entirety of the

21   testimony that I want to discuss here about Mr. Holm's offer

22   to Apple.

23             (Pause.)

24             THE WITNESS:  That is helpful.  Thank you.

25             MR. GASPAR:  Okay.  Sure.

Yurkerwich - cross

1       THE WITNESS:  I was here but I didn't remember

2   every last detail.

3   BY MR. GASPAR:

4   Q.      Okay.  So now we'll try to go through this really

5   fast.  Aperture had $20 million in sales; right?

6   A.      Right.

7   Q.      And Mr. Holm's calculus was take that number, cut it

8   in half because power technology has nothing to do with Mr.

9   Holm's technology; right?

10  A.      Well, just to be clear he said 50 percent of use

11  would be Camera Raw.

12  Q.      Camera Raw.

13  A.      So he was estimating Camera Raw like I did.

14  Q.      Okay.  So he reduced the $20 million down to $10

15  million?

16  A.      Right.

17  Q.      Then the next thing he did was look at the iPhoto

18  sales.  And those are $50 million; is that right?

19  A.      Correct.

20  Q.      And he multiplied that by a usage amount?

21  A.      Correct.

22  Q.      And in this case, it was 10 percent?

23  A.      Correct.

24  Q.      And he came up with $5 million after doing that math?

25  A.      Right.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 212 of 277 PageID #: 9137
*redacted — public version*
1348

Yurkerwich - cross

1    Q.    So then he just added these two together; right?

2    A.    Yep.

3    Q.    All right.  Then he did the next couple of steps that

4    we had talked about.  He applied a five percent royalty --

5    A.    Correct.

6    Q.    -- to this $15 million reduced amount.  And he comes

7    up with $750,000.  That's the $750,000 you mentioned?

8    A.    Right.

9    Q.    Then he applied the 50 percent prepaid discount?

10   A.    Correct.

11   Q.    Okay.  Good.  So now we have it up on the screen.  We

12   have $375,000 as an offer for all three of Mr. Holm's

13   patents; right?

14   A.    Lump sum payment.

15   Q.    A lump sum payment.  He would accept that payment

16   from Apple up front and therefore get a discount; right?

17   A.    Because it's prepaid.

18   Q.    Prepaid.  Just like the lump sum that you talked

19   about Canon would be paying; right?

20   A.    Correct.

21   Q.    So as we look at this, there are a couple of

22   differences between what Mr. Holm did and your analysis

23   about the amount of money that Canon would pay in the

24   hypothetical negotiation.

25         The first one I see is that Mr. Holm offered

1    all three patents; right?  Your analysis only contemplates

2    a license to the one patent, the '823 patent; right?

3    A.    The only one that is accused of being infringed.

4    Q.    Sure.  And then we also have this prepaid discount,

5    which is not something your analysis includes, right?

6    A.    No.  Mine does.  I have adjusted mine.

7    Q.    You have adjusted it to include a 50 percent prepaid

8    discount?

9    A.    It's valued at an earlier time, correct.

10   Q.    It's valued at an earlier time.  Let's keep that

11   point in mind and we'll come right back to that when we look

12   through your analysis.

13             When you say that it's valued at an earlier

14   time, in your analysis what it did was take about take about

15   seven million dollars and moved it to 6.3 million dollars,

16   correct?

17   A.    Correct.  But I guess the difference between mine and

18   this one is mine is based on a valid and infringed patent

19   and this one wasn't.  So that's another reason for the

20   prepaid discount in this case.  It's another difference

21   between mine and his.

22   Q.    Did Apple reject the validity of the patent somehow?

23   A.    Well, they didn't take a license, so they must have

24   had some issue.

25   Q.    They just decided not to take a license, right?

*redacted -- public version*

Yurkerwich - cross

1   A.     Or they decided not to use it.  I don't know.

2   Q.     So this is one difference.

3          This is another difference.

4   A.     Well, I guess I kind of disagree with you on the

5   second one.

6   Q.     All right.  We'll look for this 50 percent prepaid

7   discount when we review your analysis as you told the jury a

8   few minutes ago, we'll keep looking for this one.

9   A.     Okay.

10  Q.     And this here, this reduction to take into account

11  use is another important thing that Mr. Holm applied right

12  up front.  He didn't think that 70 million dollars worth of

13  sales was the right royalty base, correct?

14  A.     Yeah.  But mine is based on the Nikon-RPX payment.

15  Q.     Exactly.  Right.

16  A.     So it's somewhat -- but I also did do a use

17  calculation to assess the reasonableness of my RPX

18  calculation.

19  Q.     Well, your build-up calculations that started with

20  the RPX payment don't include a use reduction here?

21  A.     No.  But I compare it to a use value, revenue value

22  of 28.75 to arrive at a three percent royalty, which is

23  lower than his royalty.

24  Q.     And that was at the very end of your presentation,

25  right?

Yurkerwich - cross

1   A.    Well, it's like a reconciliation, if you will, from

2   the RPX deal to my apportionment of the revenue to the

3   accused feature.

4   Q.    Let's keep track of that one, too.  We're going to

5   come back to that one.

6         So Mr. Holm said ten percent of the use was

7   about the right number to use?

8   A.    For iPhoto.

9   Q.    iPhoto is a software package, right?

10  A.    Yes.

11  Q.    And Apple installs that on its Mac computers and then

12  sells it on their Mac computers, right?

13  A.    Well, I think you add it to your Mac.  I'm not

14  actually sure.

15  Q.    It's a software program that runs on the computer

16  here?

17  A.    I believe it does, yes.

18  Q.    And Mr. Holm decided ten percent was the right amount

19  to consider as a use component for his technology?

20  A.    For that type of camera application, yes.

21  Q.    And then in Canon's situation, Canon has an

22  Easy-PhotoPrint EX software program that it bundles with its

23  printers, right?

24  A.    Correct.

25  Q.    And you didn't compute what amount of use percentage

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 216 of 277 PageID #: 9141
*redacted - public version*
1352

Yurkerwich - cross

1    should be applied for just use of this software?

2    A.    Well, I did include a 25 percent factor in the

3    calculation of the 28.75.

4    Q.    Okay.  So let me write that down.  28.75 and then 25

5    percent use factor, right?

6    A.    In arriving at the 28.75, yes.

7    Q.    And the survey that we saw earlier said no more than

8    16 percent would have used the Easy-PhotoPrint EX software?

9    A.    Well, it said 16 used Easy-PhotoPrint EX and another

10   24 used bundled software and it actually mentioned

11   Photoshop.

12   Q.    Right.  But as to Canon --

13   A.    And that's one printer.

14   Q.    And the only software that matters is the

15   Easy-PhotoPrint EX, right?

16   A.    Right.  But that survey was related to one printer

17   and Canon has the software on by default in most of the

18   printers.

19   Q.    But that was the survey that you chose to use for

20   this 25 percent usage, right?

21   A.    It was one -- you have the documents I considered.

22   Q.    So let's do a little bit of math here.  And I

23   recognize that from your testimony that you may not agree

24   with why I do this math, but let's just do the math.  This

25   is sort of a back in the envelope calculation.

Yurkerwich - cross

1   A.      Okay.

2   Q.      All right.  If we apply Mr. Holm's analysis, his 50

3   percent prepaid discount to your 27.4 million, 27.4 times 50

4   percent is 13.7 million, right?

5   A.      Correct.

6   Q.      If we divide 13.7 million by the three patents, we

7   get 4.5 million, right, roughly 4.5?

8   A.      Only one of which is accused of infringement.

9   Q.      Right.  But Mr. Holm, in fairness, offered to Apple

10  three patents, right?

11  A.      But now we're looking at Canon, not Apple.

12  Q.      That's exactly right and that's my point is that your

13  27.4 million dollar number is for a license to one patent,

14  not to three, right?

15  A.      That's correct.

16  Q.      And so if we divide it by all three of these opinions

17  to make it square with the Apple analysis that Mr. Holm did,

18  we're down to 4.5 million, right?

19  A.      But it's not a comparable situation.

20  Q.      Indeed it's not because your analysis gets us here

21  without taking into account three patents.

22          So now if we multiply this 4.5 right here by the

23  same ten percent usage factor that Mr. Holm applied which he

24  thought was appropriate for the iPhoto software sold on a

25  Mac, this is the number we come up with, right?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 218 of 277 PageID #: 9143
*redacted - public version*
1354

Yurkerwich - cross

1    A.      It's a totally different situation.

2    Q.      In fact, it is a totally different situation, isn't

3    it?

4           THE COURT:  Mr. Gaspar, for the record, why

5    don't you say what that number is?

6           MR. GASPAR:  I'm sorry.  This is CDX-2003.

7           THE COURT:  And the yellow number at the end.

8           MR. GASPAR:  The number is $457,000.

9           THE COURT:  Thank you.

10          THE WITNESS:  I mean Mr. Holm, I'll just point

11   out, also had a 50 percent factor in his calculation.

12   BY MR. GASPAR:

13   Q.      Mr. Holm did, right?  Right here.

14   A.      No.  He had a 50 percent use factor.  You chose the

15   ten percent as opposed to the 50 percent, neither of which

16   are relevant to Canon in the first place.

17   Q.      Right.  The 50 percent use factor was for software

18   that was sold by itself, that wasn't used with a Mac

19   computer, right, it was just software that sold on the

20   shelf.

21   A.      I'm just saying it's apples and oranges.

22   Q.      Let's show an apples and oranges situation here.  Mr.

23   Holm's analysis was you start with a revenue number, 70

24   million dollars, and then you multiply that by a using an

25   amount to bring that 70 million dollars down, right?

Yurkerwich - cross

1   A.      Correct.

2   Q.      Then you further multiply it by the royalty amount

3   which brings the number down even further, right?

4   A.      It's the royalty rate, yes.

5   Q.      The royalty rate.  That's right.  It should say

6   royalty rate, not the royalty amount.

7   A.      It should.

8   Q.      Then you further reduce it by this discount for

9   prepayment, that's what Mr. Holm did?

10  A.      Yes, he did.

11  Q.      And then he came up with 375,000?

12  A.      Correct.

13  Q.      So we were talking apples to oranges.  Your analysis

14  is called a damages build-up, right?

15  A.      Correct.

16  Q.      And we start with seven million dollars that RPX paid

17  to Tarkus for three patents, right?

18  A.      Yeah, adjusted down to 6.5 million with time.

19  Q.      Fair point.  And then we adjust it up to take into

20  account this market share adjustment that you mentioned?

21  A.      Which recognizes the difference in the number of

22  units that it's in.

23  Q.      We'll spent a little bit of time on each of these

24  steps, so I appreciate the preview, but we'll definitely get

25  to that.  The value adjustment is yet another multiplier

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 220 of 277 PageID #: 9145
*redacted - public version*
1356

Yurkerwich - cross

1    that brings up this number --

2    A.    Correct.

3    Q.    -- in your damages build-up.

4          And the last thing you do is double it for

5    litigation success adjustment, correct?

6    A.    It's essentially a valid and infringed patent, which

7    wasn't the case in Mr. Holm's negotiation with Apple or

8    presentation to Apple.

9          MR. GASPAR:  Let's go right to your analysis.

10   If I could have PDX-475, please.

11   BY MR. GASPAR:

12   Q.    You were talking about a reduction, right, so you

13   talked about seven million dollars that was paid by RPX to

14   Tarkus, correct?

15   A.    Correct.

16   Q.    And you reduced it down to 6.5?

17   A.    Correct.

18   Q.    And the reason you did that is not for prepayment,

19   right?

20   A.    No.  It's a different date.

21   Q.    Right.  So what these are really showing is that in

22   today's dollars, seven million dollars today was worth 6.5

23   million back in 2007?

24   A.    Correct.

25   Q.    So this is where we begin.

Yurkerwich - cross

1      Then I believe -- if we go to 476, please -- we

2  have the seven million reduced down to 6.5.  Now, I think

3  we've heard sort of a lot about this so I'm not going to

4  belabor the point.  But RPX is not like Canon, right?

5  They're two totally different companies.  RPX is a patent

6  aggregator, correct?

7  A.      RPX is a surrogate for Nikon because they settled the

8  Nikon litigation.

9  Q.      Does Nikon own RPX?

10  A.      No, they don't.

11  Q.      Does RPX own Nikon?

12  A.      No.  But they certainly have a relationship.

13  Q.      They have a contract, right, or do you know?

14  A.      They do.

15  Q.      But we've never seen that contract?

16  A.      No, we haven't.

17  Q.      So Canon sells products, right?

18  A.      And so does Nikon.

19  Q.      And so does Nikon.  And RPX does not sell products?

20  A.      No, they don't.

21  Q.      They have around a hundred members in their

22  organizations that take licenses to the patents that RPX

23  buys?

24  A.      That's correct.

25  Q.      And at least 24 of these members sell products that

Yurkerwich - cross

1    either display or print or process digital photos, isn't

2    that right?

3    A.    Say that again.

4    Q.    There are a number of the 100 RPX members, quite a

5    high number, in fact, 24, that sell products that either

6    display digital photos, process those digital photos or

7    print them, isn't that right?

8    A.    I haven't counted, no.

9    Q.    Let's do a very, very quick count.  If I could go to

10   CDX-2007-1.

11          This over here was the list of RPX members that

12   was attached to the RPX license.  Do you recall seeing this?

13   A.    I saw one without highlights.

14   Q.    Without highlights.  Before the highlighted there are

15   Apple, Coby, Dell and Fujitsu?

16   A.    Right.

17   Q.    These are all RPX members?

18   A.    Yeah.  I'm taking your word for it.

19   Q.    Don't take my word for it.  It's PTX-158-13.

20   A.    I have it here.

21          Okay.  So you have the four highlighted that are

22   listed there.

23   Q.    Right.  Exactly.  So we have Apple that sells iPads,

24   right?

25   A.    They do.

Yurkerwich - cross

1  Q.    And iPads have cameras in them, right?

2  A.    iPhones have cameras in them.

3  Q.    iPhones do too, exactly.  A bunch of Apple products

4  have the ability to take and display pictures?

5        Coby makes a tablet much like an iPad, right?

6  A.    Yes.

7  Q.    And Coby is another RPX member?

8  A.    Yes, they are.

9  Q.    And Dell makes laptop computers, correct?

10 A.    Correct.

11 Q.    Those laptops can be used to process digital photos,

12 e-mail digital photos, store them?

13 A.    With Photoshop and Canon printers.

14 Q.    Indeed.  But this is a product that uses technology

15 that may include Mr. Holm's invention, is that right?

16 A.    I don't think it does.

17 Q.    You don't think it does.  But you haven't asked Dell

18 about that specifically?

19 A.    No, I have not.

20 Q.    Fujitsu makes smart phones, right?

21 A.    Yes.

22 Q.    Now, let's go to the next slide.  We have Google that

23 makes Picasa, right, photo editing software?

24 A.    Correct.

25 Q.    HTC and LG both make smart phones?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 224 of 277 PageID #: 9149
*redacted - public version*
1360

Yurkerwich - cross

1   A.      They make phones, but there's no evidence that they

2   use Mr. Holm's patent.

3   Q.      But they're all members of RPX, right?

4   A.      Right.   Who cares?

5   Q.      And you don't know if they need Mr. Holm's patents

6   today?

7   A.      I don't think they do.

8   Q.      But even though you're testifying as an economist,

9   you're willing to say today that they're never going to use

10  his patents; you don't know, do you?

11  A.      I don't know what they'll do in the future, no.

12  Q.      So there are at least 24 companies on here, the RPX

13  member list, that sell products that include photo editing,

14  photo printing or photo processing that may need Mr. Holm's

15  invention at some point, isn't that fair to say?

16  A.      No, I don't believe it is.

17  Q.      You don't believe it is.   Okay.   Well, let's go to

18  the next part of your analysis which is slide PDX-477.

19          This is your market share adjustment for Canon?

20  A.      Yes.

21  Q.      So we started at seven million, we moved down to 6.35

22  million, and now we're going to multiply 6.35 times 1.4

23  because of the market share adjustment, correct?

24  A.      Right.

25  Q.      But these Canon units are meant to be printer units?

Yurkerwich - cross

1    A.    They are.

2    Q.    And these Nikons are cameras, correct?

3    A.    Right.

4    Q.    So you're comparing apples to oranges, correct?

5    A.    I'm comparing printers to cameras, correct.

6    Q.    And this is just a straight division, you're just

7    dividing the number of units, Canon units, printers, by the

8    number of Nikon units, cameras, correct?

9    A.    Correct.

10   Q.    And cameras and printers don't compete against one

11   another, right, they're not in the same market?

12   A.    Correct.

13   Q.    And this division of these two numbers doesn't take

14   into account the price of Canon's printers or the price of

15   Nikon's cameras?

16   A.    That's accounted for in my next adjustment.  This is

17   just a quantity adjustment.

18   Q.    Just a quantity adjustment, even though apples and

19   oranges we're comparing, right?

20   A.    Well, it's comparing the quantities.  We'll get to

21   the values next.

22   Q.    All right.  Let's go to the next one and see if

23   that's accurate or not.  Let's go to 479.  All right.  This

24   is the one where we compare to see the value of the two,

25   correct?

Yurkerwich - cross

1    A.    Correct.

2    Q.    Now, there's no indication on this slide of what a

3    Canon USA accused inkjet printer costs, correct?

4    A.    Not on this slide.  I have that information,

5    obviously, but it's not on this slide.

6    Q.    Buff you haven't represented it in your 1.5 value

7    multiplier here on this slide, right?

8    A.    Well, it's included in the row marked Canon, Inc.

9    Q.    Let's go to the row marked Canon, Inc. and see if

10   it's included.  The backup is the number down here, called

11   PDX-183-104, correct?

12   A.    Correct.

13   Q.    Let's turn to that for a second.  Can you display

14   this part a little bit more?

15         So here what you're really saying is that the

16   Canon part of your value multiplier includes overall global

17   operating margins for segments of Canon's parent companies,

18   businesses that include all these products, isn't that

19   right?

20   A.    No.  You're misrepresenting my chart because I'm only

21   looking at the bottom box for purposes of the other exhibit.

22   Q.    This one right here?

23   A.    Correct.

24   Q.    Okay.  So let's make sure I have it exactly right.

25   The value multiplier that you want to apply to further build

Yurkerwich - cross

1    up the damages for Canon suggests that we should take the

2    global operating margin of Canon's parent company in Japan

3    on all of these products, right?

4    A.    It's the best comparative to the Nikon numbers.

5    Q.    Okay.  Let's go back to the Nikon numbers and see

6    what we're comparing exactly.  This is PDX-477.  What we're

7    actually comparing is the global operating margins, which is

8    the global profits of products sold anywhere in the world by

9    Canon Inc., right?

10   A.    Correct.

11   Q.    Canon Inc. is not a party, right?

12   A.    They're subsidiaries.

13   Q.    Right.  Canon USA is the party that was sued by

14   Tarkus?

15   A.    And they're a component of Canon, Inc.

16   Q.    Right.  But this includes sales globally.  We're

17   talking about products sold in Saudi Arabia and Russia, all

18   over the world, correct?

19   A.    Correct.

20   Q.    We're also talking about products that are not the

21   inkjet printer, correct?

22   A.    Correct.

23   Q.    And similarly for Nikon, this company was never sued

24   by Tarkus, was it?

25   A.    No.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 228 of 277 PageID #: 9153
*redacted — public version*
1364
Yurkerwich - cross

1   Q.     This is a Japanese parent of the company that was

2   sued by Tarkus?

3   A.     Correct.

4   Q.     And similarly for Canon, this video business includes

5   all kinds of products other than the cameras that were

6   accused of infringing by Tarkus, correct?

7   A.     Correct.

8   Q.     So here we have this value adjustment that's 1.5 I

9   think you said?

10  A.     Correct.

11  Q.     So let's go to the next slide and see if we

12  understand that one.

13          Let's go back really quick, before we go off

14  that slide, let's go back to this, let's go back one more.

15  One more.  Here we go.  Canon units.

16          The license that Mr. Holm offered to Apple for

17  $375,000 didn't say Apple, you can only make this many units

18  of your software for $375,000, right?

19  A.     That's true.

20  Q.     Apple could use as many as they want, correct?

21  A.     And in my opinion here they can use as many as they

22  want as well.

23  Q.     Exactly.  Nevertheless, we're comparing the number of

24  units that were sold; right?

25  A.     Well, here the data that we have is actual data

*redacted -- public version*

1365

Yurkerwich - cross

1   comparing Nikon's units to Canon's units.  The Nikon units

2   are the ones that we had information about.

3   Q.     But if Nikon got a license to the patents to make as

4   many units as it wanted and Canon is getting a license to

5   the patent to make as many units as it wanted, why are we

6   doing this?  It's increasing the damages; right?

7   A.     No, not at all.  This is the base data that is

8   available to compare the RPX deal to the hypothetical

9   negotiation.

10  Q.     Yes, but the hypothetical was for a fully paid up

11  license to use the patent for as many products as Canon

12  wants; isn't that fair?

13  A.     And that's what Nikon has now as well.

14  Q.     Right.

15        MR. GASPAR:  Okay.  Let's quickly go to the last

16  multiple, which is the litigation success multiplier.

17  That's PDX-481.

18  BY MR. GASPAR:

19  Q.     Okay.  So we started out at about $7 million, we came

20  down to $6.5 for present value, we multiplied that by 1.4;

21  is that correct?

22  A.     Correct.

23  Q.     And we multiplied that by 1.5, this last global

24  market share or global value operating margin?

25  A.     You are calling it the global adjustment.  I used the

Yurkerwich - cross

1  global margins as a surrogate for the relative profitability

2  of the two business units.  It was the best available

3  comparable information.

4  Q.    And I think you also testified earlier that you

5  recognized that Canon USA loses money on sales of its inkjet

6  printers; right?

7  A.    In global numbers, the ink and the paper is included.

8  Q.    And you don't have any data about how many, if at

9  all, the Auto Photo Fix feature drives demand for inkjet

10 printer cartridges or paper; is that right?

11 A.    I don't agree with that.  I have data that indicates

12 ease of use was very important to Canon so that they could

13 have more people printing pictures and sell more ink and

14 paper.

15 Q.    Now, you gave us an expert report and you gave us

16 testimony in this case about all the analysis that you did

17 to come up with your $27.4 million figure; right?

18 A.    Correct.

19 Q.    Anywhere in there is there a schedule that you

20 calculated that shows how much more cartridges or paper

21 people buy because of the Auto Photo Fix feature?

22 A.    Not specifically because of the Auto Photo Fix

23 feature.

24 Q.    So back to the litigation success multiplier.  To get

25 up to $27.4 million, your view is that litigation is a 50/50

1   proposition.  That plaintiffs might win half the time,

2   defendants might win half of the time so let's double it up

3   to $27.4.

4   A.   No, my view is that there are studies and my

5   experience in doing licensing is that the risk of validity

6   and infringement is considered in negotiating a deal and

7   it was specifically called out in the RPX agreement as a

8   50 percent risk.  There is also data that supports that.

9   Q.   A 50 percent risk; correct?

10  A.   Correct.

11  Q.   That means half?

12  A.   Correct.

13  Q.   Multiply 1 by 50 percent, you get half; right?

14  A.   Or a multiple of 2.

15  Q.   On a different topic.  You testified I think this

16  morning that it's my understanding that Mr. Holm approached

17  Canon seeking to license the patent.  Do you remember saying

18  that?

19  A.   Yes.

20  Q.   But I heard Mr. Holm testify that he had no

21  communication with Canon between the time the patent issued

22  and when he sued Canon for infringement.  Is my recollection

23  different than yours?

24  A.   My recollection from his testimony is that he made

25  Canon aware of the fact that he had patents in 2003.

Yurkerwich - cross

1   Q.      And that is before his patent issued; right?

2   A.      It's around the time that it issued.

3   Q.      All right.  I also believe you testified that Mr.

4   Holm is not competing with Adobe; right?

5   A.      Correct.

6   Q.      And Mr. Holm is not competing with Canon; correct?

7   A.      Correct.

8   Q.      Tarkus is not competing with Canon?

9   A.      Correct.

10            MR. GASPAR:  All right.  Let's do one last slide

11  here.  If we could have the last CDX slide.

12  BY MR. GASPAR:

13  Q.      So in summary, Canon would have paid, in your view,

14  $27.4 million for the right to use one patent with just

15  inkjet printers.  That was your conclusion?

16  A.      Well, they would have the right to use the patent in

17  whatever way they wish.

18  Q.      So what you are actually saying is Canon, for this

19  price, could use it in whatever products it wants?

20  A.      Correct.

21  Q.      Not just inkjet printers?

22  A.      Well, it's based on inkjet printers.

23  Q.      Which is it?  Is it only inkjet printers or is it

24  anything Canon wants?

25  A.      Well, it's based on inkjet printers.  Yes.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 233 of 277 PageID #: 9158
*redacted - public version*
1369

Yurkerwich - cross

1   Q.    Inkjet printers.  Okay.  And then I think we also

2   heard that there was an actual license that Mr. Holm gave

3   to HP of all three of his patents; right?

4   A.    Correct.

5   Q.    And I think Mr. Holm testified that Hewlett-Packard

6   could use that in any products that Hewlett-Packard wanted;

7   correct?

8   A.    Correct.

9   Q.    And I think he said, Mr. Holm said he collected

10   between $80 and $90,000 for that; right?  From HP?

11   A.    I don't recall how much he said about that, no.

12   Q.    All right.  Well, we'll pull that up in just a

13   moment.

14           $80 to $90,000 is about 300 times smaller than

15   what you would like Canon to pay; correct?

16   A.    Mathematically, yes.

17   Q.    And do you recall Mr. Holm testifying that HP offered

18   to purchase his patents using stock options?

19   A.    I recall the subject, but, again, not the quantum.

20   Q.    You don't remember that it was $100,000 roughly, the

21   value of those stock options?

22   A.    I don't, no.

23   Q.    Let's go to Apple.  I think we definitely remember

24   this; right?  Apple was offered, for $375,000, a license for

25   Aperture and iPhoto software at a price of $375,000; right?

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 234 of 277 PageID #: 9159
*redacted -- public version*
1370

Yurkerwich - cross

1   A.      Correct.

2   Q.      That's about 73 times less than what you want Canon

3   to pay; right?

4   A.      Well, they had, in his expectation, a much smaller

5   number of future units than Canon.

6   Q.      But this is what he offered -- right? -- regardless

7   of what his expectation was?

8   A.      Right, and it wasn't with a valid and infringed

9   patent as a result of a trial.

10  Q.      And Canon never -- or, excuse me -- Apple never told

11  Mr. Holm that they didn't infringe; right?

12  A.      I don't know, actually, whether they did or not.

13  Q.      I believe the testimony was that there was an e-mail

14  sent from Mr. Holm to Apple with this number in it; right?

15  A.      Yes.

16  Q.      Should we just put that e-mail up and take a look at

17  it, see if there is any mention of infringement?

18  A.      Oh, no.  I thought you said Apple said that they

19  didn't infringe.

20  Q.      Right.  Well, did Apple ever say that they infringed?

21  A.      I don't, I don't think so.

22  Q.      Did Apple ever say it didn't infringe?

23  A.      I don't think they said, one way or the other.

24  Q.      So I was just wondering why you had brought that up.

25          So we have $375,000, 73 times less for a big

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 235 of 277 PageID #: 9160
*redacted - public version*
1371

Yurkerwich - redirect

1   company like Apple than what you want Canon to pay, right?

2   A.      Again, they're two different scenarios.  One is an

3   offer outside of a valid and infringed patent for a much

4   smaller market.

5   Q.      So the answer is yes?

6   A.      Well, the answer is the math is what the math is.

7   Q.      The offer is what the offer is, isn't that fair?

8   A.      Right.  Again, for a much smaller number of units.

9               MR. GASPAR:  I think that is all I have.

10              THE COURT:  Okay.  Thank you.

11              Redirect.

12              MR. BROWN:  Good afternoon, Mr. Yurkerwich.

13              THE WITNESS:  Good afternoon.

14              MR. BROWN:  I just want to go back to the RPX

15   license that was brought up by both defendants.

16              So could we have PTX-158 back up on the screen?

17              Oh, I'm sorry.

18              (Mr. Reiter adjust Elmo settings.)

19              MR. BROWN:  And, Mr. Reiter, could we zoom in on

20   the last of the whereas clauses in this agreement?

21                       REDIRECT EXAMINATION

22   BY MR. BROWN:

23   Q.      Now, both of the defendants raised with you the issue

24   as to whether the RPX agreement had been entered into with

25   Nikon.  I just wanted to ask you to refer back to this

Yurkerwich - redirect

1   provision we looked at this morning and to, again, see

2   whether this confirms your view as opposed to the defendants

3   view as to whether this agreement was entered into by Tarkus

4   for the purpose of settling with Nikon rather than the other

5   parties that they have identified.

6           So can we look at this language again and can

7   you read that again?

8   A.    Well, yes.  Perhaps I should read from the beginning

9   where it says:  Because the defendants in the Tarkus

10  litigation have refused to acknowledge the validity and

11  infringement of any of the patents -- and that would include

12  all three defendants, Adobe, Nikon and Canon -- Tarkus has

13  therefore been forced to raise funds, Tarkus is willing to

14  settle with Nikon (as defined below), subject to Rule 408

15  of the Federal Rules of Evidence, by granting to RPX, for a

16  license fee that Tarkus believes to be less than a

17  reasonable royalty.

18  Q.    So this says Tarkus is willing to settle with Nikon

19  by granting RPX a license; correct?

20  A.    Correct.

21  Q.    And we looked at language in this agreement that also

22  said, that recited the parties' understanding at the time

23  they made this deal that there were no other parties that

24  had been accused of infringement of the patent; correct?

25  A.    Yes.

```
 1                    MR. BROWN:  I have nothing more.

 2                    THE COURT:  Okay.  Thank you.  You may step

 3     down.

 4                    Mr. Lorig.

 5                    MR. LORIG:  Your Honor, could we have a brief

 6     sidebar?

 7                    THE COURT:  Yes.

 8                    (Sidebar conference held.)

 9                    THE COURT:  Go ahead.

10                    MR. BROWN:  Your Honor, we request the Court's

11     guidance.  You said that if they open things up, we could

12     begin talking about the --

13                    THE COURT:  You are going to have to speak so

14     they can hear you.

15                    MR. LORIG:  When your Honor said we shouldn't

16     talk about the total revenues received from infringing,

17     allegedly infringing products, you also said if they opened

18     it up, it was fair game.

19                    What I saw Mr. Gaspar do is run around talking

20     about apples and oranges for $20 million in revenue.  At the

21     moment we can't tell the jury we're deal with billions of

22     revenues for each of these defendants and the $20 million

23     projected revenues of Aperture is simply not a relevant

24     comparison.  I didn't want to say anything in front of the

25     jury.
```

1    THE COURT:  I appreciate you didn't want to say

2    anything in front of the jury.  Even if I were to consider

3    it, what witness were you planning to use to put on that

4    evidence?

5         MR. LORIG:  We would finish up with

6    Mr. Yurkerwich, call him back and just put that on.  That's

7    why I didn't close.  That's why I came up here.

8         THE COURT:  Well, wouldn't the time to have been

9    to do that on the redirect, which was just completed?

10        MR. LORIG:  Your Honor, I didn't want to make an

11   issue because it seemed so sensitive.  To me, this should at

12   least be something that we can balance out the $20 million.

13   He was marching around here saying $20 million, $20 million,

14   $20 million.  I don't know what to say.

15        THE COURT:  And you're only arguing this with

16   respect to Canon, I take it?

17        MR. LORIG:  They're the only ones that opened it

18   up.

19        THE COURT:  Okay.  Mr. Gaspar.

20        MR. GASPAR:  The $20 million figure came from

21   Mr. Holm's testimony which he provided on direct testimony

22   a number of days ago.  I think it was either Thursday or

23   Friday.  This has been in the record for a long time.  It's

24   certainly something that was introduced into the record by

25   Tarkus.  They introduced this into the record through Mr.

1   Holm.  And there was testimony about a five percent royalty

2   on that figure equalling $375,000, and therefore $375,000

3   not being an appropriate number.  It's not me opening the

4   door on this.

5           THE COURT:  Okay.  Mr. Lorig, do you want to

6   respond?

7           MR. LORIG:  Yes.  I mean it's apples and

8   oranges, Apple and Canon.  Why talk about the $20 million if

9   you weren't trying to say you should be treated the same way

10   as Apple, if the sales were $20 million or $2 billion?

11           THE COURT:  All right.  Well, to the extent it's

12   a request to put Mr. Yurkerwich back on the stand to somehow

13   do further redirect with respect to Canon, that request is

14   denied.

15           First off, it's untimely.  Certainly while it

16   was sensitive and he shouldn't have done it in front of the

17   jury, he certainly could have called me over to sidebar to

18   talk about it before we finished the redirect testimony and

19   the witness stepped down.

20           Second, on the substance, I listened very

21   carefully to both cross-examinations and I did not hear any

22   opening of the door by either defendant.  So on the merits,

23   I think it lacks merit as well.

24           MR. LORIG:  Very well.

25           THE COURT:  Is it your intent to rest at this

1  point?

2      MR. LORIG:  Yes, we rest.

3      THE COURT:  All right.  I believe this is

4  directed to Mr. Scherkenbach.  Where are we with Mr. Story

5  versus Mr. Knoll and the timing issue?  I don't recall the

6  details of it.

7      MR. SCHERKENBACH:  Okay.  So we have come to an

8  agreement with counsel for Tarkus that Mr. Story would be

9  deposed tonight at 7:00 o'clock, so he will go on tomorrow

10  morning.

11      What I would like to do, and Mr. Knoll is here

12  and he is ready but his testimony is much longer than half

13  hour.  What I would like to do is put Mr. Hogarty on who is

14  here.  That is about 15 minutes.  We could finish him today

15  I think right now in that short period of time.  We can then

16  start with Mr. Story tomorrow and then we'll do Mr. Knoll.

17  That would be my expectation.

18      THE COURT:  All right.  Now, I assume once

19  plaintiff officially rests, Canon is going to have some

20  motions?

21      MR. SCHERKENBACH:  We will.  I think both.

22      THE COURT:  And Canon?

23      MR. CHALSEN:  Canon also will.

24      THE COURT:  Yes, but starting with Adobe.  And

25  what is your proposal?  Are you comfortable arguing those

1    motions after we get through the testimony or do you think

2    it needs to be done as soon as the plaintiff rests?

3                MR. SCHERKENBACH:  Oh.  After the testimony today?

4                THE COURT:  I'm going to let the jury go by 4:30.

5                MR. SCHERKENBACH:  I see.  Well, procedurally,

6    under the rule, it does no longer have to happen immediately

7    after the plaintiff's case.  So I guess my suggestion would

8    be we use all our time with the jury or close to it because

9    we need it, and then let them go.  And maybe if you could

10   allow a few minutes after 4:30 for us to put our motions on.

11               THE COURT:  It would either be later this

12   afternoon or tomorrow morning, but let me see if Canon has

13   any objection to proceeding that way.

14               MR. CHALSEN:  Your Honor, that is fine with us

15   as long as it's clear we're not waiving our ability to file

16   our Rule 50 motions at the close of plaintiff's case, which

17   we intend to do.

18               THE COURT:  All right.  And does plaintiff have

19   any objection to proceeding in that the manner outlined?

20               MR. LORIG:  Yes.  I'm not prepared to cross

21   Mr. Hogarty.  That wasn't the order.  It was supposed to be

22   Mr. Knoll, and I think they should start with Mr. Knoll and

23   put Mr. Story on.

24               THE COURT:  I misunderstood, I thought there was

25   an agreement.  There was not?

 1              MR. SCHERKENBACH:  We had disclosed Mr. Hogarty

 2     for today in accordance with the rules.

 3              THE COURT:  But not as your first witness, I

 4     take it?

 5              MR. SCHERKENBACH:  That is true, but, you know,

 6     they should have been prepared to cross him because we

 7     identified Mr. Knoll, Mr. Hogarty and Mr. Story all for

 8     today.  Exhibits have been exchanged and so forth.

 9              THE COURT:  But you have disclosed them, I take

10     it, in the order Knoll, Story, Hogarty?

11              MR. SCHERKENBACH:  Knoll, Hogarty, Story

12     actually.  It's true we disclosed Mr. Knoll first.  That is

13     true.

14              THE COURT:  Okay.  So you object to them calling

15     Mr. Hogarty out of order?

16              MR. LORIG:  I do because if I had the Hogarty

17     cross, if I had Mike Hogarty's cross I would say fine, but I

18     think we should start with Mr. Knoll and introduce him at

19     4:30.  He's going to be on for a long time anyway.

20              THE COURT:  Do you want to start with -- I'm not

21     going to force them to listen to direct of a witness that

22     they're not going to cross and are not prepared to cross

23     given that they thought he was coming third.  Do you want

24     to start with Mr. Knoll or do you want to start with him

25     tomorrow morning?

1    MR. SCHERKENBACH:  I would prefer to start with

2  him tomorrow morning, not at the expense of being charged

3  the time.  So if that is my choice?

4    MR. McCANN:  There is a video.

5    MR. CHALSEN:  We had a short video deposition.

6  We could play that.  If it's not prejudicial, we could get

7  it over with.

8    THE COURT:  Who has the deposition?  Canon?

9    MR. CHALSEN:  Yes.

10    MR. LORIG:  Who is it?

11    MR. GASPAR:  Steve Stoecker.

12    MR. LORIG:  We have a whole lot of objections

13  that Mr. Gray is prepared to argue.

14    THE COURT:  Do I have a letter on that?

15    MR. LORIG:  I believe you do.  Shall I ask

16  Mr. Gray to join us?

17    THE COURT:  No, that is all right.

18    MR. SCHERKENBACH:  Can I make this simple?  I

19  don't want to start our case with a deposition anyway.

20    Let's just call Mr. Knoll.  We'll do some

21  background.  We'll use the time until 4:30 and we'll pick up

22  with him tomorrow.

23    THE COURT:  Okay.  I appreciate that.  So I will

24  call on you, Mr. Lorig.  You will rest your case.  And then

25  I will call on Mr. Scherkenbach.  Defendants are not waiving

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 244 of 277 PageID #: 9169
*redacted -- public version*
1380

1    their right to file or argue Rule 50 motions, and we'll talk

2    after the jury is gone about the specific timing of those.

3                   MR. SCHERKENBACH:  Great.  Thank you, your

4    Honor.

5                   THE COURT:  Thank you.

6                   (Sidebar conference ends.)

7                   THE COURT:  All right, ladies and gentlemen.

8    Ladies, excuse me, ladies of the jury.  Excuse me.  Thank

9    you for your patience.

10                  Mr. Lorig.

11                  MR. LORIG:  Yes, your Honor.  Plaintiff rests

12   its case.

13                  THE COURT:  Okay.  Thank you.

14                  Mr. Scherkenbach.

15                  MR. SCHERKENBACH:  Thank you, your Honor.

16                  Ladies and gentlemen -- ladies.  I did it too.

17   As I said I would do it once, that's my one.  Good

18   afternoon.  So this is the part in the case where the

19   defendants get to start their case, there are obviously two

20   of us.  Adobe is going to go first and call a few of its

21   witnesses first, and our first witness will be Mr. Thomas

22   Knoll.  We're not going to finish him today, but we're going

23   to get started.

24                  Your Honor, Adobe calls Mr. Thomas Knoll.

25                  THE COURT:  Thank you.

Knoll - direct

1      ... THOMAS KNOLL, having been first duly sworn

2   according to law, was examined and testified as follows ...

3      THE COURT:  Good afternoon, Mr. Knoll.

4      You may proceed.

5      MR. SCHERKENBACH:  Thank you, your Honor.

6      DIRECT EXAMINATION

7   BY MR. SCHERKENBACH:

8   Q.    Mr. Knoll, did you walk up there with a laser

9   pointer?

10  A.    No, I did not.

11     MR. SCHERKENBACH:  Your Honor, may I approach?

12     THE COURT:  You may.

13     (Pointer passed forward.)

14  BY MR. SCHERKENBACH:

15  Q.    Okay.  Tell the ladies of the jury what you do for a

16  living, Mr. Knoll.

17  A.    I'm a computer programmer working for Adobe systems.

18  Q.    And did you create Adobe Camera Raw?

19  A.    Yes, I did.

20  Q.    And did you write the source code for Adobe Camera

21  Raw?

22  A.    Yes, I did.

23  Q.    And did you create the accused auto feature of Camera

24  Raw?

25  A.    Yes, I did.

Knoll - direct

1   Q.      Did you write the source code for the auto feature

2   specifically?

3   A.      Yes, I did.

4   Q.      When we use the phrase source code or you do, what do

5   you mean by source code?

6   A.      It's essentially a list of directions or instructions

7   for a computer to follow to do some activity, a recipe for

8   something to cook, directions on how to get somewhere on a

9   map, that kind of thing.

10  Q.      Can software do anything that is not in the source

11  code?

12  A.      No.

13  Q.      Does Adobe Camera Raw do any image processing of any

14  kind that is not explicitly present in the source code?

15  A.      No, it can't.

16  Q.      All right.  Now, Camera Raw is a plug-in for

17  Photoshop, right?

18  A.      Correct.

19  Q.      Who invented Photoshop?

20  A.      I did also.

21  Q.      When was that?

22  A.      Started doing that in 1987.

23  Q.      Did you write the source code for Photoshop?

24  A.      Yes, I did.

25  Q.      So you created Photoshop, Adobe Camera Raw, and the

Knoll - direct

1     auto feature of Adobe Camera Raw, right?

2     A.     Correct.

3     Q.     Before we get into the sort of the details of the

4     auto feature, tell us a little bit about your background.

5     Where did you grow up?

6     A.     I was born in Ann Arbor, Michigan, and I lived there

7     until a couple years ago.

8     Q.     And how did you learn to write source code?

9     A.     Our high school, when I was a freshman in high

10    school, had some teletype machines and they had a very brief

11    introduction to computer programming section in the math

12    class, so I had, you know, basic introduction to that, and

13    then I, a bunch of us spent a lot of time after school as a

14    hobby just playing with the computers and teaching ourselves

15    to write programs and getting better and better at that.  So

16    I got pretty good at that, just teaching myself over the

17    first couple years.

18    Q.     So when it comes to writing source code, would you

19    describe yourself as more self taught or more book taught?

20    A.     Basically self taught.

21    Q.     Where did you go to college?

22    A.     The University of Michigan in Ann Arbor.

23    Q.     And did you get a degree from the University of

24    Michigan?

25    A.     A couple degrees.  The first one was a bachelor's of

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 248 of 277 PageID #: 9173
*redacted - public version*
1384

Knoll - direct

1   science in engineering, in engineering physics.

2   Q.     What's that?

3   A.     It's a bunch of engineering classes, physics classes

4   and math classes primarily.  It's a program in the

5   engineering college.

6   Q.     And what year did you get your bachelor of science

7   degree?

8   A.     1982.

9   Q.     And then did you go on to a master's program?

10  A.     I continued on at the University in a master's

11  program in the computer information and -- computer

12  information and control engineering department.

13  Q.     And what is computer information and control

14  engineering?

15  A.     Well, the subsection that I was in was primarily

16  computer engineering and had some other classes in some of

17  the other sections of that.  It's how to create software and

18  develop computer algorithms is what I was working on.

19  Q.     And did you get a master's degree in that field?

20  A.     Yes, I did.

21  Q.     What year was that roughly?

22  A.     1984.

23  Q.     Okay.  And then subsequent to that did you enter a

24  Ph.D. program?

25  A.     Yes, I did.

*redacted — public version*

Knoll - direct

1    Q.      And where was that and in what field was that?

2    A.      It was actually the same department at the same

3    college, and my specialty that I was working on was computer

4    vision algorithms which is the process of teaching computers

5    how to understand images, so you look into an image and you

6    can tell where the people are, where the sky is, where trees

7    are.  So basically just figuring out what's inside of an

8    image as opposed to image processing which is taking one

9    image and modifying it with another image.  But in order to

10   do computer vision, you have to first do image processing.

11   Q.      Did you get a Ph.D. in computer vision?

12   A.      I never completed that, no.

13   Q.      Why not?

14   A.      I got busy doing something else called Photoshop.

15   Q.      So tell us about that.  You ended up writing

16   Photoshop instead of finishing your Ph.D.?

17   A.      Yes.  As part of my Ph.D. research I created a bunch

18   of image processing tools, and sort of at the same time my

19   brother was up in California and he was teaching himself

20   computer graphics programming as preparation for his future

21   career in visual effects for movies, and I provided him

22   copies of these tools and he then started using them and

23   liked them a lot, and kept on giving me more requests for

24   additional features of these tools, so I kept on adding

25   them.

*redacted - public version*

Knoll - direct

```
 1              At this time I was at the stage of my Ph.D.
 2     progress, I had done all of the research and the last thing
 3     I had to do was write up this very long paper called the
 4     dissertation, and I'm much more happy writing computer
 5     programs than I am writing papers, so I've always
 6     procrastinated doing my real work which was writing this
 7     dissertation, I was adding features at my brother's request,
 8     sort of goofing off.
 9     Q.    And this group of features that you started writing
10     and kept adding to at your brother's request, is that what
11     became Photoshop?
12     A.    Yes.  Actually it was exactly.  After a few months of
13     this, my brother basically called me up one night and said,
14     hey, I think we can sell this thing, and he asked if we
15     could, if we could start showing it around to various
16     companies to see if he could get some interest in somebody
17     publishing it.
18     Q.    So give us a timeframe here.  When did you actually
19     start writing Photoshop, creating the program?
20     A.    I started to assemble these tools in the fall of
21     1987.
22     Q.    Okay.  And were you ultimately successful in finding
23     somebody to sell Photoshop to?
24     A.    Yes.  John spent most of 1988 driving around doing
25     demos every few days and eventually did a demonstration for
```

*redacted — public version*

Knoll - direct

1    some people at Adobe and got a lot of interest in publishing

2    the software, so actually the -- and then after, after those

3    first few meetings I flew out to California to join him on

4    some other meetings and we agreed with Adobe with a

5    handshake in September of 1988 to publish the software.

6    Q.    And so you actually did some sort of a deal with

7    Adobe in the '88 or '89 timeframe?

8    A.    It was a handshake at first.  The terms were

9    basically agreed to already and the lawyers got involved, we

10   hired a lawyer to start our negotiations with Adobe, so they

11   went back and forth with getting the terms of the contract

12   just right.

13          In the meantime, I was, you know, keeping on

14   adding features, I wasn't distracted by the legal back and

15   forth, but the contract to acquire Photoshop for Adobe was

16   signed in April of 1989.

17   Q.    And when you say the contract to acquire Photoshop,

18   did you actually deliver to Adobe the source code for

19   Photoshop as part of that deal?

20   A.    Yes.  They had all the source code and they had the

21   right to publish it in exchange for some royalties to myself

22   and my brother.

23   Q.    And then when did Adobe ship the first version of

24   Photoshop?

25   A.    Version 1 was shipped in February of 1990.

*redacted -- public version*

1388

Knoll - direct

1   Q.     So 22 years ago?

2   A.     Yes.

3   Q.     And have you worked for Adobe in some capacity ever

4   since then?

5   A.     Essentially since that handshake agreement in 1988

6   I've been either a consultant or a full-time employee

7   recently.

8   Q.     Still back in the 1989 or '90 timeframe, when you did

9   that deal and you delivered Photoshop to Adobe, what job or

10  title did you take with the company?

11  A.     I was just a not official employee up until very

12  recently.  My title was consultant, I believe.  For all

13  practical purposes I was an employee.  I had worked the same

14  hours, I had the same privileges at the buildings, but I

15  didn't want to deal with the paperwork of filing vacation

16  reports and annual reviews and stuff like that, so I chose

17  to remain a non-employee for most of the time.

18  Q.     What's your current position with Adobe?

19  A.     I have the title of fellow.

20  Q.     What's a fellow?

21  A.     A fellow is the top of the technical chain at Adobe.

22  Q.     So you remain a technical person today?

23  A.     Yes.  I have no interest in becoming a manager and

24  dealing with, managing people.  I'd rather look at the

25  technology and work on that.

Case 1:10-cv-00063-LPS   Document 507   Filed 10/17/12   Page 253 of 277 PageID #: 9178
*redacted - public version*
1389

Knoll - direct

1   Q.      So is it accurate that you've worked in a technical

2   role at Adobe from 1990 to today?

3   A.      Yes.

4   Q.      And do you continue today to still work on the design

5   of new versions of Photoshop and the source code for

6   Photoshop?

7   A.      Yes.  I've been working on the plug-in to Photoshop

8   called Gamma Raw for the last ten years approximately and

9   I've been working on that full-time.

10  Q.      And are you inventor of any patents relating to

11  Photoshop?

12  A.      At least two that I'm aware of now.

13  Q.      All right.  Now, the jury has heard about various

14  versions of Photoshop and I want to sort of look at that and

15  put that in perspective a little bit.  Can we have ADX-300,

16  please?  ADX.

17          Your Honor, would it be possible to turn the

18  lights down here?

19          THE COURT:  Certainly.  Mr. Golden, could you

20  dim the lights for us, please?

21          Mr. Lorig.

22          MR. LORIG:  Your Honor, before we get started on

23  this, could we have a brief sidebar?  I apologize.

24          THE COURT:  Sure.  Let's keep the lights on.

25          (Sidebar conference on the record.)

*redacted - public version*

Knoll - direct

 1          THE COURT:  All right.  Go ahead.

 2          MR. LORIG:  As your Honor may know, we've

 3    written a letter objecting to opinions from Mr. Knoll, and I

 4    thought we were agreed he was just going to do background

 5    until 4:30, but you have some motions to decide in regards

 6    to him being an undisclosed expert and not having been

 7    identified pursuant to Rule 26, so we need to stay away from

 8    opinions.  That sounded like we were starting to go.

 9    Background is fine until 4:30.  Until we get a resolution of

10    those rulings.

11          THE COURT:  You're referring to one of the two

12    letters that you filed just before midnight last night, is

13    that correct?

14          MR. LORIG:  I don't know what time they were

15    sent in, but last night.

16          THE COURT:  Okay.  Mr. Scherkenbach.

17          MR. SCHERKENBACH:  I saw the letter this morning

18    for the first time.  We can address that I hope tomorrow

19    morning or after he's done today.  The purpose of this

20    demonstrative is purely more background to orient the jury

21    as to the versions of Photoshop.  I don't think I'm going to

22    get to anything that implicates their concerns in the next

23    ten minutes.

24          THE COURT:  Okay.  If you see that he has gotten

25    something that implicates your concerns, then rise again.

Case 1:10-cv-00063-LPS  Document 507  Filed 10/17/12  Page 255 of 277 PageID #: 9180
*redacted - public version*
1391

Knoll - direct

 1            MR. LORIG:  I will.  Thank you.

 2            THE COURT:  Thank you.

 3            (END OF BENCH CONFERENCE.)

 4            THE COURT:  Dim the lights now, and you may

 5    proceed.

 6            MR. SCHERKENBACH:  Thank you.

 7    BY MR. SCHERKENBACH:

 8    Q.    Mr. Knoll, what we have up here at ADX-300 obviously

 9    is a timeline, right?

10    A.    Correct.

11    Q.    And this contains an indication of the versions of

12    Photoshop and Camera Raw from beginning, the initial

13    shipment in February of 1990 to the present day, is that

14    right?

15    A.    Correct.

16    Q.    All right.  And maybe you could tell us since we see

17    this reference to version, version 1.0, 2.0 and 3.0.  Tell

18    the ladies of the jury what version is when you're talking

19    about software.

20    A.    Well, the engineers are working on sort of an

21    incremental process constantly adding features, but

22    periodically you actually want to gather up all those added

23    features and put them in a box, especially in these days,

24    and then ship them to users because you need to put it on a

25    box on the shelf.  So every, about a year and a half for

Knoll - direct

1   most of Photoshop's life we sort of stopped adding features

2   for a while, spent some time verifying that everything

3   worked correctly, copied the data on to the master disks and

4   printed documentation and put it in a box and started

5   selling that version in stores.

6   Q.     All right.  I want to direct your attention to one

7   version in particular.  Do you see version 3.0 here,

8   September 1994?

9   A.     Yes.

10  Q.     Do you recall that version of Photoshop?

11  A.     Very well.  It's probably most people's favorite

12  version of Photoshop in terms of the number of features we

13  added.

14  Q.     Why do you say that?

15  A.     It added the feature called levels which is probably

16  the biggest change ever in Photoshop from a usability

17  standpoint.

18  Q.     And in addition to levels, did you --

19  A.     I'm sorry.  Layers.  Ill misspoke.

20  Q.     Layers.

21  A.     Yes.

22  Q.     And in addition to layers, were there other new

23  features in version 3 as compared to version 2 when you

24  introduced it in September of 1994?

25  A.     Well, there's always hundreds of like new features if

Knoll - direct

1    you list them on a list.  The features that are particularly

2    relevant for this case are, it had an auto feature in the

3    multi levels dialogue and the curves dialogue and it had an

4    early version of color management including a device

5    independent color space.

6    Q.    All right.  What's a device independent color space?

7    A.    Well, Mr. Holm actually gave you a bit of a tutorial

8    about that during his talk, but essentially it's the process

9    of storing the data in some color managed way so that you

10   are able to translate them into actual physical appearance

11   colors so that with that knowledge and you are able to then

12   move that image to different devices preserving the

13   appearance of the image so you can have different monitors,

14   you can print it out on a print out and all the colors match

15   in the whole process.  So as long as you have a device

16   independent color space and then the knowledge of how to

17   translate that into various different devices, you can solve

18   the problem of things looking different on people's monitors

19   by using this device independent color space.

20   Q.    And so did Photoshop 3 back in 1994 have device

21   independent color?

22   A.    Yes, it did.  It was called the LAB color space.

23   Q.    All right.  And did you say, did the version 3.0 in

24   September '94 have any kind of an auto feature?

25   A.    It had many auto features actually by then, but it

*redacted -- public version*

1394

Knoll - direct

1    had an auto features in the levels dialogue and the curves

2    dialogue that I will show you later.

3    Q.    All right.  So we'll talk about those later.  So it

4    had auto features, device independent color.  Have you heard

5    the term color management?

6    A.    Color management is what I described with the being

7    able to move colors from one device to another preserving

8    their appearance, so, yes, it did, because it had a device

9    independent color space and it had information on various

10   devices.

11   Q.    All right.  And with Photoshop 3 back in '94, could a

12   user also specify a particular monitor profile as in

13   computer monitor?

14   A.    Yes.  We had a dialogue that we're allowed to specify

15   the parameters of a monitor.

16   Q.    As you said, we're going to come back and talk about

17   version 3.0 in a lot more detail, but for now let's finish

18   up our timeline here.

19          Let's find -- so does this timeline have all the

20   major releases of Photoshop from inception to today?

21   A.    It appears to, yes.

22   Q.    All right.  I just want to ask you about one.  We can

23   follow the versions.  So Photoshop 2, Photoshop 3, Photoshop

24   4, Photoshop 5, Photoshop 5.5, Photoshop 6, Photoshop 7.  I

25   want to ask you about this transition from Photoshop being

Knoll - direct

1   labeled with a version to CS.  Do you see that?

2   A.     I do, yes.

3   Q.     And once we go to Photoshop CS, it becomes CS1 and

4   CS2.  What's that about?  Why the change in terminology?

5   A.     Well, the Adobe at the time was originally shipping

6   all of its products on different schedules and at that time

7   we made a decision to synchronize the release so that we

8   could do more coordination between the products.  So now

9   Adobe ships updated versions of Photoshop in Design,

10  Acrobat, Illustrator, many of the other products we have in

11  the suite, over a dozen, I believe, and we time the release

12  to be simultaneous across all the products.  And so we call

13  that the Creative Suite which is that whole bundle of

14  products that we do.  In order to avoid confusion of having

15  like different version numbers for the same version of the

16  suite, we started using the suite numbering system.  So it's

17  now CS, CS2, CS3.  If you actually look in the "about" box

18  for Photoshop, you'll see the Photoshop version number is

19  sort of hidden in there too.  So Photoshop CS is the same as

20  Photoshop 8 effectively.

21  Q.     Okay.  And we're on Photoshop CS5 today?

22  A.     Yes.

23         MR. SCHERKENBACH:  Your Honor, it would be a

24  good time to break, if you don't mind.  We're going to

25  another ...

1   THE COURT:  Thank you very much for alerting us

2   to that.

3   Ladies of the jury, we finished our day today.

4   Slight change tomorrow.  Be here in time to start at 9:30

5   tomorrow.  I have some matters I need to attend to.  I'm

6   going to hope to be ready to start with you at 9:30, but I

7   know I won't be ready at nine.  So come in in time to start

8   at 9:30.  No talking about the case, no doing any research

9   and have a good night.  See you in the morning.

10   (Jury left courtroom.)

11   THE COURT:  Mr. Knoll, you are free to step

12   down.  And counsel can have a seat.

13   Let's talk about a couple things first.

14   We're going to have argument on jury instructions

15   tomorrow morning at 8:15.  So whoever is arguing jury

16   instructions for each of the three parties, be here tomorrow

17   morning in time to get started at 8:15.  That time will not

18   count towards anyone.

19   We will, of course, also be available if

20   there are issues tomorrow that we don't get to now and are

21   relevant to tomorrow.

22   Just by way of a short preview of that, as we

23   discussed at sidebar, there were two letters that came in

24   late last night.  Do either of the defendants intend to be

25   responding to those letters by letter?

1    Let me ask Ms. Dudash if she would please turn

2    the lights on for me, please.  Thanks.

3         (Courtroom lights brought up.)

4         MR. HORWITZ:  Your Honor, Rich Horwitz on behalf

5    of Canon.

6         We did respond today on the deposition

7    designation letter.  We're prepared to argue that right now.

8         THE COURT:  Obviously I haven't seen the letter,

9    but thank you for letting me know.

10        MR. HORWITZ:  I think it's an easy issue, your

11   Honor, so ...

12        THE COURT:  Well, I'm going to not address that

13   one right now since I haven't had a chance to see your

14   letter but thank you.

15        Adobe, have you filed something, too?

16        MR. SCHERKENBACH:  No, we haven't.  It came in

17   too late.  We didn't get to it.  I would like to.  If your

18   Honor wants to deal with it today, I obviously was prepared

19   to make some remarks on it.

20        THE COURT:  I'm going to deal with it tomorrow

21   morning.  I'm not telling you that you have to file a

22   letter, but if you do file one and we see it, I'll look at

23   it before tomorrow morning.

24        MR. SCHERKENBACH:  We'll do that.  Thank you.

25        THE COURT:  All right.  Well, what I do want to

*redacted - public version*

1398

1    do with this time; and I do have another matter I have to

2    get to just before 5:00; but plaintiff has rested its case,

3    and I believe defendants have some motions they want to

4    make.  So I'll give each party a few minutes to make or

5    respond to motions.

6              Does Canon wish to go first?

7              MR. CHALSEN:  Yes.  Thank you, your Honor.

8              THE COURT:  Okay.  You may.

9              MR. CHALSEN:  Thank you, your Honor.  At this

10   time, Canon USA would respectfully file and move for motion

11   under Rule 50(a) for a judgment as a matter of law at the

12   close of plaintiff's case on several issues.

13             The first one is no literal infringement.  There

14   has been no testimony that there are any density capabilities

15   obtained or assumed in connection with Canon's Auto Photo Fix

16   program, neither from an actual output device or from the sRGB

17   specification.

18             In view of the absence of evidence from the

19   software that Canon's process is obtaining or assuming

20   density capabilities of sRGB, there can be no infringement

21   of the claim step that requires obtaining density

22   capabilities of the output device.

23             Since there is no evidence of obtaining density

24   capabilities of the output device, there further can be no

25   infringement or practice of the step that requires

1  constructing of a reproduction pictorial dynamic range based

2  upon those density capabilities.

3       Since there can be no construction of a

4  reproduction pictorial dynamic range based upon those

5  density capabilities, there can further be no construction

6  of a tone reproduction curve based upon a comparison between

7  the original pictorial dynamic range and the reproduction

8  pictorial dynamic range.

9       Therefore, your Honor, it's our position there

10  is a complete failure of evidence on those critical steps of

11  the claims.  In view of that, a reasonable jury could not

12  find that there is any literal infringement in this case.

13       Furthermore, there is no infringement under

14  the doctrine of equivalents.  The doctrine of equivalents

15  requires a particularized statement of the grounds for

16  establishing equivalence or arguing equivalence, and there

17  has been no recitation adequate to satisfy the law's

18  requirement that there be a particularized statement.

19       Next, there has been no direct infringement of

20  the claim 1 of the '823 patent.  There is no evidence of any

21  actual use of the claimed process in the United States.

22       Next, your Honor, there has been no evidence of

23  any inducement by Canon USA of infringement.  Tarkus's sole

24  basis for alleging inducement was based on the testimony

25  that there was allegedly a disclosure or some kind of

1   conversation between Mr. Holm and three employees of a Canon

2   entity:  Ms. Henley, Mr. Newman and Mr. Haikin.

3           However, your Honor has already, respectfully,

4   ruled that Tarkus has not established by a preponderance of

5   the evidence that any of those three employees were employed

6   by the party that is here before you today, which is Canon

7   USA.  In the absence of that evidence, since there is no

8   evidence that Canon USA even knew about the patent prior to

9   being sued, when the complaint in this matter was filed,

10  there can be no inducement as a matter of law.

11          Moreover, we think objectively, since, as your

12  Honor has recognized in other contexts, this has been a very

13  hard fought case with ample defenses that have been raised

14  by the defendants, particularly Canon as well as Adobe, of

15  course, throughout, that there is objective belief that

16  Canon is in fact not infringing this patent, your Honor.

17          Next, we would like to move for judgment as a

18  matter of law that there has been no contributory infringement.

19  There is ample evidence in the record, including through

20  testimony of Tarkus's own witnesses, that our accused printers

21  are capable of a substantial amount of noninfringing use as

22  well as the accused software is capable of a substantial

23  amount of noninfringing use.

24          Mr. Giorgianni, Mr. Holm both basically

25  recognized that our printers can be used without the Auto

1    Photo Fix program and that the Auto Photo Fix program can

2    be used without the printers.  In that regard, there is

3    obviously plenty of evidence of the capability of our

4    accused devices to be capable of a substantial amount of

5    noninfringing use.  Therefore, plaintiff cannot establish

6    there has been any contributory infringement.

7             At this time, your Honor, that's a summary of

8    our motions for judgment as a matter of law.  Thank you very

9    much.

10            THE COURT:  Okay.  Thank you very much.

11            Let's hear Adobe, and we'll let Tarkus respond

12   to both.

13            MR. SCHERKENBACH:  Thank you, your Honor.  I

14   think we're going to be filing a paper tonight so I'll be

15   particularly brief and summarize these.

16            So Adobe moves for judgment as a matter of law

17   under Rule 50 on the following bases.  This is a summary of

18   our bases.  And as I say, we'll follow-up with a paper

19   tonight.

20            The first basis is no literal infringement.  As

21   the Court has seen from the evidence so far, there is an

22   absence of evidence that Adobe satisfies either the obtaining,

23   determining, or constructing steps of the claim, in particular

24   because the accused auto feature in the Adobe products does

25   not obtain or use in any way any characteristics of an output

1    device, real or assumed.  Adobe also does not determine

2    pictorial dynamic ranges of any kind, either original or

3    reproduction.  And those requirements run through all three

4    elements of the claim I identified.

5            Second, there is a divided infringement problem

6    that we think entitles us to judgment as a matter of law.

7            Mr. Giorgianni himself admitted in his report

8    and in his deposition that different steps of the claim

9    are performed by different people:  several performed by

10   Mr. Knoll allegedly when he developed the product, the

11   rest performed by users supposedly when they press the auto

12   button.

13           He attempted to take that back here at trial, I

14   acknowledge that, but he did so in a way that I don't see how

15   it could avoid judgment as a matter of law, not the least

16   because he conceded it was an opinion he formed not only after

17   his report but after his deposition and in consultation with

18   counsel.  That should not be sufficient to avoid judgment as a

19   matter of law on that basis.

20           Let me just add it's not just that different

21   people do the steps but there has been no evidence whatsoever

22   that Adobe directs or controls.  The standard would be that

23   Adobe would have to direct or control its users to in fact

24   push the auto button.  Marketing the auto button, describing

25   how it is used is not sufficient under the case law to satisfy

1   that standard.

2         I'm going to come back to doctrine of equivalents

3   because I want to actually emphasize that one.  I think that

4   is the one I want to single out.

5         Contributory infringement, as with Canon for

6   Adobe, there is no question, and I believe it's conceded

7   after Mr. Giorgianni's testimony, that Photoshop has

8   noninfringing uses, Adobe Camera Raw has noninfringing

9   issue.  I do think this is an issue that comes down to a

10  question of law for you.

11        If the law requires you to look at something

12  beyond just the specific accused feature when it comes to

13  figuring out what the thing is that has to have substantial

14  noninfringing uses, on this record there is no question

15  that if you look beyond the auto feature, anywhere you

16  look, there are substantial noninfringing uses.  So I think

17  in the end, I think this reduces to a legal issue on this

18  record.

19        Inducement, we would move on that basis as well.

20  There is no evidence either of intent to infringe, which is

21  required.  You have to actively induce infringement.  That

22  requires an intent component that we don't believe has been

23  shown remotely on this record.

24        In addition, I know their theory was willful

25  blindness for the period between 2003 and 2008; and we don't

1   believe the evidence that they have submitted satisfies that

2   standard under Global Tech.

3          Finally, on the infringement front, as I say.

4   I'm going to circle back to doctrine of equivalents.  There

5   is also no evidence in the record of any infringing acts

6   before October 8th of 2008, which is the first time, and I

7   believe it's undisputed, the first time Adobe had actual

8   knowledge of the patent in this case.

9          All right.  Let me comment on DOE, and then I'll

10  have a comment about damages and Section 101 invalidity.

11         So doctrine of equivalents.  And this is

12  obviously, in a garden variety case, a fact issue.

13         In this case, there was not even an attempt,

14  as far as we know, not even an attempt to make out a DOE

15  case against Adobe.  If you look at the transcript of Mr.

16  Giorgianni's direct exam on this issue, you will not see

17  the words "doctrine of equivalents" uttered with respect to

18  Adobe.

19         There was no analysis presented whatsoever.

20  Usually, there is an argument as to whether there was

21  sufficient linking evidence or direct evidence and linking

22  argument.  On this record, there is nothing.

23         In fact, you will see they tried, they gave it a

24  little bit of an effort with Canon; very, very little; but

25  against Adobe, nothing at all.  And they should not be able

1   to get to the jury on that and get that jury instruction on

2   equivalence.

3           Last bases, your Honor.  Obviously, we think

4   their reasonable royalty theory is not something that should

5   go to the jury.  We have obviously put this in front of you

6   in many ways, shapes or forms.  I am not going to repeat

7   that but we continue to believe the RPX license is not a

8   proper starting point.  We believe that even if you accept

9   it as a starting point, their adjustments to it are just not

10   acceptable under the case law or under the evidence in this

11   case; and that their alternative theory is a backup theory

12   based on five percent of some apportioned value of Adobe

13   Camera Raw is a violation of the entire market value rule

14   still.  I know your Honor has taken steps to ameliorate

15   that, but still what they are left with at the end of the

16   day is something of an entire market value rule like argument.

17           Finally, we do have an invalidity ground that we

18   want to bring to your attention.  It's actually not a jury

19   issue.  It's a 101 issue.  We flagged this in the pretrial

20   order.  I believe it's a pure question of law.  I don't

21   think it's disputed that it's a question of law.

22           But essentially their claim 1 is not limited to

23   a computer implemented method.  It is a method that can be

24   carried out entirely in someone's mind as a series of mental

25   steps.  And under the current Federal Circuit case law, that

1    is not allowed.  CyberSource, for example, is sort of the

2    most recent case on that subject.

3                    THE COURT:  Okay.

4                    MR. SCHERKENBACH:  Thank you very much.

5                    THE COURT:  Thank you very much.  We'll hear

6    from Tarkus.

7                    MR. LORIG:  Given the consequences we'd like the

8    right to brief JMOLs.

9                    THE COURT:  When could you get that done by?

10                   MR. LORIG:  Assuming if we get written motions

11   tomorrow as Mr. Scherkenbach said, I assume within a day or

12   two we could turn it around.

13                   THE COURT:  Okay.  I'll let you know.  Go ahead.

14                   MR. LORIG:  To start with Canon, Canon says

15   there was no evidence of assumed density capabilities.  To

16   do that you have to ignore Mr. Giorgianni's testimony about

17   the density capabilities from the sRGB.

18                   You can't just wave your hands and ignore the

19   testimony on JMOL.  Mr. Giorgianni's testimony has to be

20   looked at in the light most favorable to us as the

21   responding party.  And there was no comment, no way of

22   distinguishing what he said.

23                   I didn't put him on.  I sat here as you did.  I

24   heard him talking about density capabilities, I heard him

25   talking about literal infringement.  I heard him talking

*redacted - public version*

1    about direct infringement and the evidence supporting it.

2           In terms of actual use, there is no question

3    that since the auto feature is the default.  Everybody in

4    the United States has used it because it's the default.

5    Now, when we had Mr. -- I'm blanking out, the Japanese

6    gentleman who was talking about, well, we don't test it, we

7    play it.  Now, that's because somebody told I assume this

8    witness that testing is infringement and he thought that

9    playing was not.  So you had literal infringement when they

10   play, which we would call testing.  You have indirect

11   infringement when they induce people to do it because it's

12   the default.

13          The argument that there's no evidence of

14   inducement ignores the very evidence that we discussed

15   before trial began.  There is no question that they give

16   directions to people to use the feature.  They describe the

17   feature.

18          There's no question that they never got an

19   opinion.  There's no question they haven't introduced any

20   opinion.  There's no question that Broadcom says that your

21   Honor and the jury can, with all the other factors, from

22   that, conclude, from that lack of opinion, that they indeed

23   did induce infringement.

24          The argument that no one had any reason to

25   suspect it was a patent, you heard Mr. Holm's testimony as I

1    did.  He described his conversations with various

2    individuals.  He said why don't you license it?  Though the

3    most recent conversation took place in 2003, he wasn't sure

4    whether it was just before or just after, but he knew about

5    it.

6           The idea that there's no contributory

7    infringement ignores the fact that the auto feature has no

8    non-infringing component.  If you use the auto feature, you

9    only infringe.  This is something we talked about at summary

10   judgment motions before we got here.  This is the same

11   argument that we've heard throughout the pretrial.

12          THE COURT:  You're still talking about Canon,

13   correct?

14          MR. LORIG:  Correct.

15          THE COURT:  Do you agree that this is a legal

16   issue for the court to decide, whether we should just be

17   looking at the auto feature or the full software?

18          MR. LORIG:  Yeah, I do agree that this is a

19   legal issue when you look at the auto feature and determine

20   whether it has a non-infringing alternative.  We've briefed

21   that and the case law supports it.  We've briefed it to you

22   in summary judgment, I believe we've briefed it in one of

23   the pretrial motions.  It's been briefed and briefed.  And

24   this is not a new issue for your Honor.

25          And your Honor, when you ruled on this before,

1    seemed to acknowledge that the case law does support our

2    point of view.  We're happy to brief it again.

3          With regards to Adobe's arguments, again in

4    summary, this is impromptu, Mr. Giorgianni, as I heard him,

5    testified that by assuming an Adobe RGB color space, you

6    thereby include the density capabilities.  I believe that

7    was also, if memory serves me right, briefed in a pretrial

8    motion before the court.

9          Now, one can't just ignore Mr. Giorgianni.  You

10   may disagree with him.  I suspect strongly Mr. Knoll

11   disagrees with him.  I know Dr. Stevenson disagrees with

12   him.  But the fact that you disagree with him doesn't give

13   you the right for a JMOL.  Again, Mr. Giorgianni also

14   discussed the pictorial dynamic range issue.

15         So this is all, if you ignore Mr. Giorgianni and

16   you decide as a decider of fact that he's wrong and they

17   must be right, then you can grant JMOL, but you can't simply

18   ignore Mr. Giorgianni's testimony.

19         With regards to divided infringement, again,

20   this was an issue that was briefed before we came to trial.

21   And as we said at the time and as Mr. Giorgianni said on the

22   stand, and I believe Mr. Elswick did as well because it was

23   some of his testimony, it's all performed by the computer

24   program.  It's not divided infringement.  Whomever uses the

25   computer program, particularly when auto was the default, if

1    your Honor will recall, when Mr. Knoll first introduced

2    Adobe Camera Raw in February of 2003, it didn't infringe,

3    there was no auto feature, and then at the end of 2004,

4    along that chron, they said early 2005, we believe it's the

5    end of 2004, they began selling Adobe Photoshop with Adobe

6    Camera Raw with the auto as the default.  So everybody who

7    used Adobe Camera Raw infringed because it was the default.

8           And it's not a matter of divided infringement.

9    It's not a matter of who did the programming.  The computer

10   does it.  The program performs this.  And they were induced

11   to do this by the selling of the program complete with the

12   instructions on how to use, and their complete ignoring of

13   Mr. Holm repeated suggestion, please read my patents, please

14   look at my patents.  We before discussed the fact they never

15   went out and got an opinion of counsel.  Mr. Holm's like

16   over and over again, year after year saying, please, look at

17   my patents, look at my patents.

18          The idea that they didn't induce infringement by

19   selling the program ignores the lack of any legal advice,

20   lack of really to me any ordinary care in determining

21   whether they did or did not infringe.  It's all done by the

22   program.

23          With regards to contributory infringement, the

24   same issue that we have with Canon.  The auto function has

25   no other non-infringing function.  It was the default in

1   Camera Raw from October 2004 through 2007, and every time a

2   user hits that auto button, that user infringes.  There is

3   no non-infringing alternative to the auto button.

4          With regards to going back to the inducement

5   issue, counsel didn't even mention the Broadcom case that

6   when we did this just before trial, your Honor, it was, you

7   remember that series of letters --

8          THE COURT:  I'm afraid I'm going to have to cut

9   you off in two minutes.

10         MR. LORIG:  All right.  This is the same issue

11  we briefed before trial began.  Broadcom says the finder of

12  fact is entitled to infer inducement from the lack of an

13  opinion along with other circumstances.

14         And that's what's here.  The fact that Your

15  Honor decided willfulness, that doesn't affect inducement

16  for all the reasons we've briefed earlier.

17         The idea that there's no evidence of

18  infringement prior to October of 2008 again ignores the fact

19  that it was the default.

20         THE COURT:  What about doctrine of equivalents

21  for both Canon and Adobe?

22         MR. LORIG:  With regard to doctrine of

23  equivalents, I thought, I don't have a transcript in front

24  of me, my understanding of what Mr. Giorgianni said is if

25  for some reason the finder of fact does not see using sRGB

1    and Adobe RGB as obtaining the density capabilities of an

2    assumed output device, then it's the equivalent.  That's

3    what I heard him say.  We believe that whether you use sRGB

4    as Canon does or Adobe RGB as Adobe does, you literally

5    infringe.  But if you don't, you certainly infringe under

6    the doctrine of equivalents, and that's what Mr. Giorgianni

7    said.

8            With regards to the royalty, we've talked about

9    Nikon-RPX before.  This is the first time I've heard about

10   101.  I haven't heard any evidence from anybody, I didn't

11   see anything that I recall in Dr. Stevenson's report.  All I

12   have is Mr. Scherkenbach saying for the first time that I

13   recall hearing that you don't need a computer to do this.  I

14   think you need a computer to do this.  I don't know how to

15   respond to it because I haven't heard it before.  But I

16   can't think how you can do this on the back of a piece of

17   paper.

18           THE COURT:  Okay.  Thank you very much.

19           Here's what we're going to do.  I'm not ruling

20   on the motions just now.  I will give defendants until --

21   hold on -- until the end of today, meaning tonight, to file

22   something in writing if they wish.  I'll give plaintiff

23   until the end of the day tomorrow, so you'll have up to

24   11:59 tomorrow night if you wish to respond in writing, and

25   I will not rule on these motions until at least the morning

*redacted - public version*

1   after that, which I'm losing track of time, but it would be

2   the morning after that.  But in the meantime the motions are

3   pending and I'm not ruling on them.

4           Is there something else?

5           MR. CHALSEN:  Your Honor, I think you've covered

6   it already.  I just wanted it to be clear that we will be

7   filing a written motion.

8           THE COURT:  Okay.  You have until midnight

9   tonight to do so.  And I'll see whoever is arguing jury

10  instructions at 8:15 tomorrow morning.

11          Have a good night.

12          (Proceedings adjourned at 4:54 p.m.)

13

14       I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

15

16                      /s/ Brian P. Gaffigan
                        Official Court Reporter
17                       U.S. District Court

18

19

20

21

22

23

24

25